Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org
blitmans@trustees.org

*Attorneys for Plaintiffs*

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, ALASKA WILDERNESS LEAGUE, DEFENDERS OF WILDLIFE, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY, <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT, U.S. FISH & WILDLIFE SERVICE, U.S. DEPARTMENT OF THE INTERIOR, DAVID BERNHARDT, in his official capacity as Secretary of the Interior, and CHAD PADGETT, in his official capacity as State Director for the Bureau of Land Management Alaska, <br><br> Defendants. | Case No. 3:20-cv-00290-TMB |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq.*; Endangered Species Act, 16 U.S.C. §§ 1531–1544; Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiffs Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society file this Complaint for Declaratory and Injunctive Relief, and hereby allege:

## I.       NATURE OF THE CASE

1. This action seeks declaratory and injunctive relief against the Bureau of Land Management and the United States Department of the Interior (collectively, BLM) for its decision to approve the Willow Master Development Plan (Willow) — a massive oil and gas development project proposed by ConocoPhillips, Alaska Inc. (ConocoPhillips). This action also seeks declaratory and injunctive relief against the U.S. Fish and Wildlife Service (FWS) for its arbitrary and unlawful biological opinion (BiOp) for Willow.

2. Willow would be located within the northeastern portion of the National Petroleum Reserve–Alaska (Reserve), in an area already under stress from rapid industrialization and climate change. Willow would result in the construction and operation of extensive oil and gas and other infrastructure in sensitive arctic habitats and will significantly impact the region's wildlife, air, water, lands, and people.

3. BLM's decision, along with the related Environmental Impact Statement (EIS), violates the National Environmental Policy Act (NEPA), the Federal Land Policy and Management Act (FLPMA), and the Administrative Procedure Act (APA). These statutes and their implementing regulations impose important protections for the lands and resources on the Reserve. These laws require thorough, transparent, and careful analysis of the impacts of ConocoPhillips' proposal and of BLM's decision. BLM's failure to comply with these laws threatens the lands, waters, wildlife, and people of the northeastern Reserve.

4. Following formal consultation, FWS issued a BiOp on the effects of Willow to listed species and designated critical habitats protected by the Endangered Species Act (ESA). FWS determined that Willow will not jeopardize the continued existence of threatened polar bears or destroy or adversely modify the species' designated critical habitat. In making this determination, FWS failed to articulate a rational connection between the facts found and the no-jeopardy conclusion reached. FWS violated the ESA and the APA because its determinations in the BiOp are arbitrary and capricious. Further, the agency's failure to include an Incidental Take Statement (ITS) for polar bears despite anticipating that such take could occur is unlawful.

5. Plaintiffs seek remand and vacatur, declaratory, and injunctive relief against BLM, FWS, the Secretary of Interior, and agency officials. The agencies' actions and decisions fail to comply with applicable law, are arbitrary, capricious, an abuse of

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 3 of 64

discretion, and not in accordance with the law, in excess of statutory authority, and without observance of the procedure required by law. 5 U.S.C. § 706(2).

## II.    JURISDICTION AND VENUE

6. This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. §§ 1331 (federal question), 1361 (action to compel mandatory duty), 2201 (declaratory relief), and 2202 (injunctive relief). Plaintiffs have a right to judicial review under the APA, 5 U.S.C. §§ 701–706.

7. Defendants' sovereign immunity is waived pursuant to the APA, 5 U.S.C. § 702.

8. Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the BLM Alaska State and Arctic District Offices and the FWS Alaska Regional Office, because many Plaintiff groups are primarily located in or maintain offices in Alaska, and because the public lands at issue in the case are located in Alaska.

9. BLM's final environmental impact statement (FEIS) and record of decision (ROD) and FWS's BiOp are final agency actions for which Plaintiffs have a right to judicial review under the APA. 5 U.S.C. §§ 701–706.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 4 of 64

### III.    PARTIES

<u>Plaintiffs</u>

10.    Plaintiff Sovereign Iñupiat for a Living Arctic (SILA) is an Alaska-based grassroots organization made up of Iñupiat Peoples and community members. SILA's mission is to create healthy communities — spiritually, mentally, and physically — by empowering frontline communities that are closest to the impacts of the extractive industry. SILA seeks to accomplish its mission through community and shareholder engagement, knowledge-sharing events, political advocacy, and revitalizing Iñupiaq intergenerational culture and language. SILA's major focus is uplifting the voices of communities in Arctic Alaska, including a focus on the western Arctic and development near the community of Nuiqsut. SILA actively works to empower Arctic communities to protect their interests by engaging in administrative processes with the goal of ensuring meaningful involvement for these communities. This includes advocacy and outreach around the Willow project, including at public hearings.

11.    Plaintiff Northern Alaska Environmental Center (Northern Center) is an Alaska nonprofit environmental organization founded in 1971 with over 900 members, sixty percent of whom are located throughout Alaska. The Northern Center's mission is to promote the conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy. One of the Northern Center's major focus areas is its Arctic program. The Northern Center actively works to protect

the Arctic, its communities, and vital wildlife habitats and wildlands, including areas like Teshekpuk Lake in the Reserve, from the harms associated with oil and gas development. The Northern Center also works to amplify the voices of local populations impacted by development. The Northern Center participates in agency decision-making processes related to oil and gas development in the Arctic, including the challenged action. The Northern Center provides its members and the public with information about the impacts of oil and gas on the Arctic, enabling members to participate as well.

12. Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization founded in 1993 with approximately 100,000 members, including many members in Alaska. AWL's mission is to galvanize support to secure vital policies that protect and defend America's last great wild public lands and waters. AWL advocates for the protection of Alaska's wild lands and waters and works to prevent environmental degradation on Alaska's public lands and waters, including the Reserve. AWL actively works on issues related to oil and gas development and the protection of Special Areas and values in the Reserve. AWL also works closely with communities in the Arctic impacted by development. AWL is committed to honoring the human rights and traditional values of the people of the Arctic.

13. Plaintiff Defenders of Wildlife (Defenders) is a nonprofit organization founded in 1947 with approximately 1.8 million members and supporters, including over 6,000 in Alaska. Defenders has offices across the country, including Anchorage. Its

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 6 of 64

mission is to protect all native animals and plants in their natural communities, especially listed species and their designated critical habitats under the ESA. Defenders works to protect and restore key species and their habitats throughout North America through education, advocacy, litigation, and other efforts. Defenders advocates for the sound management of our public lands and wildlife, including the Reserve. Defenders prioritizes protecting imperiled species such as the polar bear and their habitats and works to reduce human-wildlife conflicts. Defenders has actively worked to promote wildlife habitat conservation and public land management in Alaska, including in the Reserve. Defenders serves on FWS's Polar Bear Recovery Advisory Work Group on Reducing Human-Polar Bear Conflicts. Defenders also works to reduce any conflicts or impacts to polar bears and other wildlife that may arise from current or proposed development activities in the Reserve and elsewhere in the Arctic.

14.     Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization of approximately 799,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,800 members. The Sierra Club's concerns encompass a variety of environmental issues in

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 7 of 64

Alaska and beyond, and the organization has long been active on issues related to oil and gas activities in America's Arctic, including in the Reserve, such as polar bear conservation. Sierra Club members use the public lands in the Arctic and Reserve for quiet recreation, aesthetic pursuits, and spiritual renewal. These areas would be threatened by increased oil and gas development that would result from Willow.

15. Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including a six-person staff in Alaska. Its overall mission is to unite people to protect America's wild places. The Wilderness Society has close to a million members and supporters, many of whom are in Alaska. The goal of its Alaska program is to permanently protect special places in America's Arctic and sub-Arctic, including in the Reserve. The Wilderness Society has been engaged in Reserve conservation efforts for decades, and has consistently participated in public processes associated with Reserve land use decisions. Staff have visited the Northeast region of the Reserve on numerous occasions to assess conservation values and to conduct scientific research. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou and fish resources that utilize much of the landscape to complete their life cycles.

16. Plaintiffs' members and supporters work, visit, and recreate in and around the northeastern Reserve (the area impacted by Willow) and plan to return. Plaintiffs'

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 8 of 64

members and supporters also live in and around the northeastern Reserve. Plaintiffs'

members and supporters use the northeastern Reserve and depend on the health of the

subsistence resources in the Reserve to support their subsistence way of life. Plaintiffs'

members and supporters enjoy or use wildlife that inhabit these areas, in particular

caribou, polar bears, and birds. Plaintiffs' members and supporters have health,

subsistence, cultural, economic, recreational, scientific, environmental, aesthetic,

educational, conservation, and other interests in the northeastern Reserve, and they enjoy

or use wildlife that inhabit the Reserve.

17.     These interests, and the members' and supporters' use and enjoyment of the

northeastern Reserve are harmed by BLM's approval of Willow and FWS' arbitrary and

unlawful BiOp. Willow's extensive oil and gas activities and associated pollution and

industrialization will destroy, degrade, and diminish the wild and natural state of this

area, will kill, injure, harm, harass, and displace wildlife (including, but not limited to the

threatened polar bear) and adversely affect the habitats on which these species depend,

and will thus harm the interests of these groups and their members and supporters.

Willow's infrastructure and increased traffic and noise will also impede members' ability

to access subsistence resources in the region. Willow will adversely affect the natural

environment and wildlife used and enjoyed by Plaintiffs' members and supporters and

harm the interests of the groups and their members and supporters.

18.     Plaintiffs and their members have procedural interests in Defendants' full compliance with planning and decision-making processes under NEPA, FLPMA, and the ESA and in Defendants' duties to substantiate their decisions because full compliance and rational decision-making vindicates Plaintiffs' underlying interests described above.

19.     BLM's adoption of the ROD and FEIS violates NEPA, FLPMA, and the APA, and threatens imminent, irreparable harm to the interests of Plaintiffs and their members. These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly traceable to the Defendants' approval of Willow in violation of the substantive and procedural protections of the law and would be redressed by the relief sought in this case.

20.     FWS's issuance of the BiOp violates the ESA and APA, and threatens imminent, irreparable harm to the interests of Plaintiffs and their members and supporters to the Southern Beaufort Sea (SBS) stock of ESA-listed polar bears. These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly traceable to the deficient BiOp for Willow and would be redressed by the relief sought in this case.

<u>Defendants</u>

21.     Defendant BLM is an agency within the U.S. Department of the Interior and is responsible for managing federal lands and the subsurface mineral estate underlying federal lands in the Reserve. BLM served as the lead agency for preparation

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 10 of 64

of the Willow EIS, and is responsible for issuing a right-of-way for BLM-managed lands and applications for permits to drill, among other authorizations.

22.     Defendant FWS is an agency within U.S. Department of the Interior and is charged with administering the ESA and Marine Mammal Protection Act (MMPA) for polar bears.

23.     Defendant U.S. Department of the Interior is an agency of the United States responsible for oversight of BLM and FWS.

24.     Defendant David Bernhardt is the Secretary of the Interior and is being sued in his official capacity. Secretary Bernhardt is the official ultimately responsible under federal law for ensuring that the actions and decisions of BLM and FWS comply with all applicable laws and regulations. Secretary Bernhardt is the U.S. Department of the Interior official who signed the ROD.

25.     Defendant Chad Padgett is the Alaska State Director for the BLM and is being sued in his official capacity. Mr. Padgett is responsible for overseeing BLM's activities in Alaska, including the authorization of Willow. Mr. Padgett is the BLM official who signed the ROD.

### IV.     STATUTORY AND REGULATORY BACKGROUND

<u>National Environmental Policy Act</u>

26.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies take a hard look

---

at the environmental impacts of their proposed actions before taking an action and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. *Id.* § 1502.1. By focusing the agency's attention on the environmental consequences of its proposed action, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332 (2)(C).

27. NEPA requires federal agencies to prepare a detailed EIS for every major federal action that will have a significant impact on the quality of the human environment. *Id.* § 4332. Such a statement is required to "provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. NEPA requires the use of "high quality" information. *Id.* § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implement NEPA." *Id.*

28. NEPA requires that agencies take a "hard look" at the direct, indirect, and cumulative environmental effects of the alternatives, including the proposed action, as well as the means to mitigate against those adverse environmental consequences. 42 U.S.C. § 4332 (2)(C); 40 C.F.R. §§ 1502.16, 1508.7. "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 12 of 64

regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998); *see* 40 C.F.R. § 1502.22(a).

29.     NEPA also requires that agencies evaluate the site-specific impacts of an action prior to making an irretrievable commitment of resources. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). An agency cannot defer conducting an analysis of foreseeable impacts by asserting that the consequences are unclear or that the agency will analyze the impacts at a later point in time if the agency is making an irretrievable commitment of resources. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002).

30.     A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

31.     In order to satisfy the hard look requirement, a reviewing agency must identify all relevant past and present actions as well as reasonably foreseeable future actions; analyze those actions' respective impacts; and use data to provide a quantified analysis of the cumulative impacts of a proposed action. *See Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020).

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 13 of 64

32.     NEPA requires BLM to consider mitigation measures in an EIS, including measures outside the jurisdiction of the action agency. 40 C.F.R. §§ 1502.14(c), (f), 1502.16(h), 1505.2(c). An agency must evaluate the effectiveness of any mitigation measures it adopts and relies on in approving an agency action. *Neighbors of Cuddy Mountain*, 137 F.3d at 1381.

33.     NEPA requires federal agencies to include alternatives to the proposed action within an EIS. 42 U.S.C. § 4332(2)(C)(iii). The alternatives analysis is the "heart" of a NEPA document, and NEPA's implementing regulations direct BLM to "[r]igorously explore and objectively evaluate all reasonable alternatives," including appropriate mitigation measures to reduce the potential impacts of the action on the environment. 40 C.F.R. § 1502.14. If an agency makes substantial changes to the proposed action, such as adding a new alternative or making changes to an existing alternative after release of the draft EIS, the agency may be required to issue a supplement to the draft EIS. *Id*. §1502.9.

34.     In defining a "reasonable" range of alternatives, NEPA requires consideration of alternatives "that are practical or feasible" and not just "whether the proponent or applicant likes or is itself capable of carrying out a particular alternative." *Id*. at 18,027.

35.     The Council on Environmental Quality (CEQ) recently issued new regulations implementing NEPA, which took effect September 14, 2020. Update to the

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 14 of 64

Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). Because the Willow process began prior to that effective date and BLM did not apply those new regulations to its decision, CEQ's prior regulations govern the EIS and ROD and all references are to those prior regulations.

Federal Land Policy and Management Act

36.    FLPMA is BLM's organic act and governs the agency's management of public lands under its jurisdiction, including the Reserve. Under FLPMA, BLM must manage public lands to protect and allow for multiple uses. 43 U.S.C. § 1732. In passing FLPMA, Congress intended that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

37.    FLPMA governs BLM's issuance of rights-of-way across public lands under BLM's jurisdiction, including in the Reserve. *Id*. § 1761. Under FLPMA, BLM may grant a right-of-way only if it "protect[s] the public interest in the lands traversed by the right-of-way or adjacent thereto." *Id*. § 1765(b). FLPMA contains both procedural and substantive requirements.

38.     FLPMA mandates that the right-of-way applicant provide specific, detailed information to BLM. A right-of-way application, such as for the challenged Willow proposal, requires submission of a detailed plan of construction, operation, and rehabilitation. *Id*. § 1764(d).

39.     A complete right-of-way application must minimally include the following: a full description of the project and its facilities; the schedule for constructing, operating, maintaining, and terminating the project and its estimated life; proposed construction and reclamation techniques; a statement of financial and technical capability to construct, operate, maintain, and terminate the project; and any plans, contracts, agreements, or other information concerning the applicant's use of the right-of-way. 43 C.F.R. § 2804.12(a).

40.     FLPMA's right-of-way provisions also contain important substantive requirements. The right-of-way can only be issued if activities resulting from it: (i) protect Federal property and economic interests; (ii) efficiently manage the lands traversed by and adjacent to the right-of-way and protect the other lawful users of those lands; (iii) protect lives and property; (iv) protect the interests of individuals living in the area traversed by the right-of-way who rely on the fish, wildlife, and other resources of the area for subsistence purposes; (v) require location of the right-of-way along a route that will cause least damage to the environment, considering feasibility and other relevant

factors; and (vi) otherwise protect the public interest in the lands traversed by the right-of-way or adjacent thereto. 43 U.S.C. § 1765(b).

41.    "Without an accurate picture of the environmental consequences of the [project], the BLM cannot determine if the 'public interest will be well served by [approving the project].'" *Ctr. for Biological Diversity v. Dep't of Interior*, 623 F.3d 633, 647 (9th Cir. 2010).

42.    A right-of-way grant must "do no unnecessary damage to the environment" *Id*. § 1764(a). BLM has a mandatory duty to impose conditions that "will minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." *Id*. § 1765(a).

<u>Naval Petroleum Reserves Production Act</u>

43.    In addition to FLPMA, the Naval Petroleum Reserves Production Act of 1976 (NPRPA) governs BLM's management of the surface values and subsurface resources in the Reserve. 42 U.S.C. §§ 6501–6508. The NPRPA requires BLM to consider and protect the ecological and other values of the Reserve. 42 U.S.C. §§ 6503(b), 6504(a), 6506a(b).

44.    Under the NPRPA, Congress instructed the Secretary of the Interior to designate as Special Areas any areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value." *Id.* § 6504(a). The Secretary is required to

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 17 of 64

ensure "maximum protection" for Teshekpuk Lake and other areas designated as having these significant values. *Id.*

45.     The Secretary is also required to adopt conditions, restrictions, and prohibitions necessary to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the Reserve from any activities. *Id*. § 6506a(b).

Endangered Species Act

46.     Congress enacted the ESA to protect and conserve threatened and endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b), (c)(1).

47.     The goal of the ESA is not only to save endangered and threatened species from extinction but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection. *Id*. §§ 1531(b) (purposes), 1532(3) (definitions).

48.     The National Marine Fisheries Service and FWS jointly administer the ESA, with jurisdiction over different species. FWS has responsibility for administering the ESA and performing consultations for polar bears. 50 C.F.R. § 402.01(b).

49.     The ESA prohibits any "person," including private parties as well as local, state, and federal agencies, from committing or causing others to commit unauthorized "take" of individual members of an endangered species, as well as threatened species protected from such take by species-specific regulations or a "special rule." 16 U.S.C. §§

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 18 of 64

1538(a)(1)(B), (G), 1538(g). For polar bears, the "special rule" prohibits unauthorized incidental take from an activity unless the taking has been authorized or exempted under the MMPA. 50 C.F.R. § 17.40(q)(2); *see also* 16 U.S.C. § 1371 (prohibiting take of marine mammals unless specifically permitted).

50.     Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" or any attempt to do the above actions. *Id*. § 1532(19). "Harm" means an "act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. "Harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id*.

51.     Section 7(a)(2) of the ESA obligates federal agencies to ensure "that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

52.     To fulfill this substantive duty, Section 7(a)(2) imposes procedural obligations on federal agencies to consult with FWS. *Id*.

53.     The ESA prescribes a multi-step process to ensure compliance with its substantive provisions by federal agencies. A federal agency proposing to take an action, i.e., the "action agency," must inquire of the Secretary of Interior whether any threatened or endangered species "may be present" in the area of the proposed action. *Id.* § 1536(c)(1); 50 CFR 402.14(a). The BLM is the action agency for purposes of Willow. If the answer is affirmative, the agency shall conduct a biological assessment to determine whether such species "is likely to be affected" by the action. *Id.*

54.     If the action agency determines that the action "is likely to adversely affect" the listed species, formal consultation with the Secretary is required. *Id* § 1536(a)(3); 50 C.F.R. § 402.14(a), (b). Formal consultation concludes with the FWS's issuance of a biological opinion under Section 7(b)(3) of the ESA. 50 C.F.R. § 402.02. The FWS and the action agency must each utilize the "best scientific and commercial data available" during the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

55.     In a biological opinion, FWS must determine whether the federal action subject to the consultation is likely to jeopardize the continued existence of the listed species or destroy or adversely modify its designated critical habitat. 16 U.S.C. § 1536(b)(4). A likelihood of jeopardy is found when "an action . . . reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 20 of 64

56.    The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of the current status of the listed species, the effects of the action, and the cumulative effects. *Id*. § 402.14(g)(2–3)–(h)(1)(i–iii). The "effects of the action" include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id* § 402.02. Cumulative effects are "effects of future State or private activities . . .  that are reasonably certain to occur within the action area of the Federal action . . . ." *Id*.

57.    If the biological opinion concludes that an action is likely to result in jeopardy to a listed species, the biological opinion must set forth the reasonable and prudent alternatives, if any, that would avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(h)(2).

58.    The Service must provide an Incidental Take Statement (ITS) if a biological opinion concludes that (1) the agency action is likely to result in jeopardy and offers reasonable and prudent alternatives, or concludes that the agency action is not likely to jeopardize the continued existence of a listed species, (2) incidental take resulting from either scenario will not violate the statute, and (3) where the ESA-listed species is a marine mammal, that the taking is authorized by the MMPA. 16 U.S.C. § 1536(b)(4).

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 21 of 64

59.     The ITS must specify the amount or extent of anticipated take due to the federal action, reasonable and prudent measures to minimize the take, any additional measures necessary to comply with the MMPA take authorization, and terms and conditions that must be observed when implementing those measures. *Id.*; 50 C.F.R. § 402.14(i)(1).

60.     Regardless of the conclusion reached in the biological opinion, the action agency has an independent duty to ensure that its actions are not likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.15.

61.     To satisfy its ongoing obligation to avoid jeopardy following the issuance of the biological opinion, the action agency must reinitiate consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law," and either "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." 50 C.F.R. § 402.16(a)(2), (3).

62.     The ESA and its regulations require an ITS when the taking of an endangered species is anticipated. *See Ctr. for Biological Diversity v. Ross*, No. CV 18-112 (JEB), 2020 WL 1809465, at *8 (D.D.C. Apr. 9, 2020).

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 22 of 64

63.     The Biological Opinion must consider the relevant factors and articulate a

rational connection between the facts found and the choice made. *See Ctr. for Biological*

*Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir. 2012) (internal

quotation marks omitted).

Marine Mammal Protection Act

64.     Recognizing that "certain species and population stocks of marine

mammals are, or may be, in danger of extinction or depletion as a result of man's

activities," Congress passed the MMPA in 1972 to ensure that marine mammals are

"protected and encouraged to develop to the greatest extent feasible." 16 U.S.C. §

1361(1), (6). The central purpose of the MMPA is to prevent marine mammal stocks

from falling below their "optimum sustainable population" levels, defined as the "number

of animals which will result in the maximum productivity of the population or the species

. . . ." *Id.* §§ 1361(2), 1362(9).

65.     To promote these objectives, the MMPA establishes a general moratorium

on the "taking" of marine mammals. *Id.* § 1371(a). Prohibited takings include actions that

kill or injure marine mammals or disrupt behavioral patterns, such as migration,

breathing, breeding, or feeding. *Id.* § 1362(13), (18).

66.     The MMPA contains several narrow exceptions to the moratorium on take.

The exception relevant here allows FWS, upon request, to promulgate regulations

authorizing incidental take of small numbers of marine mammals for a period up to five

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 23 of 64

years, provided such take will: (1) have a negligible impact on such species or stock, and (2) will not have an unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses or pursuant to a cooperative agreement. *Id*. § 1371(a)(5)(A)(i)(I).

67.     Within the context of the MMPA, "take" is broadly defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id*. § 1362(13). Harassment is further defined as any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal (Level A harassment) or has the potential to disturb a marine mammal (Level B harassment). *Id*. § 1362(18).

68.     A Letter of Authorization is required to conduct activities pursuant to an Incidental Take Regulation. 50 C.F.R. § 18.27(f)(1).

69.     Separately under the MMPA, FWS must undertake at least annually stock assessment reports for marine mammals that are listed under the ESA. 16 U.S.C. § 1386(a), (c)(1)(A). As part of that annual stock assessment report process, the agency must estimate the "potential biological removal" (PBR) level for each marine mammal stock under its jurisdiction. *Id*. § 1386(a)(6). PBR is defined as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population" under the MMPA. *Id*. § 1362(20).

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 24 of 64

Administrative Procedure Act

70.     Courts review final agency actions for which no specific judicial review mechanism is prescribed by statute under the Administrative Procedure Act (APA). 5 U.S.C. §§ 702, 704.

71.     Under the APA, courts "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in excess of statutory authority, or made "without observance of procedure required by law." *Id*. § 706(2)(A), (D).

72.     While agency determinations are entitled to deference, an agency must articulate a satisfactory explanation for its conclusions. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

## V.     FACTS

The Exceptional Values of the Reserve

73.     At approximately 22.8 million acres — an area roughly the size of Indiana — the Reserve is the largest single public land unit in the country. The Reserve provides rich habitat for caribou, grizzly and polar bears, wolves, and a range of migratory birds and waterfowl. It is also home to the Western Arctic and Teshekpuk Lake Caribou Herds, which provide key subsistence resources to numerous communities in the Reserve and across northwest Alaska.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-TMB                                    Page 25 of 64

74.     President Warren G. Harding originally set aside the Reserve in 1923 as a petroleum reserve for the U.S. Navy. In 1976, it was re-designated and Congress passed a new law recognizing the exceptional ecological values in the Reserve. The law instructed the Secretary of the Interior to designate any areas containing significant subsistence, recreational, fish and wildlife, or historical or scenic values as special areas and to provide "maximum protection" for those values. 42 U.S.C. § 6504(a).

75.     Based on this authority, the Secretary designated multiple Special Areas — including the Teshekpuk Lake and Colville River Special Areas — to ensure maximum protection of the environment, fish and wildlife, and historical or scenic values. *Id.*

76.     The Colville River Special Area was initially designated to protect peregrine falcons and their nesting habitat, and the Teshekpuk Lake Special Area was designated to protect "important nesting, staging, and molting habitat" for waterfowl and other migratory birds. National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977); 1 Bureau of Land Mgmt., National Petroleum Reserve-Alaska Integrated Activity Plan (IAP) Final Environmental Impact Statement 17 (2012).

77.     Teshekpuk Lake is one of the most productive wetland complexes in the Arctic and provides vital nesting habitat for hundreds of thousands of migratory birds. The Teshekpuk Lake area, along with the neighboring Smith Bay marine habitat, supports the highest density of shorebirds in the circumpolar Arctic, including threatened

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 26 of 64

spectacled eiders, Steller's eiders, yellow-billed loons, dunlins, and American golden-plovers. As many as 35,000 greater white-fronted geese and 37,000 brant molt in the area, as do thousands of Canada geese and Snow geese. This region is also the primary calving grounds for the Teshekpuk Lake Caribou Herd.

78.     The Colville River Delta is the largest and most ecologically rich river delta in northern Alaska. The cliffs along the Colville River provide critical nesting sites and adjacent hunting areas for peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

79.     The northeastern Reserve and Colville River (Kuukpik River in Iñupiaq) Delta are lands that have sustained the Iñupiat people since time immemorial. Teshekpuk Lake is a spiritual hunting ground that has had stories passed down for generations of the rich lands filled with caribou, fish, and freshwater. The Iñupiat have and continue to rely on the health and wellness of the land in the Western Arctic.

### The Imperiled Southern Beaufort Sea Population of Polar Bears

80.     In 2008, FWS listed the polar bear as a threatened species under the ESA. FWS, Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range, 73 Fed. Reg. 28,212 (May 15, 2008). Polar bears are also federally protected under the MMPA. 50 C.F.R. § 17.40(q).

81.     America's Arctic — including the Reserve — provides onshore denning habitat for polar bears. FWS designated critical habitat for polar bears in Alaska in 2011,

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 27 of 64

including barrier island, sea ice, and terrestrial denning habitat. Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States, 75 Fed. Reg. 76,086, 76,088–91 (Dec. 7, 2010). The Willow project area contains designated critical habitat, characteristic polar bear terrestrial denning habitat, and locations where polar bears have historically denned.

82.     The proportion of females denning on land has increased significantly as sea ice diminishes due to climate change. Polar bears are particularly vulnerable to sea ice melt given their life history and specialized habitat needs. The Southern Beaufort Sea (SBS) population is among the most imperiled polar bear populations in the world, having declined dramatically since the 1990s. In addition to climate change, polar bears in the SBS population face threats from a wide range of industrial activities, including onshore and offshore oil and gas development and increased shipping. They are also subject to subsistence hunting and mortality due to interactions with humans where there is a perceived threat to life and property.

83.     Noise and visual disturbance from human activity and operation of equipment, especially aircraft and vehicle traffic, have the potential to disturb polar bears nearby. Disturbance of maternal females during the winter denning period can result in premature den abandonment, or earlier den emergences and departures, adversely affecting polar bear cub survival.

84.     A recent 2020 study by FWS and the United State Geological Survey (USGS) stated that the current level of lethal takes for SBS polar bears "does not allow any additional lethal take under the MMPA from other sources," such as oil and gas activities. Wilson *et al.*, *Seismic Survey Design and Effects on Maternal Polar Bear Dens*, Journal of Wildlife Management (2020) [hereinafter "Wilson 2020"]. The study further states that due to the negative effects to cub survival from early den emergence, nearly all dens must remain undisturbed for oil and gas activities to meet MMPA requirements. *Id*.

### BLM's Management of the Reserve & the Oil and Gas Program

85.     BLM adopted the first-ever comprehensive management plan covering the entire Reserve in 2013. This plan, called the Integrated Activity Plan (IAP), set out broad decisions for how BLM would manage resources and the values in the Reserve. As part of the process for adopting the management plan, BLM prepared an EIS that evaluated various management and land-allocation alternatives for the Reserve.

86.     In issuing the 2013 Record of Decision (ROD) for the IAP, BLM protected many of the wildlife, habitat, and subsistence values of the Reserve. BLM also made approximately 11.8-million acres — approximately 52% — of the Reserve available for oil and gas leasing and development. The ROD also incorporated stipulations and best management practices (BMP) applicable to oil and gas and other activities in the Reserve.

87. The IAP expanded the Teshekpuk Lake Special Area from 1.75-million acres to 3.65-million acres and expanded its purposes to include protecting caribou and shorebird habitat. The IAP closed approximately 3.1 million acres of the Teshekpuk Lake Special Area to oil and gas leasing because of the area's importance to subsistence users and wildlife, including the Teshekpuk Lake Caribou Herd. It also established protective best management practices in the Teshekpuk Lake Caribou Habitat Area (BMP K-5). BLM deemed this area essential for all season use by caribou, including calving and rearing, insect-relief, and migration, and thus afforded it heightened protections.

88. The IAP expanded environmental protections for the Colville River Delta by prohibiting permanent oil and gas facilities within two miles of the Colville River, among other waterways. BLM also expanded the purpose of the Colville River Special Area to protect all raptor species.

89. After adoption of the IAP, in 2015, BLM approved ConocoPhillips' drilling permit for the Greater Mooses Tooth 1 (GMT-1) development. The project included a drilling pad and 7.6-mile road that would extend ConocoPhillips' existing oil and gas infrastructure at Alpine (on adjacent lands east of the Reserve) and Colville Delta-5 (on private land within the Reserve) further west into the Reserve. In making the decision, BLM waived a protective provision in the IAP that would have kept oil and gas infrastructure out of an established buffer around Fish Creek, an important subsistence use area for the community of Nuiqsut.

90.     In its GMT-1 decision, BLM recognized that there would be significant impacts to subsistence users and other values from the project that could not be fully mitigated by the best management practices and stipulations in the IAP. BLM also acknowledged that there would be significant environmental justice issues raised by GMT-1, and that these impacts were likely to continue to occur and to be exacerbated by future development in the Reserve.

91.     To address those impacts, including major impacts to subsistence uses, BLM required compensatory mitigation funding of $8 million from ConocoPhillips. Those funds were used in part to develop a regional mitigation strategy (RMS), which was intended to set out a plan to address the major impacts to subsistence uses occurring from development in the northeastern region of the Reserve that were not adequately addressed by the IAP. BLM issued the final RMS in August 2018. To date, no action has been taken to implement the RMS.

92.     Shortly after finalizing the RMS, BLM issued a decision authorizing ConocoPhillips' Greater Mooses Tooth 2 (GMT-2) project in the Reserve. The GMT-2 project would construct an additional gravel pad west of GMT-1, with an 8.2 mile long gravel road connection to Alpine via GMT-1. GMT-2 will extend the footprint of development into the Reserve and further exacerbate the impacts to subsistence and other values.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 31 of 64

93.     In early 2017, ConocoPhillips announced a major discovery at the Willow site. Willow is estimated to hold between 400 and 750 million barrels of oil, with production projected to be over 130,000 barrels of oil per day.

94.     There have been a number of significant discoveries and development activities since the adoption of the IAP in 2013 in addition to Willow that have the potential to significantly expand development activities and the cumulative impacts of development within and around the Reserve. Caelus Energy announced a substantial find in state waters off the coast of the Reserve in Smith Bay in 2016. Armstrong Energy, Inc. (Armstrong) also upgraded its resource estimates at the Nanushuk development to a billion-plus-barrel oil prospect in 2017. Nanushuk, which Armstrong states is the largest onshore oil discovery in three decades, lies on state lands immediately adjacent to the Reserve and the community of Nuiqsut. Oil Search, which took over Armstrong's interest in the Nanushuk project, is moving forward with its development plans for Nanushuk and estimates first production in 2023.

95.     In 2017, Secretary of the Interior Zinke signed Secretarial Order 3352, which called for revising the IAP and opening additional areas in the Reserve to oil and gas development. BLM subsequently initiated the environmental review process to revise the IAP.

96.     BLM released the draft EIS for the revised IAP for public comment at the end of 2019 and the FEIS on June 26, 2020. In the FEIS, BLM identified Alternative E as

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 32 of 64

its preferred alternative. Alternative E would open 18.7 million acres, or 82% of the Reserve to leasing. 2 Bureau of Land Mgmt., National Petroleum Reserve in Alaska: Final Integrated Activity Plan and Environmental Impact Statement (2020). Alternative E would open the entire Teshekpuk Lake Special Area to oil and gas leasing.

97.     In addition to proposing to open nearly the entire Reserve to oil and gas and other infrastructure, the EIS listed lease stipulations and required operating procedures for both oil and gas and non-oil and gas activities that were nearly all either the same or less protective than those in the 2013 IAP. The EIS also contained provisions broadly allowing for waivers, exceptions, and modifications to any lease stipulations.

98.     All of the action alternatives eliminated the Colville River Special Area and reduced the size of the Teshekpuk Lake Special Area.

99.     All of the action alternatives allow for so-called "community roads" to be built anywhere in the Reserve, including in areas closed to oil and gas leasing and development. BLM did not adopt any restrictions related to the roads' location, construction, operation, or use.

100.    In its analysis of the reasonably foreseeable future development scenario, BLM declined to consider Willow, despite the fact that BLM was in the process of reviewing, but had yet to finalize, its decision on the Willow project.

101.    To date, BLM has not issued its ROD for the IAP.

102.    In May 2018, after Secretary Zinke announced his intent to expand oil and gas leasing in the Reserve, ConocoPhillips requested that BLM approve its proposed Willow Master Development Plan.

103.    Willow requires BLM's approvals for applications for permits to drill, right-of-way grants, and gravel mining authorizations. However, ConocoPhillips has not yet submitted complete applications for these permits to BLM.

104.    Willow also requires a permit from the U.S. Army Corps of Engineers (Corps) for the discharge of fill into wetlands and waters of the United States under Section 404 of the Clean Water Act (CWA).

105.    BLM released the draft EIS for public review in August 2019. BLM stated that its draft EIS provides a "NEPA analysis that could be used to inform final approvals for individual project components, such as permits to drill and rights-of-way." 1 Bureau of Land Mgmt., Draft Environmental Impact Statement for the Willow Master Development Plan 2 (2019) [hereinafter draft EIS].

106.    The draft EIS did not mention BLM's statutory obligations under FLPMA.

107.    The draft EIS purported to fulfill the Corps' NEPA obligations, as well as BLM's, and the Corps served as a cooperating agency. *Id.* at 2–3. However, ConocoPhillips had not submitted its 404 permit application to the Corps at the time

---

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-TMB                                    Page 34 of 64

BLM published the draft EIS; as a result, much of the information related to the Corps' obligations under the CWA was neither known nor considered as part of the draft EIS.

108.    The draft EIS considered four alternatives — one no action alternative (A) and three action alternatives. As shown in the following map, *id*. at ES-2, ConocoPhillips' proposed action (Alternative B) would construct a new central processing facility and infrastructure pad in the Reserve, up to five satellite drill pads connected to the central processing facility via infield gravel roads, up to fifty wells on each pad, an airstrip, gravel roads connecting back to the GMT-1 and GMT-2 developments, and a gravel mine within the Reserve:



Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 35 of 64

109. The other two action alternatives were nearly identical to ConocoPhillips' proposal in all respects except for the absence of one infield road connection, a second airport, use of a diesel pipeline in Alternative C, and the absence of a road connection between Willow and GMT-2 under Alternative D. All of the action alternatives allowed for ConocoPhillips to construct a new offshore gravel island in Harrison Bay, north of the proposed development. As proposed, that would have allowed ConocoPhillips to barge in project infrastructure in "modules," or large storage containers, and transport them across the Teshekpuk Lake Special Area to the project area.

110. Willow's proposed access road and pipeline would cross through a mile of the Colville River Special Area raptor protection area. BLM would also approve a gravel mine within the half-mile setback for infrastructure of the Ublutuoch (Tiŋmiaqsiuġvik) River, which would require waiving protections established in the IAP. Willow would also construct infield roads, pipelines, and two drill sites (BT2 and BT4 (which is also within the Teshekpuk Lake Caribou Habitat Area)) within the Teshekpuk Lake Special Area. None of the action alternatives considered placement of infrastructure outside the boundaries of designated Special Areas, or avoiding infrastructure and activities in and around sensitive areas, such as river setbacks and the Teshekpuk Lake Caribou Habitat Area.

111. The draft EIS discusses BLM's "screening process" for alternatives that were eliminated from consideration in the EIS process. Among those, the draft EIS

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 36 of 64

dismissed a proposal to barge modules to an existing facility east of the Reserve at Oliktok Dock for transport over the Colville River via ice routes and existing infrastructure. 3 *id*. app. D at 14. The draft EIS characterized that option as "unfeasible" and stated that it "could not be implemented," in large part because of concerns about the safety of transporting modules across the Colville River and ConocoPhillips' concerns about the additional time it would take to transport smaller modules. *Id*.

112.    The draft EIS contained only a cursory and general discussion of cumulative impacts resulting from Willow and other past, present, and reasonably foreseeable future actions. The draft EIS provided a table listing reasonably foreseeable future actions but did not include detailed information on these actions. In particular, two additional, yet-to-be-proposed developments — Greater Willow 1 and 2 — were included and described as "[p]otential expansion areas to be included in the Willow Master Development Plan." 1 *id*. at 161. The cumulative effects analysis provided no detail about these development proposals or where they would be located, and BLM failed to consider them as part of the Willow proposal.

113.    Despite the fact that Willow was not considered in BLM's 2013 IAP, and the fact that significant development has occurred in the northeastern Reserve since 2013, the Willow draft EIS states that it "tiers to the 2012 IAP/EIS and the 2013 ROD." *Id*. at ES-1.

_____

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-TMB                                    Page 37 of 64

114.    BLM's impact analysis in the draft EIS assumed that all existing 2013 IAP lease stipulations and best management practices would be implemented. *See, e.g.*, *id*. at 29, 42, 109, 115, 119, 117, 125, 146. The draft EIS did not analyze Willow under the mitigation measures in the 2020 IAP.

115.    The draft EIS did not adequately identify and analyze additional mitigation measures to impose on Willow beyond the measures contained in the 2013 IAP. Despite BLM's previous findings in GMT-1 that existing lease stipulations and best management practices were insufficient to mitigate the impacts of oil and gas activities on Reserve resources and uses, BLM did not explain its failure to consider additional mitigation measures for subsistence resources.

116.    In comments on the draft EIS, the public raised a variety of concerns regarding ConocoPhillips' proposal and BLM's NEPA process. In particular, public comments pointed out that the draft EIS lacked a reasonable range of alternatives, failed to take a hard look at the full range of direct, indirect, and cumulative impacts from Willow, and failed to properly evaluate mitigation measures.

117.    Commenters also questioned the BLM's ability to move forward with its permitting process in light of the ongoing IAP revision and the fact that ConocoPhillips had not yet submitted a CWA 404 application to the Corps. The public also requested that BLM clarify what applications and aspects of the project it was approving and permitting through its NEPA process.

_____

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-TMB                                           Page 38 of 64

118.     Shortly after the release of the draft EIS, ConocoPhillips informed BLM and the Corps that it would be making significant changes to its Willow proposal. ConocoPhillips refused to disclose all of its proposed changes to the agencies at the time and provided only a few examples of how it might change the project. Steve Moore, U.S. Army Corps of Eng'rs, Conversation Record with Chris Wrobel, ConocoPhillips (Sept. 11, 2019). ConocoPhillips disclosed that it anticipated increasing the acres of wetlands filled, among other modifications. *Id*. ConocoPhillips informed the permitting agencies that the company was "deliberating internally" about "recommending" that BLM undertake a supplemental draft EIS and additional public comment period. *Id*.; *see also* Letter from Alaska Wilderness League et al. to Rachel Jones, Project Manager, BLM 56– 60 (Oct. 29, 2019). Nonetheless, BLM continued to hold public hearings and take public comment on the draft EIS. The public comment period closed on October 29, 2019.

119.     BLM issued a supplemental draft EIS on March 30, 2020.

120.     Rather than revise its draft EIS to address the critical flaws brought to BLM's attention in public comments, BLM issued a supplement that addressed only a limited number of ConocoPhillips' changes to the proposed project. 1 Bureau of Land Mgmt., Supplemental Draft Environmental Impact Statement for the Willow Master Development Plan 1 (2019).

121.     The supplemental draft EIS considered only three project components added by ConocoPhillips: an alternative involving module delivery at Oliktok Dock with

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 39 of 64

a crossing over the Colville River (referred to as Module Delivery Option 3), the addition

of a constructed freshwater reservoir, and the addition of up to three boat ramps for

subsistence access. *Id*. at 5–7.

122.    Barging modules to Oliktok Dock for transport over the Colville River via

ice bridge was the only new alternative considered in the supplemental draft EIS. *Id*. at 1.

No other alternatives were included for consideration. *Id*.

123.    The supplemental draft EIS acknowledged that ConocoPhillips had and was

continuing to make changes to its project proposal. *Id*. This included relocating the

central processing facility and airstrip by 2.5 miles, processing production from its

Greater Moose Tooth Two (GMT-2) development at Willow, adding water sources,

changing the pad size, location, road length, location, and overall project footprint,

altering traffic numbers, adding new facilities, and changing to the project's schedule and

construction sequencing. *Id*. at 1-2. In other words, ConocoPhillips proposed alterations

to nearly every aspect of the Willow project — its size, location, the facilities being used,

and levels of activity associated with the project. None of these changes were considered

in the supplemental draft EIS.

124.    The supplemental draft EIS purported to analyze ConocoPhillips' proposed

Colville River crossing, which it described as being a "grounded ice crossing" that

"would be primarily frozen fast to the riverbed." *Id*. at 6 n.3. It also stated that

ConocoPhillips would collect baseline data and "continue to monitor the proposed

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 40 of 64

Colville River crossing location for fish presence over coming winters prior to construction to gain baseline data." *Id*. at 6. The supplemental draft EIS lacked critical details about how the crossing would be designed and built and the impacts it would have on ecological processes and values, including to hydrology and fish. It did conclude, however, that the proposed Colville River crossing would directly impact up to 97% of Nuiqsut subsistence harvesters when accounting for all resources harvested. *Id*. at 56.

125.    The Corps published its Public Notice for Willow on March 26, 2020, stating that the agency had received ConocoPhillips 404 permit application, shortly after the release of the supplemental draft EIS. The supplemental draft EIS did not provide additional, adequate analysis of impacts and potential mitigation to offset impacts to aquatic resources, relevant to the Corps' 404 permit and NEPA obligations.

126.    On August 14, 2020, BLM released the FEIS for Willow. In the FEIS, BLM identified ConocoPhillips' proposed action, including its proposed Colville River crossing, as the agency's preferred alternative. 1 Bureau of Land Mgmt., Willow Master Development Plan: Final Environmental Impact Statement 8 (2020) [hereinafter FEIS].

127.    The FEIS recognized there were extensive changes to ConocoPhillips' proposal. *Id*. at 4–5. These included relocating Willow's operation center, central processing facility, airstrip, and certain drill pads; changes to the mine site; additional gravel pads and project facilities; increases in traffic; and changes to freshwater use. *Id*.

However, those changes were not analyzed in the draft or supplemental draft EIS, and were shared with the public for the first time in the FEIS. *Id.*

128. The changes in the FEIS did not address the extensive concerns raised about the project and the agencies' analysis. Despite the concerns raised by Plaintiffs, local communities, and numerous other commenters, BLM's FEIS fails to adequately describe or analyze the project design or changes that ConocoPhillips made to that design, lacks necessary baseline data, and fails to sufficiently analyze the environmental consequences to numerous resources. Like the draft and supplemental draft EISs, the FEIS provided only generalized statements regarding Willow's cumulative effects and failed to adequately analyze impacts from other past, present, and reasonably foreseeable future actions.

129. Similar to the draft EIS, the FEIS provides a cursory list of mitigation measures without adequately analyzing whether such measures would be effective at mitigating impacts to resources. However, the FEIS altered BLM's position regarding the applicability of the 2013 IAP's best management practices and mitigation measures. The FEIS stated that Willow would be governed by the best management practices and required operating procedures in place at the time applications for permits to drill are issued — meaning, they would likely fall under the provisions in the 2020 IAP. *Id.* at 28–29.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 42 of 64

130.     The FEIS did not consider any new alternatives or components of alternatives. In dismissing the no action alternative, BLM stated that it would not meet the project's purpose and need, and that BLM cannot preclude ConocoPhillips from developing its lease. 4 *id*. app. B.2 at 87. BLM stated that it did not consider an alternative that precluded infrastructure in the Teshekpuk Lake Special Area because "[a]ll else being equal, the [Teshekpuk Lake Special Area] is only an administrative boundary." *Id*. app. B.2 at 36, 101, 121. Regarding comments critiquing the similarities of the action alternatives, BLM stated that ConocoPhillips "had already worked to optimize" its road and bridge alignments and project footprint, thus BLM did not need to consider adjustments in the EIS in order to minimize impacts. 4 *id*. at 124.

131.     BLM deemed a Colville River crossing "unfeasible" in its draft EIS; however, the Colville River crossing became ConocoPhillips' proposed action and BLM's preferred alternative in the FEIS. 3 Draft EIS at app. D at 14; 1 FEIS at ES-6. BLM stated that there was no baseline data at the draft EIS stage to indicate that such a crossing at the proposed location was feasible. 4 FEIS app. B.3 at 18. In response to comments from ConocoPhillips regarding the Colville River crossing and how its effects were characterized, BLM stated that "[t]here is not sufficient design information available yet to determine what the depth, duration, direction, velocity, and frequency of impounded water would be. Therefore, the range of potential effects are described in the

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 43 of 64

EIS." *Id*. app. B.3 at 80. Despite recognizing this lack of baseline data or information about potential impacts, BLM selected this option as its preferred alternative.

132. Regarding Willow's proposed bridges, culverts, and other water crossings, BLM stated that it would require ConocoPhillips to "provide annual surveillance" of such crossings as a mitigation measure "due to the lack of a basis of design for structures proposed by [ConocoPhillips]." *Id*. app. B.2 at 41. BLM further stated that "if [ConocoPhillips] provides a basis of design, then effects as resulting mitigation could be described more definitively and narrowly." *Id*.

133. In response to comments critiquing the lack of information on aquatic resources and impacts in the EIS, BLM stated that the public would have an opportunity to comment on direct, indirect, and cumulative impacts to hydrological resources as part of the Corps' permitting process. *Id*. app. B.2 at 144.

134. In the response to numerous public comments identifying the inadequate or lacking baseline information, impacts analysis, information about the project design, and mitigation measures, BLM stated that it may do additional NEPA for the project after the adoption of the EIS and ROD. *Id*. app. B.2 at 104.

135. Regarding the decision to be made, the FEIS states that "BLM and other authorizing cooperating agencies will, in their respective ROD(s), decide whether to approve the Willow MDP and the associated issuance of permits and rights-of-way for

the construction of the development plan, in whole or in part, based on the analysis contained in the EIS." 1 *id*. at 2.

136.    In the FEIS, BLM did not indicate what it was permitting as part of the environmental review process. In response to requests that BLM clarify what the agency is actually approving through this Master Development Plan, BLM stated for the first time that ConocoPhillips had not yet submitted an application for a permit to drill or a right-of-way permit. 4 *id*. app. B.2 at 103–05. Although commenters flagged that BLM should not move forward with a NEPA process at that time for numerous reasons, BLM stated that it was "required to respond" to ConocoPhillips' application. *Id*. app. B.2 at 103. BLM did not explain why it was obligated to respond to ConocoPhillips when the company has not yet applied to BLM for the requisite authorizations for this project — specifically, for a right-of-way grant or permits to drill. BLM merely stated that it would respond to ConocoPhillips' right-of-way applications when the company submits them. *Id*. app. B.2 at 104.

137.    The FEIS lacked critical components for analysis of a right-of-way under FLPMA. For instance, the FEIS did not contain a detailed construction schedule or a reclamation plan, and other procedural requirements. To date, BLM has not clarified when construction of the project would occur. BLM also failed to make the requisite substantive determinations that the right-of-way route would cause the least damage to

the environment, protect the subsistence interests of individuals living in the area, or otherwise protect the public interest, among other required findings.

Willow Record of Decision

138.    On October 27, 2020, Secretary Bernhardt and Mr. Padgett signed the ROD for Willow, "approving the development of Project Alternative B with Module Delivery Option 3." U.S. Dep't of the Interior & Bureau of Land Mgmt., Willow Master Development Plan Record of Decision 2 (2020) [hereinafter ROD]. That consists of gravel road access to five drill sites and infrastructure barged to Oliktok Dock via modules and trucked over the Colville River ice bridge.

139.    The ROD constitutes BLM's decision under NEPA and is a final agency action. *Id*. at 1, 19. The ROD further stated that it was prepared in accordance with BLM's authority under the NPRPA, FLPMA, the Mineral Leasing Act, and Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA). *Id*.

140.    In its decision, BLM approved Willow and the associated issuance of permits and rights-of-way for the construction and operation of the Project but did not approve two of ConocoPhillips' drill sites: "[t]his ROD completes the required FEIS process and NEPA requirements for the subsequent issuance of BLM approvals, grants, and other authorizations necessary for development of all aspects of the Willow MDP on federal lands managed by the BLM except drill sites BT4 and BT5 and their respective

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 46 of 64

road and pipeline segments." *Id*. at 2–3. Those drill sites could be approved at a later time and the ROD would be amended. *Id*. at 3.

141.    The ROD identified the lease stipulations and best management practices from BLM's 2013 and 2020 IAPs that would apply to Willow, and a sparse number of Willow-specific mitigation measures from the FEIS. *Id*. app. A at 5 –18. BLM stated that ConocoPhillips must comply with all terms and conditions contained in the ROD. *Id*. at 2.

142.    The ROD does not contain any requirement for ConocoPhillips to submit documentation of MMPA compliance prior to BLM approving any exploration or development activity, and does not contain any mention of "project design criteria" discussed in the BiOp.

143.    Multiple mitigation measures specific to Willow require ConocoPhillips to design and identify water crossings at a future date. *See, e.g.*, *Id*. app. A at 9 ("Design and implement an ice bridge crossing of the Colville River that is informed by current ice and water data and allows passage of fish and water as needed, while minimizing effects to all resources.").

144.    The ROD approved development of two gravel mines on BLM-managed lands within the Ublutuoch (Tiŋmiaqsiuġvik) River half-mile setback. *Id*. at 3. The ROD indicated ConocoPhillips would mine additional gravel from ConocoPhillips' Kuparuk field. *Id*.

_____

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-TMB                                         Page 47 of 64

145.     The ROD stated that Willow will result in 611.9 acres of wetland loss due to gravel fill or excavation; direct vegetation damage and soil compaction from ice infrastructure over an additional 5,223.9 acres; and indirect changes to wetland composition due to dust and gravel spray over approximately 3,338.3 acres of wetlands. *Id*. at 16. The ROD acknowledged that Alternative D would have resulted in a smaller gravel footprint and fewer acres of wetland loss. *Id*. at 16.

146.     The ROD determined that Willow's effects on subsistence, sociocultural systems, and public health "may be highly adverse and disproportionately borne by the Nuiqsut population." *Id*. at 17–18. Willow would increase air and noise emissions and human activity in Nuiqsut's subsistence use area, which could increase stress and cause anxiety and depression. *Id*. Regarding Nuiqsut, the ROD also acknowledged that "rapid modernization and development, as well as other multiple stressful conditions, including significant changes in diet, housing, and traditional culture, has led to negative health outcomes, including suicide." *Id*. at 17. The ROD further determined that "the cumulative effects of the Project on subsistence, sociocultural systems, and public health may be highly adverse and would be disproportionately borne by populations from Nuiqsut, Utqiagvik, Anaktuvuk Pass, Atqasuk, Point Lay, and Wainwright," and such effects would be "long term and of high intensity." *Id*. at 18.

147.     The ROD made no findings pursuant to FLPMA regarding whether the project served the public interest.

_____

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-TMB                                    Page 48 of 64

148. To date, no CWA 404 permit has been issued for the project.

<u>Willow Biological Opinion</u>

149. On October 16, 2020, FWS issued the BiOp for Willow analyzing impacts to polar bears and other ESA-listed species under FWS's jurisdiction. FWS, Biological Opinion for Willow Master Development Plan (2020) [hereinafter BiOp].

150. The BiOp analyzed the Willow project as proposed by ConocoPhillips, and concluded that BLM's decision to approve Willow as described in Alternative B with Module Delivery Option 3 will not jeopardize the survival and recovery of polar bears or result in the destruction or adverse modification of the species' designated critical habitat. *Id*. at 130.

151. The BiOp contains an appendix explaining that FWS performed quantitative modeling to estimate the level of potential impact to denning polar bears from disturbance. *Id*. at app. B. The model was developed by FWS scientist Ryan Wilson and USGS scientist George Durner to quantitatively evaluate the impacts to denning mothers and cubs on the Arctic National Wildlife Coastal Plain from an area-wide seismic survey, taking into account the impact of mitigation measures. *See* Wilson 2020.

152. The Willow BiOp model overlaid Willow's proposed infrastructure (e.g., ice roads, pads, roads, mine sites) with simulated dens in the Willow project area to determine which dens could be exposed to disturbance. BiOp at app. B. at 160. FWS

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 49 of 64

assumed any dens within 1 mile from infrastructure would be exposed to disturbance. *Id.* at 161.

153.    The BiOp's appendix states that it categorized disturbances as resulting in "Level B, Level A, or lethal take (i.e., cub abandonment) of bears," and that "[f]or the sake of this analysis, we only focused on lethal and serious Level A takes of cubs during the early denning, late denning, and post-emergence periods." *Id.* at 162.

154.    The BiOp's appendix does not define "serious injury," Level A, or Level B take. The ESA and its implementing regulations do not define or otherwise utilize these terms. The MMPA defines harassment as either Level A or Level B harassment. 16 U.S.C. § 1362(13).

155.    FWS's model estimated that there would be a mean level of take by "lethal or serious injury" of 2.2 polar bear cubs over the 30-year life of the Willow project. BiOp at 163.

156.    The model estimated the probability of "serious injury or lethal takes" occurring, and states that there is an 84% probability that no such take would occur. *Id.* at 115. The BiOp states that "while it is possible that an undetected den or family group could be impacted which would result in injury or mortality to one or more polar bears, given the high probability of zero bears suffering injury or mortality over the life of the project, such a scenario is not reasonably certain to occur." *Id.*

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 50 of 64

157. FWS did not explain whether or how this modeling evaluated the likelihood of "harm" or "harassment" of denning bears as defined by the ESA.

158. Regarding take from deterrence activities, FWS found that up to two polar bears may be hazed and suffer from non-lethal physical injuries. *Id*. at 130. Hazing involves startling bears with noise or striking bears with projectiles such as bean bags or rubber bullets. *Id*. at 90.

159. The BiOp did not authorize incidental take of polar bears in an ITS.

160. In its BiOp, FWS acknowledged that it could not authorize take of polar bears for the Willow project "because such take has not yet been authorized under the MMPA . . . ." *Id*. at 133. Once take is authorized under the MMPA, FWS stated that mitigation measures from that process "will serve as the reasonable and prudent measures (RPMs) and implementing terms and conditions (T&Cs) for this [BiOp]." *Id*.

161. The BiOp states that "[i]ncidental effects to polar bears from the Proposed Action are expected to be in the form of short-term, minor changes in behavior which do not create a likelihood of injury (much less cause injury), or are not reasonably certain to occur and therefore would not constitute harassment or other any form of take as defined by the ESA . . .[h]owever, we anticipate that up to 2 bears may be hazed with non-lethal contact rounds over the life of the project." *Id*. at 133.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 51 of 64

162.     The BiOp states that BLM would be required to reinitiate consultation "[i]f human-polar bear interactions result in injury of more than 2 polar bear over the life of the project." *Id.* at 135.

163.     The BiOp does not include an explanation that reconciles its conclusion that the project would not result in any ESA take with its finding that Willow is estimated to kill or seriously injure more than two polar bear cubs. The BiOp does not provide an explanation for why future MMPA incidental take or harassment authorization mitigation measures would be incorporated into the BiOp as reasonable and prudent measures and terms and conditions in light of the fact that the BiOp explicitly did not anticipate or authorize incidental take. Nor did the BiOp explain how it defined "injury" of two bears for purposes of reinitiation of consultation given its contradictory finding that no take would occur.

164.     The BiOp assumes that Willow is subject to mitigation measures in the form of project design criteria developed for the 2020 IAP, including project design criteria (PDC) 4, which states:

> The lease area and/or potential project areas may now or hereafter contain marine mammals. The BLM may require modifications to exploration and development proposals to ensure compliance with Federal laws, including the Marine Mammal Protection Act (MMPA). The BLM would not approve any exploration or development activity absent documentation of compliance under the MMPA. Such documentation shall consist of a Letter of Authorization, Incidental Harassment Authorization, and/or written communication from USFWS and/or NMFS confirming that a take authorization is not warranted.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 52 of 64

*Id*. at 43–44.

165.    For purposes of analyzing the effects of the action with respect to den disturbance and human-polar bear interactions — and reaching its no-jeopardy conclusion — FWS relies heavily on future MMPA compliance to assert that project impacts to the polar bear will be minimized. *Id*. at 113, 116–117, 118, 124.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of NEPA — Failure to Take a Hard Look at Direct, Indirect, and Cumulative Impacts and Mitigation Measures)

166.    Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

167.    Pursuant to NEPA, agencies must take a "hard look" at the consequences, environmental impacts, and adverse effects of their proposed actions and evaluate mitigation measures. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.14, 1502.16. NEPA requires that an EIS include a detailed analysis of the direct, indirect, and cumulative impacts of the proposed action together with the impacts of past, present, and reasonably foreseeable activities. 40 C.F.R. § 1508.7.

168.    NEPA's implementing regulations require that an EIS discuss the means to mitigate adverse environmental consequences. *Id*. §§ 1502.14(f), 1502.16(h). Mitigation includes, but is not limited to, avoiding, minimizing, rectifying, or compensating for adverse project impacts to the environment. *Id*. § 1508.20.

169.    BLM violated NEPA and its implementing regulations by failing to take a hard look at Willow. ConocoPhillips made numerous changes to its Willow proposal during BLM's NEPA process that were not adequately analyzed, and provided scant and insufficient information about the project. BLM lacks sufficient information about the project's location, design, construction plan, and operations to enable it to take a hard look at the impacts of Willow or how to mitigate those impacts.

170.    BLM violated NEPA and its implementing regulations by failing to take a hard look at the potential direct, indirect, and cumulative impacts of Willow. BLM failed to conduct an adequate assessment of the environmental impacts of its Willow decision in tandem with all past, present, and reasonably foreseeable activities by failing to provide a quantified analysis of impacts from Greater Willow 1 and 2, among other oil and gas activities. The EIS also fails to provide an adequate discussion of the cumulative impacts of Willow to a wide range of resources including marine mammals, endangered species, subsistence uses and resources, soils and permafrost, hydrology, water quality, fish, and other resources in and around the Reserve.

171.    BLM failed to take a hard look at the potential direct, indirect, and cumulative impacts to resources, including subsistence, and the need for additional mitigation measures, despite the fact that BLM previously found there were and would be major impacts to subsistence from development in the Reserve that were not adequately addressed by the existing mitigation measures in the IAP.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 54 of 64

172.     BLM only provides a cursory analysis of potential mitigation measures and their effectiveness.

173.     BLM's failure to take a hard look at the direct, indirect, and cumulative impacts of Willow, and failure to adequately evaluate the effectiveness of mitigation measures renders the FEIS and ROD arbitrary, capricious, and not in accordance with the law, and BLM's issuance and adoption of the FEIS and ROD was done without following the procedures required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

**Count II**
**(Violation of NEPA — Failure to Obtain Sufficient Information Regarding Baseline Environmental Conditions)**

174.     Plaintiffs re-allege, as if fully set forth here, every allegation contained in the preceding paragraphs.

175.     NEPA requires that the EIS "describe the environment of the area(s) to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process.

176.     BLM failed to obtain key baseline information necessary to evaluate the impacts to resources potentially affected by the project and related infrastructure and facilities. This included the failure to obtain baseline information, including but not

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 55 of 64

limited to wetlands, aquatic resources and hydrology, wildlife (including caribou), fish, air quality, and subsistence uses.

177. BLM lacks updated data on the environmental baseline in light of recent industrialization in the northeastern Reserve. BLM further lacks baseline information for hydrology and water quantity at the location of the proposed Colville River crossing sufficient to determine the feasibility and environmental impacts of its preferred alternative.

178. BLM's failure to obtain this baseline information renders the FEIS and ROD arbitrary, capricious, and not in accordance with the law, and BLM's issuance and adoption of the FEIS and ROD was done without following the procedures required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## COUNT III
### (Violation of NEPA — Failure to Consider an Adequate Range of Alternatives)

179. Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

180. NEPA requires agencies to consider a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1500.2(b), (e), 1502.2(d)–(f), 1502.14, 1505.1(e). Agencies must, to the fullest extent possible, include "reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e).

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 56 of 64

181.    BLM failed to consider a reasonable range of alternatives in the EIS that would protect the Reserve's resources and avoid or minimize adverse impacts of Willow.

182.    BLM failed to consider alternatives that would minimize damage to resources from construction, drilling, operations, and transportation associated with Willow. Viable, unconsidered alternatives or components of alternatives include, but are not limited to: the failure to consider alternative layouts and development footprints, the failure to consider an alternative that avoided the placement of infrastructure in designated Special Areas and other environmentally sensitive areas, the failure to consider an alternative that reduced the extent of infrastructure and traffic activity, and the failure to consider additional mitigation measures.

183.    BLM also failed to adequately explain its failure to consider viable alternatives that would reduce the impacts resulting from its approval of Willow and protect areas and resources consistent with BLM's statutory obligations.

184.    BLM also failed to obtain information sufficient to allow for a reasoned choice among alternatives.

185.    BLM's failure to consider a reasonable range of alternatives, including viable alternatives proposed by the Plaintiffs renders the FEIS and ROD arbitrary, capricious, and not in accordance with the law, and BLM's issuance and adoption of the FEIS and ROD was without following of procedures required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 57 of 64

## Count IV
## (Violation of FLPMA — Failure to Require a Complete Right-of-Way Application)

186.  Plaintiffs re-allege, as if fully set forth here, every allegation contained in the preceding paragraphs.

187.  FLPMA requires that an applicant for a right-of-way submit detailed information to BLM, including but not limited to a full description of the project and its facilities; the schedule for constructing, operating, maintaining, and terminating the project; proposed construction and reclamation techniques; and any plans, contracts, agreements, or other information concerning the applicant's use of the right-of-way. 43 C.F.R. § 2804.12(a).

188.  BLM failed to require a complete right-of-way application from ConocoPhillips.

189.  Despite the fact that ConocoPhillips did not submit a complete FLPMA right-of-way application for Willow, BLM conducted its environmental review and permitting process for the right-of-way. The ROD constituted BLM's "approval of the Willow MDP and the associated issuance of subsequent authorizations, including permits and ROWs, for the construction and operation of the Project" and "completes the required FEIS process and NEPA requirements" for Willow. ROD at 2.

190.  The final EIS lacks critical information about Willow required under FLPMA.

191.  Willow was not approved pursuant to FLPMA's procedural requirements.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 58 of 64

192.    BLM's failure to comply with FLPMA when approving Willow is arbitrary, capricious, an abuse of discretion, and was done without observance of procedure required by FLPMA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## Count V
**(Violation of FLPMA — Failure to Protect the Environment and Public Interest)**

193.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in the preceding paragraphs.

194.    In issuing a right-of-way, BLM has a mandatory duty to impose conditions that will "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." 43 U.S.C. § 1765(a)(ii).

195.    BLM failed to impose conditions that would minimize damage from Willow to the Reserve's values, to fish and wildlife habitat, and that would otherwise protect the environment. By failing to analyze and impose appropriate conditions and mitigation measures as part of its NEPA approval for Willow, BLM failed to comply with FLPMA.

196.    In analyzing ConocoPhillips' proposed right-of-way for Willow, BLM failed to meet the strict public interest and environmental protection requirements of FLPMA. BLM failed to properly take into account factors relevant to the public interest, such as wildlife, subsistence, water quality, public health, and air quality impacts in its

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 59 of 64

decision. To the contrary, BLM found that Willow would have significant, long-term and adverse effects on local communities, in particular Nuiqsut.

197.    BLM failed to comply with FLPMA because the agency failed to make a public interest determination in its ROD or demonstrate that Willow serves the public interest.

198.    BLM's failure to protect the environment and public interest in issuing the ROD violates FLPMA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, and was done without observance of procedure required by FLPMA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

**Count VI**
**(Violation of ESA Section 7 and the APA — FWS's Failure to Prepare a Legally Sufficient BiOp)**

199.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in the preceding paragraphs.

200.    The ESA requires FWS to prepare a BiOp that uses the best scientific and commercial data available to evaluate whether Willow is likely to jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). FWS must make a rational connection between the facts found and the conclusions it draws. 5 U.S.C. § 706(2)(A).

201.    The ESA and its implementing regulations require FWS to issue an ITS if take is anticipated. 16 U.S.C. § 1536(b)(4).

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 60 of 64

202.    FWS modeling demonstrated Willow has more than a zero percent chance of causing injury or mortality to two or more polar bear cubs. Despite these findings regarding potential injury or death to polar bears, FWS did not issue an ITS for polar bears in the Willow BiOp. The BiOp also does not explain how its modeling determined whether take would occur as defined under the ESA. As a result, FWS unlawfully failed to issue an ITS and failed to draw a rational connection between the facts found and the agency's decision not to issue an ITS.

203.    Reasonable and prudent measures and terms and conditions are required as part of an ITS where take is anticipated under the ESA. 16 U.S.C. § 1536(b)(4). The BiOp states that future reasonable and prudent measures and terms and conditions would be required for Willow following MMPA compliance. The BiOp states that Willow would only cause "incidental effects to polar bears" and would not cause any form of take as defined by the ESA. FWS failed to articulate a rational connection between its statement that reasonable and prudent measures and terms and conditions would be required for Willow with its failure to issue an ITS.

204.    The BiOp states that BLM would be required to reinitiate consultation if more than two bears are injured over the life of Willow. FWS does not reconcile this reinitiation trigger with its finding that no take would occur, nor does FWS explain how it is defining "injury" for purposes of the ESA.

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 61 of 64

205. The Wilson 2020 study, which the BiOp relies on, states that in order for oil and gas activities to meet MMPA requirements, nearly all dens must remain undisturbed and no lethal take of polar bears could be permitted. The BiOp recognizes that Willow would result in den disturbance, and that such disturbance is estimated to result in death or serious injury of two or more polar bear cubs. The BiOp's finding of den disturbance and potentially lethal take indicates that Willow would not comply with the MMPA. In the BiOp's "no jeopardy" finding, FWS explicitly assumes that Willow would comply with the MMPA and that such MMPA compliance would be pivotal to ensuring compliance with the ESA. FWS's reliance on Willow's future MMPA compliance to ensure against jeopardy is arbitrary and capricious in light of FWS's prior findings and its findings in the BiOp.

206. The BiOp relies on the explicit assumption that Willow is subject to project design criteria, including PDC 4, such that "BLM would not approve any exploration or development activity absent documentation of compliance under the MMPA." BiOp at 43. The BiOp asserts that such MMPA compliance would mitigate impacts to polar bears. But the ROD contains no statement or commitment from BLM requiring documentation of MMPA compliance prior to BLM issuing any authorizations for Willow. BLM issued the ROD without requiring any such documentation, and ConocoPhillips has not yet been authorized to take polar bears under the MMPA. It is not reasonably certain that BLM could refuse to authorize Willow should the project fail to comply with the MMPA. As a

result, FWS's reliance upon MMPA compliance to ensure against jeopardy is arbitrary and capricious.

207.    FWS's failure to promulgate an ITS in light of anticipated take and need for reasonable and prudent measures and terms and conditions, failure to explain its assumption that Willow would comply with the MMPA, and reliance on uncertain mitigation measures to avoid jeopardy, each lack a rational connection between the facts found and the conclusions made. As a result, the BiOp is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and without observance of the requirements of the ESA and its implementing regulations, and the APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

1.    Declare that BLM violated NEPA, FLPMA and the APA;

2.    Declare that in issuing the BiOp the Secretary, the U.S. Department of the Interior, and FWS violated the ESA and the APA;

3.    Declare that the invalid FEIS, ROD, and BiOp cannot serve as the basis for any future actions;

4.    Declare that the actions as set forth above are arbitrary, capricious, an abuse of discretion or not in accordance with law, and without observance of procedure required by law;

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 63 of 64

5.      Vacate and set aside as unlawful the Willow ROD, FEIS, BiOp and any decisions that rely on these documents;

6.      Enter appropriate injunctive relief;

7.      Retain continuing jurisdiction over this matter until Federal Defendants fully remedy these violations of law;

8.      Award Plaintiffs all reasonable costs and fees as authorized by law; and

9.      Grant such other relief as this Court deems just and proper.

Respectfully submitted this 17th day of November, 2020,

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

Case 3:20-cv-00290-SLG   Document 1   Filed 11/17/20   Page 64 of 64