Jean E. Williams
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
Rickey Turner
Senior Trial Attorney, Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
303-844-1373
rickey.turner@usdoj.gov

Paul E. Salamanca
Deputy Assistant Attorney General
Caitlin Cipicchio
Trial Attorney, Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
202-305-0503
caitlin.cipicchio@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*,<br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>BUREAU OF LAND MANAGEMENT, *et al.*,<br>　　　　　Federal Defendants,<br>　　and<br><br>CONOCOPHILLIPS ALASKA, INC.,<br>　　　　　Intervenor-Defendant. | Case No. 3:20-cv-00290-SLG |

---

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*　　Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction

Case 3:20-cv-00290-SLG　Document 26　Filed 01/15/21　Page 1 of 51

| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
|---|---|
| Plaintiffs, | Case No. 3:20-cv-00308-SLG |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | |
| Federal Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., | |
| Intervenor-Defendant. | |

## FEDERAL DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 2 of 51

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

    I.     Legal Background ..................................................................................... 2

          A.     Endangered Species Act .................................................................. 2

          B.     Marine Mammal Protection Act ..................................................... 3

          C.     National Environmental Policy Act ............................................... 4

    II.    Factual Background .................................................................................. 5

LEGAL STANDARDS ........................................................................................ 8

    I.     Preliminary Injunction ............................................................................. 8

    II.    Administrative Procedure Act .................................................................. 9

ARGUMENT ..................................................................................................... 10

    I.     Plaintiffs Are Not Likely to Succeed on the Merits. ............................. 10

          A.     The Service's ESA Analysis Was Consistent with the ESA and Reasonable. ................................................................................. 10

               1.    BLM's proposed action. ..................................................... 11

               2.    The Service's Section 7 jeopardy analysis on polar bears. ................................................................................ 12

               3.    The Service's Section 7 adverse modification analysis on polar bear critical habitat................................................ 14

          B.     The Service's ESA Analysis Is Reasonable and Plaintiffs Offer Nothing to Rebut It.................................................................... 15

               1.    The Service complied with the governing 2019 ESA regulations. ........................................................................ 16

               2.    The Service did not rely on future MMPA compliance for its Section 7 determinations. ......................................... 17

                      a.     The Service's jeopardy determination. .................... 18

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION             i

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 3 of 51

        b.     The Service's no adverse modification determination. ........................................................... 19

    C.     Plaintiffs Have Not Shown Any Violation of NEPA ...................... 21

        1.     Plaintiffs' Complaints violate the NPRPA's Statute of Limitations .............................................................. 21

        2.     BLM took the requisite hard look at the impacts of the Willow Project on the environment ..................................... 22

        3.     BLM adequately considered a reasonable range of alternatives under NEPA ...................................... 23

        4.     BLM's greenhouse gas emissions analysis satisfies NEPA ...................................................................... 26

II.    Plaintiffs Cannot Demonstrate Imminent, Irreparable Harm ..................... 29

    A.     Plaintiffs Fail to Show Likely Irreparable Harm to Polar Bears ...... 29

        1.     The polar bear's status will not degrade during the pendency of this case. ......................................... 31

    B.     Plaintiffs Fail to Establish a Likelihood of Irreparable Harm to the Environment ................................................ 33

        1.     Plaintiffs fail to demonstrate irreparable harm to wetlands will occur from this winter's activities ................. 33

        2.     Plaintiffs' allegations of irreparable harm to caribou and other species' habitat are too speculative to support a preliminary injunction .......................................... 36

    C.     Bureaucratic Momentum Does Not Support Injunctive Relief ........ 38

III.   The Public Interest and Balance of Equities Favor Defendants .................. 40

CONCLUSION ............................................................................ 41

# TABLE OF AUTHORITIES

## Cases

*Alaska Env't.Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ........................................................................ 5

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...................................................................... 9

*Amoco Production Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987)...................................................................................... 39

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983)........................................................................................ 10

*Blanco v. Burton*,
  No. Civ. A. 06-3813, 2006 WL 2366046 (E.D. La. Aug. 14, 2006) ............. 39

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ........................................................................ 5

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ........................................................................ 29

*Cheyenne Tribe v. Hodel*,
  851 F.2d 1152 (9th Cir. 1988) ...................................................................... 39

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ...................................................................... 9

*Conservation Cong. v. U.S. Forest Serv.*,
  720 F.3d 1048 (9th Cir. 2013) ...................................................................... 8

*Ctr. for Biological Diversity v. Bernhardt* (*Liberty*),
  982 F.3d 723 (9th Cir. 2020) .............................................................. 16, 26, 27

*Ctr. for Food Safety v. Vilsack*,
  636 F.3d 1166 (9th Cir. 2011) ...................................................................... 29

*Def's of Wildlife v. Salazar*,
  812 F. Supp. 2d 1205 (D. Mont. 2009).......................................................... 30

*Dep't of Fish & Game v. Fed. Subsistence Bd.*,
  No. 3:20-cv-00195-SLG, 2020 WL 6786899 (D. Alaska Nov. 18, 2020) ..... 9

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ...................................................................... 40

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ........................................................................ 40

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ................................................................................ 40

*Friends of the Earth v. Laidlaw Env't. Servs. (TOC)*,
  528 U.S. 167 (2000) ................................................................................ 29

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
  914 F.2d 1174 (9th Cir. 1990) ................................................................ 24

*Humane Soc'y of U.S. v. Bryson*,
  No. 3:12-cv-00642-SI, 2012 WL 1952329 (D. Or. May 30, 2012) .............. 31

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*,
  156 F.Supp.3d 1252 (W.D. Wash. 2015) ............................................ 30, 37

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) .................................................................................. 5

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) .................................................................... 9

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
  689 F.3d 1060 (9th Cir. 2012) ................................................................ 24

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) .................................................................. 29

*Massachusetts v. Watt*,
  716 F.2d 946 (1st Cir. 1983) .............................................................. 38, 39

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................................. 9

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .................................................................................. 9

*Morongo Band of Mission Indians v. FAA*,
  161 F.3d 569 (9th Cir. 1998) .............................................................. 23, 24

*Motor Vehicle Mfrs. Ass'n., v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................. 10, 27

*Nat. Res. Def. Council, Inc. v. EPA*,
  822 F.2d 104 (D.C. Cir. 1987) .................................................................. 4

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  886 F.3d 803 (9th Cir. 2018) .................................................................. 37

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) .................................................................. 10

*Native Ecosystems Council v. Krueger*,
  40 F. Supp. 3d 1344 (D. Mont. 2014)..........................................................37

*Nw. Env't. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
  817 F. Supp. 2d 1290 (D. Or. 2011) ....................................................30, 35

*Nw. Env't.Def. Ctr. v. Bonneville Power Admin.*,
  117 F.3d 1520 (9th Cir. 1997) ..................................................................24

*Pac. Coast Fed'n of Fisherman's Ass'ns v. Gutierrez*,
  606 F. Supp. 2d 1195 (E.D. Cal. 2008) ...................................................30

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989).......................................................................4, 5, 23

*S. Yuba River Citizens League v. NMFS*,
  No. 2:13-cv-00059-MCE, 2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) ..............30, 31

*Sierra Club v. Fed. Energy Regulatory Comm'n*,
  867 F.3d 1357 (D.C. Cir. 2017)..................................................................28

*Sierra Club v. Marsh*,
  872 F.2d 497 (1st Cir. 1989)......................................................................39

*Sierra Forest Legacy v. Sherman*,
  646 F.3d 1161 (9th Cir. 2011) ....................................................................9

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981)....................................................................................33

*Western Watersheds Project v. Bernhardt*,
  468 F.Supp.3d 29 (D.D.C. 2020)................................................................37

*Westlands Water Dist. v. U.S. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004) .........................................................23, 24, 27

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)....................................................................8, 9, 29, 30, 32

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)....................................................................37

**Statutes**

16 U.S.C. § 1371(a)(5)(A)...............................................................................3

16 U.S.C. § 1371(a)(5)(A)(I)...........................................................................3

16 U.S.C. § 1531(b)...................................................................................2, 30

16 U.S.C. § 1536(a)(2) ....................................................................................2

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                    v

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 7 of 51

16 U.S.C. § 1536(b)(4) ................................................................................ 2

16 U.S.C. § 1536(o)(2) ................................................................................ 3

42 U.S.C. § 4332(2)(C) ............................................................................... 4

42 U.S.C. § 6505a ....................................................................................... 40

42 U.S.C. § 6505a(a) ........................................................................... 21, 41

42 U.S.C. § 6506a(n)(1) ............................................................................ 21

5 U.S.C. § 706(2) ......................................................................................... 9

5 U.S.C. §§ 701-706 .................................................................................... 9

50 C.F.R. § 402.14(i)(1)(i-v) ....................................................................... 3

Pub. L. No. 94-258, 90 Stat. 303 ................................................................ 5

Pub. L. No. 96-514, 94 Stat. 2957 .............................................................. 5

**Regulations**

40 C.F.R. § 1501.3 ...................................................................................... 4

40 C.F.R. § 1502.14(a) (2019) .................................................................. 23

40 C.F.R. Part 1500 (2018) ......................................................................... 4

50 C.F.R. § 18.27 ......................................................................................... 4

50 C.F.R. § 18.27(b) .................................................................................... 3

50 C.F.R. § 18.27(f) ..................................................................................... 3

50 C.F.R. § 228 ............................................................................................ 4

50 C.F.R. § 402.02 ..................................................................................... 13

50 C.F.R. § 402.14 ....................................................................................... 4

50 C.F.R. § 402.14(g) .................................................................................. 2

50 C.F.R. § 402.14(g)(8) ................................................................ 2, 10, 16

50 C.F.R. pt. 402 ......................................................................................... 2

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978) ......................................................... 4

51 Fed. Reg. 15,618 (Apr. 25, 1986) .......................................................... 4

54 Fed. Reg. 40,338 (Sept. 29, 1989) ......................................................... 4

83 Fed. Reg. 38,725-26 (Aug. 7, 2018) ................................................................ 6

84 Fed. Reg. 44,976 (Aug. 27, 2019) .................................................................. 2

84 Fed. Reg. 44,976 (Aug. 8, 2019) ................................................................... 16

84 Fed. Reg. 45,801 (Aug. 30, 2019) .................................................................. 7

85 Fed. Reg. 49, 677 (Aug. 14, 2020) .................................................................. 7

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                vii

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 9 of 51

## INTRODUCTION

The Willow Master Development Plan Project ("Willow Project") will allow for the construction and operation of necessary infrastructure to provide and transport to market federal oil and gas resources under leaseholds in the northeast area of the National Petroleum Reserve in Alaska ("NPR-A"). After years of thorough analysis, consultation with cooperating agencies including the Fish and Wildlife Service ("the Service"), and significant public input, and the completion of a robust environmental impact statement ("EIS") and biological opinion ("BiOp"), the Bureau of Land Management ("BLM") issued a Record of Decision ("ROD") selecting the environmentally preferred alternative for completing the Willow Project.

The Willow Project's proponent, ConocoPhillips Alaska, Inc. ("Conoco"), has always made clear its intention to begin work on the Willow Project in the beginning of this year. The activities scheduled for this winter are limited and include only the construction of ice roads, opening of a gravel mine, and laying a fraction of the gravel roads approved by BLM for the full Willow Project. Plaintiffs seek to enjoin this winter's limited construction activities, but fail to meet their heavy burden. Their merits arguments largely ignore the record and the careful analysis by BLM and the Service. Plaintiffs' allegations of irreparable harm are speculative and not tied to any activities slated to occur this winter. And the public interest in moving forward with Congressionally-mandated oil and gas development in the NPR-A outweighs any of Plaintiffs' unfounded NEPA arguments or speculative harms as to those claims.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                1

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 10 of 51

# BACKGROUND

## I. Legal Background

### A. Endangered Species Act

Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. pt. 402.[1]

Formal consultation, which was the process followed here, culminates in a biological opinion ("BiOp"), which includes a "detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h)(1)(iii). The BiOp assesses the likelihood of the proposed action resulting in jeopardy to a listed species or destruction or adverse modification to designated critical habitat. 50 C.F.R. § 402.14(g). If an action is not likely to result in jeopardy or destruction or adverse modification of critical habitat, but is reasonably likely to result in "take" incidental to the proposed action, then the Service includes an incidental take statement in the BiOp. 16 U.S.C. §

---

[1] On October 28, 2019, new implementing regulations for the ESA went into effect regarding how the Service accounts for mitigation measures included in a proposed action. *See* 50 C.F.R. § 402.14(g)(8); 84 Fed. Reg. 44,976, 45,002-007 (Aug. 27, 2019). These revised regulations govern the Service's Section 7 analysis at issue in this case.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                    2

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 11 of 51

1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i-v).  If the action agency implements the project as proposed and complies with the terms and conditions of the incidental take statement, ESA Section 7(o)(2) exempts the specified level of take from the ESA Section 9 take prohibition.  16 U.S.C. § 1536(o)(2).

**B.  Marine Mammal Protection Act**

The Marine Mammal Protection Act ("MMPA") prohibits the take of marine mammals, but its scope is narrower and its procedures distinct from those of Sections 7 and 9 of the ESA.  "Take" in the MMPA is similar to, but not the same as "take" under Section 9 of the ESA.

The MMPA allows the Service to permit the incidental take of "small numbers" of marine mammals pursuant to a specified activity for a limited period.  The total incidental take must have a "negligible impact" on the species or stock and cannot have an "unmitigable adverse impact" on the availability of the species or stock for specified subsistence uses.  16 U.S.C. § 1371(a)(5)(A); *see also* 50 C.F.R. § 18.27(b).  If the incidental take meets these requirements, the Service will upon request prescribe regulations setting forth permissible methods of taking the species in question and other means of effecting the least adverse impact possible on the species and its habitat.  *See* 50 C.F.R. § 18.27(b).  Proposed regulations are subject to public notice-and-comment.  16 U.S.C. § 1371(a)(5)(A)(I).  Once the regulations are finalized and promulgated, the Service issues individual letters of authorization to authorize the incidental take from activities conducted pursuant to established regulations.  50 C.F.R. § 18.27(f).

With respect to marine mammals, the Service cannot issue an incidental take

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    3

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 12 of 51

statement authorizing the take of an endangered or threatened species under the ESA until the take has been authorized under the MMPA. *See id.* § 1536(b)(4)(C); *see also* Incidental Take of Endangered, Threatened, and Other Depleted Marine Mammals, 54 Fed. Reg. 40,338, 40,346 (Sept. 29, 1989), codified at 50 C.F.R. §§ 18.27, 228, 402.14.

## C. National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to members of the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.[2] NEPA imposes purely procedural requirements, and "does not require that certain outcomes be reached as a result of the evaluation." *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather that unwise – agency action."

---

2 The Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). More recently, the Council published a new rule, effective September 14, 2020, substantially revising the 1978 regulations. The claims in this case arise under the 1978 regulations, as amended in 1986. All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction 4

Case 3:20-cv-00290-SLG Document 26 Filed 01/15/21 Page 13 of 51

*Robertson*, 490 U.S. at 351.  Rather, "[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

## II.    Factual Background

The nearly 23 million acres that comprise the NPR-A were originally designated a naval petroleum reserve by executive order in 1923.  *N. Alaska Env't.Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006).  The U.S. Navy managed the Petroleum Reserve until 1976, when Congress enacted the Naval Petroleum Reserves Production Act ("NPRPA"), Pub. L. No. 94-258, 90 Stat. 303, re-designating the reserve as the "National Petroleum Reserve in Alaska," withdrawing it from operation of the mining and mineral leasing laws, and placing it under the jurisdiction of the Secretary of the Interior.  90 Stat. 303. Congress amended the NPRPA in the Department of the Interior Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, at 2964–65, by directing the Secretary of the Interior to undertake "an expeditious program of competitive leasing of oil and gas in the [NPR-A]."

In November 2012, BLM issued an Integrated Activity Plan/Environmental Impact Statement ("IAP/EIS") covering the entire NPR-A as a single planning area, to address the "nation's need for production of more oil and gas through additional leasing in the NPR-A, and to protect surface values consistent with the exploration and development of oil and gas."  AR268917.  The February 2013 ROD for the 2012 IAP/EIS opened 11.8 million acres of the NPR-A for oil and gas leasing, subject to numerous

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    5

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 14 of 51

lease stipulations and best management practices imposing requirements on lessees when constructing facilities and conducting oil and gas operations. AR271559, AR271562-63, AR271596-650. In June 2020, BLM issued a new Final IAP/EIS for the NPR-A. AR286553. On December 31, 2020, Secretary Bernhardt signed the ROD adopting Alternative E, the preferred alternative in the 2020 IAP/EIS, opening an additional 6.8 million acres in the NPR-A to oil and gas leasing subject to numerous lease stipulations and required operating procedures (formerly called best management practices). AR287107-09, AR287125-67.

Conoco has valid leases within the NPR-A that "provide the right to develop the oil and gas resources therein." AR182372. Conoco requested BLM prepare an EIS for the Willow Master Development Plan, which proposes to build infrastructure components for the purpose of oil and gas development. AR182389. The Willow Project may include up to five drill sites, a central processing facility, an operations center pad, up to 37.0 miles of gravel roads, ice roads, one to two airstrips, up to 385.5 miles of pipelines, and a gravel mine, as well as the transportation modules for hauling project materials to the Project area. *Id*. The Willow Project is anticipated to produce approximately 586 million barrels of oil over its lifetime. *Id.* In response to Conoco's request, on August 7, 2018, BLM issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Willow Master Development Plan Oil and Gas Prospect, Alaska*. 83 Fed. Reg. 38,725-26. BLM held an extended scoping period ending September 20, 2018, with an additional extension for the Community of Nuiqsut to comment. AR182391.

On August 30, 2019, BLM issued a notice of availability of the Willow Draft EIS

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction 6

Case 3:20-cv-00290-SLG Document 26 Filed 01/15/21 Page 15 of 51

("DEIS"). 84 Fed. Reg. 45,801. The comment period was open until October 29, 2019 and multiple public meetings were held in that comment period. AR182392. BLM received 935 submissions during the DEIS public comment period. *Id.* In response to subsistence-related concerns raised during the public period for the DEIS, Conoco amended its application to incorporate a new module delivery option (via an ice bridge across the Colville River), as well as other modifications to its project design. *Id.* BLM issued a Supplement to the DEIS ("SDEIS") on March 20, 2020 reflecting these changes. *Id.* BLM held an additional 45-day comment period for the SDEIS, during which, BLM held eight virtual meetings via Zoom (due to the COVID-19 epidemic) and received a total of 31,015 submissions. AR182393. On August 14, 2020, BLM issued a Notice of Availability of the Final EIS ("FEIS"). 85 Fed. Reg. 49,677. On October 26, 2020, Secretary Bernhardt signed the ROD adopting Alternative B of the FEIS (Conoco's proposed project) and Module Delivery Option 3 (the Colville River Crossing). AR186073.

In March 2020, BLM also requested ESA Section 7 consultation with the Service on the potential effects of the Willow Project on ESA-listed species, like the polar bear at issue in this lawsuit, and any designated critical habitat. FWS AR000097. In October 2020, the Service issued its BiOp and concluded consultation. With respect to the polar bear, the Service determined that the Willow Project was not likely to jeopardize the continued existence of the polar bear or adversely modify its designated critical habitat.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    7

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 16 of 51

FWS AR000763-66.[3]

BLM is currently processing Conoco's right-of-way application and applications for permits to drill for the Willow Project. SILA[4] ECF 17-44. 28, 5. Once those applications are approved, Conoco proposes to begin construction in February 2021. SILA Mem. in Supp. of Mot. for TRO & Prelim. Inj. 2 n.2, ECF 17-1 ("SILA Br."). For the winter 2021 season, Conoco's construction plans are to build ice roads connecting an existing road in the Greater Mooses Tooth ("GMT") 2 development to the Willow mine site and 2.8 miles of a gravel access road that, once complete, will connect the existing road and the Project area. SILA ECF 17-44, 1.

## LEGAL STANDARDS

### I. Preliminary Injunction

A plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, the Ninth Circuit has found "'serious questions going to the merits' [rather than a likelihood

---

3 Also, under the existing MMPA Southern Beaufort Sea Incidental Take Regulation, the Service issued a Letter of Authorization to Conoco for the Willow project on December 21, 2020.
4 Pursuant to the Court's January 14, 2021 Order, this consolidated opposition brief responds to motions filed by two sets of Plaintiffs – Sovereign Inupiat for a Living Arctic et al. ("SILA") (Case No. 20-cv-290-SLG), and Center for Biological Diversity et al. ("CBD") (Case No. 20-cv-308-SLG).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    8

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 17 of 51

of success on the merits] and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). Under either test, the plaintiff must "establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction[,]"*id.* at 1131, and a deficiency in any one of the required elements precludes extraordinary relief. *Winter*, 555 U.S. at 24; *see also Dep't of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-cv-00195-SLG, 2020 WL 6786899, at *4 (D. Alaska Nov. 18, 2020). Because a "preliminary injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation omitted), the party seeking such an injunction must make "a clear showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22.[5] A deficiency in any one of the required elements precludes extraordinary relief. *Id.* at 24. "Even in NEPA cases, an injunction should issue only if the traditional four-factor test is satisfied; no thumb on the scales is warranted." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011) (internal quotation marks and alteration omitted) (quoting *Monsanto Co.*, 561 U.S. at 157).

## II. Administrative Procedure Act

Review on the merits is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004). Under the APA, final agency action is reviewed under 5 U.S.C. § 706(2), and

---

5 Defendants concur in the observation that the temporary restraining order standard is "substantially identical" to the preliminary injunction standard. *See* SILA Br. 8 n.37.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    9

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 18 of 51

such review is highly deferential. *Lands Council v. McNair*, 537 F.3d 981, 992-94 (9th Cir. 2008), *overruled in part on other grounds*, *Winter*, 555 U.S. at 22. Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and choice made. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

Plaintiffs fail to meet their heavy burden in seeking preliminary injunctive relief. Plaintiffs have not shown a likelihood of success, or even raised serious questions, on the merits of their arguments against the ROD and BiOp. Nor have Plaintiffs shown how the project components planned for this winter season will cause them any irreparable harm. Additionally, for Plaintiffs' NEPA claims, the balance of harms and public interest favor withholding injunctive relief.

**I.     Plaintiffs Are Not Likely to Succeed on the Merits.**

**A. The Service's ESA Analysis Was Consistent with the ESA and Reasonable.**

Plaintiffs' argument that the Service inappropriately relied on uncertain MMPA mitigation measures for its ESA Section 7 determinations concerning polar bears, *see* SILA Br. 9-13, is wrong. The Service fully complied with the ESA and the relevant implementing regulations. 50 C.F.R. § 402.14(g)(8). And the Service's expert opinion

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    10

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 19 of 51

that the authorization of Conoco's Willow Project would not jeopardize the polar bear's continued existence nor would it adversely modify any designated critical habitat is reasonable. FWS AR000763-66. Contrary to Plaintiffs' assertions, the Service's ESA Section 7 determinations are consistent with the ESA, reasonable, supported by the administrative record, and should be upheld.

### 1. BLM's proposed action.

Before authorizing the Willow Project, BLM requested Section 7 consultation with the Service because, among other ESA-listed species, BLM identified potential effects to the polar bear and its designated critical habitat. FWS AR000097. To mitigate any potential adverse effects, BLM, as part of its proposed action, required numerous protective and mitigation measures, including:

- Project design features to avoid and minimize adverse effects on polar bear and designated critical habitat. FWS AR000143; *see also* FWS AR000219-34.

- Required lease stipulations and required operating procedures that directly or indirectly avoided and/or reduced adverse effects to ESA-listed species and designated critical habitat. FWS AR000144-48; *see also* FWS AR000660-77.

- Required "Project Design Criteria" adopted from the governing land management plan (Integrated Activity Plan) for the NPR-A like Project Design Criteria 4 which states, "The lease area and/or potential project areas may now or hereafter contain marine mammals. The BLM may require modifications to exploration or development proposals to ensure compliance with Federal laws, including the Marine Mammal Protection Act (MMPA). The BLM would not approve any exploration or

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                         11

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 20 of 51

development activity absent documentation of compliance under the MMPA." FWS AR000677; *see also* FWS AR000148.

## 2. The Service's Section 7 jeopardy analysis on polar bears.

As part of its Section 7 jeopardy analysis, the Service first looked at potential adverse effects of the Willow Project on polar bears in the action area. FWS AR000747-58. The Service determined that the primary potential adverse effect from the Willow Project would be disturbance to both non-denning (transient) and denning polar bears. With respect to non-denning bears, the Service explained that any potential disturbance would be infrequent due to the following: (1) the location of the Willow Project as the vast majority of the action area is located far from the coast and in areas of low polar bear abundance; (2) the timing of activities as many activities would occur only during summer when very few transient bears would be present; and (3) required mitigation measures built into the Willow Project like minimum flight altitudes, plans to avoid attracting bears, among others. FWS AR000749. The Service further explained that if non-denning polar bears are subjected to disturbance, they would likely move away from the source of that disturbance, resulting only in minor, temporary changes in behavior. *Id*.

The Service next analyzed potential disturbance effects on denning bears. The Service identified potential types of adverse effects to denning bears from the Willow Project but found that such effects would be minimal and/or unlikely because the vast majority of the Project would occur in areas of very low denning density and because "BLM [Required Operating Procedure] C-1 and 3 require den detection surveys prior to

initiating winter operations and the establishment of a 1-mile operational exclusion zone around any detected dens." FWS AR000748. Additionally, while acknowledging the fact that *no* survey is perfect and captures every den, the Service used a sophisticated model to account for the probability that a den is not detected through surveys and then exposed to disturbance. FWS AR000747-49. The Service's model estimated an >84% probability of zero denning bears suffering injury or mortality occurring over the 30-year life of the Willow Project, and on that basis concluded that disturbance resulting in injury or mortality to any denning bears is not reasonably certain to occur. FWS AR000748-49.

After analyzing this data regarding non-denning and denning bears, the Service acknowledged that the Willow Project would "intermittently incidentally expose small numbers of polar bears of the [Southern Beaufort Sea] stock to disturbance." FWS AR000764. But the Service also determined that "most of those exposures would not be biologically significant," that "[t]he spatial and temporal distance between disturbance events would limit the potential for impacts to be biologically significant to individual bears," and further reduced "the potential for biologically significant impacts to individual bears to compound to effects at the [Southern Beaufort Sea] stock level, let alone the species level." *Id*. The Service concluded that, even when accounting for potential climate change-related stressors in the future, "we anticipate that the activities authorized under the Proposed Action would continue to impact small numbers of individual polar bears within the [Southern Beaufort Sea] stock and would not appreciably affect the survival and recovery of the polar bear species as a whole." *Id*. For these reasons, the Service determined that the Willow Project would not jeopardize

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                          13

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 22 of 51

the polar bear. *Id*; *see also* 50 C.F.R. 402.02. Additionally, after concluding "no jeopardy," the Service acknowledged the Willow Project's additional protective measures like future compliance with the standards of the MMPA which only bolstered the Service's confidence in the "no jeopardy" determination it had already reached. FWS AR000764. The determination was consistent with the ESA, reasonable, supported by the record, and should be upheld.

### 3. The Service's Section 7 adverse modification analysis on polar bear critical habitat.

After determining that the Willow Project would have minimal or no adverse effects on individual polar bears, the Service next analyzed potential impacts to designated critical habitat. FWS AR000758-60, FWS AR000765-66. The Service determined that only a very small portion of the Willow Project would occur within or near designated critical habitat, that the Willow Project has a very limited capacity to affect such habitat through a few specific activities, and that adverse effects, if any, would be "minor." FWS AR000758-60, FWS AR000765-66. The Service explained its conclusions for each critical habitat unit:

- **Unit 1 – Sea Ice**: The Service determined that the only manner in which the Willow Project could affect sea ice was through project-related vessels spilling oil or other petroleum product into marine waters. FWS AR000765. The Service determined that the potential for a marine oil spill would be minimized by compliance with specific required operating procedures built into the proposed action and Conoco's spill prevention plans. FWS AR000765.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction                                            14

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 23 of 51

- **Unit 2 – Terrestrial Denning Habitat**: The Service concluded that the Willow Project would not appreciably diminish the conservation value of terrestrial denning habitat based on the "very small" overlap between the Willow Project and terrestrial denning habitat, and because the proposed activities are of "similar scope to ongoing routine use and upgrades" in the only area where overlap does occur. FWS AR000765, FWS AR000760 (stating that "no impacts to designated critical habitat for terrestrial denning will result from the proposed project.").

- **Unit 3 – Barrier Islands**: The Service explained that barrier islands could be affected through disturbance and/or marine oil spills, but determined any potential effects to be "minor and temporary." FWS AR000765.

For these reasons, the Service determined that the Willow Project would not result in adverse modification because the limited and minor effects would not appreciably diminish the conservation value of the bear's critical habitat. FWS AR000765-66. Additionally, like its jeopardy analysis, the Service opined that compliance with future MMPA standards would provide "additional" and "further assurance" that actual adverse effects would not exceed already-established "minor" levels. *See e.g.*, FWS AR000760, FWS AR000765-66. The Service's "no adverse modification" analysis is consistent with the ESA, reasonable, supported by the administrative record, and should be upheld.

### B. The Service's ESA Analysis Is Reasonable and Plaintiffs Offer Nothing to Rebut It.

Dissatisfied with the Service's well-reasoned Section 7 determinations, Plaintiffs argue that the Service improperly relied on future unspecified MMPA mitigation

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction                    15

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 24 of 51

measures that are not reasonably certain to occur to reach its Section 7 conclusions. SILA Br. 9-13. In support of this argument, Plaintiffs rely heavily on a recent Ninth Circuit decision, *Center for Biological Diversity v. Bernhardt* (*Liberty*), 982 F.3d 723 (9th Cir. 2020). Plaintiffs' arguments fail for a number of reasons. Contrary to Plaintiffs' suggestion, the *Liberty* decision does not apply here because revised ESA regulations do not require a specific and binding plan with respect to future MMPA mitigation measures. In any event, Plaintiffs are mistaken that the Service's Section 7 determination relies on future MMPA compliance.

### 1. The Service complied with the governing 2019 ESA regulations.

Even if the Service relied on future MMPA mitigation measures to reach its determination (it did not), it is entirely appropriate to do so under the newly revised ESA consultation regulations (which Plaintiffs do not challenge in this case). As a result, the Ninth Circuit's recent *CBD* decision is inapposite as it interprets the requirements of pre-2019 and now superseded ESA consultation regulations. Revised regulation 50 C.F.R. § 402.14(g)(8) (effective October 28, 2019) governed the Willow Project Section 7 consultation and explicitly required the Service to consider future mitigation measures incorporated into an action agency's proposed action – here, BLM's authorization of the Willow Project – "that are intended to avoid, minimize, or offset the effects of an action" just like any other portions of the proposed action, including actions with adverse effects, "and do not require any additional demonstration of binding plans." Contrary to Plaintiffs' argument, the ESA does not require the Service to ignore beneficial effects of measures included in the proposed action to avoid, minimize, or offset adverse effects

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    16

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 25 of 51

unless BLM meets some heightened bar of documentation regarding their commitment – like specific binding plans with a clear commitment of resources. 84 Fed. Reg. 44,976, 45,002-007 (Aug. 8, 2019).

To the contrary, the ESA requires the Service to consider the effects of the Willow Project in its entirety, including aspects of the proposed action with adverse or beneficial effects. 84 Fed. Reg. at 45,002-03. The Service is then required to issue an expert opinion, using the best available science and data, on the potential effects of the Willow Project on the polar bear and its designated critical habitat. *Id*. The revised regulation makes clear that it is BLM's responsibility, as the action agency, to ultimately implement the proposed action's future mitigation measures to comply with both the ESA and the Service's expert opinion to avoid jeopardy and adverse modification. *Id*. Even if the Service had relied on BLM's and Conoco's future MMPA compliance for its Section 7 determinations here (and it did not), the Service still would have complied with the ESA and the relevant implementing regulations. Plaintiffs' argument that the Service's Section 7 determinations inappropriately relied on future MMPA mitigation measures fails.

## 2. The Service did not rely on future MMPA compliance for its Section 7 determinations.

Contrary to Plaintiffs' argument, the Service did not rely on future MMPA compliance for its Section 7 determinations. The Service discussed extensively the MMPA and its requirement for BLM and Conoco to comply with the statute's substantive standards to ensure (1) small number of take, (2) negligible impacts to the

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION 17

Case 3:20-cv-00290-SLG Document 26 Filed 01/15/21 Page 26 of 51

Southern Beaufort Sea polar bear stock, and (3) no unmitigable adverse impacts on the availability of the stock for subsistence uses. That is to be expected given the close interplay between the ESA and MMPA with respect to the polar bear, an ESA-listed marine mammal. But, as demonstrated in the conclusion sections of the BiOp, the Service based its Section 7 determinations only on the fact that due to the location of the Willow Project and the minimal presence of polar bear individuals or designated critical habitat, adverse effects, if any, would be "minor." FWS AR000764-66. For these reasons alone, the Willow Project would not jeopardize the polar bear or adversely modify its designated critical habitat. *Id*.

### a. The Service's jeopardy determination.

As discussed, the Service based its "no jeopardy" determination *only* on the following: (1) the location of the project as the vast majority of the action area is located far from the coast and in areas of low polar bear abundance; (2) the timing of activities as many activities would occur only during summer when very few bears would be present; (3) mitigation measures built into the proposed action itself like minimum flight altitudes, plans to avoid attracting bears, among others; (4) required den surveys; (5) required one-mile operational exclusion zone around any detected dens; and sophisticated modeling indicating >84% probability of zero disturbance or injury to denning bears occurring over the 30-year life of the Willow Project. FWS AR000764. After already concluding "no jeopardy," the Service acknowledged the Willow Project's additional protective measures like future compliance with the substance and standards of the MMPA which only bolstered the Service's already-determined "no jeopardy" conclusion. *Id*. Plaintiffs'

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    18

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 27 of 51

assertion that the Service relied on future MMPA mitigation measures is simply wrong.

### b. The Service's no adverse modification determination.

Like the Service's jeopardy determination, its adverse modification determination did not rely on future MMPA mitigation measures.

- **Unit 1 – Sea Ice**: The Service determined that the potential for a marine oil spill would be low and any potential adverse effects further minimized by compliance with specific required operating procedures and spill prevention plans. FWS AR000765. There is no mention of the MMPA in this portion of the BiOp with respect to oil spills much less a reliance upon any MMPA mitigation measures. With respect to impacts to seals, the Service does mention the MMPA's substantive standards – *i.e.*, small number of take, negligible impacts to the Southern Beaufort Sea polar bear stock, and no unmitigable adverse impacts on the availability of the stock for subsistence uses – as opposed to actual mitigation measures that "provide further assurance" that the conservation value of sea ice critical habitat would not be appreciably diminished. *Id*. The "provide further assurance" language makes clear that MMPA-related considerations increase the Service's confidence in the relative lack of adverse impacts to sea ice but were not needed to reach that conclusion in the first instance.

- **Unit 2 – Terrestrial Denning Habitat**: The Service concluded that the proposed action would not appreciably diminish the conservation value of terrestrial denning critical habitat based on the "very small" overlap between the Willow Project and terrestrial denning habitat, and because the proposed activities are of "similar scope to ongoing routine use and upgrades" in the only area where overlap does occur. FWS

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION          19

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 28 of 51

AR000765. The Service does not mention much less rely upon the MMPA or any mitigation measures in making this finding.

- **Unit 3 – Barrier Islands**: The Service determined that barrier island critical habitat could be affected by disturbance and/or marine oil spills, but also characterized any potential effects as "minor and temporary." *Id*. The Service does acknowledge that Project Design Feature 4 and associated MMPA substantive compliance would provide "significant additional protection for polar bears," and that substantive MMPA standards (*i.e*., small numbers, negligible impact, and no unmitigable adverse impact on subsistence uses) would provide "assurance" that the conservation value of barrier islands would not be appreciably diminished. FWS AR000766. But these statements simply expand upon the Service's prior determination that any impacts would only be "minor and temporary," and were not included in what the Service "relied on" in determining that the Willow Project has limited capacity to adversely affect barrier islands in the first instance.

In sum, the Service determined that only a very small subcomponent of the Willow Project's activity would occur within or near designated critical habitat, that the project has a limited opportunities to affect critical habitat, and, as a result, adverse effects (if any) would be "minor" and would not result in adverse modification. FWS AR000765-66. Additionally, like its jeopardy analysis, while the Service opined that compliance with future MMPA standards would provide "additional" and "further" assurance that actual adverse effects would not exceed already-established "minor" levels, it did not rely on future MMPA mitigation measures in the first instance. *See e.g.*,

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                    20

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 29 of 51

*Id.* Plaintiffs fail to demonstrate how the Service's Section 7 determinations are inconsistent with the ESA or unreasonable.

### C. Plaintiffs Have Not Shown Any Violation of NEPA

#### 1. Plaintiffs' Complaints violate the NPRPA's statute of limitations.

As an initial matter, Plaintiffs fail to satisfy an important jurisdictional requirement of the NPRPA in bringing their NEPA claims. 42 U.S.C. § 6506a(n)(1) provides that any action "seeking judicial review of the adequacy of any program or site specific environmental impact statement under [NEPA] concerning oil and gas leasing in the National Petroleum Reserve-Alaska shall be barred unless brought … within 60 days after notice of the availability of such statement is published in the Federal Register." This short statute of limitations makes sense in the context of the NPRPA, which provides that "[t]he Secretary shall conduct an expeditious program of competitive leasing of oil and gas in the Reserve." 42 U.S.C. § 6505a(a). The Willow EIS is a site-specific EIS, drafted solely for the purposes of analyzing an oil and gas development project proposed pursuant to Conoco's lease rights and to occur on oil and gas leases within the NPR-A. The EIS's evaluation of these lease-based activities constitutes implementation of the NPR-A leasing program and is within the ambit of § 6506a(n). And, Plaintiffs failed to satisfy the 60-day requirement of that statute. The Notice of Availability of the FEIS was published in the Federal Register on August 14, 2020. SILA Plaintiffs filed their Complaint on November 17, 2020 (20-cv-290-SLG, ECF No. 1) and CBD Plaintiffs filed their Complaint on December 21, 2020 (20-cv-308-SLG, ECF No. 1). Thus, both sets of Plaintiffs' NEPA claims are time-barred and must be

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION 21

Case 3:20-cv-00290-SLG Document 26 Filed 01/15/21 Page 30 of 51

dismissed.

### 2. BLM took the requisite hard look at the impacts of the Willow Project on the environment.

The SILA Plaintiffs contend that BLM failed to take a hard look at Willow's impacts "because BLM lacked critical information about the project proposal and design." SILA Br. 14-17. But BLM took a hard look at the Willow Project's impacts, including impacts from the alternative water crossings proposed and the impacts from building gravel roads and other infrastructure.

The FEIS includes descriptions of the proposed bridges for the Willow Project, including the number of bridges in Alternative B (AR182484-85), the length of the bridges, their clearance above 100-year design-flood elevation or highest documented flood elevation, and corresponding construction details. AR182400. Section 3.8.2.3.4 of the FEIS describes the potential effects of all in-water structures on surface waters, including on suspended sediment, turbidity, backwater, riverbed erosion, sediment deposit, and changed morphology. AR182484-85. The Water Resources Technical Appendix, provides a more detailed explanation of the potential impacts to streams from bridges. AR185533-35. The FEIS also suggests twelve mitigation measures associated with the design and siting of bridges specifically, AR1823483-84, all of which are adopted by the ROD in some form. AR186081-83. These mitigation measures provide minimum design specifications for placement and construction of bridges. *Id.* In response to comments from the EPA regarding the flow data for the Colville River Crossing, BLM included in Appendix E to the FEIS the Ocean Point Technical

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                    22

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 31 of 51

Memorandum, which describes estimated discharge at Ocean Point (where the Colville River Crossing is located). AR185538. BLM did not "lack[] critical information" regarding impacts to water resources from the proposed bridges (SILA Br. 14), but instead provided that information in the FEIS, satisfying NEPA's requirement to "carefully consider[] detailed information concerning significant environmental impacts" and provide the public with "relevant information." *Robertson*, 490 U.S. at 349.

Plaintiffs also downplay the significant amount of information in the FEIS regarding roads and infrastructure that BLM considered in its analysis. SILA Br. 19. The FEIS details in numerous places the total length of roads and amount of gravel for those roads. *See, e.g.*, AR182375-76, AR183232, AR183242, AR183277). Similarly the location of gravel roads is identified in Figures 2.4.1-3. AR182754, AR182755, AR182756. As to specifics on drill pads, the EIS analyzes a range of number of wells per pad and sizes of pads, and the associated impacts of each pad. AR182398, AR182410. This information was adequate for BLM to take a hard look at the impacts of the Willow Project.

### 3. BLM adequately considered a reasonable range of alternatives under NEPA.

NEPA's implementing regulations prescribe that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (2019). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (citation and quotation omitted). But this requirement is not rigid.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction 23

Case 3:20-cv-00290-SLG Document 26 Filed 01/15/21 Page 32 of 51

Otherwise, "an agency could generate countless alternatives." *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998) (citation omitted). Instead, an agency's choice of alternatives is governed by a "rule of reason," under which an EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Westlands Water Dist.*, 376 F.3d at 868 (citation omitted); *see also Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) (Agency need not "consider alternatives which are infeasible, ineffective, or inconsistent" with its objectives). An agency's consideration of alternatives is dictated by the "nature and scope of the proposed action." *Nw. Env't.Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997) (citation omitted). An agency need not analyze alternatives that do not meet the agency's purpose and need. *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1070-71 (9th Cir. 2012). The "touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Morongo Band*, 161 F.3d at 575 (citation and quotations omitted).

The purpose of the Proposed Action is "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources under leaseholds in the northeast area of the NPR-A, consistent with the proponent's federal oil and gas lease and unit obligations." AR182390. The need for BLM's action is to issue authorizations under the NPRPA to conduct oil and gas development in the NPR-A. *Id.*

The FEIS analyzes in detail four alternatives. Alternative A, the No Action Alternative, was provided for baseline comparison but BLM found it did not "have the

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    24

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 33 of 51

authority to select this alternative because [Conoco's] leases are valid and provide the right to develop the oil and gas resources therein." AR182372. Alternative B is the Proponent's proposed project, eventually adopted by the ROD. That alternative extends an "all season gravel road from the Greater Mooses Tooth 2 development toward the Project area" and connects all Project facilities, including the processing facility, with gravel roads. Alternatives C and D included fewer gravel roads in different locations, and were intended to minimize the Project's effects on caribou movement and subsistence users (Alternative C), and reduce impacts to hydrology and wetlands (both). AR182372-73. The FEIS also analyzes three different options for delivering prefabricated modules to the Project area, any of which could be combined with any of the alternatives. AR182373-74.

Plaintiffs allege BLM's alternatives analysis is flawed because it did not consider additional alternatives proposed by Plaintiffs. Specifically, CBD Plaintiffs propose an alternative that would prohibit permanent infrastructure in the Teshekpuk Lake and Colville River Special Areas,[6] and an alternative that would permit drilling only during the winter season and eliminate construction of permanent roads. CBD Pls.' Mot. for Prelim. Inj. 10-12, ECF No. 9 (Case No. 3:20-cv-00308-JWS) ("CBD Br.").

BLM explained in response to comments that the purpose and need of the project could not be met without infrastructure in the Teshekpuk Lake Special Area because two of the drill sites (Bear Tooth 2 and 4) are within that Special Area in an area available to

<hr>

6 The 2020 IAP ROD eliminates the Colville River Special Area entirely. AR287108.

oil and gas leasing. AR183012. As to the proposal that Conoco be limited to winter-only drilling, BLM explained that drilling only during the winter season would reduce drilling to approximately two months per year. *Id.* This would significantly affect the economic feasibility of the Willow Project. *Id.* It would also affect the lease rights granted to Conoco as "leases are subject to a limited term of years." *Id.* Such a short drilling season would extend the life of the project (and its associated impacts) for decades, perhaps beyond the term of the lease. *Id.* BLM need not consider infeasible alternatives. Further, during the alternatives development, BLM concluded an ice road or tundra access only option would "create unacceptable hazards for safety and emergency response and limit the number of wells that could be drilled per season." AR183188. BLM therefore clearly explained how both proposed alternatives did not achieve the project's purpose and need, and therefore properly excluded them from detailed analysis in the FEIS.

### 4. BLM's greenhouse gas emissions analysis satisfies NEPA.

The CBD Plaintiffs argue that BLM's analysis of greenhouse gas emissions ("GHG") violated NEPA because BLM "used the same analysis here rejected" by the Ninth Circuit. CBD Br. 7 (citing *Ctr. for Biological Diversity v. Bernhardt* (*Liberty*), 2020 WL 7135484, at *5 (9th Cir. Dec. 7, 2020)). However, Plaintiffs' application of that decision to the Willow Project's GHG emissions analysis is mistaken. BLM's decision to approve the Willow Project is a different decision, based on a different record, and BLM's analysis of the Willow Project can be distinguished from BOEM's analysis of the Liberty Project in the *Liberty* case.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction                              26

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 35 of 51

BLM's analysis of lifecycle GHG emissions associated with the Willow Project does not include the proposition clearly most offensive to the court in *Liberty*. The court in *Liberty* was clear that "BOEM's conclusion that *not* drilling will result in more carbon emissions than drilling is counterintuitive." *Id.* at *9. The panel rejected this proposition at a visceral level, finding "[a]n agency acts arbitrarily and capriciously when it reaches a decision that is 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). BLM made no comparable conclusion in its FEIS here. Unlike in *Liberty*, where the agency concluded that the absence of the proposed project would cause *increased* GHG emissions, here BLM clearly explained that

> The absence of the Project itself would not lead directly to emissions. Therefore, for ease of comparison to the action alternatives, GHG emissions in the No Action Alternative are assigned a baseline value of zero in the EIS, reflecting the status quo and current GHG emissions trends in the absence of the Project.

AR182422-23. BLM's straightforward approach produced an entirely plausible result and provided the decision maker a clear understanding of the GHG emissions expected to be associated with the Willow Project from the No Action Alternative. Thus, the Willow EIS provided what is required under NEPA, a clear and reasonable analysis of environmental impacts across alternatives. *See Westlands Water*, 376 F.3d at 872.

Faced with what it considered a "counterintuitive" and "implausible" underlying assumption by BOEM, the panel found it could not defer to the agency's expertise, and moved on to question BOEM's explanation for not attempting to calculate the impacts of Liberty on foreign emissions. *Liberty*, at *9. The panel criticized BOEM for providing

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction 27

Case 3:20-cv-00290-SLG Document 26 Filed 01/15/21 Page 36 of 51

an explanation that "did not summarize existing research addressing foreign oil emissions nor attempt to estimate the magnitude of such emissions" and "ignore[d] basic economics principles and state[d]—without citations or discussion—that the impact of the Liberty project on foreign oil consumption will be negligible." *Id.* The panel rejected this approach, holding "the EIS 'should have either given a quantitative estimate of the downstream greenhouse gas emissions' that will result from consuming oil abroad, or 'explained more specifically why it could not have done so[.]'" *Id.* (quoting *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1374 (D.C. Cir. 2017)).

BLM's analysis for the Willow Project avoids these shortcomings as BLM adequately explained why it could not perform a reliable quantitative estimate of downstream GHG emissions in foreign countries. BLM specifically explained that it could not extend the modeling of foreign oil markets and price to global GHG emissions estimates because of "uncertainty and lack of reliable data" for a number of crucial factors for that analysis. AR182957, AR 182963. That analysis would require "detailed data on proportional consumption changes and the most likely energy substitutions." AR183508. Calculating global GHG emissions estimates would also require detailed data on "emissions from refineries, natural gas systems, [and] coal processing." *Id.* An estimate of downstream GHG emissions based on foreign consumption would also require detailed data and information on "emissions factors specific to the energy substitutes for all countries worldwide" as "the GHG emissions rates for even the same class of fuels can vary significantly from country to country." *Id.* Notably, the court's analysis in *Liberty* did not have before it the detailed explanation of data that BLM has

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction                                      28

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 37 of 51

explained was necessary but unavailable for analysis of the Willow Project. Plaintiffs incorrectly assume that because BLM analyzed changes in the demand for energy from the Willow Project, BLM could also assess global emissions stemming from those changes in demand. CBD Br. 7-9. BLM's determination that it lacked reliable data on necessary factors to conduct that analysis is entitled to deference.

## II.    Plaintiffs Cannot Demonstrate Imminent, Irreparable Harm.

To obtain a preliminary injunction, Plaintiffs must show a "likelihood of irreparable injury." *Winter*, 555 U.S. at 21. The mere "possibility" of harm is insufficient. *Winter*, 555 U.S. at 22. Rather, Plaintiffs bear the burden of "*demonstrat[ing]* immediate threatened injury[,]" and mere "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (italics in original) (citations omitted). None of Plaintiffs' alleged harms meet this burden.

### A. Plaintiffs Fail to Show Likely Irreparable Harm to Polar Bears.

To prevail, Plaintiffs must demonstrate that they—not the environment—are *likely* to suffer irreparable harm. *Winter*, 555 U.S. at 20; *Friends of the Earth v. Laidlaw Env't. Servs. (TOC)*, 528 U.S. 167, 180-81 (2000) (relevant showing "is not injury to the environment, but injury to the plaintiff"). The harm must be immediate, individualized, and substantiated with evidence. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Leiva-Perez v. Holder*, 640 F.3d at 968-69. And Plaintiffs must do more than establish standing. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction                                          29

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 38 of 51

Plaintiffs submit standing declarations alleging that their members visit the area to look for polar bears. SILA Br. 20-21; SILA ECFs 17-5, 17-6, 17-8, 17-9, 17-12, and 17-14. Any harm to Plaintiffs is therefore based derivatively on the harm they allege to the polar bears in the action area. *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F.Supp.3d 1252, 1261 (W.D. Wash. 2015). To "irreparably" injure these viewing interests, it is axiomatic that there must be significant population-level effects to the species in question. *Id*. at *7-8; *Winter*, 555 U.S. at 22-23. These standards accord with the ESA, which does not confer private rights in individual animals, but provides public rights in the protection of "species." 16 U.S.C. § 1531(b); *Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009).

Thus, as many courts have held, "[i]rreparable harm to ESA listed species must be measured at the species level," and a "plaintiff must present a 'concrete showing of probable deaths during the interim period and of how these deaths may impact the species.'" *Nw. Env't. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) (citation omitted); *see also Idaho Rivers*, 2015 WL 9700887, at *7-8; *S. Yuba River Citizens League v. NMFS*, No. 2:13-cv-00059-MCE, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013); *Defenders of Wildlife*, 812 F. Supp. 2d at 1209; *Pac. Coast Fed'n of Fisherman's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210, n.12 (E.D. Cal. 2008). Plaintiffs cannot make this showing. Irreparable harm is not likely to occur during the pendency of this case, either to the polar bear in the Reserve or Plaintiffs' derivative interests in searching for them.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                     30

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 39 of 51

### 1. The polar bear's status will not degrade during the pendency of this case.

The fallacy of Plaintiffs' motion with respect to the polar bear is that the population is at imminent risk, such that the bear's status is likely to immediately and irreparably degrade and prevent the Court from granting meaningful relief (if necessary) after resolving the merits. *Humane Soc'y of U.S. v. Bryson*, No. 3:12-cv-00642-SI, 2012 WL 1952329, at \*5 (D. Or. May 30, 2012).

Plaintiffs have only recited general adverse effects to polar bear. SILA Br. 20-21. They have "made no real effort to quantify the effects of [the proposed action] on these species, and more importantly have made no attempt whatsoever to quantify any impact occurring during the interim [] period that will elapse" before the merits can be decided. *S. Yuba River Citizens League*, 2013 WL 4094777, at \*7. For good reason—the evidence does not show the Willow Project's effects are of such a great magnitude that the Southern Beaufort Sea population or the entire polar bear population are in immediate danger of extinction. *See, supra*, Argument Section I.A.

Even Plaintiffs apparently agree. They concede that any imminent, population-level harms are purely speculative and conjectural. *See, e.g.*, SILA Br. at 20 (surmising that "additional take *could* cause irreparable harm to polar bears.") (emphasis added); SILA ECF 17-5 ¶23; SILA ECF 17-6 ¶18; SILA ECF 17-8 ¶16; SILA ECF 17-9 ¶37; SILA ECF 17-12 ¶33; SILA ECF 17-14 ¶17. A mere possibility or unsupported prediction that irreparable harm "could" occur does not suffice, as that standard "is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    31

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 40 of 51

entitled to such relief." *Winter*, 555 U.S. at 22.

More critically, the evidence shows – and the Service's expert opinion concludes – that the Willow Project is likely to maintain the polar bear's current status not only until the Court can reach the merits of this case but for the entire 30-year life of the Willow Project. The Service expects the most likely adverse effect from the Willow Project, if any, to be in the form of disturbances that would result in only minor, temporary changes in the behavior of individual non-denning polar bears. FWS AR000747-49. While the project could conceivably disturb denning bears and thereby cause injury or mortality to cubs, the Service's recent modeling predicts a low probability of such events occurring – about a 14 percent chance over the entire 30 year period of the Willow Project. FWS AR000748-49. The probability of adverse disturbance effects decreases even further when analyzing for just the initial years of proposed activities in the Willow Project. FWS AR000749. Like the potential effects from disturbance, potential effects from all other aspects of the Willow Project, in any, are expected to be minor. *See, supra* Argument Section I.A. The only ESA take of polar bears that is reasonably likely to result from the Willow Project stems from the potential need to haze up to two bears with non-lethal contact rounds over the 30 year life of the project. FWS AR000767. Based on this information, among other things, the expert wildlife agency has determined that adverse effects to the polar bear or its critical habitat, if any, would be minor and not even come close to appreciably reducing the prospects of survival and recovery of the polar bear species as a whole.

With respect to the polar bear, the facts and evidence belie Plaintiffs' assumptions

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                    32

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 41 of 51

and general assertions of irreparable harm, and Plaintiffs' filings confirm that they cannot show entitlement to emergency relief. This is not a situation where the polar bear population or Plaintiffs' interests in viewing them are likely to be irreparably harmed while the Court addresses the merits, and Plaintiffs cannot substantiate their request for emergency relief. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Plaintiffs fail to demonstrate any immediate irreparable harm with respect to the polar bear.

### B. Plaintiffs Fail to Establish a Likelihood of Irreparable Harm to the Environment

#### 1. Plaintiffs fail to demonstrate irreparable harm to wetlands will occur from this winter's activities.

The SILA Plaintiffs argue that the excavation and filling of wetlands "with over 5 million cubic yards of gravel, with mining and road construction beginning shortly after February 2, 2021," constitutes irreparable harm. SILA Br. 18-19. Similarly, CBD Plaintiffs allege that the "road and destroyed tundra and wetland habitats will cause harm that lasts far into the future." CBD Br. 16. However, the declarations and citations provided by Plaintiffs in support of this argument largely speculate as to impacts resulting from the entire Willow Project; none of these sources specify what irreparable harm will occur, in the absence of an injunction, from the Willow Project components slated for completion this winter.

Plaintiffs cite to the FEIS, an analysis of the entire Willow Project, when describing what constitutes irreparable harm. CBD Br. 16. The Fennessy Declaration discusses the overall impacts of the Willow Project, calculating degradation of a total of 9,305.7 acres of wetlands from the Willow Project. SILA ECF 17-15, ¶3. Other

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
Defs.' Opposition to Motions for Preliminary Injunction                                    33

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 42 of 51

declarations submitted in support of Plaintiffs' motions also contain allegations of harm resulting from the entire Willow Project, rather than this winter's activities. *See, e.g.*, SILA ECF 17-13, ¶19 (expressing concerns with "the cumulative impacts of Willow and other development within the Reserve"); SILA ECF 17-9, ¶¶33, 36. While the entire Willow project will cause a reduction in the total acreage of wetlands in the NPR-A, it does not follow that the relatively small portion of work proposed to be completed this winter will cause irreparable injury to Plaintiffs. *See Nw. Env't. Def. Center*, 817 F.Supp.2d at 1314-15 (finding plaintiffs failed to demonstrate irreparable harm to the environment where the project proponent's "extraction plan is much narrower in scope than generalized mining that may be authorized under the [Corps' permit] in the future," and Plaintiff "proffered no evidence of what effect [this] limited proposal will have, much less clear evidence of irreparable harm."). Construction of the Willow Project is slated to occur over nine construction seasons, 2021-2029. AR182406, AR182412. This winter's proposed activities represent only a small fraction of that total construction (and disturbance) and include constructing an ice road to the gravel mining site, opening the Willow Gravel Mine, and excavating and laying gravel to construct a 2.8 mile portion of an access road from the existing GMT2 gravel pad.[7] CBD ECF 9-9, 1.

Some declarants state they will be harmed by a combination of the Willow Project and the 2020 IAP (not challenged in this case), which goes well beyond the construction

---

[7] The 2.8 mile road segment slated for completion this year continues a road previously approved by the GMT-2 EIS, approved in 2018, which was not challenged for any violations of NEPA. AR273367. The Willow Project will require a total of 37 miles of gravel roads. AR182376.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                    34

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 43 of 51

scheduled for this winter. SILA ECF 17-5, ¶22 (discussing "combined impacts of Willow, revisions to the IAP, and future development stemming from Willow."), SILA ECF 17-16, ¶27 (discussing combination of Willow and BLM's revision of the IAP "effects upon [the] landscape"). One SILA declarant does contend that the "construction phase alone of a project like Willow" will cause harm by filling wetlands, but even then does not specify that this year's construction will have those effects. SILA ECF 17-5 ¶22. In explaining how their interests will be harmed, the declarant contends only that the "combined impacts of Willow, revisions to the IAP, and future development stemming from Willow will harm our members' ability to continue to recreate and enjoy." SILA ECF 17-5 ¶22. This vague assertion, and the declarations more generally, do not demonstrate any specific irreparable harms from the 2021 planned activities, and cannot support a preliminary injunction.

Further, Plaintiffs merely speculate about the Willow Project's eventual impacts. *See*, *e.g*, SILA ECF 17-9, ¶36 ("Willow is likely to cause significant long term damage"); SILA ECF 17-6, ¶27 (Reserve's features "may be erased"); CBD ECF 9-16 ¶¶21, 23 (describing the potential impacts or the increased risks). These speculative statements about the impacts of the full Willow Project do not establish a likelihood of irreparable harm from this winter's activities in the absence of an injunction.

Finally, Plaintiffs have not shown that the reduction in wetlands from gravel extraction is irreparable. The FEIS includes a reclamation plan – Appendix D.2. After reclamation, "the mine site cells would be allowed to naturally fill with water … to potentially provide waterfowl and shorebird habitats." AR182405. Waterfowl are an

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION 35

Case 3:20-cv-00290-SLG Document 26 Filed 01/15/21 Page 44 of 51

important subsistence resource to local residents (AR182617-20) and the creation of additional waterfowl habitat may enhance the waterfowl populations and subsistence harvest opportunities. Despite Dr. Fennessy's statement that gravel mining in floodplains generally is "one of the most aggressive human actions," BLM's analysis shows there are potential benefits from the creation of additional lakes after the completion of gravel mining. Whether or not potential benefits materialize, this does not constitute irreparable harm.

### 2. Plaintiffs' allegations of irreparable harm to caribou and other species' habitat are too speculative to support a preliminary injunction.

Both sets of Plaintiffs suggest that the Willow Project will cause disturbance to habitat for caribou, and by extension, to their members who have an interest in viewing and protecting wildlife, or subsistence hunting. SILA Br. 19-20; CBD Br. 16-17. As described above, the speculative allegations pertaining to the entire project do not satisfy the requirement that Plaintiffs' demonstrate likely irreparable harm from this winter's activities. *See, e.g.*, CBD ECF 9-16, ¶19 (expressing concern "that oil and gas activity under the Willow project will harm my ability to see polar bears, caribou, and other migratory species"); CBD ECF 9-14, ¶24 (citing only "potential impacts from infrastructure" to support of his claim that "construction activities that are scheduled to start this winter [] will negatively impact water quality, fish, and wildlife in the Reserve."). CBD Plaintiffs also allege "the immediate effects of construction this winter" will cause harm to caribou, CBD Br. 14-16, but their allegations are highly speculative and generalized and therefore do not establish irreparable harm for the purposes of a

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    36

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 45 of 51

preliminary injunction.  *See Krueger*, 40 F. Supp. 3d at 1348-49 (denying a motion for a preliminary injunction in part because plaintiffs did not "provide evidence of any irreparable harm to any endangered, threatened, or proposed species or species habitat in the absence of an injunction" or even that such species were present in the affected area); *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1264 (W.D. Wash. 2015) (concluding that "because Plaintiffs have failed to make a strong showing that irreparable harm to the Pacific lamprey is likely, they have also failed to establish a likelihood of irreparable harm to" themselves).  *Cf. Nat'l Wildlife Fed.*, 886 F.3d at 822 (upholding district court's grant of injunctive relief where a plaintiff connected his recreational and aesthetic injuries to the alleged irreparable injuries to salmonids).

Irreparable injury "must be both certain and great; it must be actual and not theoretical."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  And, "the movant must substantiate the claim that irreparable injury is likely to occur.  Bare allegations of what is likely to occur are insufficient because the court must decide whether the harm will in fact occur."  *Western Watersheds Project v. Bernhardt*, 468 F.Supp.3d 29, 47 (D.D.C. 2020) (internal quotation marks omitted) (citing *Wis. Gas Co. v. FERC*).  CBD Plaintiffs' allegations of harm are couched entirely in speculative terminology: the "construction of ice and gravel roads is also likely to affect caribou", and "this winter's construction is likely to harm subsistence activities," and "these activities could also substantially affect caribou survival and recruitment."  CBD Br. 15.

Additionally, Plaintiffs have failed to tie any of this winter's scheduled construction to irreparable harm to caribou or other species.  The activities slated for

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                37

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 46 of 51

completion this winter are outside of the Teshekpuk Lake Special Area where caribou are concentrated. AR182754. Further, the EIS concluded that the Willow Project would have no direct population-level effect on caribou (and other species). AR182654. Both sets of plaintiffs argue that noise from construction or roads can disturb the environment, but fail to explain how that construction-related noise from this winter will cause any irreparable harm. *See* SILA ECF 17-4, ¶32; SILA ECF 17-9, ¶38; CBD ECF 9-14 ¶¶21-22 (construction noise from the Willow Project would affect planned trip in "spring of 2022 or 2023"). Plaintiffs' allegations of harm from the activities that would occur during the pendency of this litigation are too speculative to support a preliminary injunction.

## C. "Bureaucratic Momentum" Does Not Support Injunctive Relief.

Plaintiffs cannot rely on the theory of bureaucratic momentum to demonstrate irreparable harm. *See* CBD Br. 19. Regardless of any dynamic that may exist within the agency as these cases develop, the Court retains a broad array of options to take appropriate action relating to the Willow Project's future. Even if there such a thing as a bureaucratic steamroller, it does not interfere with the remedial powers the Court might deem appropriate after reaching the merits.

The bureaucratic momentum theory was espoused in *Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983). Then-Judge Breyer enjoined a lease sale on the outer continental shelf off the coast of Massachusetts based, in part, on the theory that, if the lease sale were allowed to go forward, it would engender a "bureaucratic commitment" to the lease sale, which he found was a type of irreparable harm. *Id.* at 952-53. Four years

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    38

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 47 of 51

later, however, the Supreme Court issued its decision in *Village of Gambell*, in which it refuted the notion that harm to the environment may be presumed and reversed the preliminary injunction of an offshore oil and gas lease sale. *See* 480 U.S. at 544-45. Following that Supreme Court decision, the First Circuit revisited *Watt* in *Sierra Club v. Marsh*, 872 F.2d 497, 499 (1st Cir. 1989), explaining that it did not mean that procedural harm alone would constitute irreparable harm:

> Rather, the harm at stake is a harm to the *environment*, but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.

*Id.* at 500 (italics in original). Plaintiffs must show a likelihood of irreparable harm to the environment to obtain a preliminary injunction. Bureaucratic momentum alone cannot satisfy their burden of demonstrating irreparable harm. *See id.*; *see also Blanco v. Burton*, 2006 WL 2366046, at *18-19 (E.D. La. Aug. 14, 2006) (discussing *Watt*, *Village of Gambell*, and *Marsh* and rejecting the bureaucratic momentum argument). The Ninth Circuit has similarly been critical of the bureaucratic momentum argument. *See N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1154-57 (9th Cir. 1988). And, as CBD Plaintiffs acknowledge, the decisions granting injunctions based on this theory "have generally arisen in connection with leasing or contract decisions," CBD Br. 19, and not in cases challenging the early stages of a project following extensive NEPA analysis and opportunities for public comment.

Conoco proposes to extend an existing road an additional 2.8 miles this winter. SILA ECF 17-44, 1. Plaintiffs do not explain why BLM would feel a sense of

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                          39

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 48 of 51

commitment to complete that road and the project as a whole should this Court find its existing analysis inadequate. And, even if BLM might feel some sense of commitment to Alternative B in this instance, this constrains neither the Court's review nor its remedial power. Thus any protection against "bureaucratic momentum" is already in place in the form of this Court's authority; Plaintiffs cannot rely upon this alleged concern as a basis for proving imminent, irreparable injury.

## III. The Public Interest and Balance of Equities Favor Defendants.

For their NEPA claims, Plaintiffs must further prove that a preliminary injunction would serve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the analyses of the public interest and balance of equities merge, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). Absent the necessary showing on the first two elements a court "need not dwell on the final two factors" and, "when considered alongside the [movant's] failure to show irreparable harm, the final two factors do not weigh in favor of a stay." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778-79 (9th Cir. 2018).

Plaintiffs state the "public [] has an overarching interest in its government abiding by the laws and regulations governing it." CBD Br. 21. Even if this Court were to find a likely violation of law, however, the requested injunction would not further the public interest because it would undermine the Congressionally-sanctioned process for oil and gas leasing in the NPR-A. 42 U.S.C. § 6505a. Congress has determined that oil and gas leasing in the NPR-A should occur. 42 U.S.C. § 6505a(a). BLM's purpose and need here was to provide Conoco the opportunity to exercise its existing rights under

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    40

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 49 of 51

previously-authorized federal oil and gas leases.  AR182369.  Additionally, the injunction, if granted, could have the effect of delaying revenue to the State of Alaska, North Slope Borough, and Federal Defendants in the form of royalties and state and local taxes associated with the Willow Project.  AR186063.

Delay of an activity Congress has found useful and necessary, in addition to the economic harm to Defendants (and likely Conoco), outweigh Plaintiffs' dubious allegations of harm, especially where Plaintiffs have not established the authorization of that activity violated any law.

## **CONCLUSION**

For the foregoing reasons, the Court should deny each of Plaintiffs' motions for temporary restraining order or preliminary injunction.

Respectfully submitted this 15th day of January, 2021.

JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

RICKEY TURNER
Senior Trial Attorney
Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
(303) 844-1373
rickey.turner@usdoj.gov

PAUL E. SALAMANCA
Deputy Assistant Attorney General

 _/s/ Caitlin Cipicchio_
CAITLIN CIPICCHIO
Trial Attorney, Natural Resources Section

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    41

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 50 of 51

P.O. Box 7611
Washington, D.C. 20044
202-305-0503
202-305-0506 (fax)
caitlin.cipicchio@usdoj.gov

*Counsel for Defendants*

Of Counsel:

Mike Gieryic
Office of the Regional Solicitor
U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508
907-271-1420
mike.gieryic@sol.doi.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(2), as modified by ECF No. 20 (3:20-cv-00290-SLG), because this memorandum contains 10,974 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font, and I obtained the word count using Microsoft Word.

*/s/ Caitlin Cipicchio*
Caitlin Cipicchio

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2021, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Caitlin Cipicchio*
Caitlin Cipicchio

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; -308-SLG
DEFS.' OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION                                    42

Case 3:20-cv-00290-SLG   Document 26   Filed 01/15/21   Page 51 of 51