Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
James C. Feldman (Bar No. 1702003)
james.feldman@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500
Attorneys for ConocoPhillips Alaska, Inc.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al., | No.: 3:20-cv-00290-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, et al., | |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., | |
| Intervenor-Defendant. | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | No.: 3:20-cv-00308-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, et al., | |
| Defendants. | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., | |
| Intervenor-Defendant. | |

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION BY
CONOCOPHILLIPS ALASKA, INC.**

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

**TABLE OF CONTENTS**

Page

I. Introduction .................................................................................................. 1

II. Background ................................................................................................ 2

III. Argument ................................................................................................. 3

    A.    Preliminary Injunctive Relief Is an Extraordinary Remedy ......................... 3

    B.    Plaintiffs Are Unlikely to Suffer Irreparable Injury from the Limited Construction Activities This Winter. ............................................... 4

        1.    SILA Presents No Evidence of Irreparable Injury to Polar Bears This Winter ....................................................................... 5

        2.    Plaintiffs Fail to Demonstrate Imminent Irreparable Injury to Recreational, Aesthetic, or Subsistence Interests This Winter. ....... 10

            a.    Plaintiffs must show irreparable injury to their members, not just to the environment. ................................. 12

            b.    Plaintiffs fail to demonstrate irreparable injury to their alleged interests in seeing the Petroleum Reserve in an undisturbed state. ............................................. 15

            c.    Plaintiffs fail to demonstrate irreparable injury to their interests in fish and wildlife. .................................. 19

            d.    Plaintiffs fail to demonstrate irreparable injury from sound. ................................................................. 25

            e.    CBD fails to demonstrate irreparable procedural injury. ....................................................................... 27

    C.    SILA Is Unlikely to Succeed on the Merits. ..................................... 29

        1.    BLM's Biological Opinion Complies with the ESA. ..................... 29

        2.    BLM Took the Requisite Hard Look at Willow and Its Impacts. ............................................................................. 32

    D.    CBD Is Unlikely to Succeed on the Merits. ..................................... 34

        1.    The EIS for the Willow MDP Fully Disclosed and Explained Greenhouse Gas Effects. ...................................................... 34

        2.    The EIS Considers a Reasonable Range of Alternatives. ............... 37

    E.    The Balance of the Equities and Public Interest Weigh Against an Injunction ...................................................................... 41

IV. Conclusion ............................................................................................. 45

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

i

# TABLE OF AUTHORITIES

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**Page(s)**

**Cases**

*Alcresta Therapeutics, Inc. v. Azar*,
   318 F. Supp. 3d 321 (D.D.C. 2018) ............................................................... 19

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ......................................................................... 4

*All. for the Wild Rockies v. Kruger*,
   35 F. Supp. 3d 1259 (D. Mont. 2014) ........................................................... 41

*Am. Rivers v. FERC*,
   201 F.3d 1186 (9th Cir. 1999) ....................................................................... 41

*Am. Unites for Kids v. Lyon*,
   No. CV 15-2124 PA, 2016 WL 4571409 (C.D. Cal. Sept. 1, 2016) ........... 17

*Amoco Production Co. v. Village of Gambell*,
   480 U.S. 531 (1987) ................................................................................. 43, 44

*Armstrong v. Scribner*,
   No. CIV. 06CV852L(RBB), 2008 WL 268974 (S.D. Cal. Jan. 30, 2008) ............ 9

*Audubon Soc'y of Portland v. Nat'l Marine Fisheries Serv.*,
   849 F. Supp. 2d 1017 (D. Or. 2011) ............................................................... 9

*Berg v. Obama*,
   586 F.3d 234 (3d Cir. 2009) ........................................................................... 20

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ......................................................................... 33

*Center for Biological Diversity v. Bernhardt*,
   982 F.3d 723 (9th Cir. 2020) ............................................................ 29, 34, 35

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) ............................................................. 5, 8, 12

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

ii

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Ctr. for Biological Diversity v. Hays*,
No. 215-CV-01627 TLN CMK, 2015 WL 5916739 (E.D. Cal. Oct. 8, 2015) ................................................................................................ 24

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ................................................................ 32

*Ctr. for Food Safety v. Vilsack*,
636 F.3d 1166 (9th Cir. 2011) ................................................................ 1

*Defs. of Wildlife v. Salazar*,
812 F. Supp. 2d 1205 (D. Mont. 2009) .................................................. 6

*Dep't of Fish & Game v. Fed. Subsistence Bd.*,
No. 3:20-CV-00195-SLG, 2020 WL 6786899 (D. Alaska Nov. 18, 2020) .................................................................................................... 5

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ..................................................... 5, 13, 42

*Earth Island Inst. v. Elliott*,
290 F. Supp. 3d 1102 (E.D. Cal. 2017) ......................................... 13, 19

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007) ................................................................ 4

*Friends of Tilden Park, Inc. v. D.C.*,
806 A.2d 1201 (D.C. 2002) .................................................................. 18

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) .............................................................. 39

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) .............................................................. 12

*Fund for Animals v. Mainella*,
294 F. Supp. 2d 46 (D.D.C. 2003) ........................................................ 13

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ................................................................ 42

*Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*,
739 F.2d 466 (9th Cir. 1984) .................................................................. 4

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

iii

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Half Moon Bay Fishermen's Mktg. Ass'n v. Carlucci,*
857 F.2d 505 (9th Cir. 1988) ............................................................... 33

*Humane Soc'y v. Gutierrez,*
523 F.3d 990 (9th Cir. 2008) .................................................................. 6

*Hunters v. Marten,*
470 F. Supp. 3d 1151 (D. Mont. 2020) ................................................ 33

*Idaho Rivers United v. Army Corps of Eng'rs,*
156 F. Supp. 3d 1252 (W.D. Wash. 2015) ....................................... 9, 23

*Jones v. D.C.,*
177 F. Supp. 3d 542 (D.D.C. 2016) ..................................................... 18

*Kunaknana v. U.S. Army Corps of Eng'rs,*
23 F. Supp. 3d 1063 (D. Alaska 2014) ........................................... 10, 42

*League of Wilderness Defs. v. U.S. Forest Service,*
689 F.3d 1060 (9th Cir. 2012) ............................................................. 37

*Manzanita Band of Kumeyaay Nation v. Wolf,*
No. 1:20-CV-02712 (TNM), 2020 WL 6118182 (D.D.C. Oct. 16, 2020)... 8, 10, 20, 25

*Marbled Murrelet v. Babbitt,*
83 F.3d 1068 (9th Cir. 1996) ............................................................... 41

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ....................................................................... 3, 21

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ...................................................................... 12, 41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................................. 35

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
177 F.3d 800 (9th Cir. 1999) ............................................................... 39

*Munaf v. Green,*
553 U.S. 674 (2008) ............................................................................. 3

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

iv

*N. Alaska Envtl. Ctr. v. Norton*,
    361 F. Supp. 2d 1069 (D. Alaska 2005) ...................................................... 40

*Nat'l Parks Conservation Ass'n v. Semonite*,
    282 F. Supp. 3d 284 (D.D.C. 2017) ........................................... 11, 26, 27, 28

*Nat'l Parks Conservation Ass'n v. United States Forest Serv.*, No. 15-CV-
    01582 (APM), 2016 WL 420470 (D.D.C. Jan. 22, 2016) ........................ 13, 14, 17

*Nat'l Res. Def. Council v. Kempthorne*,
    525 F. Supp. 2d 115 (D.D.C. 2007) ........................................... 15, 41, 44, 45

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*,
    23 F.3d 1508 (9th Cir. 1994) ..................................................................... 5, 6

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    886 F.3d 803 (9th Cir. 2018) ................................................................. 5, 8, 12

*Native Ecosystems Council v. Krueger*,
    40 F. Supp. 3d 1344 (D. Mont. 2014) ............................................................ 42

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ...................................................................... 37

*Native Vill. of Nuiqsut v. BLM*,
    432 F. Supp. 3d 10003 (D. Alaska 2020) ................................................. 37, 40

*Ness v. Law Enf't Support Agency*,
    No. C10-5111 KLS, 2012 WL 13176243 (W.D. Wash. Aug. 9, 2012) .................... 20

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    No. 3:18-CV-00437-HZ, 2019 WL 2372591 (D. Or. June 5, 2019) ........................ 6

*Or. Nat. Desert Ass'n v. BLM*,
    625 F.3d 1092 (9th Cir. 2010) ...................................................................... 33

*Pekin Ins. Co. v. Estate of Krager*,
    No. CV-17-01050-PHX-DLR, 2019 WL 1059986 (D. Ariz. Mar. 6,
    2019) .......................................................................................................... 9

*Pimentel v. Dreyfus*,
    670 F.3d 1096 (9th Cir. 2012) ....................................................................... 4

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

v

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Shell Offshore, Inc. v. Greenpeace Inc.*,
    709 F.3d 1281 (9th Cir. 2013) ................................................................ 41

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989) .................................................................. 27

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) ................................................... 9, 13, 24

*Sierra Club v. U. S. Army Corps of Eng'rs*,
    No. 1:20-CV-460-RP, 2020 WL 5096947 (W.D. Tex. Aug. 28, 2020) ........... 9, 21, 27

*Sierra Club v. U.S. Dep't of Energy*,
    8667 F.3d 189 (D.C. Cir. 2017) .............................................................. 36

*Thomas v. Peterson*,
    753 F.2d 754 (9th Cir. 1985) .................................................................. 8

*Washington Toxics Coalition v. Environmental Protection Agency*,
    413 F.3d 1024 (9th Cir. 2005) .............................................................. 7, 8

*Water Keeper All. v. U.S. Dep't of Def.*,
    271 F.3d 21 (1st Cir. 2001) .................................................................... 6

*Winter v. NRDC*,
    555 U.S. 7 (2008) ................................................................ 4, 5, 27, 41

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................ 4

**Statutes**

42 U.S.C. § 6504(a) ................................................................................ 40

42 U.S.C. § 6506a ................................................................................... 2

42 U.S.C. § 6506a(a) ............................................................................. 44

42 U.S.C. § 6506a(n)(1) ......................................................................... 29

**Regulations**

40 C.F.R. § 1502.9(d)(1)(i)-(ii) .............................................................. 33

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

40 C.F.R. § 1502.14(a) ............................................................................... 41

50 C.F.R. § 402.14(c)(1)(i) ......................................................................... 30

50 C.F.R. § 402.14(g)(8) ............................................................................ 30

84 Fed. Reg. 44,976 (Aug. 27, 2019) .................................................... 29, 30

84 Fed. Reg. 50,333 (Sept. 25, 2019) ......................................................... 29

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

vii

# I. INTRODUCTION

Intervenor-Defendant ConocoPhillips Alaska, Inc. ("ConocoPhillips") intends to engage in important construction work this winter in the National Petroleum Reserve – Alaska ("Petroleum Reserve"). This work, which is the first step in the development of the long- and carefully planned and permitted Willow project, will consist of extending an existing gravel road by up to 2.8 miles and opening 9 acres of a gravel mine to provide materials to build that road.

Two groups of plaintiffs—the Sovereign Iñupiat for a Living Arctic, et al. ("SILA") and the Center for Biological Diversity, et al. ("CBD" and collectively "Plaintiffs")—have challenged the Bureau of Land Management's ("BLM") approval of the Willow project and seek a preliminary injunction to halt the planned work. As set forth below, both motions should be denied. Plaintiffs fail to demonstrate, with actual evidence, that they are likely to suffer irreparable injury from this winter's limited work and, accordingly, the Court "need not address . . . the remaining elements of the preliminary injunction standard."[1] Even so, Plaintiffs are also unlikely to prevail on the merits of their claims, and the balance of equities and public interest do not favor the extraordinary and drastic relief requested by Plaintiffs.

---

[1] *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

1

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

## II. BACKGROUND

In 1980, Congress directed the Secretary of the Interior to "conduct an expeditious program of competitive leasing of oil and gas" in the 23-million-acre Petroleum Reserve.[2] Pursuant to that authority, BLM has produced integrated activity plans governing leasing and environmental protection in the Petroleum Reserve. ConocoPhillips has acquired significant lease holdings in the Petroleum Reserve, and has taken a careful and progressive approach to the exploration and development of its leases, starting with the CD5 satellite drill site (which commenced production in 2015), moving to the GMT1 satellite drill site (which commenced production in 2018 in the Greater Mooses Tooth Unit ("GMTU")), and then to the GMT2 satellite drill site (which is forecast to begin production in late 2021).[3] Although some of the Plaintiffs filed a lawsuit challenging the CD5 development, none of them, or anyone else, challenged the GMT1 or GMT2 developments.

The Willow Record of Decision ("ROD") issued by BLM authorizes ConocoPhillips to construct up to three drill sites and related support infrastructure, including a central processing facility, airstrip, operations center, freshwater reservoir, and all-season gravel road connecting the Willow development to the GMT2 facilities.

---

[2] 42 U.S.C. § 6506a.

[3] Declaration of Connor Dunn ¶ 4.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

2

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Construction will begin this winter, consisting of extending the existing GMT2 gravel road by up to 2.8 miles and opening the gravel source to build that section of road.[4]

BLM's ROD is based upon a 2,700-page final Environmental Impact Statement ("EIS"), which marks the culmination of two and a half years of environmental review, dozens of public meetings, multiple public comment periods, input from numerous federal, state and local EIS cooperating agencies, and significant project revisions and improvements made directly in response to feedback received by stakeholders. The Willow project is subject to a rigorous suite of mitigation measures, best management practices, design features, and required operating procedures.[5]

## III. ARGUMENT

### A. Preliminary Injunctive Relief Is an Extraordinary Remedy.

A preliminary injunction is an "'extraordinary and drastic remedy,'"[6] and can only issue based on a "'clear showing'" and "substantial proof."[7] "A plaintiff seeking a preliminary injunction must establish (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips

---

[4] The Declarations of Connor Dunn ("Dunn Decl."), James I. Brodie ("Brodie Decl."), Lisa L. Pekich ("Pekich Decl."), and Robyn E. McGhee ("McGhee Decl.") provide more detail about the Willow project and this winter's planned work.

[5] Ex. 5 (AR186079-088).

[6] *Munaf v. Green*, 553 U.S. 674, 689 (2008) (citation omitted).

[7] *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation and emphasis omitted).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

3

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

in the plaintiff's favor; and (4) that an injunction is in the public interest."[8] "Under the 'sliding scale' approach to preliminary injunctions . . . 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'"[9] For example, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements . . . are also met."[10]

**B.** **Plaintiffs Are Unlikely to Suffer Irreparable Injury from the Limited Construction Activities This Winter.**

The *sine qua non* for obtaining injunctive relief is a demonstration by the movant "that irreparable injury is 'likely' to occur" absent an injunction, "not just possible."[11] A "[s]peculative injury does not constitute irreparable injury."[12] Likewise, "conclusory allegations are insufficient to establish irreparable harm."[13] This requirement applies equally when the alleged harms are environmental in nature because there is "no

---

[8] *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (per curiam) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

[9] *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

[10] *All. for the Wild Rockies*, 632 F.3d at 1132.

[11] *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *All. for the Wild Rockies*, 632 F.3d at 1131.

[12] *Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

[13] *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1099 (9th Cir. 2007).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

4

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

presumption of irreparable injury" in environmental cases.[14] "[A]llegations of irreparable harm must be supported with actual evidence, and not merely conclusory statements or unsupported allegations."[15] The threatened irreparable harm must be sufficiently imminent that it is likely to occur "before a decision on the merits can be rendered."[16]

### 1. SILA Presents No Evidence of Irreparable Injury to Polar Bears This Winter.

For its ESA claim, SILA's burden is to "show that they themselves are likely to suffer irreparable harm absent an injunction."[17] A plaintiff must show a "definitive threat of future harm to protected species" sufficient to establish likely irreparable harm to their own recreational or aesthetic interests *in that species*.[18] "This could, for example, take the form of a showing that developments during this case will materially diminish the species' prospects for future survival or recovery and/or will appreciably diminish the

---

[14] *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (alleged harm to woodpecker habitat from logging "at most, showed such a possibility, but no likelihood of irreparable harm"); *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).

[15] *Dep't of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-CV-00195-SLG, 2020 WL 6786899, at *17 (D. Alaska Nov. 18, 2020) (quotation marks and citation omitted).

[16] *Winter*, 555 U.S. at 22 (quotations and citations omitted).

[17] *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (quotations and citation omitted).

[18] *Id.*; *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

value of their critical habitat."[19] At a minimum, a moving party must provide "clear evidence that" future operations "will result in the deaths of members of a protected species" in a manner that impacts the *conservation of that species*,[20] although even the death of individual members of a listed species may be insufficient to establish irreparable harm.[21]

Here, it is highly *unlikely* that any polar bear will even be in the vicinity of the work this winter, let alone be injured by those activities.[22] None of the work will occur in polar bear critical habitat.[23] The closest known historical den site is 7.2 miles away from the mine site and 10 miles away from the road construction site, and that den site has not been used in the last 13 years.[24] Moreover, all construction and ice road building activities are subject to substantial polar bear interaction mitigation measures that further

---

[19] *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:18-CV-00437-HZ, 2019 WL 2372591, at *11 (D. Or. June 5, 2019) (internal quotations and citation omitted).

[20] *Burlington N. R.R.*, 23 F.3d at 1512 (no irreparable harm to grizzly bears); *Water Keeper All. v. U.S. Dep't of Def.,* 271 F.3d 21, 34 (1st Cir. 2001) (no irreparable harm where plaintiffs failed to make "concrete showing of probable deaths during the interim period and of how these deaths may impact the species").

[21] *Humane Soc'y v. Gutierrez,* 523 F.3d 990, 991 (9th Cir. 2008) (death of over 2,000 listed salmon not irreparable harm to the species); *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009) ("irreparable injury requires harm significant to the overall population.") (internal quotations and citation omitted).

[22] McGhee Decl. ¶¶ 7-13.

[23] McGhee Decl. ¶ 7.

[24] *Id*. ¶ 9.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

6

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

render impacts improbable.[25] It is therefore *unlikely* that ConocoPhillips will interact in *any way* with a polar bear this winter, and certainly not in a way that causes any actual injury to a single bear (let alone to the species).[26]

Indeed, the BiOp concludes that "up to 2 polar bears may be hazed resulting in non-lethal physical injuries during activities *over the 30-year life of the Proposed Action*."[27] This conclusion is based, *inter alia*, on the project's location ("a significant distance from the coast") and the lack of nearby den sites.[28] The U.S. Fish and Wildlife Service ("FWS") considered the possibility of den disturbance (largely associated with activities near Oliktok dock that will not be occurring this winter) and determined such disturbance is improbable, with an "84% probability that 0 takes occur" during the 30-year life of the project.[29] Irreparable injury to any individual polar bear is thus highly unlikely at *any time* during the life of the project.

SILA provides no evidence to the contrary and states that "[i]t is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed," quoting *Washington Toxics Coalition v. Environmental Protection Agency*,

---

[25] *Id*. ¶ 4, 8, 10, 11, 13.

[26] *Id*. ¶ 12.

[27] Ex. 7 (FWS-AR764) (emphasis added).

[28] *Id*.

[29] *Id*. (FWS-AR749).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

7

413 F.3d 1024, 1035 (9th Cir. 2005) and *Thomas v. Peterson*, 753 F.2d 754, 765 (9th Cir. 1985).[30] That is not the law. As the Ninth Circuit explained in *Cottonwood*, "*Thomas* and its progeny"—including *Washington Toxics*— have been *overruled*, and a plaintiff in an ESA case, like every other plaintiff, "must show irreparable injury to justify injunctive relief."[31] Thus, it clearly *is the responsibility* of SILA to prove likely irreparable injury to the polar bear, and in turn, likely irreparable injury to its members' interests.[32] There is no "thumb on the scales" in evaluating irreparable injury.[33]

SILA's declarations do not meet that burden. Lisa Baraff speculates that activities from the larger Willow project (not specifically this winter's work) "*could* disturb or harm polar bears."[34] Speculation about what "could" happen is not a substitute for "evidence that injuries are likely to occur."[35] Adam Kolton speculates that "[o]il and gas activities have the potential to disturb polar bears in their dens" but identifies no dens in the construction site (because there are none) and provides no evidence that such

[30] SILA Br. at 20 n.96.

[31] *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1088-91 ("[T]here is no presumption of irreparable injury where there has been a procedural violation in ESA cases").

[32] *Id*. at 1090; *Nat'l Wildlife Fed'n,* 886 F.3d at 822. SILA incorrectly suggests that speculative "threat to individual polar bears" is similar to the harms faced in *National Wildlife Federation*, which involved the *actual killing* of thousands of endangered salmon. SILA Br. at 21; *Nat'l Wildlife Fed'n,* 886 F.3d at 820-21.

[33] *Cottonwood Envtl. Law Ctr.,* 789 F.3d at 1090.

[34] Baraff Decl. (Dkt. 17-5) ¶ 23 (emphasis added).

[35] *Manzanita Band of Kumeyaay Nation v. Wolf*, No. 1:20-CV-02712 (TNM), 2020 WL 6118182, at *7 (D.D.C. Oct. 16, 2020).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

8

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

"potential" impacts are likely.[36] Nicole Wittington Evans states that members are "concerned that Willow's massive industrial development will disturb polar bear critical habitat."[37] But construction this winter is not located in polar bear critical habitat.[38] Speculation "cannot form the basis of a showing of irreparable harm" and neither can "speculation built upon further speculation."[39]

The only actual evidence identified by any declarant is the BiOp.[40] But the BiOp only confirms that the risks SILA complains of are highly improbable (*e.g.*, 84% chance of zero takes in the next 30 years). Plaintiffs "have offered no scientific studies or expert opinions in support of their position," and merely pointing to the BiOp "is not enough."[41]

---

[36] Kolton Decl. (SILA Dkt. 17-8) ¶ 22. *Idaho Rivers United v. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1262 (W.D. Wash. 2015) ("[T]he use of the terms 'potential' and 'can' connotes the mere possibility of such effects.")

[37] Evans Decl. (SILA Dkt. 17-14) ¶ 27.

[38] McGhee Decl. ¶ 7.

[39] *Sierra Club v. U. S. Army Corps of Eng'rs*, No. 1:20-CV-460-RP, 2020 WL 5096947, at *10 (W.D. Tex. Aug. 28, 2020) (internal citations, quotations, and brackets omitted).

[40] Fair Decl. (Dkt. 17-6) ¶ 19; Ritzman Del. (Dkt. 17-12) ¶ 34. Plaintiffs also cite to the declaration of David Krause (Dkt. 17-9), but the declaration is *unsigned* and therefore has "no evidentiary value." *Armstrong v. Scribner*, No. CIV. 06CV852L(RBB), 2008 WL 268974, at *7 (S.D. Cal. Jan. 30, 2008); *Pekin Ins. Co. v. Estate of Krager*, No. CV-17-01050-PHX-DLR, 2019 WL 1059986, at *4 (D. Ariz. Mar. 6, 2019) ("An unsigned affidavit or declaration is an inadmissible document"). In any event, Mr. Krause's unsigned declaration asserts no imminent injuries to polar bears this winter.

[41] *Audubon Soc'y of Portland v. Nat'l Marine Fisheries Serv.*, 849 F. Supp. 2d 1017, 1049 (D. Or. 2011); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39–40 (D.D.C. 2013) (statement in biological opinion that "'Indiana bats may

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

9

Case 3:20-cv-00290-SLG   Document 28   Filed 01/15/21   Page 17 of 54

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

SILA fails to show likely irreparable injury to its members' interests in the polar bear, and this "dooms" their request for a preliminary injunction under the ESA.[42]

### 2. Plaintiffs Fail to Demonstrate Imminent Irreparable Injury to Recreational, Aesthetic, or Subsistence Interests This Winter.

Both SILA and CBD seek a preliminary injunction under NEPA, based on alleged injuries to a variety of recreational, aesthetic, and subsistence interests. They submit numerous declarations, some from the same persons.[43] Some declarants (those who do not live on the North Slope) fear that the construction of the Willow project will ruin a pristine wilderness that they may want to visit or study or will harm wildlife they may want to view. These non-local declarants fail to show that they ever have been to, or plan to go to, the specific areas under construction this winter, and their claims of irreparable

be killed or injured' during construction of the pipeline" insufficient to establish likely irreparable injury).

[42] *Manzanita Band of Kumeyaay Nation,* 2020 WL 6118182, at *3.

[43] CBD's lawsuit relies on three of the *same* declarants as the SILA lawsuit, raising claim-splitting and standing concerns. Both lawsuits rely on the declarations of Ahtuangaruak (CBD Dkt. 9-13; SILA Dkt. 17-4), Fair (CBD Dkt.9-15; SILA Dkt. 17-6), and Ritzman (CBD Dkt. 9-14; SILA Dkt. 17-12), for standing and irreparable injury. Those individuals plainly cannot bring two different lawsuits in this Court in their own names, so it is not apparent why they can achieve that result by having SILA and CBD file two different lawsuits on their behalf. This appears to be a thinly veiled end-run around Article III standing requirements because without the duplicative declarations of Ahtuangaruak, Fair, and Ritzman, CBD does not have standing. CBD's four remaining declarants have either never even been to the Petroleum Reserve (Cummings (CBD Dkt. 9-17); Keever (CBD Dkt. 9-18); Donaghy (CBD Dkt. 9-19)) or only to the opposite side of the 23-million acre Reserve (Steiner (CBD Dkt. 9-16)). This is not a sufficient geographic nexus to establish standing to challenge the Willow project. *See Kunaknana v. U.S. Army Corps of Eng'rs,* 23 F. Supp. 3d 1063, 1082-83 (D. Alaska 2014).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

10

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

injury are based on layered speculation that construction of the larger Willow project (not specifically construction this winter) will harm wildlife, which will in turn impair their ability to view wildlife in other locations.

Others by contrast (two residents of Nuiqsut) believe the area is already too industrialized and worry that the Willow project will further impair their subsistence way of life. ConocoPhillips is respectful of the concerns raised by some community members about the Willow project and has worked diligently with the community to design the project in a manner that avoids, minimizes, and mitigates impacts to local residents.[44] The worries expressed about this winter's construction activities, however, are speculative and unfounded, and appear to be based on a general opposition to past, present, and future oil and gas activity throughout the North Slope. Ultimately, none of these declarations (local or non-local) meet the "high burden" for showing that construction activities this winter will cause irreparable injury to their interests, and concerns about construction activity in future years is not grounds for a preliminary injunction.[45]

---

[44] Pekich Decl. ¶¶ 6-11; Dunn Decl. ¶¶ 11-16.

[45] *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288–89 (D.D.C. 2017) ("[T]he source of the plaintiff's alleged irreparable harm—'mammoth towers'—won't begin to be built for at least another six months, leaving the parties' ample time to fully brief the merits of the case.").

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

11

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

### a. Plaintiffs must show irreparable injury to their members, not just to the environment.

SILA and CBD both focus their irreparable harm arguments on the fact that construction this winter will cause permanent changes to the environment—wetlands will be filled for road construction and ground will be cleared and excavated for the gravel mine. CBD alleges this harm is "irreparable" and SILA goes further to say this creates a "presumption of irreparable harm."[46] Plaintiffs misstate the standard for injunctive relief.

In *Monsanto*, the Supreme Court rejected the presumption of harm in NEPA cases, explaining that there is no "thumb on the scales."[47] Controlling precedent is clear that there "is no presumption of irreparable injury" under NEPA (or the ESA),[48] and Plaintiffs must show that "they themselves are likely to suffer irreparable harm absent an injunction," not merely an "injury to the environment."[49]

Injury to the environment often does *not* cause irreparable injury to a particular plaintiff's recreational or aesthetic interests.[50] For example, although logging causes

---

[46] SILA Br. at 18; CBD Br. at 16.

[47] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).

[48] *Cottonwood Envtl. Law Ctr.,* 789 F.3d at 1091.

[49] *Nat'l Wildlife Fed'n,* 886 F.3d at 822 (internal quotations and citations omitted). The cases cited by SILA at footnote 91 are inapt because they were all decided prior to *Monsanto*.

[50] *Fund for Animals v. Frizzell,* 530 F.2d 982, 986-87 (D.C. Cir. 1975) (death of "10,000 snow geese, or from 10 to 15 percent of the fall flight" was not irreparable injury to plaintiffs).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

12

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

permanent environmental injury, the Ninth Circuit affirmed denial of a preliminary injunction where the plaintiffs failed to show that logging would irreparably impair their interest in viewing woodpeckers.[51] Likewise, while bear hunting is obviously irreparable for the bears involved, a court denied a preliminary injunction where the plaintiffs failed to show that a bear hunt would irreparably injure their "aesthetic, spiritual, and cultural interests in observing, photographing, studying, and appreciating bears in the Recreation Area."[52]

As applicable here, courts typically require "proof of . . . permanent, devastating impact on the environment . . . to enjoin construction projects."[53] Harm to recreational or aesthetic interest in the environment that is "objectively minimal" is not irreparable injury.[54] For example, in *National Parks Conservation Ass'n v. U.S. Forest Service*, the Forest Service approved construction of the first five acres of a 24.6-acre gravel mine located on 5,200 acres of public lands (called the Elkhorn Ranchlands) adjacent to Theodore Roosevelt National Park.[55] The plaintiff sought a preliminary injunction under NEPA, arguing that "it likely will suffer irreparable harm because its 'members

---

[51] *Earth Island Inst.*, 626 F.3d at 474 (rejecting "argument that logging is per se enough to warrant an injunction because it constituted irreparable environmental harm").

[52] *Fund for Animals v. Mainella*, 294 F. Supp. 2d 46, 58 (D.D.C. 2003) (internal quotations and citation omitted).

[53] *Sierra Club,* 990 F. Supp. 2d at 39-40.

[54] *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1124 (E.D. Cal. 2017).

[55] *Nat'l Parks Conservation Ass'n v. United States Forest Serv.*, No. 15-CV-01582 (APM), 2016 WL 420470, at *8 (D.D.C. Jan. 22, 2016).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

13

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

frequently visit, use and enjoy national parks, including Theodore Roosevelt National Park,' and the Gravel Pit 'will irreparably damage the Elkhorn Ranchlands and the scenic landscape, quiet solitude and historic values of the ... Park.'"[56]

The court rejected the argument. *First*, the court found that the declarations failed to demonstrate that members would be visiting during the time when construction would be occurring, and expressed nothing but a "vague desire to return" that is insufficient to even support standing, and "certainly does not establish irreparable harm."[57] *Second*, although the court took "seriously any permanent alteration to the natural environment," the permanent change was "only on five acres of land – less than [0.1] percent of the 5,200-acre Elkhorn Ranchlands that surrounds the Elkhorn Ranch Unit."[58] The impacts of the permanent disturbance were further reduced by mitigation and reclamation measures.[59] Thus, the alleged harm was "not sufficiently 'great' to permit the court to grant the extraordinary relief requested."[60]

Accordingly, it is not enough for Plaintiffs to show that construction activities this winter will cause environmental impacts. They must provide *actual proof* that those

---

[56] *Id*. at *8.

[57] *Id*. (citation omitted).

[58] *Id*. at *10. The decision states the percentage as .001%, but the court appears to have not moved the decimal point.

[59] *Id*.

[60] *Id*.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG
14

environmental impacts will likely cause irreparable injury to their members' recreational, aesthetic, or subsistence interests. They fail to do so.

### b. Plaintiffs fail to demonstrate irreparable injury to their alleged interests in seeing the Petroleum Reserve in an undisturbed state.

Plaintiffs argue that this winter's work will impact their members' interest in seeing the Petroleum Reserve in its "natural setting." Although an aesthetic interest in seeing "wild character" could, in some cases, form the basis of irreparable injury, Plaintiffs fail to produce a single declarant who has either visited, or intends to visit, the locations of the mine site or the 2.8-mile road extension. These activities will actually occur several miles from the location where the Willow project will be constructed. The mine and the road extension will be located within the GMTU, nearby (or connected to) *existing* GMT1 and GTM2 infrastructure (*e.g.*, roads, pipelines and wells).[61] Claims of irreparable harm to the "wild character" are tenuous at best "[g]iven this prior development, and its proximity" to the road extension and the mine.[62] Tellingly, no declarant testifies as to the wild character of the GMTU or that they would be injured (irreparably or otherwise) if they actually saw the mine (or reclaimed mine) or road

---

[61] *See* Brodie Decl. ¶¶ 5-7, 13 Ex. A.

[62] *Nat'l Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 125 (D.D.C. 2007) ("Given this prior development, and the proximity of these new wells to ongoing oil and gas production, the Court cannot conclude there is an imminent danger to the 'wild character' of the area posed by these additional wells.").

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

15

extension within that Unit. Indeed, none of the Plaintiffs (or anyone else) challenged the construction of GMT1 or GMT2.

Some of the declarants have never even visited the Petroleum Reserve,[63] and those who have only claim to have visited locations nowhere near construction this winter, like the Utukok Uplands (at least 142 miles from construction this winter) and the Kasegaluk Lagoon Special Area (at least 204 miles away from construction this winter).[64] Other declarants claim an interest in *summer* rafting (when no construction will be occurring) on rivers like the Colville River (not the Ublutuoch river near the mine) and raise concerns about crossings that will be built in *future* years, not this winter,[65] or visiting the Fish Creek area or Teshekpuk Lake Special Area where no construction is occurring this winter (or Teshekpuk Lake itself, which is nowhere near the construction site).[66] Vague allegations about possible future visits to areas "affected by Willow" in the future[67] or to unspecified locations where part of "the Willow project is proposed"[68] do not show a

---

[63] Isherwood Decl. (SILA Dkt. 17-7); Baraff Decl. (SILA Dkt. 17-5); Maupin Decl. (SILA Dkt. 17-11); Cummings Decl. (CBD Dkt. 9-17); Keever Decl. (CBD Dkt. 9-18); Donaghy Decl. (CBD Dkt. 9-19).

[64] Kolton Decl. (SILA Dkt. 17-8) ¶ 14; Krause (unsigned) Decl. (SILA Dkt. 17-9) ¶ 24; Wald Decl. (SILA Dkt. 17-3) ¶ 9.

[65] Krause (unsigned) Decl. (SILA Dkt. 17-9) ¶ 25.

[66] Fair Decl. (SILA Dkt. 17-6) ¶ 19; Wald Decl. (SILA Dkt. 17-3) ¶18.

[67] Fair Decl. (SILA Dkt. 17-6) ¶¶ 17, 19; Fair Decl. (CBD Dkt. 9-15) ¶¶ 15, 17; Steiner Decl. (CBD Dkt. 9-16) ¶ 13.

[68] Kolton Decl. (SILA Dkt. 17-8) ¶14.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

16

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

plan to visit the discrete construction locations as those locations are miles from where Willow project facilities will be built. Plaintiffs are not likely to suffer an irreparable aesthetic injury from construction at locations where they have never been and will never go.[69]

In fact, Plaintiffs' members who visit the Petroleum Reserve for recreational and aesthetic interests state that they already generally *avoid* the areas around the GMTU (where construction will occur this winter) because of *existing* development in that area.[70] Future aesthetic or recreational injuries associated with the mine and 2.8-mile road extension are therefore improbable.

The only declarants who even come close to establishing a geographic connection to the mine site are the two Nuiqsut residents, Mr. Kunaknana and Ms. Ahtuangaruak. But these declarations also fall short. Mr. Kunaknana's declaration is deficient on its face because he testifies that he is a "supporter" rather than a "member" of SILA, and he does not identify as a member of any other Plaintiff.[71] "A 'supporter' is not the same as a

---

[69] *Nat'l Parks Conservation Ass'n,* 2016 WL 420470, at *8–9 ("injury cannot be imminent unless at least one of the association's members intends to visit the location in the near future")

[70] Ritzman Decl. (SILA Dkt. 17-12) ¶ 24; Ritzman Decl. (CBD Dkt. 9-14) ¶10; Wald Decl. (SILA Dkt. 17-13) ¶ 14.

[71] Kunaknana Decl. (SILA Dkt. 17-10) ¶ 3. *Am. Unites for Kids v. Lyon*, No. CV 15-2124 PA (AJWX), 2016 WL 4571409, at *9 (C.D. Cal. Sept. 1, 2016) ("[t]he Declaration of Katie Lapajne, who identifies herself as a 'supporter' of PEER, but not a member, does not establish the necessary facts to support's PEER's associational standing").

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

17

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

'member'...."[72] "[T]he irreparable harm prong of the injunctive relief calculus only concerns harm suffered by *the party or parties seeking injunctive relief*," and "any alleged harm to third parties is properly addressed under the public interest prong of the injunctive relief calculus."[73] Because Mr. Kunaknana is a third party, his declaration cannot establish irreparable injury to Plaintiffs. Even if considered, Mr. Kunaknana does not state that he has ever been to the mine site (only somewhere downstream of that location) or the planned road extension.[74] Nor does he state that he would be injured by seeing the gravel mine or the gravel road extension.[75]

Ms. Ahtuangaruak testifies that "we hunt caribou where the mine is going to be located,"[76] but she does not say "we" intend to hunt caribou in that location this winter. And surveys show little or no hunting of caribou in that area in previous winters.[77] Ms. Ahtuangaruak also expresses no interest in seeing the mine site or road extension in an undisturbed state (or injury from seeing a gravel mine or gravel road). Moreover, her use of the word "we" rather than "I" fails to establish that she, herself, has ever been to the mine site or ever plans to go there, in the winter or otherwise. The Nuiqsut community is

---

[72] *Friends of Tilden Park, Inc. v. D.C.*, 806 A.2d 1201, 1209 (D.C. 2002).

[73] *Jones v. D.C.*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016).

[74] Kunaknana Decl. (SILA Dkt. 17-10) ¶ 7.

[75] *Id*.

[76] Ahtuangaruak Decl. (CBD Dkt. 9-13) ¶ 35.

[77] Pekich Decl. ¶¶ 12-14.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

18

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

not a party to this lawsuit, and "injuries to third parties are not a basis to find irreparable harm."[78]

Furthermore, even if a member actually established that they were likely to see the mine site or road extension at some future date, this minimal disturbance is not irreparable injury. This winter's work will impact only 24 to 29.9 acres of the 23-million acre Petroleum Reserve, or about 0.00013% of the Reserve,[79] far less than the 0.1 percentage of disturbance at issue in *National Parks*. Both road construction and mining are subject to extensive mitigation measures, including mitigation for the permanent protection of wetlands, and the mine site will ultimately be reclaimed into a deepwater lake for wildlife.[80] Although these changes to the environment may be permanent (subject to future remediation),[81] they are "objectively minimal" and do not warrant the extraordinary remedy of an injunction.[82]

### c. Plaintiffs fail to demonstrate irreparable injury to their interests in fish and wildlife.

Without any connection to the specific areas under construction, Plaintiffs claim that the Willow project will hurt the non-local declarants' interests in viewing or studying

---

[78] *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018).

[79] Brodie Decl. ¶ 13; Dunn Decl. ¶ 20.

[80] Brodie Decl. ¶¶ 15-16.

[81] *Id*. ¶ 15.

[82] *Earth Island Inst.,* 290 F. Supp. 3d at 1124.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

19

wildlife in other parts of the Petroleum Reserve (or elsewhere) or hurt the local declarants' subsistence interests. However, most of these concerns are targeted at the larger Willow project rather than the discrete construction activities planned this year. Moreover, all of these identified concerns are based on speculation, fear, and worry, none of which establish likely irreparable injury.

Mr. Kunaknana is "worried about how the mine will impact us and the health of the fish downstream."[83] Ms. Ahtuangaruak expresses her "worry that all the noises and activities from the mine will affect caribou migrations through the area," "worry about the gravel roads' impacts on caribou movements," and "worry that calving and calf imprinting could be affected because of these issues."[84] But, "[w]hile worrying that something may happen can be difficult, it does not rise to the level of irreparable harm."[85] Likewise "concerns and fears" are not "evidence that injuries are likely to occur."[86] These worries are based on speculation that construction activity could harm wildlife this winter (for which they provide no evidence) layered on top of speculation that such harms will be of sufficient magnitude to then irreparably impact their subsistence

---

[83] Kunaknana Decl. (SILA Dkt. 17-10) ¶ 7.

[84] Ahtuangaruak Decl. (SILA Dkt. 9-13) ¶ 36.

[85] *Ness v. Law Enf't Support Agency*, No. C10-5111 KLS, 2012 WL 13176243, at *4 (W.D. Wash. Aug. 9, 2012); *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009) ("worry" is "not an injury cognizable in a federal court").

[86] *Manzanita Band of Kumeyaay Nation,* 2020 WL 6118182, at *7.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

20

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

interests in those species this winter (for which they also provide no evidence). This speculation is not "substantial proof" of irreparable injury.[87]

And much of this speculation is clearly wrong. Ms. Ahtuangaruak repeatedly mentions the impact of helicopters on subsistence and caribou.[88] But there are no helicopter operations planned for the Willow construction project this winter.[89] Ms. Ahtuangaruak worries that activity from the gravel mine will "impact calving and calf imprinting," but calving occurs in June.[90] Work on the mine will be completely demobilized by May 1, 2021.[91]

CBD provides no expert testimony to back up Ms. Ahtuangaruak's worries. Instead, CBD relies on the EIS, which projects that construction activity will "disturb and displace caribou."[92] But these are temporary impacts (if they happen at all), not permanent ones, and do not support a conclusion that *the initial construction activities this winter* will irreparably injure subsistence interests.[93]

---

[87] *Mazurek,* 520 U.S. at 972.

[88] Ahtuangaruak Decl. (CBD Dkt. 9-13) ¶¶ 12, 14, 15, 18, 58

[89] Pekich Decl. ¶¶ 10-11.

[90] Ahtuangaruak ¶ 58; Ex. 6 (AR182804).

[91] Brodie Decl. ¶ 12.

[92] CBD Br. at 9.

[93] *Sierra Club,* 2020 WL 5096947, at *11 ("[T]he impact on endangered species is likely temporary and not irreparable")

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

21

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

The reality is that this winter's work is *unlikely* to adversely affect caribou because it will occur in an area that is not a high population area for caribou, especially in the winter.[94] Movement rates of Teshekpuk Lake Caribou Herd are lowest in the winter, traveling an average of 2.8 km per day during the winter season.[95] Hence, the winter work is not expected to materially impact movements or availability for local hunters, nor would any migration route be affected.[96] Moreover, caribou are commonly observed in and around winter oil and gas activities (including ice roads and gravel roads) without noticeable impacts, and ConocoPhillips implements mitigation measures to protect against potential impacts to caribou.[97]

Concerns about downstream water quality impacts from the mine are also speculative. SILA provides a single expert declaration from Shiobhan Fennessy (who appears to have no Arctic wetlands expertise or experience), but her assessment is focused on the *total* Willow project, not construction activities this winter. Even still, Ms. Fennessy's testimony is no less speculative than the other declarants, as she testifies that the "placement of the mine on the floodplain and the proximity of the mine pits to the river channel increases the *potential* for adverse impacts," and that "any degradation of

---

[94] McGhee Decl. ¶¶ 14-17.

[95] *Id*. ¶ 15.

[96] McGhee Decl. ¶¶ 14-17; Pekich Decl. ¶¶ 12-14.

[97] McGhee Decl. ¶ 17. Ex. C; Brodie Decl. ¶¶ 14, 16; *see also* Ex. 5 (AR186086-087).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

22

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

the floodplain . . . *can* lead to degradation of the aquatic resource."[98] The court in *Idaho Rivers* rejected nearly identical testimony: "[t]his statement that 'likely potential impacts and harm ... can result from ... dredging activities' falls short" of showing likely irreparable harm, because "the use of the terms 'potential' and 'can' connotes the mere possibility of such effects."[99] Moreover, Ms. Fennessy misses the fact that the mine "would not be located in active stream channels or floodplains,"[100] and does not address the efficacy of mitigation measures imposed by BLM,[101] the Corps,[102] or the State of Alaska.[103]

In fact, any wetlands impact will be objectively minimal. Much of the 23-million acre Petroleum Reserve is wetlands, and this winter's work will only impact up to 29.9 acres of wetlands.[104] Before construction begins this winter on those 29.9 acres, ConocoPhillips must secure compensatory mitigation through site protection agreements to preserve 800 acres of valuable wetlands in the region.[105] SILA's "sound and fury

---

[98] Fennessy Decl. (SILA Dkt. 17-15) ¶¶ 10, 11 (emphasis added).

[99] *Idaho Rivers United,* 156 F. Supp. 3d at 1262.

[100] Ex. 6 (AR183004, 183034).

[101] Ex. 5 (AR186079).

[102] Dunn Decl. Ex. B.

[103] *Id*. Ex. C.

[104] Brodie Decl. ¶ 13.

[105] Dunn Decl. ¶ 18.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

23

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

regarding the land that must be cleared and the wetlands that may be altered" fail to demonstrate irreparable injury to its members.[106]

The remaining declarations are also speculative. Jeffrey Fair professes his interests in studying yellow-billed loons in the future "in the Fish Creek area" but provides no evidence that this winter's work (which will not be in the Fish Creek area) will impact yellow-billed loons (which are not present in the winter), let alone irreparably injure his research activities or his "professional Alaskan legacy."[107] Mr. Fair also fails to acknowledge that the mine is nowhere near a yellow-billed loon nesting location, and that the road extension (by design) avoids the buffer around known yellow-billed loon nest sites, making injury to loons this winter improbable.[108] Richard Steiner relies on the far-fetched speculation that "oil and gas activity under the Willow project will harm my ability to see polar bears, caribou, and other migratory species on my upcoming trip to [the Alaska National Wildlife Refuge],"[109] and Michael Wald is concerned that "the impacts from the Willow project will make it harder for my clients and I to continue enjoying these species in other parts of the Arctic they migrate to."[110] Such speculation is

---

[106] *Sierra Club,* 990 F. Supp. 2d at 39-40.

[107] Fair Decl. (SILA Dkt. 17-6) ¶¶ 19-20. *Ctr. for Biological Diversity v. Hays*, No. 215-CV-01627 TLN CMK, 2015 WL 5916739, at *10 (E.D. Cal. Oct. 8, 2015) (harm not irreparable because research could be conducted outside of logging zone).

[108] Exhibit 9 (AR178373); Ex. 6 (AR18588-598).

[109] Steiner Decl. (CBD Dkt. 9-16) ¶ 19.

[110] Wald Decl. (SILA Dkt. 17-13) ¶ 13.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

built on a foundation of "quicksand," not on "evidence that injuries are likely to occur."[111]

### d. Plaintiffs fail to demonstrate irreparable injury from sound.

CBD raises concerns about the sound and disturbance associated with construction this winter. These arguments also fail.

*First*, none of the non-local declarants testify that they will visit *anywhere* in the Petroleum Reserve this winter. Those members, obviously, cannot be disturbed by sound from a thousand miles away (or more).

*Second*, Plaintiffs express concerns that noise will displace caribou, but again provide no evidence that such displacement is either significant or permanent, or that it will be of sufficient lasting magnitude to impact summer viewing opportunities or subsistence activities. As set forth above, such impacts are unlikely.[112]

*Third*, Ms. Ahtuangaruak expresses concern that the use of explosives at the nearby ASRC gravel mine caused property damage in Nuiqsut and post-traumatic stress disorder.[113] But this concern, while no doubt sincere, is not well-founded in this case.[114]

---

[111] *Manzanita Band of Kumeyaay Nation*, 2020 WL 6118182, at *7.

[112] *See supra* Section III.B.2.c.

[113] Ahtuangaruak Decl. (CBD Dkt. 9-13) ¶ 36.

[114] Brodie Decl. ¶¶ 6-9. Ms. Ahtuangaruak appears to be talking about third parties—not herself or other members of Plaintiffs. The declaration of Siqiñiq Maupin (SILA Dkt. 17-11) does not establish likely irreparable harm either. Ms. Maupin lives in Fairbanks (¶ 5), and will not be exposed to sounds from mining. Nonetheless, her concerns about "explosions going off every night" *if* she moved to Nuiqsut (¶ 22) are *Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG *Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

25

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

The proposed mining this winter is located about seven miles from Nuiqsut, as compared to the ASRC mine, which is about four miles from Nuiqsut.[115] Moreover, ConocoPhillips will use smaller "shot" sizes that reduce the amount of sound, limit the number of blasts this winter, and, unlike the ASRC mine, the prevailing wind direction is away from Nuiqsut, further reducing sound impacts.[116] In addition, the ROD specifically imposes limitations on blasting times (10 am to 8 pm), with notification and scheduling requirements.[117] General construction noises at the mine will not be perceptible at Nuiqsut.[118] Blasting noises will be at most 59 dBA at Nuiqsut, "which is roughly the volume of conversational speech,"[119] and "would be very short lived and instantaneous,"[120] and occur only 18 times this winter.[121] "Construction, by its very nature, is temporary,"[122] and the noise from mine operations will cease by May 1, 2021.[123] These are not irreparable injuries.

---

speculative. They are also improbable given mandatory restrictions on blasting times. *See infra* note 117.

[115] Brodie Decl. ¶¶ 6, 9. Ex. 6 (AR183011).

[116] Brodie Decl. ¶¶ 8-9.

[117] Ex. 5 (AR186080). Brodie Decl. ¶ 8.

[118] Brodie Decl. ¶ 8.

[119] Ex. 6 (AR183011).

[120] Ex. 6 (AR182458).

[121] Brodie Decl. ¶ 8.

[122] *Semonite*, 282 F. Supp. 3d at 289-90.

[123] Brodie Decl. ¶ 12.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

26

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

### e. CBD fails to demonstrate irreparable procedural injury.

Finally, CBD relies on the pre-*Winter* decision in *Sierra Club v. Marsh*[124] to argue that construction of the 2.8-mile road extension will have a "bureaucratic steamroller" effect that will foreclose BLM from considering the alternative of having no permanent roads as part of Willow.[125] The district court in *Semonite* rejected nearly identical arguments.[126] The plaintiffs sought to enjoin the construction of a transmission line project across the James River, claiming the initial construction of 17 in-water (and visible) foundations would cause irreparable procedural injury because "government decision makers will already have their minds made up and reasonable alternatives will necessarily be limited."[127]

The court rejected that argument, holding "procedural harm standing alone is insufficient to constitute irreparable harm."[128] The court was "not persuaded" by the procedural injury argument based on *Sierra Club*, because *Winter* requires "that irreparable harm be likely, not merely speculative."[129] The court found "it hard to believe that the Corps, which has no financial stake in this Project and is merely the permitting

---

[124] 872 F.2d 497, 504 (1st Cir. 1989).

[125] CBD Br. at 18.

[126] 282 F. Supp. 3d at 289-90.

[127] *Id*. at 290.

[128] *Id*.

[129] *Id*.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

27

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

organization, would be unable to objectively weigh reasonable alternatives in a future EIS just because [the applicant] has started construction."[130] Further, the court reasoned that if it "determines that the EIS is required, it can direct the Corps to ignore the fact that [the project proponent] has already begun the Project in considering the reasonable alternatives."[131]

The same is true here. It is "hard to believe" that the BLM will be unable to objectively weigh reasonable alternatives simply because ConocoPhillips has started construction. If needed, the Court could order BLM to not consider ConocoPhillips' initial construction during remand. If BLM on remand selected an alternative that foreclosed the need for the new gravel mine (even though the use of the ASRC mine would have greater impacts on Nuiqsut),[132] the mine site could be reclaimed.[133] If BLM on remand selected an alternative that left the Willow project without road access (even though such an alternative would create significant operational and safety concerns for ConocoPhillips), the 2.8-mile segment could be decommissioned or reclaimed.[134]

In sum, because Plaintiffs have failed to show a likelihood of irreparable harm from this winter's work, their motions should be denied for this reason alone.

---

[130] *Id.*

[131] *Id.*

[132] Ex. 6 (AR182928).

[133] Brodie Decl. ¶ 15.

[134] *Id.*

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

28

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**C.** **SILA Is Unlikely to Succeed on the Merits.[135]**

**1.** **BLM's Biological Opinion Complies with the ESA.**

SILA argues that the BiOp is unlawful because FWS supposedly relied upon mitigation measures that are not reasonably certain to occur.[136] SILA relies on the recent Ninth Circuit decision in *Center for Biological Diversity v. Bernhardt*, in which the court invalidated a biological opinion for Hilcorp's Liberty project in the offshore Beaufort Sea ("Liberty BiOp"). SILA's argument has several fatal flaws.

*First*, although the decision in *Center for Biological Diversity* is certainly recent, the Liberty BiOp is actually governed by now-outdated regulations. The Willow BiOp, by contrast, is governed by the amended ESA Section 7 implementing regulations, which became effective on October 28, 2019.[137] The current regulations make an important change that completely undermines SILA's argument. The *current* ESA regulations add the underlined text below and now state:

> [T]he Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions <u>as proposed or</u> taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. <u>Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like</u>

---

[135] For the reasons stated by Federal Defendants, SILA and CBD's NEPA claims are barred by the applicable statute of limitations. *See* Dkt. (SILA) 26 at 21; *see also* 42 U.S.C. § 6506a(n)(1).

[136] SILA Br. at 9-13.

[137] 84 Fed. Reg. 44,976 (Aug. 27, 2019); 84 Fed. Reg. 50,333 (Sept. 25, 2019).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

29

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

other portions of the action **and do not require any additional demonstration of binding plans**.[138]

The premise of SILA's argument—that the mitigation measures in the Willow BiOp must be "sufficiently specific, binding, or certain to occur"—is therefore mistaken. For this reason alone, SILA's argument is unlikely to succeed.

*Second*, FWS identified, described, and considered the mitigation measures in the Willow BiOp as the law requires. The ESA implementing regulations require the "action agency" (here, BLM) to provide the consulting agency (here, FWS) with, *inter alia*, "[a] description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action."[139] This description "shall provide sufficient detail to assess the effects of the action on listed species and critical habitat."[140] Accordingly,

---

[138] 50 C.F.R. § 402.14(g)(8) (emphases added); *see* 84 Fed. Reg. at 45,002 ("[J]udicial decisions have created confusion regarding what level of certainty is required to demonstrate that a measure will in fact be implemented before the Services can consider it in a biological opinion. In particular, the Ninth Circuit has held that even an expressed sincere commitment by a Federal agency or applicant to implement future improvements to benefit a species must be rejected absent "specific and binding plans" with "a clear, definite commitment of resources for future improvements." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 935-36 (9th Cir. 2008). *To address this issue, we are proceeding with the revisions to § 402.14(g)(8)….*" (emphasis added)).

[139] 50 C.F.R. § 402.14(c)(1)(i).

[140] *Id.*; 84 Fed. Reg. at 45,002 ("[T]the Services will provide our opinion on the effects of the action if implemented as proposed.").

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

30

BLM's Biological Assessment ("BA") details all of the MMPA mitigation and monitoring measures that are applicable to Willow and part of the proposed action.[141]

FWS describes and considers these measures (and others) in the BiOp. For example, the BiOp describes with specificity all of the design features that are intended to minimize impacts to polar bear critical habitat and reduce human-polar bear conflicts.[142] It provides detailed descriptions of required measures to minimize disturbance around polar bear dens.[143] The BiOp also expressly references the MMPA mitigation and monitoring measures set forth in Appendix B of the BA and provides detailed descriptions of the MMPA incidental take program as applied to Willow.[144]

*Third*, SILA's claim that the MMPA mitigation and monitoring measures are "not reasonably certain to occur" is not only contrary to current regulations, but also contradicted by the record. As the BiOp explains:

> BLM's commitment to ensure compliance with the MMPA by requiring MMPA incidental take authorizations, and/or written communication that a take authorization is not warranted, prior to engaging in project activities, ensures these standards would apply, thereby limiting potential impacts of the project to those in compliance with the

---

[141] *See* Ex. 8 (AR164490-96); Ex. 7 (FWS-AR764) ("[T]he Proposed Action also contains protective measures that provide significant minimization of impacts to polar bears, most importantly BLM's commitment to ensure compliance with the MMPA."); *id.* (FWS-AR766).

[142] Ex. 7 (FWS-AR697-660, 662).

[143] *Id.* (FWS-AR665, 578-79).

[144] *Id.* (FWS-AR678, 744-45, 751).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

31

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

protective limitations of the MMPA, which is a more
restrictive standard than the ESA.[145]

If MMPA compliance is required for the action to proceed, then the MMPA mitigation

and monitoring measures are plainly "reasonably certain to occur."[146] For all of these

reasons, SILA's claim is not likely to succeed.[147]

### 2. BLM Took the Requisite Hard Look at Willow and Its Impacts.

SILA claims that BLM failed to take a "hard look" because it lacked "critical

information about the project proposal and design."[148] For the reasons stated in Federal

Defendants' brief (Dkt. 26 (SILA) at 22-23), SILA's arguments are refuted by the EIS,

amount to flyspecking, and misapply the law.

Additionally, SILA faults ConocoPhillips and BLM for "continuing to make

project changes throughout the NEPA process" and complains that not all project

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

---

[145] *Id*. (FWS-AR747); *see also id*. (FWS-AR744) ("BLM would not approve
project activities absent documentation of compliance under the MMPA."); *id*. (FWS-
AR-677) (same).

[146] BLM's commitment to ensure compliance with the MMPA's "negligible
impact" standard ensures a lower level of impact than the ESA's "jeopardy" standard
requires. *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 913 (9th Cir. 2012).

[147] SILA suggests that "FWS estimated that Willow may seriously injure or kill a
mean of 2.2 cubs over the life of the project." SILA Br. at 11. But SILA acknowledges,
as it must, that FWS found that such an impact had only a 16% chance of occurring and
that it was "reasonably certain" that *no polar bear incidental takes* would occur over the
life of the project. Ex. 7 (FWS-AR749).

[148] SILA Br. at 15-16.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

32

modifications were evaluated in the Supplemental EIS.[149] NEPA requires an EIS to be supplemented only if "[t]he agency makes *substantial* changes in the proposed action that are relevant to environmental concerns" or "[t]here are *significant* new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[150] SILA fails to show why these standards are met, much less cite them. Furthermore, the Ninth Circuit recognizes that "agencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input, without having to circulate a supplemental draft EIS describing the proposed action."[151] Here, BLM sufficiently explained why some project changes required analysis in the Supplemental EIS and why other insignificant project refinements did not.[152] More broadly, SILA's argument is generally antithetical to the purpose of NEPA, which is to foster informed decision-making through a public process that is intended to improve proposed actions.[153] All of SILA's "hard look" arguments are unlikely to succeed.

---

[149] *Id*. at 16.

[150] 40 C.F.R. § 1502.9(d)(1)(i)-(ii) (emphases added).

[151] *Half Moon Bay Fishermen's Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) (quoting *California v. Block*, 690 F.2d 753, 770–72 (9th Cir. 1982).

[152] Ex. 9 (AR178272-73) ("Other project changes . . . are not expected to substantively change the overall analysis or results described in Chapter 3 of the Draft EIS."); *see* Ex. 6 (AR182392-93).

[153] *See Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action."); *Hunters v. Marten*, 470 F. Supp. 3d 1151, 1161 (D. Mont. 2020) ("NEPA also allows the agency to modify its projects in light of public input").

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

33

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**D.      CBD Is Unlikely to Succeed on the Merits.**

        **1.      The EIS for the Willow MDP Fully Disclosed and Explained Greenhouse Gas Effects.**

CBD asserts that BLM violated NEPA by failing to estimate potential global greenhouse gas emissions associated with the project.[154] CBD relies solely upon the Ninth Circuit's recent opinion in *Center for Biological Diversity v. Bernhardt*[155] for this claim. But contrary to CBD's contention that the Willow MDP relied on "the same core rationale and record,"[156] the Willow EIS and supporting documents are distinguishable from the Liberty EIS in key respects.

*First*, the lynchpin to the court's holding in *CBD* was the Bureau of Ocean Energy Management's ("BOEM")[157] counterintuitive finding that *not* building the proposed the Liberty project would result in "25,370,000 *more* metric tons" of carbon dioxide emissions than if the project was constructed.[158] The plaintiffs in that case complained that this finding was caused by the agency's failure to consider the indirect

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

---

[154] Dkt. 9 at 6-9.

[155] 982 F.3d 723 (9th Cir. 2020).

[156] Dkt. 9 at 6.

[157] The first page of the court's order incorrectly states that the appeal is from a BLM decision.

[158] *CBD*, 982 F.3d at 736.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

effect of increased foreign oil consumption resulting from construction of the project.[159]

The court agreed, holding:

> BOEM's conclusion that *not* drilling will result in more carbon emissions is counterintuitive. An agency acts arbitrarily and capriciously when it reaches a decision that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Without further explanation, we cannot ascribe the implausibility of the result to BOEM's expertise or rational decision-making.[160]

In contrast, BLM rationally concluded here that *not* developing the Willow Project would result in *less* downstream carbon emissions.[161] Accordingly, the Willow EIS does not contain the same error that "demonstrate[d] the need for further explanation" in *CBD*.[162]

*Second*, unlike the NEPA analysis that the Ninth Circuit found deficient for the Liberty project, BLM comprehensively evaluated greenhouse gas emissions for the Willow MDP and explained in detail why it was unable to quantify foreign consumption of oil in its indirect effects' analysis. In the Willow EIS, BLM dedicated a ten-page section to analyzing the direct and indirect effects associated with greenhouse gas emissions,[163] which, in turn, is supported by appendices specifically addressing "Climate

---

[159] *Id.*

[160] *Id.* at 739 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[161] Ex. 6 (AR182423) ("GHG emissions in the No Action Alternative are assigned a baseline value of zero in the EIS"); *see also id.* (AR183493).

[162] *CBD*, 982 F.3d at 739.

[163] Ex. 6 (AR182418-28).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

35

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

and Climate Change"[164] as well as "Market Substitutions and Greenhouse Gas Downstream Emissions Estimates."[165] BLM also provided a detailed explanation in response to comments about the foreign consumption issue.[166] In contrast, the Liberty EIS contains a two-page section addressing effects associated with GHG emissions, no appendix with a supporting analysis of downstream emissions, and a short response to public comments.[167]

*Third*, also unlike the Liberty project, which did not focus on oil being produced primarily for the domestic market, the Willow EIS explains, "[i]t is reasonable to exclude foreign oil consumption in the context of market substitution because the oil produced by the Willow MDP Project would likely be consumed domestically; therefore, substitution sources for the Project would also be consumed domestically."[168] BLM therefore reasonably concluded that additional analysis of a dubious foreign consumption scenario was unnecessary.[169]

*CBD* is therefore distinguishable and not controlling. The Willow EIS does not reach the same counterintuitive finding that the Ninth Circuit found to require additional

---

[164] Ex. 6 (AR183482-500).

[165] Ex. 6 (AR183502-509).

[166] Ex. 6 (AR182947-48; AR182956-57; AR182963; AR182965).

[167] *See* Ex. 10 (AR275729-31, AR276205).

[168] Ex. 6 (AR182963).

[169] *See Sierra Club v. U.S. Dep't of Energy*, 8667 F.3d 189, 202 (D.C. Cir. 2017).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

36

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

explanation in the Liberty EIS. The Willow EIS and its appendices also provide the

supporting analyses that the court found to be missing in *CBD*. As such, CBD is unlikely

to prevail on the merits of this claim.

### 2. The EIS Considers a Reasonable Range of Alternatives.

"NEPA does not require BLM to explicitly consider every possible alternative to

a proposed action."[170] Nor was BLM required to consider alternatives "that extend

beyond those reasonably related to the purposes of the project."[171] CBD does *not*

challenge the stated purpose of the Willow project. Instead, CBD argues that BLM failed

to consider the alternatives put forward by Plaintiffs.[172] This argument is unlikely to

succeed for the reasons stated in the Federal Defendants' brief (Dkt. 26 (SILA) at 23-26)

as well as the following additional reasons.

*First*, contrary to CBD's assertions, the action alternatives differ in key respects in

their approaches to facilitating access to ConocoPhillips' leases and minimizing impacts

to the environment. For example, ConocoPhillips' proposed project (Alternative B)

would extend the all-season gravel road from GMT2 to the Willow project site, thereby

connecting the Willow development to facilities in the GMTU and the Alpine facilities in

---

[171] *See League of Wilderness Defs. v. U.S. Forest Service*, 689 F.3d 1060, 1071 (9th Cir. 2012) (citation omitted); *Native Vill. of Nuiqsut v. BLM*, 432 F. Supp. 3d 1003, 1041 (D. Alaska 2020) ("Whether an alternative is reasonable and appropriate depends on the stated purpose for the proposed action.") (citing *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005)).

[172] Dkt. 9 at 9-13.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

the Colville River Unit. Alternative B would also connect all Willow facilities with in-field gravel roads for year-round use.[173] Alternative C, on the other hand, presents a "Disconnected Infield Road" option, which has no gravel road or bridge connecting the Willow Processing Facility to the BT1 drill site.[174] Alternative C has less gravel roads and bridge crossings than Alternative B, but more ice roads, an additional airstrip, and more flights.[175] Alternative D—the "Disconnected Access" Alternative—eliminates the gravel road connecting Willow to ConocoPhillips' facilities in the GMTU. It has the least amount of gravel roads and bridge crossings, but significantly more ice roads, water use, and vehicle trips.[176] Moreover, BLM considered three very different module delivery options for the transportation supplies and equipment to construct the project, all of which presented different impacts.[177] This range of varying alternatives, with meaningful differences in their design, overall footprint, and environmental impacts—while also serving the project purpose—is readily distinguishable from cases rejecting "virtually identical" or "indistinguishable" alternatives.[178]

---

[173] Ex. 6 (AR182396).

[174] *Id*. (AR182396-97).

[175] *Id*. (AR182375-82).

[176] *Id*.

[177] *Id.* (AR182408-409).

[178] *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (two "virtually identical" action alternatives that differed only in re-labeling a portion of lands transferred as a "donation" rather than an "exchange"); *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038-39 (9th Cir. 2008) (two action

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

38

*Second*, the action alternatives were developed by BLM and its cooperating agencies through a rigorous evaluation of 33 potential alternative components, 26 of which "were eliminated from further analysis because they did not meet the overall Project purpose [or] were not considered economically or technically feasible or practicable" (among other reasons).[179] The EIS describes the alternatives that were considered and the rationales for eliminating them from further analysis, including the alternatives CBD incorrectly argues the EIS failed to consider.[180]

For example, the EIS *did* consider a roadless Willow Production Facility alternative as well as an alternative that removed gravel road connections to the BT-2 and BT-4 drill sites and explained the reasons these alternatives were rejected.[181] Additionally, the EIS explained why CBD's comparison to the roadless drill site at CD-3 within the Alpine development is inapt. Although CD-3 can only *mobilize and demobilize* the drilling rig in the winter months when ice roads are present, CD-3 has its own airstrip and also river access which supports safe year-round *drilling* operations with emergency

---

"virtually indistinguishable" alternatives proposing the *same* user capacity limits on recreational visitors to National Park).

[179] Ex. 6 (AR183180).

[180] *See* Ex. 6 (AR183180-87).

[181] *See id.* (Table D.3.2, component Numbers 3, 6, and 8 describing how these alternatives would increase air traffic, require construction of an additional airstrip closer to high-density caribou calving grounds, increase water usage over the life of the Project, and increase health and environmental risk in the event of emergency).

response capabilities, making the project economically feasible and safe to operate in the absence of all-season road access.[182]

Finally, CBD's argument for an alternative prohibiting infrastructure in the Teshekpuk Lake and Colville River Special Areas is contrary to the NPRPA's directive that BLM carry out exploration in the Petroleum Reserve's special areas in a manner assuring "maximum protection of such surface values *to the extent consistent with the requirements of this Act for the exploration of the Reserve*."[183] Drill sites BT2 and BT4 (which is not authorized by the ROD) are located in leased areas within the Teshekpuk Lake Special Area where infrastructure is allowed and anticipated to occur under the 2013 IAP. Indeed, BLM's decision to make portions of the Petroleum Reserve's special areas available for oil and gas leasing and exploration has been upheld by this Court.[184]

In sum, CBD's alternatives argument is unlikely to succeed. NEPA simply requires a brief discussion of alternatives that were considered but ultimately eliminated from detailed study—precisely as BLM did here.[185]

---

[182] Ex. 6 (AR183012).

[183] 42 U.S.C. § 6504(a) (emphasis added).

[184] *See Native Vill. of Nuiqsut,* 432 F. Supp. 3d 1003; *see also N. Alaska Envtl. Ctr. v. Norton,* 361 F. Supp. 2d 1069 (D. Alaska 2005), *aff'd by N. Alaska Envtl. Ctr.,* 457 F.3d at 978.

[185] *See* 40 C.F.R. § 1502.14(a); *Am. Rivers v. FERC*, 201 F.3d 1186, 1200 (9th Cir. 1999); *Kempthorne*, 457 F.3d at 978.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG
40

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**E.** **The Balance of the Equities and Public Interest Weigh Against an Injunction.**

Under the "traditional" *Winter* test, Plaintiffs must prove that the balance of hardships tips in their favor.[186] Under the Ninth Circuit's alternative "sliding scale" test, Plaintiffs must prove that the balance of hardships tips *sharply* in their favor.[187] Neither standard is met here.

NEPA and ESA claims are evaluated differently in the balancing of the equities. For an ESA claim, "the balance of hardships always tips sharply in favor of endangered or threatened species."[188] However, the plaintiff has the burden to "present the court with some basis on which it can conclude that an injunction would in fact benefit the protected species."[189] SILA has presented no credible evidence that an injunction this winter will have any benefit whatsoever to the polar bear. The evidence is clear that any impact is improbable, and speculation to the contrary does not tip the scales of equity.[190]

For NEPA claims, courts apply the typical equitable balancing factors. "A court cannot abandon a balance of harms analysis just because a potential environmental injury

---

[186] *See, e.g., Monsanto,* 561 U.S. at 157.

[187] *See, e.g., Shell Offshore, Inc. v. Greenpeace Inc.,* 709 F.3d 1281, 1291 (9th Cir. 2013).

[188] *See, e.g.*, *Marbled Murrelet v. Babbitt,* 83 F.3d 1068, 1073 (9th Cir. 1996).

[189] *All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1267 (D. Mont. 2014).

[190] *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1351 (D. Mont. 2014) ("speculative harms to such species" outweighed by "strong public interest in protecting municipal water supplies from catastrophic wildfire").

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

is at issue."[191] "Rather, this Court must weigh the environmental injuries invoked by [Plaintiffs] against the other injuries identified by the other parties."[192]

As demonstrated above in Section III.B, Plaintiffs' concerns about harms to their recreational, aesthetic, and subsistence interests are entirely speculative and unsupported. Indeed, those concerns are belied by the fact that Plaintiffs did not even challenge (let alone seek to enjoin) the GMT1 project (which involved 7.6 miles of gravel road and 25 acres of gravel mining) or the GMT2 project (which involved a 8.2-mile gravel road and 23 acres of gravel mining).[193] The 2.8-miles of road to be constructed this winter connects directly to these roads and has exactly the same nature and character. Plaintiffs' concerns are also belied by the fact that many of them expressly *supported* the 2013 IAP's selected alternative, which contemplates as many as *eight* central processing facilities like Willow, calling it a "balanced" approach to management.[194]

Balanced against Plaintiffs' speculative concerns, an injunction will have real and immediate economic consequences for ConocoPhillips. ConocoPhillips has invested approximately $500 million in lease acquisition, exploration and appraisal drilling, conceptual engineering, permitting, and other expenditures to find the Willow discovery,

[191] *Kunaknana*, 2014 WL 975592, at *3 (citations and quotations omitted)

[192] *Id*. (citations and quotations omitted); *see, e.g., Earth Island Inst.*, 626 F.3d at 475.

[193] Brodie Decl. ¶ 7. *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (reasoning that plaintiff's own delay "undercut ... claim of irreparable harm").

[194] Ex. 12 (AR269520, AR270891-92).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

42

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

plan the development, and secure BLM's approval.[195] An injunction would negatively impact the project schedule by a year or more, could result in deferral of initial production (when revenue starts, along with taxes and royalties), and adversely affect project economics.[196] These are potentially very significant costs, in addition to lost expenditures made in preparing for this winter's work.[197]

In *Amoco Production Co. v. Village of Gambell*, the Supreme Court reversed and vacated injunctive relief in a case concerning potential harm to subsistence resources from oil and gas exploration in the Bering Sea.[198] The Court rejected the Ninth Circuit's holding that "irreparable damage is *presumed* when an agency fails to evaluate thoroughly the environmental impact of a proposed action," finding "[t]his presumption is contrary to traditional equitable principles."[199] Moreover, the Court found that the alleged "injury to subsistence resources from exploration was not at all probable."[200] Accordingly, the Supreme Court found that the potential for environmental harm was

---

[195] Dunn Dec. ¶¶ 23-25; Brodie Decl. ¶ 19. Any lost expenditures or economic impacts of delay will not be recoverable as Plaintiffs have represented that they cannot afford a bond in this case. *See* e.g. SILA Dkt. 17-8 ¶ 24.

[196] Dunn Dec. ¶¶ 23-25; Brodie Decl. ¶ 19.

[197] *Id.*

[198] 480 U.S. 531, 535, 545 (1987).

[199] *Id.* at 544-45 (emphasis in original).

[200] *Id.* at 545; *see also id.* at 544 (EIS and other agency studies "expressly found that exploration activities would not significantly restrict subsistence uses").

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

43

outweighed by the countervailing financial harm an injunction would cause.[201] The same is true here.

Finally, the public interest does not favor an injunction. The "development of domestic energy resources is of paramount public interest and will be harmed (at least to some extent) if that development is delayed."[202] The NPRPA directs the Secretary of the Interior to carry out an "expeditious program of competitive leasing of oil and gas," and to protect important resources," thereby balancing our national interests in both oil and gas development and conservation of natural resources within the Petroleum Reserve.[203] Moreover, the State of Alaska, the North Slope Borough, and other public entities submitted letters expressing strong support for the Willow MDP, which will provide significant public benefits that will be widely distributed, including $2.1 billion in tax and surcharge revenue to the State of Alaska, $7.6 billion in tax and other revenue to the federal government ($2.6 billion of which is intended to benefit impacted municipalities), and $1.3 billion in tax revenue to the North Slope Borough.[204] Plaintiffs' requested

---

[201] *Id.* at 545.

[202] *Kempthorne*, 525 F. Supp. 2d at 126-27.

[203] 42 U.S.C. § 6506a(a); *see* Dkt. 127 § II.A (addressing NPRPA and Petroleum Reserve); *see also Amoco*, 480 U.S. at 544-45 ("[P]ublic interest [] favored continued oil exploration, given OCSLA's stated policy").

[204] *See* Declaration of Harry K. Brower, Jr. ("Brower Decl."); Dunn Decl. ¶¶ 22; Ex. 6 (AR182612-14). Additionally, on January 15, 2021, the North Slope Borough Assembly adopted ordinance 76-06-75, An Ordinance Approving the Willow Project Master Plan and Amending the Official Zoning Map of the North Slope Borough to Rezone as Resource Development District Those Lands Needed to Develop the Willow *Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG *Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

injection will delay these important revenues, and the creation of hundreds of jobs, and is contrary to the public interest.[205]

## IV. CONCLUSION

Plaintiffs' motions for preliminary injunction should be denied.

DATED: January 15, 2021.

STOEL RIVES LLP

By: */s/ Ryan P. Steen*
Ryan P. Steen (Bar No. 0912084)
Jason T. Morgan (Bar No. 1602010)
James C. Feldman (Bar No. 1702003)

Attorneys for ConocoPhillips Alaska, Inc.

Certification: Counsel for Intervenor-Defendant certifies that this brief is 10,997 words, which is under the 11,000 word limit that has been granted by the Court.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

---

Project. *See* Dunn Decl. ¶ 26; Brower Decl. ¶ 9 (rezone "specifically to allow the Willow project to begin construction during the 2021 winter construction season"); *see also* Ex. 11.

[205] *Kempthorne*, 525 F. Supp. 2d 126-27 (injunction not in public interest where it "would, without doubt, delay receipt of significant revenue by the federal, state and local governments"); Ex. 6 (AR182612-14).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG

45

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2021, I filed a true and correct copy of the

foregoing document with the Clerk of the Court for the United States District Court of

Alaska by using the CM/ECF system. Participants in this Case No. 3:20-cv-00290-SLG

and 3:20-cv-00308-SLG who are registered CM/ECF users will be served by the

CM/ECF system.

| | |
|---|---|
| Brian Litmans | blitmans@trustees.org |
| Bridget Earley Psarianos | bpsarianos@trustees.org |
| Brook Brisson | bbrisson@trustees.org |
| Suzanne Bostrom | sbostrom@trustees.org |
| Jeremy C. Lieb | jlieb@earthjustice.org |
| Eric P. Jorgensen | ejorgensen@earthjustice.org |

*/s/ Ryan P. Steen*
Ryan P. Steen

109372206.4 0028116-00157

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* - Case No. 3:20-cv-00290-SLG
*Center for Biological Diversity, et al. v. BLM et al.* - Case No. 3:20-cv-00308-SLG