Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org
blitmans@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al*., | Case No. 3:20-cv-00290-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al*., | |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendants. | |

## PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT
(Civil Rule 56(a), Local Civil Rule 16.3)

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES...........................................................................................ii

LIST OF SHORT NAMES AND ACRONYMS ...........................................................vi

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

STANDARD OF REVIEW .............................................................................................. 5

PLAINTIFFS' INTERESTS ............................................................................................ 6

ARGUMENT.................................................................................................................... 7

   I.   BLM and the Corps Violated NEPA.................................................................... 7

      A.   SILA's NEPA Claims Are Not Time-Barred. ..................................... 9

      B.   BLM and the Corps Lacked Project Information and Failed to Obtain Baseline Information Necessary to Take a Hard Look............................................................. 12

      C.   BLM and the Corps Failed to Adequately Consider Willow's Cumulative Effects.................................................................................................................. 17

      D.   BLM Failed to Adequately Disclose and Analyze the Effects of Willow's Greenhouse Gas Emissions. ....................................................................................... 23

   II.   The Corps Violated the CWA.......................................................................... 25

      A.   The Corps Lacked Sufficient Information to Conclude Willow Would Not Cause Significant Degradation..................................................................................... 26

      B.   The Corps' Finding That Willow's Impacts Would be Adequately Mitigated Is Arbitrary. ..................................................................................................................... 29

   III.   FWS Violated the ESA. ................................................................................ 34

      A.   FWS Relied on Future, Uncertain Mitigation Measures. ................. 35

      B.   FWS's Take Findings are Inconsistent and Unsupported. ............... 37

   IV.   The Court Should Vacate the Agencies' Decisions............................................ 41

CONCLUSION ............................................................................................................. 42

TABLE OF AUTHORITIES

Federal Cases

*Alaska v. Andrus*,
   580 F.2d 465 (D.C. Cir. 1978) ...................................................................... 10

*Alaska Conservation Council v. U.S. Forest Serv.*,
   443 F. Supp. 3d 995 (D. Alaska 2020) ........................................................ 13

*Alliance for the Wild Rockies v. U.S. Forest Serv.*,
   907 F.3d 1105 (9th Cir. 2018) ............................................................... 40, 41

*Bark v. U.S. Forest Serv.*,
   958 F.3d 865 (9th Cir. 2020) ................................................................ 17, 20

*Blue Mountains Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) ...................................................................... 7

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*,
   688 F.3d 989 (9th Cir. 2012) ..................................................................... 40

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ................................................................ 7, 13

*Cf. Coal. for Clean Air v. Envtl. Prot. Agency*,
   971 F.2d 219 (9th Cir. 1992) ....................................................................... 9

*City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*,
   123 F.3d 1142 (9th Cir. 1997) ............................................................... 8, 21

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*,
   466 F. Supp. 3d 1217 (W.D. Wash. 2020) .................................................. 41

*Cottonwood Envtl. Law Ctr. v U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) ................................................................... 41

*Ctr. for Biological Diversity v. Bernhardt* ,
   982 F.3d 723 (9th Cir. 2020) ............................................................... passim

*Ctr. for Biological Diversity v. Ross*,
   No. CV 18-112 (JEB), 2020 WL 1809465 (D.D.C. Apr. 9, 2020) .............. 40

*Ctr. for Biological Diversity v. Salazar*,
   695 F.3d 893 (9th Cir. 2012) ..................................................................... 37

*Estate of Bell v. Comm'r*,
   928 F.2d 901 (9th Cir. 1991) ............................................................... 10, 11

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
   423 U.S. 326 (1976) ................................................................................... 40

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ..................................................................................... 6

*Great Basin Res. Watch v. Hankins*,
   456 F.3d 955 (9th Cir. 2006) ......................................................... 12, 17, 19

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                       ii

*Humane Soc'y of the U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ........................................................... 41

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ........................................................................... 6

*Kern v. U.S. Bureau of Land Mgmt.*,
    284 F.3d 1062 (9th Cir. 2002) ......................................................... 20

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
    387 F.3d 989 (9th Cir. 2004) ............................................... 13, 20, 22

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ..................................................... 8, 20

*Love v. Thomas*,
    858 F.2d 1347 (9th Cir. 1988) ........................................................... 8

*Marble Mountain Audubon Soc'y v. Rice*,
    914 F.2d 179 (9th Cir. 1990) ............................................................. 8

*Moapa Band of Paiute Indians v. U.S. Dep't of Interior*,
    747 F.2d 563 (9th Cir. 1984) ............................................................. 8

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................. 5

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ........................................................... 20

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    (*STB*), 668 F.3d 1067 (9th Cir. 2011) ...................................... passim

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) ........................................................... 20

*Natural Res. Defense Council, Inc. v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988) .................................................... 8, 21

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) ........................................... 16, 20, 22

*Nw. Coal. for Alternatives to Pesticides v. U.S. Envtl. Prot. Agency*,
    544 F.3d 1043 (9th Cir. 2008) ....................................................... 6, 9

*Or. Nat. Res. Council, Inc. v. Kantor*,
    99 F.3d 334 (9th Cir. 1996) ............................................................. 10

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*,
    806 F.3d 520 (9th Cir. 2015) ..................................................... 40, 41

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ..................................................................... 12, 13

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
    21-35085 (9th Cir. Feb. 13,2021) ..................................................... 9

*United States v. Bonilla-Montenegro*,
    331 F.3d 1047 (9th Cir. 2003) ......................................................... 11

*United States v. Trident Seafoods Corp.*,
    92 F.3d 855 (9th Cir. 1996) ............................................................. 11

*W. Oil & Gas Ass'n v. Alaska*,
  439 U.S. 922 (1978)..................................................................................................... 10

Federal Statutes

5 U.S.C. § 706 ........................................................................................................ 5, 40
16 U.S.C. § 1362 ......................................................................................................... 34
16 U.S.C. § 1371 ......................................................................................................... 34
16 U.S.C. § 1531 ......................................................................................................... 41
16 U.S.C. § 1532 ......................................................................................................... 34
16 U.S.C. § 1536 .................................................................................................... 33, 37
16 U.S.C. § 1538 ......................................................................................................... 33
33 U.S.C. § 1251 ......................................................................................................... 41
33 U.S.C. § 1311 ......................................................................................................... 24
33 U.S.C. § 1344 ......................................................................................................... 24
42 U.S.C. § 4332 ..................................................................................................... 7, 16
42 U.S.C. § 6504 ......................................................................................................... 10
42U.S.C. § 6505 .......................................................................................................... 10
42 U.S.C. § 6506a .................................................................................................... 9, 10
Act of April 5, 1976, Pub. L. No. 94-258, § 104,90 Stat. 303 (1976).............................. 11
Act of Sept. 30, 1981, Pub. L. No. 96-514, 94 Stat. 2957 (1980). .................................. 11
Energy Policy Act of 2005, Pub. L. No. 109-58 § 347, 119 Stat. 594 (2005). ................. 11

Federal Regulations

33 C.F.R. § 320.4................................................................................................ 24, 25, 30
33 C.F.R. § 332.3......................................................................................................... 32
33 C.F.R. § 332.4......................................................................................................... 32
33 C.F.R. § 336.1......................................................................................................... 25
40 C.F.R. § 230.97....................................................................................................... 32
40 C.F.R. § 230.1......................................................................................................... 41
40 C.F.R. § 230.10.................................................................................................. 25, 30
40 C.F.R. § 230.11....................................................................................................... 25
40 C.F.R. § 230.12.................................................................................................. 27, 29
40 C.F.R. § 230.2......................................................................................................... 25
40 C.F.R. § 230.20–.23................................................................................................. 25
40 C.F.R. § 230.93.................................................................................................. 30, 31
40 C.F.R. § 1500.1....................................................................................................... 41
40 C.F.R. § 1502.1......................................................................................................... 7
40 C.F.R. § 1508.25..................................................................................................... 16
40 C.F.R. § 1508.7......................................................................................................... 8

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                    iv

50 C.F.R. § 17.3 ..................................................................................................... 34
50 C.F.R. § 402.14 ......................................................................................... 36, 37
50 C.F.R. § 402.16 ................................................................................................ 37

Other Authorities

Compensatory Mitigation for Losses of Aquatic Resources; Final Rule, 73 Fed. Reg.
   19,594 (Apr. 10, 2008) .................................................................................. 26
Endangered and Threatened Wildlife and Plants; Regulations for Interagency
   Cooperation, 84 Federal Register 44,976 (Aug. 27, 2019) ........................................... 36
Designation of Critical Habitat for the Polar Bear, 75 Fed. Reg. 76086 (Dec. 7, 2010). ... 4
Determination of Threatened Status for the Polar Bear, 73 Fed. Reg. 28212 (May 15,
   2008) . ........................................................................................................... 4
H.R. REP. NO. 96-1147 (1980) ..................................................................................... 11
S. REP. NO. 96-985 (1980) ........................................................................................... 11

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Beaufort ITR | Beaufort Sea Incidental Take Regulation |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| BOEM | Bureau of Ocean Energy Management |
| ConocoPhillips | ConocoPhillips Alaska, Inc. |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FWS | U.S. Fish and Wildlife Service |
| GHG | Greenhouse Gas |
| Greater Willow | Greater Willow 1 and 2 |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NPRPA | National Petroleum Reserve Production Act |
| Reserve | National Petroleum Reserve-Alaska |
| RFFA | Reasonably Foreseeable Future Action |

ROD(s)                    Record(s) of Decision

SDEIS                     Supplemental Draft Environmental Impact Statement

SILA                      Sovereign Iñupiat for a Living Arctic

Willow                    Willow Master Development Plan

WOUS                      Waters of the United States

404 Permit                Clean Water Act Section 404 Permit

## INTRODUCTION

The National Petroleum Reserve–Alaska (Reserve) is one of the wildest expanses of public lands in the United States. Although the Bureau of Land Management (BLM) administers an oil and gas program in the Reserve, it is also required to protect the Reserve's wildlife and surface values. ConocoPhillips Alaska, Inc. (ConocoPhillips) has been actively expanding oil and gas development in the Reserve, near the community of Nuiqsut. Its most recent proposal, the Willow Master Development Plan project (Willow), would be an extensive new oil and gas facility in an undeveloped area between and adjacent to both Nuiqsut and the Teshekpuk Lake Special Area.

Plaintiffs Sovereign Iñupiat for a Living Arctic and partner groups (collectively, SILA) bring this action because the BLM, U.S. Army Corps of Engineers (Corps), and U.S. Fish and Wildlife Service (FWS) each unlawfully granted approvals for Willow. BLM and the Corps violated the National Environmental Policy Act (NEPA) by conducting a hasty review without requisite information that failed to thoroughly assess Willow's foreseeable direct, indirect, and cumulative effects. The Corps violated the Clean Water Act (CWA) by approving a Section 404 permit without essential information and an adequate analysis of impacts and mitigation. Finally, FWS, the agency responsible for ensuring that Willow would not jeopardize polar bears, issued a Biological Opinion (BiOp) that failed to comply with the Endangered Species Act (ESA). FWS relied on unspecified mitigation measures and made arbitrary findings regarding whether Willow would result in "take" of bears.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                    1

By approving Willow without conducting the required analysis under the relevant statutes, the agencies violated NEPA, the CWA, and the ESA. Accordingly, this Court should grant SILA's motion for summary judgment, vacate the Records of Decision (RODs) and other authorizations issued by BLM and the Corps, and vacate FWS's BiOp.

## FACTUAL BACKGROUND

At approximately 23 million acres, the Reserve stretches across the Western Arctic and provides rich wildlife habitat for wildlife, including caribou and other subsistence resources. It is a mosaic of tundra wetlands and waterbodies, which are important for wildlife and subsistence use.[1] Its unique landscapes and wildlife also provide opportunities for recreation and for scientific study.[2] The rivers, lakes, wetlands, and floodplains provide many essential ecosystem functions.[3] Because of their importance, BLM established "setbacks" prohibiting permanent oil and gas facilities and certain activities along many waterbodies.[4]

Willow is an extensive oil and gas development that includes a spiderweb of new gravel roads connecting to existing development to the east, a new oil and gas processing facility, up to five "satellite" drill pads with up to seventy wells each, an airstrip, 300+ miles of pipelines, and numerous water crossings.[5] It includes two gravel mine sites

---

[1] BLM_AR269120, BLM_AR269146, BLM_AR269163.
[2] BLM_AR269366–69, BLM_AR269380.
[3] BLM_AR269146.
[4] BLM_AR268946.
[5] BLM_AR182386 (map), BLM_AR182410–15, BLM_AR182398.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                              2

within the Ublutuoch River setback,[6] and additional infrastructure within other setbacks.[7] Willow requires a variety of approvals from BLM, including rights-of-way, permits to drill, and contracts for gravel mining to obtain fill material. BLM began the NEPA process for Willow in 2018, releasing a draft environmental impact statement (EIS) in August 2019 and a supplemental draft EIS (SDEIS) in March 2020.[8]

ConocoPhillips was also required to obtain a 404 permit from the Corps to fill wetlands. The Corps was a cooperating agency on the EIS, which purported to fulfill the Corps' NEPA obligations.[9] However, ConocoPhillips did not submit its 404 permit application until after the completion of the draft EIS.[10] In March 2020, the Corps published its notice of the 404 permit application.[11]

Four days later, BLM issued a SDEIS analyzing changes to the project design, including an alternative BLM previously rejected.[12] The SDEIS was limited to considering only three project changes; it did not evaluate the recently submitted 404 permit application or all of the project changes ConocoPhillips had made since the draft EIS.[13]

---

[6] BLM_AR182412–13.
[7] BLM_AR182586.
[8] BLM_AR178263, BLM_AR182369.
[9] BLM_AR167932.
[10] Corps_AR004245.
[11] Corps_AR004058.
[12] BLM_AR178263, BLM_AR178275–77, BLM_AR168287.
[13] BLM_AR178263, BLM_AR178271.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                    3

BLM issued the final EIS in August 2020 and adopted its ROD in October, approving ConocoPhillips' proposed action.[14] BLM stated that the ROD completed the NEPA analysis for yet-to-be-issued "approvals, grants, and other authorizations necessary for development of all aspects of [] Willow."[15] BLM issued its ROD before ConocoPhillips submitted applications for the permits authorized in the ROD.[16]

In December 2020, the Corps issued its ROD and 404 permit.[17] The Corps approved the discharge of 5.3 million cubic yards of fill, directly and permanently impacting 616.9 acres of waters, including wetlands.[18] The Corps adopted BLM's final EIS (FEIS) for its NEPA compliance and to meet its obligations to evaluate impacts under the CWA.[19] Both the FEIS and the Corps' ROD failed to assess the functions of and key impacts to wetlands.[20]

The Reserve also provides habitat for polar bears, which are protected by the Marine Mammal Protection Act (MMPA) and as a threatened species under the ESA.[21] The polar bear population in the vicinity of Willow is rapidly declining,[22] worsened by climate change.[23] Industrial activities, especially aircraft and vehicle traffic, disturb polar

---

[14] BLM_AR186056–57.
[15] *Id.*
[16] Defs. Answer to Compl. at ¶117 (ECF No. 74).
[17] Corps_AR000150–234.
[18] Corps_AR000151–52.
[19] Corps_AR000151, Corps_AR00158, Corps_AR000197–204.
[20] Corps_AR000169.
[21] 73 Fed. Reg. 28212 (May 15, 2008); 75 Fed. Reg. 76086 (Dec. 7, 2010).
[22] BLM_AR164944–45.
[23] 75 Fed. Reg. 76086, 76093

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                          4

bears.[24] Disturbance of maternal dens can cause premature den abandonment, reducing cub survival.[25] Following consultation under the ESA, FWS issued a BiOp on Willow's effects to polar bears and their critical habitat.[26] FWS estimated Willow might seriously injure or kill two or more polar bear cubs.[27] Nonetheless, FWS determined that Willow was not likely to "take" or jeopardize polar bears, or destroy or adversely modify critical habitat.[28] FWS based these findings largely on its assumption that future MMPA permitting would mitigate impacts.[29]

STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), courts "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if adopted "without observance of procedure required by law."[30] Agency action violates this standard when the agency "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it

---

[24] BLM_AR164974–77.
[25] BLM_164973.
[26] FWS_AR000635.
[27] FWS_AR000749.
[28] FWS_AR000764–66.
[29] *Id.*
[30] 5 U.S.C. § 706(2)(A), (D).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                          5

could not be ascribed to a difference in view or the product of agency expertise."[31] Although an agency's rational conclusions are entitled to deference, the Court must engage in a searching and careful review to ensure that the decision has a firm basis in the record.[32]

<u>PLAINTIFFS' INTERESTS</u>

SILA has standing to bring this action because they and their members will suffer injuries in fact, those injuries are traceable to defendants' actions, and are redressable by a favorable decision of this Court.[33] Each plaintiffs' mission is to protect public lands and wildlife, including in the Reserve.[34] Their members use and enjoy the Reserve, and many live in the region and rely on the Reserve and the area that will be impacted by Willow for their way of life.[35] These members are injured by the agencies' approval of Willow in violation of the law.[36] A favorable decision from the Court would redress these injuries.

---

[31] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[32] *Nw. Coal. for Alternatives to Pesticides v. U.S. Envtl. Prot. Agency*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008).

[33] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000); *see also Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343–45 (1977) (associational standing test).

[34] Baraff Dec. at 3–5; Itchoak Dec. at 3–5; Maupin Dec. at 3–6; Whittington-Evans Dec. at 2; Kolton Dec. at 2–4; Ritzman Dec. at 3, 5.

[35] Baraff Dec. at 12–13; Itchoak Dec. at 14–16; Wald Dec. at 3–6; Fair Dec. at 2–6, 8–11; Maupin Dec. at 4, 9–11; Kunaknana Dec. at 2–4, 6; Whittington-Evans Dec. at 9–10; Kolton Dec. at 7; Ritzman Dec. at 8–11; Ahtuangaruak Dec. at 2–4, 10.

[36] Baraff Dec. at 8–11, 13; Itchoak Dec. at 16–21; Wald Dec. at 9–13; Fair Dec. at 14–17; Maupin Dec. at 9–14; Kunaknana Dec. at 3–4, 7–8, 10–14; Whittington-Evans Dec. at 11–17; Kolton Dec. at 7–12; Ritzman Dec. at 11–16; Ahtuangaruak Dec. at 7–13, 15–19.

ARGUMENT

BLM and the Corps violated NEPA in their review and approval of Willow by failing to take a hard look at Willow's impacts. SILA's NEPA challenges are timely and the agencies: failed to analyze Willow's impacts to aquatic resources, in part because they lacked necessary baseline information; failed to consider Willow's cumulative effects, particularly to fish and polar bears; and failed to adequately consider Willow's greenhouse gas emissions. Additionally, the Corps violated the CWA because it lacked sufficient information to evaluate, and made arbitrary determinations regarding, Willow's impacts to aquatic resources and whether such impacts were sufficiently mitigated. Finally, FWS violated the ESA in making its findings regarding Willow's impacts to threatened polar bears because it relied on uncertain mitigation measures and its incidental take statement is unsupported and in error. Because of these legal violations, this Court should vacate the agencies' approvals.

**I. BLM AND THE CORPS VIOLATED NEPA.**

BLM and the Corps violated NEPA by failing to take a hard look at the direct, indirect, and cumulative impacts of Willow. Under NEPA, agencies must evaluate the consequences of an action by taking a "hard look" at its direct, indirect, and cumulative impacts and viable alternatives.[37] This requires a "full and fair discussion of significant

---

[37] 42 U.S.C. § 4332(2)(c); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).

environmental impacts."[38] NEPA also requires agencies evaluate site-specific impacts prior to making an irretrievable commitment of resources.[39] An agency cannot take a hard look at impacts when it does not have site-specific information about the project and project area, or adequate information about baseline conditions.[40]

A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" (RFFAs) and "can result from individually minor but collectively significant actions."[41] NEPA mandates there be both "a sufficiently detailed catalogue of past, present and [RFFAs]" and an "adequate analysis" of such actions and their impacts.[42] This requires sufficient detail for decision makers to decide "whether, or how, to alter" actions to reduce cumulative impacts.[43]

---

[38] 40 C.F.R. § 1502.1.

[39] *California v. Block*, 690 F.2d 753, 761, 763 (9th Cir. 1982).

[40] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.* (*STB*), 668 F.3d 1067, 1084–85 (9th Cir. 2011).

[41] 40 C.F.R. § 1508.7.

[42] *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005).

[43] *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997) (quoting *Natural Res. Defense Council, Inc. v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988)).

### A. SILA's NEPA Claims Are Not Time-Barred.

SILA's NEPA claims are timely. There is "a strong presumption in favor of judicial review of administrative actions."[44] "[P]rohibitions against judicial review are … narrowly construed"[45] and "will not be found absent a clear command of the statute."[46]

The National Petroleum Reserve Production Act (NPRPA) statute of limitations does not apply. As the Ninth Circuit recognized, the provision's plain language supports this interpretation.[47] That provision requires any action challenging "the adequacy of any program or site-specific environmental impact statement … concerning oil and gas leasing" to be brought within 60 days after the notice of availability of such statement.[48] The plain language reflects Congress only intended the provision to apply to leasing EISs — i.e., those analyzing the impacts of lease sales. Willow is a decision to approve development and production, not a leasing decision. It is also significant Congress chose to use the verb "leasing," not the noun "lease."[49] The verb "leasing" is defined as the act of "grant[ing] by lease" and the noun "lease" refers to the "contract by which one

---

[44] *Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 181 (9th Cir. 1990).
[45] *Id.*
[46] *Moapa Band of Paiute Indians v. U.S. Dep't of Interior*, 747 F.2d 563, 565 (9th Cir. 1984); *Love v. Thomas*, 858 F.2d 1347, 1355–56 (9th Cir. 1988).
[47] Order at 3, *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, Case No. 21-35085 (9th Cir. Feb. 13, 2021) (No. 36) [hereinafter SILA Order].
[48] 42 U.S.C. § 6506a(n)(1).
[49] *Cf. Coal. for Clean Air v. Envtl. Prot. Agency*, 971 F.2d 219, 224–25 (9th Cir. 1992) (indicating verb tense is evidence of intent).

conveys real estate."[50] The act of granting a lease only occurs once, when the agency holds a sale and issues leases. Congress' use of a verb instead of a noun shows Congress' intent to refer to only the action of leasing — not to extend the provision to anything relating to a lease. The word "concerning" —defined as "relating to" or "regarding" — does not alter the scope of the provision because it still requires that any challenge relate to leasing.[51] The reference to programmatic and site-specific EISs also does not expand the provision's scope since there can be both programmatic and site-specific leasing EISs, which was understood in 1980 when the provision was enacted.[52]

The NPRPA reinforces that Congress viewed leasing as distinct from exploration and production. The statute of limitations is in a section titled "Competitive leasing of oil and gas" focusing on BLM's implementation of a leasing program.[53] Congress expressly refers to the different oil and gas stages throughout the NPRPA, differentiating between leasing, exploration, development, and production.[54] Congress is "presumed to act intentionally and purposefully when it includes language in one section but omits it in another."[55] Had Congress intended to encompass other stages in the statute of limitations,

---

[50] WEBSTER'S NEW ENCYCLOPEDIC DICTIONARY 373 (2002) [hereinafter WEBSTER'S].

[51] *Id.* at 1044.

[52] SILA Order, *supra* note 47, at 3–4 (concluding Congress "could well have been referring only to leasing decisions when it referred to programmatic and site-specific EISs" given agency practice at the time); *see, e.g.*, *Alaska v. Andrus*, 580 F.2d 465, 468 (D.C. Cir. 1978), *vacated in part by W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978).

[53] 42 U.S.C. § 6506a.

[54] *See, e.g.*, 42 U.S.C. §§ 6504(a), 6505(b)(1), 6506a(n)(2).

[55] *Or. Nat. Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir. 1996) (quoting *Estate of Bell v. Comm'r*, 928 F.2d 901, 904 (9th Cir. 1991)).

it could have expressly referred to those stages, as it did elsewhere. This context demonstrates Congress did not intend to limit judicial review of development decisions like Willow. At a minimum, the language does not provide a "clear command" to overcome the presumption favoring judicial review.

The legislative history further supports this interpretation. When Congress adopted the NPRPA in 1976, it included a general prohibition on production and development but provided for a government-led exploration program.[56] Congress opened the Reserve to leasing in 1980.[57] That legislative history indicates Congress was focused on quickly shifting the government-led and financed exploration program to a private sector exploration and leasing program.[58] Congress included an accelerated timeline for a lease sale to occur within 20 months and simultaneously adopted the statute of limitations.[59] This indicates Congress was focused on accelerating the timeframe around leasing. There is no indication Congress mistakenly omitted "production" or "development" from those provisions. Rather, the bill reinforced that Congress distinguished between the various oil and gas stages, such as leasing, exploration, and production.[60] Additionally, Congress did

---

[56] Pub. L. 94-258, § 104 (1976) (stating, subject to a limited exception, "production of petroleum from the reserve is prohibited and no development leading to production of petroleum from the reserve shall be undertaken until authorized by an Act of Congress").

[57] Pub. L. 96-514 (1980).

[58] S. REP. NO. 96-985, at 33–34 (1980); H.R. REP. NO. 96-1147, at 32–33 (1980).

[59] Pub. L. 96-514.

[60] *Id.* (referring to "any exploration or production" needing to comply with protective provisions).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                11

not rescind the general prohibition on production and development until 2005.[61] Congress is presumed to act with knowledge of the provisions of legislation already enacted, and the Court should avoid a reading that would render this provision superfluous.[62]

Overall, the plain language, context, and legislative history demonstrate that the statute of limitations does not apply to non-leasing decisions like Willow. There is no clear command sufficient to overcome the presumption in favor of judicial review.

**B.      BLM and the Corps Lacked Project Information and Failed to Obtain Baseline Information Necessary to Take a Hard Look.**

The agencies lacked critical project design and baseline information necessary to take a hard look at Willow's impacts. For aquatic impacts, the EIS did not adequately describe how major project elements, including seven major bridges and 200+ culverts, would be constructed or provide specific design information.[63] The EIS contains a handful of charts and maps summarizing how many bridges and culverts there would be, as well as some short, generalized summaries of the ways bridges can impact hydrology, like restricted flow and turbidity changes.[64] However, generalized summaries of the

---

[61] Energy Policy Act of 2005, Pub. L. 109-58 § 347 (2005).

[62] *United States v. Trident Seafoods Corp.*, 92 F.3d 855, 862 (9th Cir. 1996); *United States v. Bonilla-Montenegro*, 331 F.3d 1047, 1051 (9th Cir. 2003).

[63] BLM_AR182411–12, BLM_AR182400, BLM_AR167939 (noting bridges would range generally from 40–500 feet).

[64] *See, e.g.*, BLM_AR182484–85, BLM_AR182377, BLM_AR182400, BLM_AR185533–35.

potential impacts of bridges are not a hard look at the impacts of *this* proposal.[65] This is not the type of site-specific, detailed analysis of impacts required by NEPA.[66]

The EIS also contained little to no information on the length or location of the proposed roads, the amount of gravel needed for each road, or the site-specific impacts from infrastructure placement.[67] The EIS only provided a wide range of the number of wells per pad, ignoring that the number of wells informs the size, infrastructure needs, and impacts of each pad.[68] Summarizing Willow's total infrastructure is not the same as analyzing the impacts.[69]

Notably, BLM stated it might do additional NEPA analysis later, after project specifics were established.[70] However, both BLM and the Corps made irretrievable commitments at this stage by issuing the relevant decisions and approvals, including the right of way and the 404 permit, in reliance on the FEIS. NEPA requires agencies ensure adequate data and project information exist to fully analyze the impacts before approving

---

[65] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (stating NEPA requires an agency has "available, and will carefully consider, detailed information concerning significant environmental impacts").

[66] *See id.*; *Great Basin Res. Watch v. Hankins*, 456 F.3d 955, 973–74 (9th Cir. 2006); *STB*, 668 F.3d at 1084–85.

[67] BLM_AR167936, BLM_AR167939, BLM_AR182451–52.

[68] BLM_AR167937, BLM_AR182398 (estimating "40 to 70" wells per pad).

[69] *See Robertson*, 490 U.S. at 349; *Klamath-Siskiyou Wildlands Ctr. v. BLM* (*Klamath-Siskiyou*), 387 F.3d 989, 993–95 (9th Cir. 2004); *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1007–12 (D. Alaska 2020) (explaining site-specific EIS must analyze impacts at project location).

[70] BLM_AR182995.

a project — not after.[71] The agencies were therefore required to analyze the site-specific impacts now, not a later unspecified point in time.[72]

The lack of critical information about aquatic resources and the project was especially troubling for the Corps' NEPA review because the EIS failed to adequately analyze the impacts to wetlands and waterways. The Corps did not receive ConocoPhillips' 404 application until February 3, 2020, and then received a revised application on March 18[73] — two days before the SDEIS was released. The agencies previously expressed concerns with the NEPA and 404 permitting processes diverging.[74] Nonetheless, the agencies did not update the EIS to incorporate information related to the 404 permit application, such as likely impacts to wetlands.

Moreover, the agencies lacked key, site-specific project and baseline information to even engage in that analysis. For example, in response to comments about the severe lack of analysis for aquatic resources and wetlands, the FEIS states, "Because wetlands are abundant on the North Slope and the wetlands that would be impacted by the project are not unique, the indirect effects to fish would likely not be measurable."[75] Such conclusory statements are not a hard look. Despite these gaps, the Corps adopted the

---

[71] *STB*, 668 F.3d at 1085.
[72] *California v. Block*, 690 F.2d at 761–63.
[73] Corps_AR004946, Corps_AR004245.
[74] Corps_AR006207–09.
[75] BLM_AR182998; *but see* BLM_AR183133 (Environmental Protection Agency commenting that EIS should include a more in-depth, site-specific analysis of the impacts to aquatic resources to inform decisions about mitigation).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 14

FEIS in its ROD and did not conduct any further NEPA analysis of Willow's aquatic impacts.[76] As a result, the Corps never took a hard look at the site-specific impacts to wetlands and other aquatic resources from Willow.

The lack of project information was also reflected in the mitigation measures adopted for Willow. Those measures demonstrate that work to gather baseline information to inform project component design had not occurred.[77] Without this design and key information, BLM could not analyze the impacts of these components. For example, BLM stated it would require "annual surveillance" of water crossings "due to the lack of a basis of design for structures proposed."[78] But a promise to conduct future monitoring, after project approval, is not an analysis under NEPA.[79] Another one of the mitigation "design criteria" stated, "[a]s appropriate, consider both 1) snow- and ice-impacted conditions and 2) ice-free conditions in the hydraulic design of bridges, culverts, and pipeline river crossings…. Based on the available information, develop designs that would perform satisfactorily during the design event."[80] This is analogous to the type of "plan for a plan" previously rejected by the Ninth Circuit,[81] and illustrates the agencies lacked detailed project designs and site-specific baseline information to do a meaningful analysis.

---

[76] Corps_AR000151.
[77] BLM_AR186081–82.
[78] BLM_AR182932.
[79] *See STB*, 668 F.3d at 1085.
[80] BLM_AR182481.
[81] *STB*, 668 F.3d at 1085.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 15

The EIS lacked other baseline information necessary to evaluate the impacts to aquatic resources and fisheries, for example at the Colville River Crossing.[82] BLM initially raised concerns that ConocoPhillips did not provide enough data for the crossing location.[83] The State of Alaska acknowledged that, without years of repeated sampling, "all we are really doing is guessing what the crossing conditions might be."[84] Despite a technical memorandum addressing the crossing, BLM never obtained key baseline information or took a hard look at the impacts. The technical memorandum only analyzed a hypothetical "synthetic data set" based on information from a wholly different area because there was "no flow data available" for the relevant location.[85] This missing information about the location and conditions at the crossing was critical to conducting an adequate analysis of the impacts and any necessary mitigation measures. Without that key information, BLM was unable to take a hard look at the likely impacts.[86]

In sum, the agencies must base their analysis on actual project and baseline information — not hypothetical, rough estimates of anticipated infrastructure or generalized descriptions of facility components — to take an adequate hard look.[87]

---

[82] Corps_AR00178–79; BLM_AR123686 (explaining that ConocoPhillips would later determine whether fish are present at Colville River crossing location, whether fish would need to be transported around the ice bridge, and if so, how).

[83] BLM_AR123686, BLM_AR135601 ("3 data points over 3 days makes it difficult to analyze impacts because the amount of data doesn't provide a baseline for comparison.").

[84] BLM_AR101501–02.

[85] BLM_AR185538–44.

[86] *STB*, 668 F.3d at 1084–85.

[87] *Id.* at 1085.

Lacking this critical information, they could not and did not take a hard look at Willow's site-specific direct, indirect, and cumulative impacts, in violation of NEPA.

### C.   BLM and the Corps Failed to Adequately Consider Willow's Cumulative Effects.

The agencies failed to take a hard look at Willow's cumulative impacts.[88] The agencies' cumulative impacts analysis violates NEPA because it does not contain detailed information regarding various RFFAs or an adequate analysis of the cumulative impacts to fish and polar bears in light of those RFFAs.

#### 1.   The EIS Does Not Provide Detailed Information Regarding RFFAs.

While the EIS listed 21 RFFAs in a table and briefly described each one,[89] the agencies failed to provide sufficient information to analyze three RFFAs: Greater Willow 1 and 2 (Greater Willow), Nanushuk, and nearby exploration activities. Listing projects is inadequate; agencies must have sufficient information about each RFFA to meaningfully analyze impacts.[90]

---

[88] 42 U.S.C.A. § 4332(2)(C); 40 C.F.R. § 1508.25(a)(2); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998).

[89] BLM_AR180251–53.

[90] *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872–73 (9th Cir. 2020) (finding cumulative impact analysis insufficient because identified RFFAs were listed but unanalyzed); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 972 (9th Cir. 2006) (rejecting EIS "merely list[ing] other mines in the area without detailing impacts from each").

First, the EIS failed to provide detailed information on Greater Willow —

ConocoPhillips' planned expansion that would add two adjacent drill sites to Willow.[91]

Greater Willow would increase Willow's localized impacts in as soon as six years.[92] Yet,

it is merely described as "[p]otential expansion areas to be included in the Willow Master

Development Plan" eight miles away.[93] The record shows the agencies had information

on this project that was not included or analyzed in the EIS, including the proposed drill

site locations,[94] estimates for production amount and timing,[95] and that Willow's

pipelines were designed to support Greater Willow development.[96] Indeed, the agencies

had sufficient information regarding Greater Willow to initially include the drill sites in

the agencies' consideration of alternatives.[97] Despite this, the EIS omitted relevant

information and failed to meaningfully analyze Greater Willow and its cumulative

impacts.

Second, the EIS failed to provide detailed information on Nanushuk, a massive oil

and gas facility only 35 miles from Willow that will include up to 146 wells, gravel pads,

roads, and pipelines.[98] The EIS describes Nanushuk as a "[n]ew oil and gas development

---

[91] BLM_AR180440.
[92] BLM_AR103717.
[93] BLM_AR180252.
[94] BLM_AR180440.
[95] BLM_AR180881 (explaining Willow's facilities accommodate additional production from Greater Willow).
[96] BLM_AR121875; BLM_AR180524 (explaining Willow's pipeline supports include space for Greater Willow).
[97] BLM_AR103717.
[98] BLM_AR276700; BLM_AR180251.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 18

east of the Colville River" that began construction in 2019,[99] but contains no detail regarding Nanushuk's scale or likely impacts, nor any analysis of the cumulative impacts of these two projects together. The agencies purport to incorporate the Nanushuk EIS by reference for their cumulative effects analysis,[100] but there is no analysis to incorporate. Nanushuk's EIS lists Willow as a potential RFFA,[101] but excludes Willow from its cumulative effects analysis.[102] Because there was no analysis in the Nanushuk EIS, the agencies needed to conduct that analysis here.

Third, the EIS deemed all exploration "speculative," rather than providing information regarding known, relevant exploration projects as RFFAs.[103] The EIS labels all such activity "Miscellaneous Seismic Exploration" occurring "varie[d]" distances from Willow.[104] The contention that all exploration is speculative or that each exploration project contributes equally to Willow's cumulative effects is contradicted by the record. For instance, Greater Grizzly — located 15 miles from Willow with ongoing and future planned exploration — was initially listed as an RFFA until BLM switched course and "lump[ed] all exploration together."[105] BLM also declined ConocoPhillips' suggestion to specify a number of other "larger" RFFAs,[106] including ConocoPhillips' ongoing

---

[99] BLM_AR180251.
[100] BLM_AR180250.
[101] BLM_AR276965.
[102] BLM_AR276960.
[103] BLM_AR100578–79.
[104] BLM_AR180251.
[105] BLM_AR100578–79.
[106] BLM_AR135563–65.

appraisal of an area 20 miles from Willow,[107] Harpoon exploration activities,[108] and ongoing production tests and potential development at its Narwhal prospect.[109] As a result, the EIS obscures the associated cumulative impact of extensive, ongoing exploration activities involving drilling, water withdrawals, ice road construction, and the use of heavy machinery to conduct seismic surveys, all in Willow's surrounding area.[110] The cumulative impacts of these projects should have been included and analyzed as RFFAs.[111] The failure to do so violates NEPA.[112]

### 2. The EIS Failed to Adequately Analyze Willow's Cumulative Effects on Fish and Polar Bears.

Largely due to the lack of information about individual RFFAs, the EIS failed to adequately analyze Willow's cumulative effects on fish and polar bears. Agencies cannot rely on general statements about possible effects and must conduct a meaningful analysis of individual projects.[113] At a minimum, the agencies needed to provide more detailed analyses of Greater Willow, Nanushuk, and nearby exploration because they are in close

---

[107] BLM_AR135566.
[108] *Id.* (located within Willow area).
[109] *Id.* (located in Colville River Unit with possible tieback to Alpine).
[110] BLM_AR180251.
[111] BLM_AR176208; *see also STB*, 668 F.3d at 1078–79 (explaining EIS must engage in reasonable forecasting and rejecting cumulative impact analysis that failed to analyze projects lacking specific construction timelines or locations where likely future development data was available).
[112] *Lands Council*, 395 F.3d at 1027–28.
[113] *Bark*, 958 F.3d at 872; *Klamath-Siskiyou*, 387 F.3d at 993–95; *Lands Council*, 395 F.3d at 1028; *Cuddy Mountain*, 137 F.3d at 1379–80.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 20

proximity to Willow[114] and would significantly impact fish and polar bears.[115] The agencies failed to provide "quantified or detailed information" regarding cumulative effects.[116]

Greater Willow is not mentioned in the cumulative effects analysis for fish or polar bears. If developed, Greater Willow's drilling, gravel mining, ice road construction, and footprint would impact waterways, fisheries, and polar bear habitat immediately adjacent to Willow.[117] The EIS acknowledges that Willow itself will adversely impact these resources.[118] But the EIS does not analyze how Greater Willow will contribute to these impacts. Greater Willow will imminently increase the project impacts, but the EIS does not provide necessary information or the required analysis to determine "whether, or how … to lessen" Willow's cumulative environmental impacts.[119]

---

[114] *See Klamath-Siskiyou*, 387 F.3d at 995 (explaining need to analyze adjacent projects); *see also Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 897 (9th Cir. 2002) (requiring analysis of projects in same geographic area); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810–11 (9th Cir. 1999) (same).

[115] *Supra* notes 24–25 (industrial activities harm polar bears), *infra* notes 118, 120, 123 (infrastructure and development harm fish); *see Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1078 (9th Cir. 2002) (requiring analysis of projects impacting same resource); BUREAU OF LAND MGMT., NATIONAL ENVIRONMENTAL PROTECTION ACT HANDBOOK (H-1790-1) at 58 (2008) (explaining scope of cumulative effects analysis includes boundary of resource affected).

[116] *Cuddy Mountain*, 137 F.3d at 1379.

[117] *See supra* notes 21 (Reserve provides polar bear habitat) and BLM_AR182507 (fish widely distributed in adjacent area).

[118] BLM_AR180262 (impacts to polar bears), BLM_AR180257-58 (impacts to fish).

[119] *City of Carmel–By–The–Sea*, 123 F.3d at 1160 (quoting *Natural Res. Defense Council, Inc.*, 865 F.2d at 299).

The cumulative effects analysis for fish and polar bears also fails to analyze Nanushuk or nearby exploration projects. Analysis of Nanushuk is necessary because it is a major oil and gas development with considerable impacts for fish and polar bears within Willow's vicinity.[120] Impacts from Greater Grizzly, Narwhal, Harpoon, and continued appraisal of the Willow area also should have been analyzed because exploration could exacerbate impacts from Willow.[121] Despite these significant impacts, the EIS does not mention — let alone analyze — the cumulative impacts to fish or polar bears from Nanushuk or any nearby exploration projects in conjunction with Willow.[122]

The cumulative effects sections for fish and polar bears analyze only two of the 21 RFFAs listed — revisions to the Bureau of Ocean Energy Management's (BOEM) leasing program and the Integrated Activity Plan for the Reserve. Impacts from all remaining RFFAs are lumped together and addressed generally. Regarding fish, the EIS concludes that RFFAs "would have similar types of effects on fish (habitat loss or alteration and disturbance)" as existing infrastructure and development activities.[123] Similarly, the EIS concludes that marine mammals, including polar bears, "would be cumulatively affected by other RFFAs" and that Willow "would contribute to those

---

[120] BLM_AR276730 (Nanushuk EIS describing impacts to fish and habitat), BLM_AR276728 (Nanushuk EIS explaining polar bear behavioral effects and habitat loss).
[121] BLM_AR269702–03 (explaining exploration can cause "direct mortality" of polar bears), BLM_AR269594 (explaining repeated exploration noise during winter season "merits concern" for fish).
[122] BLM_AR180251–53.
[123] BLM_AR180257.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                22

cumulative effects" by incrementally increasing habitat loss, disturbance, displacement, injury, and mortality.[124] These conclusions ignore individual RFFA impacts through excessive generalization and fail to indicate the scale, degree, temporal effect, and overall consequence of RFFA impacts, falling short of the requisite quantified and detailed assessment required by NEPA.[125] The EIS's generalized, conclusory statements conceal the true magnitude of Willow's cumulative impacts to fish and polar bears, violating NEPA.

### D. BLM Failed to Adequately Disclose and Analyze the Effects of Willow's Greenhouse Gas Emissions.

BLM failed to consider Willow's indirect climate impacts by improperly estimating its potential downstream GHG emissions. BLM used the same modeling approach for Willow that the Ninth Circuit recently rejected in *Center for Biological Diversity v. Bernhardt* (*CBD*).[126] *CBD*'s holding controls this case under its facts and law.[127]

The Court in *CBD* determined that BOEM's model — intended to assess downstream greenhouse gas emissions from combustion of oil produced by the Liberty

---

[124] BLM  AR180262.
[125] *See Klamath-Siskiyou*, 387 F.3d at 994–95 (rejecting analysis that failed to provide objective quantification of impacts); *Cuddy Mountain*, 137 F.3d at 1379 (rejecting analysis for failure to detail extent of combined project impacts and requiring "some quantified or detailed information").
[126] 982 F.3d 723, 736–40 (9th Cir. 2020).
[127] SILA Order, *supra* note 47, at 3–5; *see also* Order re Motions for Injunction Pending Appeal at 6 (ECF No. 54).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                        23

development project — failed to account for reasonably foreseeable emissions that were an indirect effect of oil drilling.[128] Specifically, the model improperly failed to consider foreign oil consumption under its No Action Alternative, although BOEM had adequate information to estimate those effects.[129] As a result, the EIS's alternatives analysis was inadequate.[130]

BLM relied on the same flawed modeling and analysis rejected in *CBD*.[131] BLM excluded foreign oil consumption from its analysis under the rationale offered by BOEM in *CBD*: that it lacked adequate information to consider or estimate these effects.[132] BLM had adequate information to quantify Willow's effects on foreign oil consumption.[133] At a minimum, BLM was obligated to provide a reasoned explanation why such an analysis or estimation was not possible.[134] It did not.[135]

Because of this flaw, Willow's EIS concluded that downstream greenhouse gas emissions caused by Willow would only be "slightly higher" than emissions under the No Action alternative.[136] As in *CBD*, the failure to adequately disclose and analyze these impacts improperly skewed BLM's alternatives analysis and violated NEPA.

---

[128] 982 F.3d at 738.
[129] *Id*. at 737.
[130] *Id*. at 740.
[131] BLM_AR182422–23, BLM_AR183504.
[132] BLM_AR183508.
[133] 982 F.3d at 738–39 (citing available studies); BLM_AR176250–53 (citing studies in the record at BLM_AR319437–39, BLM_AR318368–451).
[134] *CBD*, 982 F.3d at 739.
[135] *Id*. at 738.
[136] BLM_AR183506; *CBD* at 739.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 24

## II.   THE CORPS VIOLATED THE CWA.

The Corps violated the CWA for two reasons: (1) it lacked sufficient information to determine Willow's direct and secondary effects would not cause significant degradation; and (2) it lacked information to conclude that all appropriate and practicable steps would be taken to minimize Willow's adverse effects and failed to analyze the sufficiency of proposed mitigation.

The CWA prohibits the discharge of pollutants, including dredged or fill material, into Waters of the United States (WOUS) unless authorized by a permit.[137] This includes discharges into wetlands, which provide a variety of beneficial functions.[138] The Corps and U.S. Environmental Protection Agency (EPA) promulgated regulations to govern the discharge of fill material to wetlands.[139] All 404 permits must comply with the "404(b)(1) Guidelines."[140]

Under the 404(b)(1) Guidelines, the Corps cannot issue a 404 permit if the proposed discharge "will cause or contribute to significant degradation of [WOUS],"[141] or if "[t]here does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines."[142] In making this determination, the Corps must fully evaluate the direct and cumulative impacts of the

---

[137] 33 U.S.C. § 1311(a).
[138] *Id.* § 1344(a); 33 C.F.R. § 320.4(b) (identifying functions).
[139] 40 C.F.R. § 230.2(a).
[140] 33 C.F.R. § 320.4(a)(1).
[141] 40 C.F.R. § 230.10(c).
[142] *Id.* § 230.12(a)(3)(iv).

activity upon resources,[143] as well as the secondary effects of the proposed discharge.[144] "Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material."[145] The 404(b)(1) Guidelines also prohibit the Corps from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."[146]

A.      **The Corps Lacked Sufficient Information to Conclude Willow Would Not Cause Significant Degradation.**

As detailed above, the Corps lacked baseline resource and project information relevant to Willow's direct impacts, including site-specific information on the location and placement of fill materials and water flow levels.[147] This missing information was critical to understanding the functions of wetlands Willow would destroy and determining whether Willow would directly or cumulatively cause significant degradation; without it, the Corps' conclusion that Willow would not cause significant degradation was arbitrary.

Wetlands provide important functions and values, which are unique among wetland types and affected by placement of fill material.[148] Both EPA and the Corps

---

[143] *See* 33 C.F.R. §§ 320.4(a)(1), 336.1(c)(5) (endangered species), 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§ 230.11(a)–(h), 230.20–.23 (aquatic ecosystem).
[144] 40 C.F.R. § 230.11(h)(1).
[145] *Id.*
[146] 40 C.F.R. § 230.10(d).
[147] *Supra* Argument Section I.B.
[148] Corps_AR003761.

recognized that merely providing the acres of wetland types impacted was insufficient to determine Willow's impacts, and that an assessment of the functional values of wetlands was needed.[149] The Corps requested Willow's permitting be paused to collect this information; BLM refused.[150] Without this information, the Corps merely listed the types of wetlands occurring in the project area and examples of functions that could be impacted.[151] The Corps did not actually analyze the loss of functions of wetlands from Willow in the EIS or ROD.[152] Without this analysis, the Corps lacked sufficient information to reasonably conclude that Willow would not cause or contribute to significant degradation.[153]

The Corps also lacked critical information regarding Willow's secondary effects, and failed to consider the scant information it had. Specifically, the Corps failed to adequately analyze site-specific impacts from fugitive dust and water impoundment. The Corps acknowledged there would be permanent, direct impacts to 616.9 acres and impacts to an additional 3,351.9 acres of dust shadow.[154] But it did not assess the impacts

---

[149] BLM_AR103085–86; *see also* 73 Fed. Reg. 19,594, 19,601–02 (Apr. 10, 2008) (EPA and Corps regulation explaining importance of assessing wetlands functions).

[150] BLM_AR103085–86.

[151] Corps_AR000209–10.

[152] *See* BLM_AR183133 (EPA recommending FEIS include site-specific analysis of wetland functions and losses); Corps_AR003766–67 (public comments identifying EIS's failure to analyze impacts to wetland functions).

[153] 40 C.F.R. § 230.12(a)(3)(iv).

[154] Corps_AR000202.

to individual waterways and wetlands from impoundment or fugitive dust deposition to wetland functions.

As public comments explained, Willow's gravel infrastructure and culverts were likely to impound water, causing alteration to surface flows and natural drainage patterns; this results in ponding, subsidence, and permanent alteration of wetland types and functions.[155] Critically, the Corps did not address the fact that that there was a 64% chance Willow's culverts would not function properly during their lifetime or explain how that failure rate factored into its findings.[156]

The Corps also assumed that secondary effects would only occur within 100 meters of gravel fill.[157] However, this 100-meter (328 feet) limitation for the Corps' impact analysis is inconsistent with its determination that impacts within 500 feet of fill in anadromous waterways were significant enough to warrant compensatory mitigation.[158] The record does not reconcile why the agency only considered impacts within a 328-foot radius of project infrastructure in the secondary effects analysis, but required compensatory mitigation for impacts within 500 feet. Because the Corps arbitrarily cut off its analysis at 100 meters, it did not analyze the full range of Willow's secondary impacts.

---

[155] Corps_AR003760–63.
[156] BLM_AR185535.
[157] Corps_AR000175.
[158] *Infra* note 173.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                    28

Without an assessment of the nature and degree of Willow's direct and secondary impacts and sufficient information about wetlands type and function to inform that assessment, the Corps' "no significant degradation" determination is arbitrary.

## B. The Corps' Finding That Willow's Impacts Would be Adequately Mitigated Is Arbitrary.

The Corps' determination of "no significant degradation" was based, in part, on its assertions that appropriate mitigation would minimize, avoid, and compensate for Willow's impacts.[159] However, the Corps lacked sufficient information to make this finding.

First, the Corps failed to consider whether all appropriate and practicable steps were taken to minimize secondary effects.[160] For instance, the Corps' vague minimization measures require ConocoPhillips to maintain natural drainage patterns and preserve floodplain connectivity.[161] This overlooks the significant inefficiency rate predicted for Willow's culverts and the associated impacts to aquatic resources.[162] In response to FWS concerns regarding this issue, the Corps merely stated that culverts would be "maintained in good working condition."[163] This statement does not square with the predicted flood exceedance rate or the Corps' obligation to consider all appropriate and practicable steps to mitigate impacts. The Corps also provided a vague requirement that ConocoPhillips

---

[159] Corps_AR000151–52.
[160] Corps_AR000202; 40 C.F.R. § 230.12(a)(3)(iii).
[161] Corps_AR000192.
[162] *Supra* note 156 (64% chance of culverts exceeding design flood).
[163] Corps_AR000167.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                    29

minimize fugitive dust, without describing what level of dust control is required.[164] The

Corps points to the FEIS and ConocoPhillips' dust control plan,[165] but those documents

do not specify or analyze the dust control measures necessary to address the dust impacts

to over 3,300 acres.[166] The Corps' conclusory statements do not constitute an analysis of

whether "appropriate and practicable steps have been taken which will minimize"

Willow's secondary effects.[167]

Second, the Corps' findings that compensatory mitigation would sufficiently offset

any "unavoidable impacts" to the aquatic ecosystem are deeply flawed.[168] "[T]he amount

of required compensatory mitigation must be, to the extent practicable, sufficient to

replace lost aquatic resource functions."[169] Compensatory mitigation cannot offset

aquatic losses without first assessing what those lost functions are.[170] The Corps lacked

such information, as described above.[171]

---

[164] Corps_AR000196; *see also* BLM_AR182501 (noting that dust and gravel spray "would" result from fill activities and vehicle traffic).

[165] Corps_AR000202.

[166] BLM_AR185900–05 (dust control appendix); Corps_AR000202 (3,351.9 acres of wetlands impacted by dust). It appears BLM assumed 50% efficacy of ConocoPhillips' proposed dust control (BLM_AR157118) based on speed limits that were not adopted as enforceable requirements. BLM_AR162130, BLM_AR162134.

[167] 40 C.F.R. § 230.10(d).

[168] *Id.* § 230.93.

[169] *Id.* § 230.93(f)(1).

[170] *Id.* § 230.93(a)(1) (basing compensatory mitigation requirements "on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity…. [and] requirements must be commensurate with the amount and type of impact").

[171] *Supra* Argument Section II.A.

Moreover, ConocoPhillips' mitigation plan was deficient in identifying how Willow's impacts would actually be offset.[172] ConocoPhillips was required to mitigate only a fraction of Willow's direct and secondary impacts. The mitigation plan determined that compensatory mitigation would be required for Willow's permanent impacts within 500 feet of anadromous waterways, and within the Teshekpuk Lake and Colville River Special Areas.[173] The Corps did not explain how it determined that impacts to these wetlands (a total of 237.8 acres)[174] should be offset, while the impacts from fill in other wetlands (totaling 3,730.9 acres) should not.[175] "The amount of required compensatory mitigation must be, to the extent practicable, sufficient to replace lost aquatic resource functions."[176] The Corps' record contains no evidence explaining why mitigating a fraction of wetland impacts was sufficient, or why it would be impracticable to fully compensate for the functional impacts of Willow. Indeed, EPA raised this concern, noting "it is not clear that all appropriate and practicable steps will be taken to avoid, minimize, and compensate for remaining impacts to aquatic resources."[177]

---

[172] 33 C.F.R. § 320.4(r)(1); 40 C.F.R. § 230.10(d).

[173] Corps_AR000186–87. ConocoPhillips assessed the functions of wetlands in this narrow subset of Willow's footprint. Corps_AR000349–50. The record contains no indication why a functional assessment was done for these areas but not others.

[174] Corps_AR000336 (noting 122.8 acres of direct impacts and 115.0 acres of indirect impacts required compensation).

[175] Willow would impact to 3,968.8 acres of wetlands directly and indirectly, and permanently destroy 481.1 acres of WOUS. Corps_AR000201–02.

[176] 40 C.F.R. § 230.93(f)(1).

[177] Corps_AR0003974. At the time of EPA's letter, ConocoPhillips proposed to offset 13% of Willow's permanent impacts. Corps_AR0003976.

These shortcomings are exacerbated by the Corps' failure to ensure the adequacy of the mitigation it required. ConocoPhillips' mitigation plan indicates it would complete two tundra rehabilitation projects and secure one of two alternative "preservation" areas.[178] The plan only points to two large expanses in the vicinity of Fish Creek and Cape Halkett;[179] it does not identify the actual 800-acre area to be preserved or the functions at either site.[180] It merely acknowledges some of the types of wetlands located in both areas, without explaining how the functions lost from Willow's development would be offset by the functions preserved.[181] The mitigation plan assumed that both sites would be subject to an identical 100-acre development footprint if not preserved.[182] No industrial activities are proposed for either site, and the types of activities at each site are likely to be different than Willow's standalone facility.[183] The record does not explain how the Corps verified ConocoPhillips' projected footprints for activities at these sites or the threat of development outlined in the mitigation plan. "Preservation" must eliminate a demonstrated threat,[184] and the Corps must verify that a legal instrument permanently

---

[178] Corps_AR000334–38.

[179] Corps_AR000607–08 (maps).

[180] Corps_AR000355–56 (stating exact locations of preservation areas to be determined later).

[181] Corps_AR000488–90; *see* 33 C.F.R. § 332.4(c)(5) (requiring delineation of WOUS at proposed mitigation sites).

[182] Corps_AR000487–88.

[183] Corps_AR000356 (noting Cape Halkett would be used to support new offshore or no-surface occupancy drilling, while Fish Creek is within a producing oil and gas unit).

[184] 33 C.F.R. § 332.3(h)(1)(iv).

protects preserved areas.[185] However, the mitigation plan makes vague statements regarding what activities would be permitted to occur at the sites, and what legal instrument would be used to ensure protection of whichever site is chosen.[186]

The Corps offered the conclusory statement that ConocoPhillips' plan "would provide appropriate and sufficient compensatory mitigation required to offset unavoidable losses to aquatic resources."[187] Without knowing where the preservation sites would be located, how they would be preserved, and what "preservation" means on the ground, it is unclear how the Corps reached this determination. Because the Corps did not assess the functions of the wetlands that ConocoPhillips would rehabilitate or preserve, or explain how the mitigation plan compensates for the wetland functions lost as result of Willow to the extent practicable, its finding is arbitrary and capricious.

In sum, the Corps failed to obtain sufficient information or conduct an adequate analysis of Willow's direct and secondary effects to support its finding that Willow would not cause significant degradation, and failed to explain its finding that Willow's effects would be appropriately mitigated.

---

[185] *See id*. § 332.3(h)(1)(v); *see also id.* § 332.4(c)(4) (requiring Corps verify long-term protection); 40 C.F.R § 230.97(a)(2) (explaining incompatible uses jeopardizing mitigation objectives should be prohibited).

[186] Corps_AR000342–33 (listing activities that "could" be precluded or allowed on preservation sites, and noting that allowing "commercial activities, such as snow trails, seismic data collection, or other business ventures will be determined on a case-by-case basis").

[187] Corps_AR000188.

## III. FWS VIOLATED THE ESA.

FWS violated the ESA by relying on uncertain mitigation measures to make its required determinations and making arbitrary findings regarding Willow's potential to "take" polar bears. The ESA requires "[e]ach Federal agency … insure that any action authorized [by it] … is not likely to jeopardize the continued existence of any endangered species."[188] To achieve this goal, agencies must consult with FWS to ensure their actions are not likely to jeopardize species or destroy or adversely modify critical habitat.[189] The ESA also generally prohibits the "take" of any individual member of an endangered species.[190] "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[191] Harm is defined as "an act which actually kills or injures wildlife."[192] Polar bears are protected from unauthorized incidental take under both the ESA and the MMPA. The MMPA establishes a general moratorium on the incidental take of marine mammals, except where FWS makes a finding that such take will have only a negligible impact on the species or stock.[193] While

---

[188] 16 U.S.C. § 1536(a)(2).

[189] *Id.*

[190] *Id.* § 1538(a)(1)(B).

[191] *Id.* § 1532(19); *see also* 50 C.F.R. § 17.3 (defining "harass" as action that "creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering").

[192] 50 C.F.R. § 17.3.

[193] 16 U.S.C. § 1371(a), (a)(5)(A); *see also id.* § 1362(13) (defining take).

both statutes address take, they have distinct legal requirements, and each must be satisfied.[194]

**A.    FWS Relied on Future, Uncertain Mitigation Measures.**

FWS violated the ESA by relying on future, uncertain mitigation measures. Although FWS may rely on mitigation measures to reach a no-jeopardy or no-adverse-modification conclusion where such measures are reasonably specific, it cannot rely on uncertain, undefined measures in future MMPA permitting to reach its conclusions.[195] The Ninth Circuit's holding in *CBD* also controls this issue under its facts and law: FWS's vague statements relying on future MMPA compliance were insufficient to support its no-jeopardy and no-adverse-modification determinations.[196]

Just as in *CBD*, FWS relied on future, unspecified MMPA permitting processes to support its no-jeopardy and no-adverse-modification determinations. FWS summarized the MMPA mitigation measures that "would be applied on a case-by-case basis" and listed nine non-specific "examples" based on the existing Beaufort Sea Incidental Take Regulation (Beaufort ITR).[197] But FWS did not identify the specific MMPA measures that would be applied and enforced for Willow.[198] This is insufficient under the law.[199]

---

[194] *CBD*, 982 F.3d at 745.

[195] *CBD*, 982 F.3d at 743–45.

[196] *Id.* at 743–44.

[197] FWS_AR000678–79.

[198] *Id.*

[199] *See CBD*, 982 F.3d at 747 (explaining future mitigation measures required on "case-by-case basis" and mitigation strategy's eventual MMPA approval are insufficient under ESA). Willow is subject to the same general MMPA mitigation requirements from

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                        35

That Willow would require future MMPA permitting "does not preclude or preempt FWS's responsibility to include the mitigation measures that it relies upon in a [BiOp] under … the ESA. The agency cannot refer to future, unstated authorizations under the MMPA to fulfill its obligations under [the ESA]."[200] FWS also stated that past MMPA permitting for oil and gas activities ensured impacts to marine mammals have been negligible, and BLM's commitment to ensuring Willow's MMPA compliance is the "[m]ost important" factor limiting impacts to bears to support its findings.[201] FWS expressly discussed the importance of MMPA compliance in making its findings.[202] Indeed, agency staff preparing the biological assessment recognized they were "relying too heavily on the [Beaufort] ITRs and mitigation measures to solve all of our problems."[203]

Recent revisions to the consultation regulations do not alter the ESA's requirement that agencies provide — and FWS consider — specific, detailed information about mitigation measures to ensure FWS's determinations are based on an informed, accurate

---

the Beaufort ITR acknowledged but unanalyzed in *CBD*. 982 F.3d at 746. As in *CBD*, the future MMPA authorizations FWS relies upon are for 5-year periods, which is inappropriate for the 30-year project. *Id.*

[200] *CBD*, 982 F.3d at 745.

[201] FWS_AR000750–55; *see also* FWS_AR000723–24 (explaining MMPA's program for managing bear deterrence "reduces the need for lethal take").

[202] FWS_AR000764 (no-jeopardy determination concluding Willow "contains protective measures that provide significant minimization of impacts to polar bears, most importantly BLM's commitment to ensure compliance with the MMPA"), FWS_AR000765–66 (explaining MMPA compliance ensures against adverse modification of critical habitat).

[203] BLM_AR301897.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                      36

effects analysis. The revised regulation, 50 C.F.R. § 402.14(g)(8), states that FWS need not require a "demonstration of binding plans" that mitigation measures will be implemented.[204] FWS did not eliminate the regulatory requirement that mitigation measures considered in an action be identified with certainty and specificity.[205] *CBD* still controls: FWS's reliance on future MMPA compliance in making its no-jeopardy and no-adverse-modification determinations violated the ESA.

### B.    FWS's Take Findings are Inconsistent and Unsupported.

The ESA requires an incidental take statement (ITS) where FWS concludes, as here, "that a project will not jeopardize a species or modify its critical habitat."[206] In issuing an ITS with a BiOp, FWS must also find incidental take from the project has been authorized under MMPA.[207] The ITS must specify the amount or extent of permitted incidental take, "reasonable and prudent measures" to minimize impacts of take, and "terms and conditions" to implement those measures.[208] An ITS serves several important functions. First, it "serves as a check on the agency's original decision that the incidental

---

[204] *See also* 84 Fed. Reg. 44,976, 45,002–03 (Aug. 27, 2019) (rejecting "recommendation to create a heightened standard of documentation" and to require "financial assurances" for implementation).

[205] *Id.* at 45,003 (explaining if proposed mitigation "fails to include the level of detail necessary for [FWS] to understand the action and evaluate its effects to listed species or critical habitat, then [FWS] will be unable to take into account those effects when developing [the BiOp]").

[206] *CBD*, 982 F.3d at 748.

[207] 16 U.S.C. § 1536(b)(4)(A)–(C); *see also id.* § 1371(a)(5) (MMPA take authorization process).

[208] *Id.* § 1536(b)(4)(C)(ii)–(iv); 50 C.F.R. § 402.14(i).

take of listed species … will not jeopardize the … species."[209] Second, it establishes the level of incidental take that, if exceeded, requires reinitiation of consultation.[210] Finally, it establishes binding reasonable and prudent measures with terms and conditions to mitigate and monitor the impacts of incidental take.[211]

FWS's ITS contains contradictory statements about the take of polar bears. It first states that Willow will not cause "any form of take as defined by the ESA."[212] The next sentence, however, "anticipate[s] that up to two bears may be hazed with non-lethal contact rounds" over Willow's project life.[213] Hazing is take: "[t]ake under the ESA can … occur via nonlethal harassment."[214]

The BiOp then explains that, because take has not yet been authorized under the MMPA, it cannot be authorized under the ESA, but that once take is authorized under the MMPA, "take under the ESA … will be considered by [FWS] to also be authorized under the ESA."[215] The BiOp next explains future mitigation measures developed through the MMPA process will be treated as reasonable and prudent measures and terms and

---

[209] *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012) (quotation and alteration omitted).

[210] 50 C.F.R. § 402.16(a)(1).

[211] *Id.* § 402.14(i)(1)(ii)–(iv); *see also CBD*, 982 F.3d at 748.

[212] FWS_AR000767.

[213] *Id.* "Hazing" means deterring bears with noise or visual stimuli, or shooting bears with rounds of bean bags or rubber bullets to direct them away from facilities and humans. FWS_AR000724.

[214] *CBD*, 982 F.3d at 749.

[215] FWS_AR000767.

conditions for this BiOp.[216] Adding even more confusion, the BiOp provides that consultation will be reinitiated if Willow results "in injury of more than 2 polar bear[s]" over the project life.[217]

FWS's statements acknowledging that take will occur are inconsistent with its finding that Willow will not result in any ESA-prohibited take, including "injury." The BiOp also does not explain why future MMPA mitigation measures will be incorporated as reasonable and prudent measures and terms and conditions given that it does not anticipate or authorize any incidental take; reasonable and prudent measures and terms and conditions are only required when take is anticipated or authorized. The ITS also fails to acknowledge the BiOp's finding that human-bear interactions "causing physical injuries" would occur.[218] The BiOp further fails to explain how it defines "injury" of two bears for purposes of reinitiation of consultation, given its finding that no take will occur.[219] Indeed, this implies that "injury" of up to two bears is authorized because less would not trigger reinitiation.

The record further highlights how FWS arbitrarily altered and ignored the likelihood of take. A near-final version of the BiOp explained the FWS's den-disturbance

---

[216] *Id.*
[217] FWS_AR000769.
[218] FWS_AR000752.
[219] *Supra* notes 190–92 and accompanying text (defining injury as "take" under ESA).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                    39

modeling had estimated a "wide range of take" from Willow.[220] The BiOp's final language deleted this language and downplays the model's findings regarding the probability of take from den disturbance and concludes such take is not reasonably certain to occur.[221] The rationale for these changes is not provided in the record. Critically, FWS did not analyze the impacts of direct injury or death to polar bears and cubs from den disturbance in its no-jeopardy analysis; it simply stated this would not occur, despite its own record evidence to the contrary.[222]

By failing to adequately consider whether Willow will result in incidental take, and analyzing the effects of that take, FWS failed to adequately analyze whether Willow will jeopardize polar bears. In sum, where, as here, FWS anticipates that an action will cause incidental take, a BiOp must specify that take in an ITS.[223] That MMPA take has not yet been authorized does not excuse this requirement.[224] Because FWS failed to quantify or address take in the ITS, FWS violated the ESA.[225]

---

[220] FWS_AR020116; *see also* ECF 17-1 at 5; FWS_AR000748 (explaining den-disturbance may cause injury and mortality of adults and cubs).

[221] *See* FWS_000748–49, FWS_AR000797.

[222] FWS_AR000764.

[223] *Ctr. for Biological Diversity v. Ross*, No. CV 18-112 (JEB), 2020 WL 1809465, at *3 (D.D.C. Apr. 9, 2020) ("[T]he regulations also make clear that an ITS must be produced whenever incidental take is reasonably certain to occur." (internal quote and alteration omitted)).

[224] *Id.* at *8.

[225] *CBD*, 982 F.3d at 750.

## IV. THE COURT SHOULD VACATE THE AGENCIES' DECISIONS.

Vacatur is the presumptive remedy under the APA,[226] which mandates that when agency action violates the law, "[t]he reviewing court shall … hold unlawful and set aside [the] agency action."[227] The Court should apply the presumptive remedy and vacate the RODs, FEIS, BiOP, and permits.[228]

The agencies and ConocoPhillips may argue that vacatur is not warranted based on equitable considerations.[229] As an equitable defense, the burden is on defendants to show that deviation from the presumptive remedy is warranted,[230] which they cannot do. There will be no environmental harm or disruptive consequences from vacating the decisions; instead, vacatur will ensure protection of the area.[231] Additionally, the legal violations go

---

[226] *See Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976); *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

[227] 5 U.S.C. § 706(2).

[228] *See, e.g.*, *CBD*, 982 F.3d at 751 (vacating oil and gas permit based on NEPA and ESA violations).

[229] *See Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520, 532–33 (9th Cir. 2015) (stating test for remand without vacatur in limited circumstances where there would be serious environmental harm from vacating and the error is not serious) (citing *Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012)).

[230] *See, e.g.*, *Alliance for the Wild Rockies*, 907 F.3d at 1121–22; *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 466 F. Supp. 3d 1217, 1226 (W.D. Wash. 2020).

[231] *Pollinator Stewardship Council*, 806 F.3d at 532.

to the core purposes of the statutes and the heart of the agencies' decisions,[232] and under

the ESA, the equities must favor the species.[233] In sum, vacatur is warranted.[234]

## CONCLUSION

This Court should grant SILA's Motion for Summary Judgment,[235] and vacate the

BLM ROD, Corps ROD, FEIS, BiOp, and all decisions that rely on these documents,

including the right-of-way authorization and material sales contract.

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) because it contains 9,998 words, excluding the parts of the brief exempted by Local Civil Rule. 7.4(a)(4).

s/ Bridget Psarianos

---

[232] 40 C.F.R. § 1500.1 (NEPA); 16 U.S.C. § 1531(b) (ESA); 33 U.S.C. § 1251(a) & 40 C.F.R. § 230.1 (CWA).

[233] *Cottonwood Envtl. Law Ctr. v U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015) ("[C]ourts do not have discretion to balance the parties' competing interests in ESA cases.").

[234] *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053, n.7 (9th Cir. 2010); *see also Pollinator Stewardship Council*, 806 F.3d at 532 (noting "limited circumstances" of remand without vacatur).

[235] SILA pled violations of the Federal Land Policy Management Act but is not pursuing those claims.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                    42

Bridget Psarianos

## CERTIFICATE OF SERVICE

I certify that on April 23, 2021, I caused a copy of the PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.

s/ Bridget Psarianos
Bridget Psarianos

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                              43