Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org
blitmans@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*, | Case No. 3:20-cv-00290-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendants. | |

## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... ii

LIST OF SHORT NAMES AND ACRONYMS ................................................... v

INTRODUCTION .................................................................................................. 1

ARGUMENT .......................................................................................................... 1

    I.    BLM and the Corps Violated NEPA. ................................................................ 1

        A.    SILA's NEPA Claims Are Not Time Barred. ....................................... 1

        B.    BLM and the Corps Did Not Adequately Consider Willow's Site-Specific Impacts. ...................................................................................................... 6

        C.    The Agencies Did Not Adequately Consider Willow's Cumulative Effects. .. 12

        D.    BLM's Analysis of Greenhouse Gas Emissions Is Deficient. .......................... 18

    II.    The Corps Violated the CWA. ....................................................................... 20

        A.    The Corps Lacked Required Information to Determine Whether Willow Would Cause or Contribute to Significant Degradation. ...................................................... 20

        B.    The Corps' Mitigation Findings Are Arbitrary. ............................................. 25

    III.    FWS Violated the ESA. ................................................................................. 30

        C.    FWS Relied on Unspecified Mitigation Measures. .......................................... 30

        D.    FWS's Take Findings Violate the ESA. ............................................................ 33

    IV.    The Presumptive Remedy of Vacatur Is Appropriate. ......................................... 35

    CONCLUSION ............................................................................................... 37

Page(s)

Federal Cases

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C.Cir.1993) ........................................................ 37
*Badaracco v. Comm'r*,
    464 U.S. 386 (1984) ................................................................... 2
*Bark v. U.S. Forest Serv.*,
    958 F.3d 865 (9th Cir. 2020) ........................................................ 17
*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
    524 F.3d 938 (9th Cir. 2008) ........................................................ 28
*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*,
    688 F.3d 989 (9th Cir. 2012) .................................................. 36, 37
*California v. U.S. Bureau of Land Mgmt.*,
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) .......................................... 36
*Cascadia Wildlands v. Bureau of Indian Affairs*,
    801 F.3d 1105 (9th Cir. 2015) ...................................................... 15
*Ctr. for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) ................................................. passim
*Ctr.for Biological Diversity v. Ross*,
    No. CV 18-112, 2020 WL 1809465 (D.D.C. Apr. 9, 2020) ............... 33, 34, 35
*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) ........................................................ 27
*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ................................................ 17, 18
*Ctr. for Food Safety v. Vilsack*,
    734 F. Supp. 2d 948 (N.D. Cal. 2010) ........................................... 36
*Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*,
    399 F. Supp. 3d 888 (D. Alaska 2019) ........................................... 13
*City of Carmel-By-the-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) ...................................................... 17
*Coal. for Clean Air v. U.S. Envtl. Prot. Agency*,
    971 F.2d 219 (9th Cir. 1992) ..................................................... 3, 5
*Cook Inletkeeper v. U.S. Army Corps of Engineers* ,
    541 F. App'x 787 (9th Cir. 2013) ............................................ 28, 29
*Estate of Bell v. Comm'r*,
    928 F.2d 901 (9th Cir. 1991) ........................................................ 2
*Fed. Deposit Ins. Corp. v. Former Officers & Directors of Metro. Bank*,
    884 F.2d 1304 (9th Cir. 1989) ...................................................... 2

*Friends of Endangered Species, Inc. v. Jantzen*,
    760 F.2d 976 (9th Cir. 1985) ....................................................................... 27
*Gaule v. Meade*,
    402 F. Supp. 2d 1078 (D. Alaska 2005) .................................................... 27
*Great Basin Mine Watch v. Hankins*,
    456 F.3d 955 (9th Cir. 2006) ........................................................................ 7
*Humane Soc'y of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ............................................................... 17, 36
*Jones v. National Marine Fisheries Service* ,
    741 F.3d 989 (9th Cir. 2013) ................................................................ 11, 13
*Kern v. U.S. Bureau of Land Mgmt.*,
    284 F.3d 1062 (9th Cir. 2002) .................................................................... 13
*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) .................................................................... 14
*League of Wilderness Defenders–Blue MountainsBiodiversity Project v. U.S. Forest*
    *Service* ,
    549 F.3d 1211 (9th Cir. 2008) .................................................................... 16
*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ...................................................................... 13
*Love v. Thomas*,
    858 F.2d 1347 (9th Cir. 1988) ...................................................................... 2
*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ............................................................................... 27, 29
*Moapa Band of Paiute Indians v. U.S. Dep't of Interior*,
    747 F.2d 563 (9th Cir. 1984) ........................................................................ 2
*Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    *(State Farm)*, 463 U.S. 29 (1983) ...................................................... passim
*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
    *(STB)*, 668 F.3d 1067 (9th Cir. 2011) .............................................. 7, 10, 11
*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*,
    947 F. Supp. 2d 1031 (D. Alaska 2013) .................................................... 27
*Or. Nat. Res. Council v. Allen*,
    476 F.3d 1031 (9th Cir. 2007) .................................................................... 33
*Or' Nat. Res. Council Fund v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) .................................................................... 14
*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
    265 F.3d 1028 (9th Cir. 2001) .................................................................... 27
*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency,*
    806 F.3d 520 (9th Cir. 2015) ...................................................................... 36
*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ....................................................................... 6, 7, 8, 19

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                iii

*Sierra Club v. U.S. Department of Energy*,
  867 F.3d 189 (D.C. Cir. 2017) .................................................................. 19
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt*,
  21-35085 (9th Cir Feb.13, 2021) ........................................................... 5, 37
*Tosello v. U.S.*,
  210 F.3d 1125 (9th Cir. 2000) ................................................................... 2

## Federal Statutes

16 U.S.C. § 1371 ........................................................................................ 33
16 U.S.C. § 1536 ................................................................................... 31, 33
16 U.S.C. § 1538 ........................................................................................ 33
42 U.S.C. § 6504 .......................................................................................... 4
42 U.S.C. § 6506a ................................................................................ 2, 4, 20
42 U.S.C. § 6508 .......................................................................................... 4
Energy Policy Act of 2005, Pub. L. 109-58 § 347 (2005) ................................. 4

## Federal Regulations

33 C.F.R. § 320.4(r)(2) ......................................................................... 25, 29
33 C.F.R. § 332.3(a)(1) ........................................................... 21, 25, 26, 27
40 C.F.R. § 230.10(c) ............................................................................ 21, 27
40 C.F.R. § 230.11(e) .................................................................................. 21
40 C.F.R. § 230.12(a)(3)(iv) .................................................................. 21, 25
43 C.F.R. § 3152.2(b) .................................................................................. 20
50 C.F.R. § 402.14(c)(1)(i) .................................................................... 31, 34

## Other Authorities

126 Cong. Rec. 31,196 (1980) ...................................................................... 5
BUREAU OF LAND MGMT., NATIONAL ENVIRONMENTAL PROTECTION ACT HANDBOOK
  (2008) ..................................................................................................... 15
U.S. Army Corps of Eng'rs, Alaska District Compensatory Mitigation Thought Process
(Sept. 18, 2018) ............................................................................................ 21
U.S. Army Corps of Eng'rs, Regulatory Guidance Letter No. 02-02, *Guidance on
Compensatory Mitigation Projects for Aquatic Resource Impacts Under the Corps
Regulatory Program Pursuant to Section 404 of the Clean Water Act and Section 10 of
the Rivers and Harbors Act of 1899* (Dec. 24, 2002) ................................... 21

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| BOEM | Bureau of Ocean Energy Management |
| ConocoPhillips | ConocoPhillips Alaska, Inc. |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FWS | U.S. Fish and Wildlife Service |
| GHG | Greenhouse Gas |
| Greater Willow | Greater Willow 1 and 2 |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NPRPA | National Petroleum Reserve Production Act |
| Reserve | National Petroleum Reserve-Alaska |
| RFFA | Reasonably Foreseeable Future Action |
| ROD(s) | Record(s) of Decision |

SILA                    Sovereign Iñupiat for a Living Arctic

Willow                  Willow Master Development Plan

WOUS                    Waters of the United States

404 Permit              Clean Water Act Section 404 Permit

INTRODUCTION

The Federal Defendants, Intervenor-Defendants ConocoPhillips Alaska, Inc. (ConocoPhillips), State of Alaska (State), and North Slope Borough (Borough) fail to show that the U.S. Bureau of Land Management (BLM), Army Corps of Engineers (Corps), and Fish and Wildlife Service (FWS) complied with the National Environmental Policy Act (NEPA), Clean Water Act (CWA), and the Endangered Species Act (ESA) in their respective approvals of the Willow Master Development Plan (Willow). The Court should grant summary judgment for Plaintiffs Sovereign Iñupiat for a Living Arctic et al. (collectively SILA), and vacate the Records of Decision (RODs) and other authorizations issued by BLM and the Corps and FWS's Biological Opinion (BiOp).

ARGUMENT

## I. BLM AND THE CORPS VIOLATED NEPA.

### A.     SILA's NEPA Claims Are Not Time Barred.

The Naval Petroleum Reserve Production Act's (NPRPA) statute of limitations does not apply to SILA's NEPA claims.[1] Contrary to Defendants' assertions, the presumption in favor of review is applicable and prohibitions against judicial review of agency decisions should be narrowly construed.[2] The cases SILA cited indicate that, absent a "clear command" of the statute — not present here — this Court should not

---

[1] Pls.' Opening Br. for Summ. J. 17–20, ECF No. 95 [hereinafter SILA].

[2] Fed. Defs.' Combined Br. in Opp'n Pursuant to L.R. 16.3(c)(2) 21–22, ECF No. 103 [hereinafter Feds.]; Opp'n Br. by ConocoPhillips Alaska, Inc. 24, ECF No. 104 [hereinafter CPAI].

_

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                               1

foreclose review by extending the statute of limitations to this development decision.[3] The cases ConocoPhillips cites to urge a strict construction in favor of the government are not on point because those cases involved the timeliness of the government's ability to bring its own lawsuits or defend against taxpayer claims,[4] whereas this case involves review of administrative actions, for which courts have "long recognized" a presumption in favor of judicial review.[5]

Defendants' arguments that the statute of limitations encompasses development decisions because such actions are taken pursuant to leases would override the plain language,[6] which indicates Congress only time-barred challenges to NEPA documents "concerning oil and gas leasing."[7] Defendants do not rebut the canon that Congress is "presumed to act intentionally and purposely when it includes language in one section but omits it in another."[8] Defendants' argument that Congress used the word "leasing" to include other stages[9] ignores that Congress was aware of all the stages of oil and gas and

---

[3] *Moapa Band of Paiute Indians v. U.S. Dep't of Interior*, 747 F.2d 563, 565 (9th Cir. 1984); *Love v. Thomas*, 858 F.2d 1347, 1355–56 (9th Cir. 1988).

[4] CPAI 24; *Fed. Deposit Ins. Corp. v. Former Officers & Directors of Metro. Bank*, 884 F.2d 1304, 1309 (9th Cir. 1989) (applying a strict construction when statute of limitations is "sought to be applied to bar rights of the Government" (quoting *Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984))); *Tosello v. U.S.*, 210 F.3d 1125, 1127 (9th Cir. 2000) (relying on *Badaracco* and involving a taxpayer who was time barred from seeking a refund from the government).

[5] *See, e.g.*, *Love*, 858 F.2d at 1356.

[6] Feds. 23; CPAI 26–27, 29.

[7] 42 U.S.C. § 6506a(n)(1).

[8] *Estate of Bell v. Comm'r*, 928 F.2d 901, 904 (9th Cir. 1991).

[9] Feds. 23; CPAI 25–26.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                    2

specifically referred to them in the statute when it intended to do so.[10] Congress' use of the words "concerning" and "any" do not expand the provision to encompass other oil and gas stages not expressly included in the provision, as urged by Defendants, since those words are still cabined by the provision's ultimate focus: leasing.[11] Congress' choice not to reference those later stages in the statute of limitations must be given meaning.

Defendants' arguments that "leasing" encompasses all oil and gas stages merely because ConocoPhillips holds a lease over a period of time would rewrite the statute and eviscerate Congress' intent in using the word "leasing," not "lease."[12] Congress' use of the word "leasing" instead of "lease" indicates intent to refer to the action of leasing — not to extend the provision to anything relating to a lease.[13] ConocoPhillips contradicts itself by asserting that leasing is ongoing and cannot be separated from development and exploration, while elsewhere in its brief acknowledging the irretrievable commitment for no surface occupancy leases "is made at the leasing stage, which is long past."[14] Defendants' construction would stretch the boundaries of the statute beyond the plain language and common understanding of the term "leasing."

---

[10] SILA 18–19.
[11] Feds. 23; CPAI 24–26.
[12] *Coal. for Clean Air v. U.S. Envtl. Prot. Agency*, 971 F.2d 219, 224–25 (9th Cir. 1992) (indicating verb tense is evidence of intent).
[13] SILA 17–18.
[14] CPAI 28–29, 53.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 3

Federal Defendants also cite a number of provisions in the NPRPA to argue Congress wanted the statute of limitations to apply more broadly.[15] But much of this language was not adopted until 2005, when Congress repealed the general prohibition on production and development and adopted a number of provisions specific to production.[16] Regardless, those provisions reinforce that Congress understood the different oil and gas stages and could have included them in the statute of limitations if it intended to. Defendants also claim SILA is wrong in stating the prohibition on production and development existed until 2005,[17] but their arguments are contradicted by the statute itself: Congress did not remove the general prohibition on production and development from the statute until 2005.[18] Defendants' arguments would render Congress' choice to leave that language in place wholly superfluous, contrary to principles of statutory construction.[19]

Federal Defendants' argument that the use of "site-specific" expanded the scope of the statute to encompass exploration and development is also unavailing.[20] As the Ninth Circuit recognized and ConocoPhillips concedes, there can be both programmatic and

---

[15] Feds. 25.
[16] Pub. L. 109-58 § 347 (2005). *Compare* 42 U.S.C. § 6506a(i)–(k), *with* 42 U.S.C. §§ 6504(a), 6508 (1982).
[17] Feds. 25, note 6; CPAI 32.
[18] 42 U.S.C. § 6504(a) (1982); Pub. L. 109-58 § 347.
[19] SILA 19–20.
[20] Feds. 23–24.

site-specific leasing environmental impact statements (EIS).[21] BLM's independent NEPA obligations to do site-specific NEPA analysis for other oil and gas decisions does not expand the scope of the statute of limitations beyond the leasing stage.

Defendants also incorrectly assert the ultimate object and policy of the 1980 rider was oil production.[22] The legislative history shows Congress' goal was to privatize the formerly government-led exploration program and expedite lease sales.[23] Regardless, they point to nothing in the legislative history that overrides the plain language or that indicates Congress inadvertently excluded development decisions from the statute of limitations. Federal Defendants' reliance on the statements of individual legislators to claim Congress intended to include development decisions within the statute of limitations is misplaced.[24] The "statements of individual legislators are entitled to little, if any, weight."[25] Even if the Court considers those statements, they still demonstrate that Congress' focus was on expediting leasing and shifting the exploration program to the private sector.[26] The statements do not show Congress intended to include development decisions within the statute of limitations.

---

[21] Order at 3–4, *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, Case No. 21-35085 (9th Cir. Feb. 13, 2021) [hereinafter SILA Order]; CPAI 29 note 90; SILA 18.

[22] Feds. 24–25; CPAI 31–32.

[23] SILA 19–20.

[24] Feds. 25–26.

[25] *Coal. for Clean Air*, 971 F.2d at 227; Feds. 25.

[26] *See, e.g.*, 126 Cong. Rec. 31,196 (1980) (statement of Sen. Stevens) ("The conferees have agreed to include language to expedite private leasing and exploration ….").

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 5

In sum, the plain language of the statute indicates Congress did not intend to foreclose review of development decisions and there is no clear command to the contrary; the statute of limitations does not apply.

### B. BLM and the Corps Did Not Adequately Consider Willow's Site-Specific Impacts.

BLM and the Corps failed to take a hard look at the site-specific impacts of Willow to aquatic resources and lacked site-specific information about the project and project area.[27] Defendants' record citations underscore this fact. Defendants point to cursory and generalized summaries of impacts — at times merely a paragraph — that do not include a site-specific analysis of Willow's impacts.[28] Generalized summaries of the potential impacts of bridges, like restricted flow and turbidity changes, are not a hard look at the impacts of *this* proposal, involving seven bridges and over 200 culverts.[29] Defendants also cite charts and maps summarizing Willow's components as evidence the EIS took a hard look at impacts and had "detailed descriptions" of the proposed

---

[27] SILA 20–25.

[28] Feds. 35, 37; CPAI 35–36; N. Slope Borough's Resp. in Opp'n to Pls.' Opening Brs. for Summ. J. 37–38, ECF No. 102 [hereinafter NSB]; *see, e.g.*, BLM_AR182484–85 (one paragraph summary saying there would be bridges and culverts); BLM_AR182400 (two paragraphs saying bridges and culverts "would be designed" based on site-specific information); BLM_AR183240 (summarily referring to the bridges and approximating bridge sizes based on available aerial imagery); BLM_AR182398 (paragraph saying there will be five drill sites with 40–70 wells each); BLM_AR182449–52 (general summary of how infrastructure can impact thawing and thermokarsting and summarizing fill quantities).

[29] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (stating NEPA requires an agency has "available, and will carefully consider, detailed information concerning significant environmental impacts").

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 6

infrastructure.[30] Summarizing Willow's total infrastructure is not the same as analyzing its impacts and is not the site-specific, detailed analysis NEPA requires.[31]

Defendants' additional citations to the water resources and the wetland and vegetation appendices also do not demonstrate the agency engaged in a site-specific analysis of the impacts of Willow.[32] Those appendices provide only general overviews of the waterbodies, their flow levels, and types of wetlands in the area.[33] Listing limited baseline information is not a site-specific analysis of how this project will alter and impact those resources. The EIS appendices provide overviews of how bridges and culverts can impact hydrology generally, but not specific to Willow.[34] Defendants' other citations to the EIS sections on water resources and wetlands similarly contain summaries of the waterbodies and wetlands in the area generally, summarize different stipulations and best management practices under the 2013 and 2020 Integrated Activity Plans (IAPs), and reference proposed mitigation measures that are not based on a site-specific

---

[30] Feds. 37; *see, e.g.*, BLM_AR182375–76 (chart summarizing overall footprints); BLM_AR182754–56 (maps); BLM_AR183232 (summarizing number of possible drill sites and overall acreage); BLM_AR182410, BLM_AR183242, BLM_AR183277–78 (charts estimating fill and overall project elements).

[31] *Robertson*, 490 U.S. at 349; *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973–74 (9th Cir. 2006); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.* (*STB*), 668 F.3d 1067, 1084–85 (9th Cir. 2011).

[32] Feds. 35; CPAI 36, 38; NSB 38–40. The State's claim that SILA has not shown why additional site-specific information would inform decisionmakers ignores that agencies, not the public, must comply with NEPA and do a site-specific analysis. *Robertson*, 490 U.S. at 349; State of Alaska's Combined Resp. to Pls.' Mots. For Summ. J. 16, ECF 101 [hereinafter SOA].

[33] BLM_AR185506–35.

[34] *See, e.g.*, BLM_AR185533–35.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                          7

analysis of the project.[35] ConocoPhillips' road optimization memo summarizes the initial process ConocoPhillips used to develop "road route concepts"; it is not an analysis by the agencies of the site-specific impacts of the ultimate route selected.[36] The Borough further asserts that, even though the final EIS (FEIS) contains general information, it is not lacking specific information because many impacted resources are not unique.[37] This ignores NEPA's mandate to analyze Willow's site-specific impacts,[38] and that there will be serious impacts to subsistence users, designated Special Areas, and other important resources.

Defendants point to the CWA section 404 permit application to claim BLM and the Corps had detailed information about the project.[39] Defendants' reliance on the content of the 404 application underscores how much information was lacking when the agencies prepared the EIS. ConocoPhillips' permit application did not go to the Corps until shortly before the release of the supplemental draft EIS.[40] ConocoPhillips claims that it submitted sufficient information earlier in a draft environmental evaluation

---

[35] CPAI 37; NSB 39–40; BLM_AR182470–93, BLM_AR185506–33, BLM_AR182493–506. The Borough cites the cumulative impacts section, but that section is insufficient as well because it is high level and lacks a site-specific analysis about the impacts of Willow. BLM_AR182674–80; NSB 39–40.
[36] CPAI 36; NSB 38; BLM_AR185890.
[37] NSB 41.
[38] *Robertson*, 490 U.S. at 349.
[39] CPAI 36–37; NSB 38. Federal Defendants misinterpret SILA's point regarding future permitting. Feds. 37. BLM's statements highlight that BLM did not have the necessary permit applications before conducting the NEPA analysis and approving Willow. SILA 21.
[40] SILA 22.

document (EED).[41] The EED was effectively ConocoPhillips' attempt to write portions of the EIS; it was not a substitute for a permit application because it did not contain in-depth information about the project or its site-specific impacts.[42] The EED also does not reflect ConocoPhillips' numerous changes to its proposal throughout the process, which were not merely "refinements" in response to BLM's information requests.[43]

As discussed further below, much of the information provided to the Corps was also still lacking,[44] particularly regarding plans and impacts analyses for Willow's culverts. Defendants cite to a "typical" culvert design and statements that culverts would be located based on site-specific conditions to assert that the analysis was sufficient.[45] But the agencies never updated the FEIS to analyze the culverts' site-specific impacts. Federal Defendants cite to a page in the FEIS noting updates were made to address ConocoPhillips's many project changes, but the cited page does not reflect that the agencies did that analysis.[46] Defendants further mischaracterize SILA's arguments as saying the Corps could not rely on BLM's analysis generally.[47] The problem is not that

---

[41] CPAI 37–38.

[42] Corps_AR7977–8420.

[43] *See, e.g.*, SILA 11 (discussing project changes).

[44] *See infra* Part II.A.

[45] CPAI 35; NSB 38; Corps_AR005074–76, Corps_AR004979.

[46] Feds. 36; BLM_AR182392–93.

[47] Feds. 36; NSB 42.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                        9

the Corps relied on the FEIS, but that the analysis was insufficient to support the Corps' CWA or NEPA obligations.[48]

Defendants also wrongly claim SILA misinterprets the nature of the mitigation measures and assert it is appropriate to leave room for final designs to account for site-specific information.[49] Many of those measures, particularly for culverts, reflect that there were not yet sufficiently detailed design plans or site-specific information to conduct an analysis — not merely that different conditions needed to be considered in the design.[50] Without that information, the agencies could not sufficiently analyze the effectiveness of those mitigation measures.[51]

Further, Defendants' citations to the record do not reflect that the agencies took an adequate hard look at potential mitigation measures.[52] As noted above, they point to general mitigation measures from IAPs, which are not specific to Willow.[53] Their citations to high-level design suggestions[54] just reflect that designs need to meet certain standards, not that the agencies analyzed whether those measures will be adequate to

---

[48] *Infra* notes 126–126, 136 and accompanying text. The Corps' participation as a cooperating agency in the NEPA process does not change that the FEIS's analysis of aquatic resources was deficient to meet its CWA obligations. NSB 62; Feds. 36, 45–46; CPAI 75–76.

[49] Feds. 37–38; CPAI 38; NSB 38.

[50] SILA 23.

[51] *STB*, 668 F.3d at 1085 (rejecting "plan for a plan"); SILA 23.

[52] CPAI 36; NSB 41.

[53] CPAI 36; NSB 41; BLM_AR182478, BLM_AR182495; *see also supra* note 35.

[54] CPAI 36; BLM_AR182481.

mitigate Willow's site-specific impacts. As such, the *STB* case is on point.[55] That case

involved a situation where the agency did not have sufficient information to engage in the

required analysis.[56] Similarly, here, the agencies were missing key information about

specific elements of the project at the site-specific level necessary to analyze the impacts

and effectiveness of mitigation measures. Post-construction monitoring, while important,

is not sufficient to make up for the lack of analysis to avoid creating problems in the first

place.[57] The *Jones v. National Marine Fisheries Service* case is also distinguishable.[58]

Unlike that case, where the agency concluded impacts were unlikely and it did not need

additional data or more than future monitoring, here the agencies were missing necessary

information about the design of the mitigation measures to analyze their effectiveness and

impacts.[59]

      Defendants' arguments that BLM responded to the Environmental Protection

Agency's (EPA) concerns about the lack of information and analysis by adding a

technical memorandum addressing the Ocean Point crossing fail because BLM never

obtained key baseline information or took a hard look at the impacts of that crossing.

What BLM calls an analysis of the discharge at Ocean Point is only a hypothetical

analysis of a "synthetic dataset."[60] Defendants' claim that ConocoPhillips did a

---

[55] *But see* Feds. 38; CPAI 38–39.
[56] *STB*, 668 F.3d at 1085.
[57] *See* CPAI 38–39.
[58] CPAI 39.
[59] 741 F.3d 989, 1000 (9th Cir. 2013).
[60] BLM_AR185538–44.

comprehensive field study on water resources related to the crossing is not supported by the record.[61] The cited reports summarize data from three days of data collection. BLM stated "3 data points over 3 days makes it difficult to analyze impacts because the amount of data doesn't provide a baseline for comparison"[62] and the report itself identified that more data was needed.[63]

Overall, Defendants failed to take a hard look at the site-specific impacts of Willow or to obtain key baseline and project information necessary to evaluate those impacts, in violation of NEPA.

C.     **The Agencies Did Not Adequately Consider Willow's Cumulative Effects.**

1.     *The Agencies Failed to Analyze Reasonably Foreseeable Future Actions.*

The agencies' failure to analyze Nanushuk, Greater Willow 1 and 2 (Greater Willow), and a range of exploration projects violates NEPA because all of these projects are reasonably foreseeable.

Defendants claim the cumulative effects analysis for Nanushuk was incorporated by reference from the Nanushuk EIS.[64] Their claims should be rejected because, as SILA explained, both the Willow and the Nanushuk EIS failed to analyze these projects'

---

[61] CPAI 39; Feds. 35–36; NSB 39. The Borough refers to a decade-plus old study for a pipeline crossing on a wholly different area of the Colville. NSB 40.
[62] SILA 24.
[63] BLM_AR145524.
[64] Feds. 41; CPAI 57; NSB 45; SOA 18 note 6 (Nanushuk included in analysis).

combined cumulative impacts.[65] Agencies cannot tier to an EIS that lacks the required analysis.[66]

The Borough's and ConocoPhillips' arguments that Greater Willow and known exploration projects are merely contemplated or speculative are contrary to the record and should be rejected.[67] Greater Willow and the exploration projects SILA identified were either ongoing or had known timeframes, known locations, and were suggested as Reasonably Foreseeable Future Actions (RFFAs) by ConocoPhillips.[68] Indeed, Federal Defendants acknowledge that Greater Willow was reasonably foreseeable.[69] The cases relied on by the Borough and ConocoPhillips to argue these projects are speculative are therefore factually distinguishable.[70] BLM and the Corps cannot rely on statements of

---

[65] SILA 26–27.

[66] *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002).

[67] NSB 44–46; (Greater Willow speculative beyond drill sites and exploration "merely contemplated"); CPAI 56, 58–59 (Greater Willow and exploration speculative).

[68] SILA 26–28; *Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 399 F. Supp. 3d 888, 921–22 (D. Alaska 2019), *aff'd*, 825 F. App'x 425 (9th Cir. 2020); *Jones*, 741 F.3d at 1001; *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014).

[69] Feds. 42 note 14 (if speculative, projects would not be included in cumulative effects analysis as RFFAs).

[70] NSB 45–46; CPAI 56–57; *Chilkat Indian Vill. of Klukwan*, 399 F. Supp. 3d at 921–22 (future projects with no specific information such as timeframes unforeseeable); *Jones*, 741 F.3d at 1001 (general desire to increase mining with no indication of scope, location, or number of projects contemplated unforeseeable); *Blue Mountains*, 752 F.3d at 762 (logging project unforeseeable where agency had no intention to decide on project at any particular time).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                      13

uncertainty "to avoid even attempting the requisite analysis."[71] As BLM's guidance instructs, these "highly probable" projects were foreseeable.[72]

Federal Defendants also assert that the agencies disclosed known information about Greater Willow.[73] But scattering that information throughout the EIS, rather than analyzing it in conjunction with Willow's cumulative effects, does not comply with NEPA.[74]

Finally, BLM's justification for lumping all exploration together is unsupported by the record.[75] None of the EIS's stated reasons for this approach — changing details, varied project proponents, and uncertainty[76] — apply to Greater Grizzly, Harpoon, Narwhal, or the ongoing appraisal of the Willow area. The agencies had specific information on these projects and they were either ongoing or slated to occur imminently, rendering this explanation arbitrary.[77] In addition, ConocoPhillips provides no support for the contention that short-term projects need not be analyzed.[78]

---

[71] Feds. 40, 42 ("at this point" Greater Willow only a potential expansion and individual analysis of exploration infeasible); CPAI 56, 58–59 (Greater Willow speculative and exploration uncertain); NSB 44–46 (same as CPAI); *Cf. Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 (9th Cir. 2007) (stating uncertainty "inherent part" of cumulative effects analysis).

[72] BUREAU OF LAND MGMT., NATIONAL ENVIRONMENTAL PROTECTION ACT HANDBOOK 59 (2008) (H-1790-1).

[73] Feds. 40–41.

[74] SILA 25; *Lands Council v. Powell*, 395 F.3d 1019, 1027–28 (9th Cir. 2005).

[75] Feds. 42; CPAI 58; NSB 46.

[76] BLM_AR182669.

[77] SILA 27–28; *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm)*, 463 U.S. 29, 43, 52 (1983).

[78] CPAI 58.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                14

In sum, the EIS failed to adequately analyze cumulative effects from reasonably foreseeable actions with Willow.

###### 2. The EIS's Analysis of Fish and Polar Bear Impacts Was Deficient.

The EIS failed to analyze Willow's cumulative impacts to fish and polar bears in combination with reasonably foreseeable actions as required by NEPA.[79]

The analysis for fish and polar bears failed to address relevant RFFAs individually.[80] Defendants' assertions that the EIS "aggregated" its analysis is contrary to the record.[81] Although RFFAs may either be individually analyzed or aggregated into a quantified environmental baseline, the FEIS must explain that analysis and consider incremental environmental impacts.[82] That did not occur here.[83] The Borough's and ConocoPhillips' reliance on *Cascadia Wildlands v. Bureau of Indian Affairs*,[84] is misplaced. There, an aggregated cumulative effects analysis was deemed sufficient where the agency quantified the environmental baseline to conclude that a proposed timber sale would cumulatively reduce owl habitat by a specific percentage.[85] The analysis in *Cascadia* stands in stark contrast to the Willow EIS, which does not include aggregated

---

[79] SILA 28–31.
[80] SILA 28–31.
[81] Feds. 43–44; CPAI 58.
[82] *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1112 (9th Cir. 2015).
[83] SILA 30–31. BLM_AR182675–76; 182679–80 (no explanation of aggregation or quantification).
[84] 801 F.3d 1105; NSB 47; CPAI 55.
[85] *Cascadia*, 801 F.3d at 1109–10.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                 15

environmental baseline calculations or explain how conclusions were reached.[86]

Defendants' reliance on *League of Wilderness Defenders–Blue Mountains Biodiversity Project v. U.S. Forest Service* (*Blue Mountains*)[87] to argue that an agency's cumulative effects analysis may be aggregated and such decisions must be given deference is similarly misplaced.[88] That court rejected part of that cumulative effects analysis because — like the analysis of fish and polar bears in the Willow EIS — it "almost complete[ly]" failed to include information about relevant projects.[89] Thus, to the extent the EIS may have aggregated impacts, its conclusions are too vague and conclusory to meet NEPA's requirements.[90]

Indeed, Defendants offer inconsistent arguments about whether RFFAs, such as Greater Willow, were aggregated into or excluded altogether from the cumulative effects analysis for fish and polar bears.[91] Federal Defendants assert that the failure to mention an RFFA for some resources indicates that it was irrelevant to the analysis,[92] but for other resources, the failure to mention an RFFA means it was "clearly" part of an aggregated

---

[86] *Supra* note 83.
[87] 549 F.3d 1211 (9th Cir. 2008).
[88] NSB 46; CPAI 55, 57.
[89] *Blue Mountains*, 549 F.3d at 1218; SILA 25–28.
[90] SILA 30–31.
[91] Feds. 41, 43–44 (Greater Willow not analyzed for fish and polar bears); CPAI 58 (claiming that, although not mentioned, Greater Willow was aggregated for fish and polar bears); NSB 47 (same); SOA 19 (same).
[92] Feds. 41 (claiming that, where unmentioned, Greater Willow had no relevant effect on resource).

analysis.[93] The conflicting explanations for the agencies' actions are post hoc rationales and should be rejected.[94] Because RFFAs were inconsistently considered across individual resources without explanation,[95] and the agencies failed to explain how conclusions were reached, the analysis is arbitrary and violates NEPA and the APA.[96] Furthermore, the contention that Greater Willow would have no relevant effects on fish or polar bears in the time frame analyzed — through 2081[97] — is contrary to the record.[98] Oil and gas projects impact fish and polar bears[99] and Greater Willow's construction could begin in as little as six years.[100] And, as explained above, the EIS did not consider the cumulative effects of the Nanushuk project on fish and polar bears.[101]

---

[93] Feds. 43–44 (arguing that, although not mentioned, Nanushuk and exploration projects were included in analysis of fish and polar bears).

[94] *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012) ("We cannot gloss over the absence of a cogent explanation by the agency by relying on the post hoc rationalizations…." (quoting *Humane Soc'y of U.S. v. Locke,* 626 F.3d 1040, 1049 (9th Cir.2010))).

[95] Defendants suggest analysis of RFFAs for certain resources is sufficient. Feds 41 (Greater Willow addressed in emissions section); CPAI 57–58 (Greater Willow, Nanushuk, and exploration considered for some resources). This approach is inadequate. *See Bark v. U.S. Forest Serv*., 958 F.3d 865, 872 (9th Cir. 2020) (addressing sufficiency of RFFA analysis on a resource by resource basis).

[96] SILA 28–31; *City of Carmel-By-the-Sea v. U.S. Dep't of Transp*., 123 F.3d 1142, 1160–61 (9th Cir. 1997); *Ctr. for Biological Diversity*, 698 F.3d at 1124; *State Farm*, 463 U.S. 29, 43.

[97] BLM_AR182668.

[98] Feds. 41 (citing BLM_AR182673 without explanation).

[99] BLM_AR182679–80 (polar bears); BLM_AR182675 (fish).

[100] BLM_AR103717.

[101] *Supra* p. 12. Federal Defendants' cite to a map from the Nanushuk EIS is unavailing because it only shows RFFAs relevant to subsistence and traditional uses for Nanushuk. Feds. 43 (discussing fish and polar bears).

In sum, the agencies' cumulative effects analysis for fish and polar bears failed to individually consider or properly aggregate project impacts from Greater Willow, Nanushuk, and known exploration projects.

### D. BLM's Analysis of Greenhouse Gas Emissions Is Deficient.

BLM's analysis of Willow's climate impacts violated NEPA.[102] In *Center for Biological Diversity v. Bernhardt* (*CBD*), the Ninth Circuit explained that agencies must estimate the emissions from foreign consumption of oil or explain why it could not estimate them, and evaluate the effects.[103] Defendants concede that BLM did not quantify or estimate emissions from foreign oil sources.[104] This is inconsistent with *CBD*.[105] Defendants' arguments that BLM sufficiently explained why it could not quantify or estimate those impacts[106] ignores the studies in the record and the Ninth Circuit's recognition in *CBD* that those studies allow the agency to complete the called-for quantitative analysis.[107] An agency explanation that is counter to the record is arbitrary.[108] And BLM's cursory explanations for its failure to quantify these emissions are

---

[102] SILA 31–32.

[103] 982 F.3d 723, 738–40 (9th Cir. 2020).

[104] Feds. 27–28; CPAI 48–49; SOA 19–21.

[105] 982 F.3d at 740.

[106] Feds. 28–29; CPAI 48–49; NSB 24–26; SOA 19–21.

[107] *See CBD*, 982 F.3d at 738–39 (identifying scientific documents in record that would allow BOEM to complete required analysis); SILA 32 & note 133 (citing same studies in record).

[108] *State Farm*, 463 U.S. at 43. Contrary to ConocoPhillips' and the State's assertions regarding deference, the Ninth Circuit concluded in *CBD* that a higher level of deference was not warranted because an energy-resource agency does not have expertise in the area of economic modeling. 982 F.3d at 740; SOA 20 note 7; CPAI 51.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                                                   18

functionally indistinguishable from the explanations offered and rejected in *CBD*.[109]

Moreover, because the Ninth Circuit recognized that such studies provide a sufficient

basis for the agency to consider foreign oil consumption, Defendants' reliance on *Sierra*

*Club v. U.S. Department of Energy* is misplaced.[110]

Defendants' contention that because BLM did not conclude that the no-action

alternative would have higher emissions than the action alternatives, as BOEM did in

*CBD*, a more thorough explanation is not required also fails.[111] The Ninth Circuit's

holding was not based solely on BOEM's conclusion regarding the no-action alternative;

it was grounded in NEPA's core requirements to accurately disclose and analyze impacts

of indirect effects, which BLM failed to do here.[112] Similarly, the Borough's contention

that *CBD* is inapposite based on BLM's assumption that substitution sources would be

consumed domestically fails because oil is a global product, as BLM recognized.[113]

BOEM also made the same assumption in *CBD*.[114]

Finally, Defendants' argument that because BLM could not select the no-action

alternative, the modeling outcomes do not matter is contrary to NEPA's fundamental

goals of ensuring an informed decision and allowing public engagement.[115] Indeed,

---

[109] *CBD*, 982 F.3d at 737–38; CPAI 48–49; Feds. 28–29.
[110] 867 F.3d 189, 201–02 (D.C. Cir. 2017); CPAI 51; NSB 26; SOA 20–21.
[111] Feds. 27–28; CPAI 49–51; NSB 21–22.
[112] *CBD*, 982 F.3d at 737–38; SILA 32.
[113] NSB 23–24; BLM_AR183508.
[114] *CBD*, 982 F.3d at 739.
[115] *Robertson*, 490 U.S. at 349; Feds. 29–30; CPAI 52–54. To be clear, SILA does not concede that BLM cannot select the no-action alternative.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                     19

ConocoPhillips' argument that the agency does not need to properly analyze the impacts of a no-action alternative when it cannot select that alternative contradicts their acknowledgment that analysis of a no-action alternative is required even when the agency cannot select that alternative.[116] ConocoPhillips' argument also ignores that BLM has broad authority to condition, restrict, or prohibit activity on leases[117] and could consider different alternatives or mitigation measures on remand to limit emissions. To the extent that ConocoPhillips asserts that these emissions are not indirect emissions under NEPA, BLM expressly identified them as such.[118] In sum, BLM's analysis of climate and greenhouse gas emissions is controlled by *CBD*: the agency's deficient analysis violates NEPA.

## II. THE CORPS VIOLATED THE CWA.

### A. The Corps Lacked Required Information to Determine Whether Willow Would Cause or Contribute to Significant Degradation.

No one contests that the Corps must consider wetland functions and values under the CWA.[119] What is at issue is whether the Corps assessed those functions and values to support the finding that the project will not cause or contribute to significant degradation.

---

[116] CPAI 53–54 & notes 195–96 (citing agency guidance and cases requiring consideration of effects of no-action alternative even if agency cannot select it); *cf.* Feds. 27–28 (arguing EIS provided required analysis of impacts for alternatives, including no-action).

[117] *See* 42 U.S.C. § 6506a(b), (k); 43 C.F.R. § 3152.2(b).

[118] CPAI 52–54; BLM_AR182422–23, BLM_AR183493; *see also* BLM_AR183507 (explaining purpose of using model was to estimate emissions from no-action alternative).

[119] *See* Feds. 45; CPAI 75.

The Corps' regulations and Guidance require the Corps to consider the functions and services lost and the associated impacts to the aquatic ecosystem.[120] Without an analysis of lost wetland functions, the Corps could not make non-arbitrary findings that Willow would not cause or contribute to significant degradation or that mitigation would offset losses.[121]

The level of analysis must be commensurate with the scope and scale of the authorized impacts and functions lost,[122] and Willow's impacts would be massive, resulting in 616.9 acres of permanent impacts to waters of the United States (WOUS), 157.9 acres of temporary impacts, and 3,351.9 acres of secondary impacts.[123] The Corps failed to analyze the impacts and lost functions from Willow. Remarkably, nowhere in the Corps' analysis is there a determination of "the nature and degree of effect" the project will have on the "structure and function of the aquatic ecosystem."[124]

---

[120] *See* 33 C.F.R. § 332.3(c)(3)(iii); 40 C.F.R. § 230.11(e) (Corps' determination of effects "'shall' … [d]etermine the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem."); *see also* U.S. Army Corps of Eng'rs, Regulatory Guidance Letter No. 02-02, *Guidance on Compensatory Mitigation Projects for Aquatic Resource Impacts Under the Corps Regulatory Program Pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899*, at 2 (Dec. 24, 2002) ("Districts should use a functional assessment by qualified professionals to determine impacts and compensatory mitigation requirements.").

[121] *See* SILA 35; *see also* 40 C.F.R. § 230.12(a)(3)(iv); 40 C.F.R. § 230.10(c); U.S. Army Corps of Eng'rs, Alaska District Compensatory Mitigation Thought Process 9–10 (Rev. Sept. 18, 2018) (explaining Corps must identify the functions that impacted wetlands perform).

[122] 33 C.F.R. § 332.3(c)(3)(iii).

[123] Corps_AR000201–02.

[124] 40 C.F.R. § 230.11(e); *contra* NSB 61–62; CPAI 74–76; Feds. 45–46.

Defendants refer to pages that merely list the types of vegetation in Willow's project area, note total amounts of fill, contain snippets of information on waterways, or have high-level statements about potential impacts associated with the kind of fill activities involved with Willow.[125] Nothing on those pages indicates the Corps undertook the required analysis, identifying the nature and degree of impacts to the particular wetlands filled by the project. [126] Defendants rely on a single page of the Corps' ROD to indicate that the Corps analyzed lost wetland functions,[127] but that page does not identify the extent of lost functions, where those losses would occur, how those specific losses would be mitigated, or otherwise reflect that the Corps engaged in that analysis.[128]

---

[125] *See, e.g.*, BLM_AR145089–146 (Colville River Crossing report containing only three data points); BLM_AR135405–28, BLM_AR135515-519 (field data for one data point included in previous report); BLM_AR135483–86 (water withdrawals for two lakes); BLM_AR182493–506 (high level description of wetland impacts generally but not describing functions impacted); BLM_AR182675 (less than one page of cumulative effects discussion); BLM_AR185550–57 (listing total impacts by wetland type, not functions); Corps_AR000209 (noting 18 types of wetlands were identified, but not actually identifying them and identifying how fill "could" impact wetlands but failing to identify the nature and degree of actual impacts); Corps_AR000197–202 (conclusory statements regarding water quality); Corps_AR000183–87 (summarizing total size of watersheds disturbed).

[126] Defendants assert the FEIS contained adequate information regarding impacts to wetland functions. CPAI 75; Feds. 45. However, in response to comments critiquing the lack of analysis of wetland functions in the EIS, BLM cursorily stated "[a]n aquatic site assessment is not required for NEPA," BLM_AR182998–99, and the FEIS did not purport to contain this analysis.

[127] Feds. 46.

[128] Corps_AR000209.

ConocoPhillips' and the Borough's assertion that an aquatic site assessment analyzing wetland functions was completed for the entire Willow project[129] is belied by the record, which shows that ConocoPhillips only assessed a fraction of the project area.[130] Without analyzing all of Willow's direct and secondary effects, the Corps could not make a reasonable determination regarding significant degradation.[131]

Secondary effects to wetlands from dust impacts were also inadequately assessed.[132] Defendants point to a number of record citations purporting to indicate that the Corps closely considered impacts from road dust deposition.[133] Defendants rely on studies cited in the FEIS to justify limiting consideration of dust impacts at 100 meters from the road corridor.[134] However, these studies do not support limiting impacts to 100

---

[129] CPAI 75; NSB 62.

[130] Corps_000453-532, Corps_AR000461–62 (indicating only impacts within three areas were assessed: Teshekpuk Lake and Colville River Special Areas and within 500 feet of anadromous waterways). Table 2.1 totaled these "debits" at 122.8 acres and notes each "area" assessed was from the pre-determined areas warranting compensatory mitigation. Corps_AR000464–65.

[131] SILA notes 173–176 (explaining ConocoPhillips assessed functional losses of 237.8 acres but that Willow would impact 3,730.9 total acres). Defendants also accuse SILA of misleading the Court regarding the Corps' request for additional time and technical information regarding aquatic resources, CPAI 75 note 291; Feds. 45 note 15, but SILA's assertion is supported by meeting notes between the Corps, EPA, and BLM, with comments attributed to the Corps. BLM_AR103085–86 (discussing need for information regarding wetland functions, feasibility of alternatives, and the need for an aquatic site assessment).

[132] SILA 35–36. Contrary to ConocoPhillips' assertions (CPAI notes 301, 306) the Corps' obligation to consider secondary effects from water impoundment and dust was raised during the comment period. Corps AR_003758–62, Corps AR_AR003778, Corps AR_AR003784, Corps AR_AR003791.

[133] NSB 63; Feds. 46; CPAI 76.

[134] NSB 63–64; CPAI 77–79; Feds. 47.

meters. To the contrary, the studies indicate that impacts from the dust shadow would likely be substantially more extensive, with impacts extending three- to eight-fold beyond the 100-meter boundary considered by the Corps.[135] At a minimum, the Corps needed to explain its decision to limit consideration of impacts at 100 meters in light of the studies it relied on. It failed to do so.

Secondary impacts from culverts were also inadequately analyzed because the Corps did not have site-specific culvert designs available for review at the time the project was authorized.[136] ConocoPhillips' "comprehensive discussion" of culvert design in the FEIS[137] is just one brief paragraph noting that culverts would be designed for the 50-year flood event.[138] Designing culverts for a 50-year flood event is precisely what the FEIS states would likely exceed the design flood standard.[139] Defendants' arguments that monitoring requirements would ensure culverts function properly[140] are unavailing

---

[135] BLM_AR182503. Auerbach (1997) found soils did not recover to their natural pH for 800 meters from the Dalton Highway, BLM_AR192112–13, and notes that the "zone of maximum dust deposition" causing significant changes to soils and vegetation extends 300 meters from the road. BLM_AR192111. Myers-Smith (2006) found similar results, with modeling demonstrating dust altered vegetation within 600 meters of roads. BLM_AR231609.

[136] *See supra* pp 9–10 (discussing the lack of detailed design information for culverts); BLM_AR186081 (stating culvert locations would be identified post-FEIS); *see also* BLM_AR182932 (comment response noting that culvert monitoring mitigation measures are required "due to the lack of a basis of design for structures").

[137] CPAI 77.

[138] BLM_AR182400

[139] SILA 37; *see also* BLM_AR186038–39 (EPA noting concern over protection of wetlands and FEIS's findings that gravel infrastructure would block or restrict surface water flows).

[140] Feds. 47; CPAI 76–77.

because the Corps lacked information to analyze their effectiveness before making its required CWA findings and because monitoring for impacts does not mean the Corps can assume such impacts would simply be avoided.[141]

Without information on direct and secondary impacts, the Corps did not have "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the [404(b)(1)] Guidelines" and cannot issue a 404 permit.[142]

## B. The Corps' Mitigation Findings Are Arbitrary.

Pursuant to Corps regulations, mitigation is required to replace lost aquatic functions and cannot be based on arbitrary findings of significance.[143] In addition, the Corps cannot diminish impacts — or the mitigation required to offset those impacts — by assessing impacts on a landscape scale that dilutes the direct impacts from the project.

First, ConocoPhillips misinterprets the Corps' regulations to argue that the Corps only requires compensatory mitigation for "significant resources losses" — i.e., particularly damaging portions of a project.[144] This fundamentally misrepresents the Corps' regulatory requirements for mitigation. The first regulation ConocoPhillips cites is

---

[141] *Supra* pp. 10–11.

[142] 40 C.F.R. § 230.12(a)(3)(iv); *State Farm*, 463 U.S. at 43. The Borough also argues that the Corps adequately considered cumulative effects; SILA did not brief that issue for the CWA. NSB 64–65.

[143] 33 C.F.R. § 332.3(f)(1) ("[T]he amount of required mitigation must be, to the extent practicable, sufficient to replace lost aquatic resource functions."). The Borough argues that BLM-imposed mitigation would ensure impacts are avoided and minimized. NSB 67–68. This fails to acknowledge the CWA's requirement to offset environmental losses from unavoidable impacts. 33 C.F.R. § 332.3(a)(1).

[144] CPAI 81 (citing 33 C.F.R. § 320.4(r)(2)).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                              25

"a general statement of mitigation policy … [and] not a substitute for the mitigation requirements necessary to ensure that a permit action … complies with the section 404(b)(1) Guidelines."[145] The substantive regulation, in contrast, specifically requires compensatory mitigation to replace lost aquatic resource functions.[146] In other words, the aquatic impacts of the entire project need to be mitigated — not just a fraction of those impacts. The Corps needed to explain why it limited its assessment and mitigation to three narrow areas (within 500 feet of anadromous waters and within the Teshekpuk Lake and Colville River Special Areas).[147] It did not.

Second, the Corps inappropriately downplayed Willow's impacts by looking at Willow's footprint of 3,730.9 acres of direct and indirect impacts relative to a 1.7 million acre area.[148] This is both problematic for purposes of understanding Willow's real and consequential impacts to the wetlands, and irrelevant for purposes of determining appropriate mitigation. The regulatory focus for mitigation is lost aquatic functions.[149] The 404(b)(1) Guidelines prohibit issuance of a permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the

---

[145] 33 C.F.R. § 320.4(r)(2) note 1.
[146] *Id.* § 332.3(f)(1). For projects with no functional assessment or related document, the acres of wetland impacts must be compensated at a one-to-one ratio. *Id.* The Corps failed to require a one-to-one ratio, nor did it explain why such mitigation was either impracticable or inappropriate.
[147] SILA 39.
[148] *Supra* note 123; BLM_AR182386 (map of project area); Corps_AR000186.
[149] *Supra* notes 143, 146.

discharge on the aquatic ecosystem."[150] Contrary to Defendants' claims,[151] the goal of the Corps' watershed approach "is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of compensatory mitigation sites."[152] Neither this regulation nor the guidance documents cited by Defendants[153] limit the Corps' consideration of mitigation to impacts that are only significant on a watershed scale or allow the Corps to define significance in a way that would negate a project's impacts from ever meeting that threshold.[154] The Corps' failure to require mitigation to replace lost aquatic resource functions violated the CWA.

Defendants also imply the Corps has limitless discretion regarding whether to require mitigation at all.[155] In support for this assertion, ConocoPhillips points to cases considering mitigation under NEPA, not the CWA.[156] "Unlike the CWA, NEPA does not contain substantive environmental standards, nor … mandate that agencies achieve

---

[150] 40 C.F.R. § 230.10(d).

[151] CPAI 82; NSB 72.

[152] 33 C.F.R. § 332.3(c)(1).

[153] Feds. 48; NSB 66–67; SOA 24–27.

[154] *See e.g. Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001) (holding that environmental impacts of an activity cannot be minimized by adopting a scale of analysis so broad that it marginalizes the site-level impact of the activity).

[155] NSB 72–73; CPAI 81, 83.

[156] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (NEPA); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012) (ESA, MMPA and NEPA); *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976 (9th Cir. 1985) (NEPA and ESA claims); *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031 (D. Alaska 2013) (ESA, MMPA, and NEPA); *Gaule v. Meade*, 402 F. Supp. 2d 1078 (D. Alaska 2005) (NEPA claims).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                      27

particular substantive environmental results."[157] ConocoPhillips also cites *Cook Inletkeeper v. U.S. Army Corps of Engineers* for the proposition that compensatory mitigation is not mandated.[158] However, that decision focused on whether the Corps should require additional compensatory mitigation, not whether mitigation is required at all.[159]

ConocoPhillips' assertion that the Corps "explained the technical methodology it used" when determining compensatory mitigation is not borne out by the record.[160] ConocoPhillips' Compensatory Mitigation Plan (CMP) proposed mitigation for a fraction of Willow's impacts,[161] and the Corps' subsequent ROD approved the CMP with two sentences noting ConocoPhillips would offset that fraction of impacts and deeming the CMP sufficient.[162] Defendants point to nothing in the Corps' record indicating that the agency considered mitigating this fraction of impacts or informed ConocoPhillips of its determination in advance of receiving the CMP. Nor does the record support the Corps' finding that there would be "significant unavoidable impacts" warranting mitigation for the three selected areas, but not others[163] — further highlighting the arbitrary nature of

_____

[157] *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008).
[158] 541 F. App'x 787 (9th Cir. 2013); CPAI 81 note 325.
[159] *Id.* at 788–89.
[160] CPAI 83.
[161] Corps_AR000188.
[162] Corps_AR000188; *supra note* 131.
[163] Corps_AR000188; SILA 22, note 75 (FEIS stating Willow's "indirect effects to fish would likely not be measurable"). Neither the FEIS nor technical appendix discuss the significance of impacts within the Teshekpuk Lake or Colville River Special Areas.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                    28

Case 3:20-cv-00290-SLG   Document 107   Filed 06/11/21   Page 35 of 46

particular substantive environmental results."[157] ConocoPhillips also cites *Cook Inletkeeper v. U.S. Army Corps of Engineers* for the proposition that compensatory mitigation is not mandated.[158] However, that decision focused on whether the Corps should require additional compensatory mitigation, not whether mitigation is required at all.[159]

ConocoPhillips' assertion that the Corps "explained the technical methodology it used" when determining compensatory mitigation is not borne out by the record.[160] ConocoPhillips' Compensatory Mitigation Plan (CMP) proposed mitigation for a fraction of Willow's impacts,[161] and the Corps' subsequent ROD approved the CMP with two sentences noting ConocoPhillips would offset that fraction of impacts and deeming the CMP sufficient.[162] Defendants point to nothing in the Corps' record indicating that the agency considered mitigating this fraction of impacts or informed ConocoPhillips of its determination in advance of receiving the CMP. Nor does the record support the Corps' finding that there would be "significant unavoidable impacts" warranting mitigation for the three selected areas, but not others[163] — further highlighting the arbitrary nature of

_____

[157] *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008).
[158] 541 F. App'x 787 (9th Cir. 2013); CPAI 81 note 325.
[159] *Id.* at 788–89.
[160] CPAI 83.
[161] Corps_AR000188.
[162] Corps_AR000188; *supra note* 131.
[163] Corps_AR000188; SILA 22, note 75 (FEIS stating Willow's "indirect effects to fish would likely not be measurable"). Neither the FEIS nor technical appendix discuss the significance of impacts within the Teshekpuk Lake or Colville River Special Areas.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                    28

Case 3:20-cv-00290-SLG   Document 107   Filed 06/11/21   Page 35 of 46

the Corps' decision to solely mitigate impacts in these areas.[164] While agencies are entitled to deference, courts must carefully review the record to determine that the agency made a reasoned decision.[165] That record is wholly lacking here.

Finally, Defendants do not meaningfully rebut SILA's arguments that the Corps lacked specificity regarding the ultimate compensatory mitigation projects selected.[166] Defendants' arguments that the Corps would later approve the preservation site miss the point:[167] the Corps needed that information to determine whether preservation would offset losses from Willow. Defendants' post hoc arguments that a specific preservation instrument was finalized months later do not cure the Corps' failure to obtain that information before its approval and should be rejected.[168]

In sum, the Corps lacked critical information regarding Willow's direct and secondary impacts to wetlands and their functions, and did not support its conclusion that Willow would not cause significant degradation or that aquatic losses have been sufficiently mitigated.

---

[164] SILA 39–41; *see also* 33 C.F.R. § 320.4(r)(2) (compensatory mitigation is required for "significant resource losses which are specifically identifiable"); *see State Farm*, 463 U.S. at 43.

[165] *Marsh,* 490 U.S. at 378 (Corps entitled to deference where it explained its reasoning and used its own experts to evaluate information); *Cook Inletkeeper,* 541 F. App'x at 788 (explaining that "the record supports the determination that … the Corps did not blindly accept the [applicant's] representations").

[166] SILA 40–41.

[167] Feds. 50; NSB 73–74; CPAI 83–85.

[168] CPAI 84–85; NSB 73–74. *See supra* note 44 (Courts should reject post hoc rationales).

III.    **FWS VIOLATED THE ESA.**

   C.    **FWS Relied on Unspecified Mitigation Measures.**

FWS relied on future Marine Mammal Protection Act (MMPA) mitigation measures to reach its no-jeopardy and no-adverse-modification determinations.[169] To the extent Defendants assert that other mitigation played a role in FWS's determinations, that argument is misplaced.[170] SILA does not argue that FWS solely relied on MMPA compliance to mitigate impacts of Willow. SILA argues, consistent with *CBD*, that the fact that other aspects of the project may reduce impacts to polar bears does not obviate FWS's obligation to ensure mitigation measures it relies on, including future MMPA compliance, be stated with specificity.[171]

Defendants argue FWS's analysis and determinations were based on Willow's location and other, specific measures, not MMPA compliance.[172] That is contrary to the record and ignores that BLM's commitment to MMPA compliance is a key part of FWS's assumptions in the BiOp.[173] More specifically, FWS assumed unspecified MMPA-required measures would preclude Willow's adverse impacts throughout the

---

[169] SILA 43–45.

[170] Feds. 58–62; NSB 53–55.

[171] 982 F.3d at 744 (den detection surveys polar bear interaction plan required); *id.* at 748 (explaining FWS relied on three factors for its no adverse modification finding, including MMPA compliance); *see also* FWS_AR000721–25 (explaining MMPA process and noting MMPA compliance is one of three "factors" reducing effects, along with project location and other mitigation).

[172] Feds. 58–62; NSB 53–55.

[173] SILA 44 notes 201–03; FWS_AR000677–78 (describing BLM's commitment to require MMPA compliance).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                      30

BiOp's effects analysis, which found MMPA compliance would help ensure against disturbance,[174] human-polar bear interactions,[175] lethal take,[176] impacts to prey species,[177] and adverse modification of critical habitat.[178] FWS's ultimate conclusions regarding no-jeopardy and no-adverse-modification expressly relied on the requirement to obtain MMPA compliance to protect polar bears and critical habitat.[179]

Defendants further argue that, even if FWS relied on MMPA compliance to make its determinations, such reliance is appropriate due to a revised sentence in the ESA regulations.[180] That revision does not affect the Ninth Circuit's holding in *CBD* and its applicability here: FWS still cannot support no-jeopardy and no-adverse-modification determinations based on future, unspecified mitigation measures.[181] This specificity is required under the ESA and its current regulations.[182] The new sentence establishes only that FWS need not demand *additional* proof that mitigation measures will be

_____

[174] FWS_AR000750–51 (MMPA compliance is the "[m]ost important" factor limiting disturbance impacts). Defendants make much of the results of FWS's disturbance model, Feds. 59; NSB 53–54; CPAI 68–69, but fail to acknowledge this modeling discussion concludes by reiterating the importance of MMPA compliance.

[175] FWS_AR000752.

[176] FWS_AR000723–24.

[177] FWS_AR000757.

[178] FWS_AR000759 (sea ice unit); FWS_AR000760 (barrier island unit).

[179] FWS_AR000764 (no-jeopardy conclusion explicitly premised on effects of proposed action, including protective measures, most importantly MMPA compliance); FWS_AR000765–66 (explaining in conclusions and "determinations" that MMPA compliance ensures against adverse modification of critical habitat).

[180] CPAI 59–65; NSB 49–50; Feds. 63–64.

[181] *CBD*, 982 F.3d at 745; SILA 44–45.

[182] 50 C.F.R. § 402.14(c)(1)(i); 16 U.S.C. § 1536(a)(2), (b)(4)(ii) (requiring specific mitigation).

implemented following consultation; it did not eliminate the requirement for mitigation to be identified with specificity.[183]

ConocoPhillips attempts to skirt SILA's core argument and *CBD*'s holding: that a BiOp's mitigation measures must be identified with specificity and future compliance with the Beaufort Sea Incidental Take Regulation does not provide the requisite level of specificity.[184] Neither SILA nor *CBD*'s holding focus on whether future MMPA mitigation measures would be implemented, enforced, or violated following consultation.[185] ConocoPhillips' arguments regarding overruled case holdings miss the point because they focus on the requirement for "specific and binding plans" for enforcement, not specificity of measures relied on during consultation.[186] Here, consistent with *CBD*, FWS lacked the specific, detailed information it needed to assess Willow's effects under the ESA.[187]

---

[183] SILA 45 notes 204–05.
[184] SILA 43–44; *CBD*, 982 F.3d at 743 (explaining that, to determine effects, FWS "must describe, in detail, the action agency's plan to offset the environmental damage caused by the project.")
[185] *CBD*, 982 F.3d at 745–47.
[186] CPAI 60–62.
[187] SILA 42–45; FWS_AR000678–79 (listing "examples" to be applied on a "case-by-case" basis); *see also CBD*, 982 F.3d at 744 (observing "measures rely principally on yet unapproved and undefined mitigation measures under the MMPA"); *id.* at 747 ("The few concrete strategies [typical MMPA requirements] provided are offered only as *examples* of possible strategies that could be taken.").

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                    32

### D. FWS's Take Findings Violate the ESA.

Defendants' arguments that the BiOp properly "accounted for" polar bear take are inconsistent with applicable law.[188] Defendants concede that the BiOp concluded two takes of polar bears are reasonably certain to occur over Willow's project life.[189] This means FWS was required to provide an incidental take statement (ITS)[190] and demonstrate in the ITS such take complied with the ESA and MMPA.[191] FWS failed to do so, in violation of the ESA.

The requirements for an ITS are clear: it must specify the impact of authorized take on the species, include reasonable and prudent measures to minimize impacts, provide measures to ensure "negligible" impacts under the MMPA, and provide terms and conditions to implement such measures.[192] An ITS cannot issue for a marine mammal unless and until such take is authorized under the MMPA.[193]

---

[188] Feds. 67.

[189] Feds. 67; CPAI 69–70; NSB 58.

[190] *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007) ("Both the BiOp and the Incidental Take Statement must be formulated by the FWS during the formal consultation process; indeed, the regulations specifically require the FWS to provide the Incidental Take Statement with the biological opinion.") (internal quotations omitted)).

[191] *Ctr. for Biological Diversity v. Ross* (*Ross*), No. CV 18-112 (JEB), 2020 WL 1809465, at *3 (D.D.C. Apr. 9, 2020).

[192] 16 U.S.C. §§ 1371(a)(5)(A) (MMPA), 1536(b)(4)(i)–(iv) (ESA); SILA 45–46. An ITS permits otherwise-prohibited take under the ESA. 16 U.S.C. §§ 1536(o)(2), 1538(a)(1)(B).

[193] 16 U.S.C. § 1536(b)(4)(C); *see also* SILA 45.

The BiOp states that take of polar bears could not be authorized under the ESA because it had not been authorized under the MMPA.[194] The ESA and its regulations "plainly require" an ITS when take is reasonably certain to occur, and they require that the ITS find that authorized take would not run afoul of both the ESA and MMPA.[195] A lack of MMPA compliance does not excuse FWS from this ESA mandate.[196]

Defendants do not rebut this framework, but instead offer arguments that are inconsistent with the law and each other.[197] Federal Defendants attempt to parse out different types of take,[198] but do not explain how this alters FWS's obligation to provide an ITS in its BiOp when take is anticipated. Because of the BiOp's "unambiguous statement that ESA-defined take is anticipated to occur,"[199] FWS was required to issue an ITS. It did not, and could not, unless and until that take was authorized under the MMPA. ConocoPhillips and the Borough state that take would be authorized following MMPA authorizations,[200] but there is no legal basis for a "contingent" ITS. Additionally, the relevant language under the "Incidental Take Statement" heading for polar bears does not

---

[194] FWS_AR000767.
[195] 50 C.F.R. § 402.14(g)(7); *Ross*, 2020 WL 1809465, at *9.
[196] SILA 48.
[197] CPAI argues that the BiOp authorized take. CPAI 70. This is contrary to the record, NSB's arguments (NSB 58), the State's arguments (SOA 31–32), and its own admission that MMPA take must be authorized first (CPAI 70 note 266). Federal Defendants' argument ignores the overlap between ESA and MMPA take authorizations, but acknowledges the statutory framework generally. Feds. 14.
[198] Feds. 65–67.
[199] NSB 58.
[200] CPAI 70 note 266; NSB 58.

authorize take of two bears, and fails to provide any exemption from ESA take liability, reasonable and prudent measures, terms and conditions, or measures necessary to comply with the MMPA.[201] This is not an ITS. The trigger for reinitiation of consultation pointed to by Defendants also does not save the BiOp because "[a]ny non-ITS substitute, even one that fulfills one of several functions of an ITS, will not do."[202]

Finally, to the extent that SILA raised inconsistencies between the BiOp's statement that no ESA take would occur and its statements that take would occur via hazing,[203] the BiOp itself creates this contradiction.[204] Because take was reasonably certain to occur, FWS had to issue an ITS authorizing take and complying with specific requirements in the BiOp. It did not, rendering the BiOp arbitrary and capricious.

## IV. THE PRESUMPTIVE REMEDY OF VACATUR IS APPROPRIATE.

Contrary to Defendants' arguments,[205] they have not met their burden to show that this case is one of the "rare circumstances" to deviate from the default remedy of

---

[201] FWS_AR000766–67. By contrast, the BiOp's ITS for spectacled eiders meets these requirements. *Id*.

[202] Feds. 56; NSB 58–59; *Ross*, 2020 WL 1809465, at *9 (explaining that BiOp's reinitiation trigger did not meet ESA's requirements for an ITS).

[203] Feds. 66–67; CPAI 70; NSB 58.

[204] SILA 46–47.

[205] Feds. 67–68; CPAI 85–87. Defendants seek supplemental briefing on remedy. Feds. 67; CPAI 85–86; NSB 74, 76. Defendants did not request separate remedy briefing when the parties proposed a briefing schedule and had the opportunity to brief the issue of remedy to the Court. Joint Stipulation re: Briefing Schedule (ECF No. 85). This request should be rejected.

Case 3:20-cv-00290-SLG   Document 107   Filed 06/11/21   Page 42 of 46

vacatur.[206] In considering whether remand without vacatur may be warranted, courts focus on the seriousness of the agency's error and the disruptive consequences of vacatur.[207]

Defendants do not assert that the legal errors SILA raises are minor.[208] Indeed, the agencies' legal violations go to the core purposes of the laws and are consequential to the agencies' decisions.[209] The Ninth Circuit recently vacated the approval of an oil and gas development because of similar NEPA and ESA violations.[210]

Regarding the disruptive consequences of vacatur, the critical focus is whether vacatur would cause environmental harm.[211] Here, the project proceeding threatens harm

_____

[206] SILA 49–50; *Humane Soc'y of the U.S.*, 626 F.3d at 1053, note 7 ; *see also Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency* , 806 F.3d 520, 532 (9th Cir. 2015) (noting "limited circumstances" of remand without vacatur).

[207] *Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012).

[208] *See Pollinator Stewardship Council*, 806 F.3d at 532–33 (explaining that remand without vacatur is only warranted if the legal error is not serious); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017) (stating "[c]ourts generally only remand without vacatur when the errors are minor procedural mistakes").

[209] SILA 49–50. Given the serious nature of the legal violations for multiple permits, the State's suggestion that the Court sever only the offending portions should be rejected. SOA 33.

[210] *CBD*, 982 F.3d at 751.

[211] *See Pollinator Stewardship Council*, 806 F.3d at 532 (vacating rule that could harm bee populations because leaving rule in place "risks more potential environmental harm than vacating it"); *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely [when] serious irreparable environmental injury [will occur if the decision is vacated].").

to resources and subsistence;[212] vacatur does not. By virtue of the preliminary injunction preventing construction from beginning, there are simply no disruptive consequences that warrant a departure from the default remedy.[213] ConocoPhillips asserts that vacatur threatens the company's ability to develop its leases and the company will lose investments.[214] This is not so; ConocoPhillips will retain its leases and can still seek new permits to develop. The Borough points to lost future revenues if the approvals are vacated.[215] These revenues are uncertain and should not be considered because ConocoPhillips has not committed to fully fund Willow's development.[216]

In sum, Defendants failed to meet their burden of showing that this case is one of the rare circumstances where remand without vacatur is warranted. Accordingly, the Court should apply the presumptive remedy and vacate the agencies' decisions.

<u>CONCLUSION</u>

This Court should grant SILA's Motion for Summary Judgment, and vacate the BLM ROD, Corps ROD, FEIS, BiOp, and all decisions that rely on these documents.

Respectfully submitted this 11th day of June, 2021,

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)

---

[212] *See* SILA Order at 4–5 (finding irreparable harm from Willow proceeding).
[213] *Cf. Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (explaining that the courts consider "the disruptive consequences of an interim change that may itself be changed" (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.Cir.1993))).
[214] CPAI 86–87.
[215] NSB 75–76.
[216] Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj. Ex. 2 at 1 (ECF No. 40-5).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:20-cv-00290-SLG                                                37

Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that this document contains 9,753 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits requested in Plaintiffs' Unopposed Motion to File Overlength Reply (ECF 106).

s/ Bridget Psarianos
Bridget Psarianos

**CERTIFICATE OF SERVICE**

I certify that on June 11, 2021, I caused a copy of the PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.

s/ Bridget Psarianos
Bridget Psarianos