**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*, | |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | Case No. 3:20-cv-00290-SLG |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendants. | |
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | Case No. 3:20-cv-00308-SLG |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendants. | |

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT

Before the Court are two motions for summary judgment in related cases filed by Center for Biological Diversity Plaintiffs ("CBD Plaintiffs")[1] and Sovereign Iñupiat for a Living Arctic Plaintiffs ("SILA Plaintiffs").[2] Plaintiffs in each case (collectively, "Plaintiffs") challenge various aspects of Federal Defendants'[3] review and approval of ConocoPhillips Alaska, Inc.'s ("ConocoPhillips") Willow Master Development Plan ("Willow," "Willow Project," or "Project") in the National Petroleum Reserve in Alaska ("NPR-A") on Alaska's North Slope. Federal Defendants,[4] ConocoPhillips,[5] the State of Alaska,[6] and North Slope Borough[7] filed

---

[1] *See* Docket 92 (Case No. 3:20-cv-00308-SLG). Center for Biological Diversity Plaintiffs are Center for Biological Diversity, Friends of the Earth, and Greenpeace, Inc.

[2] *See* Docket 95 (Case No. 3:20-cv-00290-SLG). Sovereign Iñupiat for a Living Arctic Plaintiffs are Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society.

[3] Federal Defendants are the United States Bureau of Land Management; United States Fish and Wildlife Service; United States Department of the Interior; Deb Haaland, in her official capacity as Secretary of the Interior; Chad B. Padgett, in his official capacity as Alaska State Director of the Bureau of Land Management; the United States Army Corps of Engineers; and David Hobbie, in his official capacity as Regional Regulatory Chief of the Army Corps of Engineers-Alaska District. The Army Corps of Engineers and Mr. Hobbie are defendants only in the SILA action. *See* Docket 36 at 12, ¶¶ 24, 27 (Am. Compl.) (Case No. 3:20-cv-00290-SLG).

[4] *See* Docket 99 (Case No. 3:20-cv-00308-SLG); Docket 103 (Case No. 3:20-cv-00290-SLG).

[5] *See* Docket 100 (Case No. 3:20-cv-00308-SLG); Docket 104 (Case No. 3:20-cv-00290-SLG). ConocoPhillips Alaska, Inc. was admitted as intervenor-defendant in both cases. *See* Docket 17 (Case No. 3:20-cv-00308-SLG); Docket 13 (Case No. 3:20-cv-00290-SLG).

[6] *See* Docket 97 (Case No. 3:20-cv-00308-SLG); Docket 101 (Case No. 3:20-cv-00290-SLG). The State of Alaska was admitted as intervenor-defendant in both cases. *See* Docket 93 (Case No. 3:20-cv-00308-SLG); Docket 96 (Case No. 3:20-cv-00290-SLG).

[7] *See* Docket 98 (Case No. 3:20-cv-00308-SLG); Docket 102 (Case No. 3:20-cv-00290-SLG). North Slope Borough was admitted as intervenor-defendant in both cases. *See* Docket 86

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 2 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 2 of 110

combined oppositions to Plaintiffs' separate motions. Plaintiffs each replied in support.[8] Oral argument was held on July 12, 2021.[9]

## INTRODUCTION

I. **Factual Background**

A. **The Willow Project**

ConocoPhillips' Willow Master Development Plan is a proposed oil and gas development project under leaseholds in the northeast area of the National Petroleum Reserve in Alaska.[10]

The Project encompasses a series of interconnected infrastructure components that would be constructed over approximately nine years, including up to five drill sites, a central processing facility, an operations center pad, up to 37 miles of gravel roads and seven bridges, up to 575.4 total miles of ice roads during construction, an airstrip, up to 315.9 miles of pipelines (94.4 miles of new pipeline rack), a gravel mine site, sealift barge transport of construction materials and prefabricated modules to the North Slope, a constructed freshwater reservoir

---

(Case No. 3:20-cv-00308-SLG); Docket 81 (Case No. 3:20-cv-00290-SLG).

[8] *See* Docket 103 (Case No. 3:20-cv-00308-SLG); Docket 107 (Case No. 3:20-cv-00290-SLG).

[9] *See* Docket 115 (Case No. 3:20-cv-00308-SLG); Docket 120 (Case No. 3:20-cv-00290-SLG).

[10] *See* BLM AR 186055 (Record of Decision); BLM AR 182369; *see also* Order, *Sovereign Iñupiat for a Living Arctic v. BLM*, Case No. 3:20-cv-00290-SLG, Case No. 3:20-cv-00308-SLG, 2021 WL 343925, at *1 (D. Alaska Feb. 1, 2021) (discussing the NPR-A).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 3 of 110

sized to provide 55 million gallons of water for winter withdrawal, and up to three boat ramps for subsistence users.[11]

The Project is anticipated to have a peak production in excess of 160,000 barrels of oil per day (with a processing capacity of 200,000 barrels of oil per day) over its 30-year life, producing approximately 586 million barrels of oil.[12]

### B. Environmental Review

ConocoPhillips sought the Bureau of Land Management's ("BLM") approval of the Willow Project under the National Environmental Policy Act ("NEPA")[13] and a Clean Water Act ("CWA")[14] Section 404 permit from the U.S. Army Corps of Engineers ("Corps"). BLM initiated formal consultation with the U.S. Fish and Wildlife Service ("FWS") pursuant to the Endangered Species Act ("ESA").[15]

### 1. National Environmental Policy Act

On May 10, 2018, ConocoPhillips requested that BLM prepare an Environmental Impact Statement ("EIS") for the Willow Project, as required by NEPA.[16] The following year, BLM made available for public comment a Draft EIS

---

[11] BLM AR 186055 (ROD); BLM AR 182369.

[12] BLM AR 186055 (ROD); BLM AR 182369.

[13] 42 U.S.C. § 4321 *et seq.*

[14] 33 U.S.C. § 1251 *et seq.*

[15] 16 U.S.C. § 1531 *et seq.*

[16] BLM AR 182389. BLM was the lead agency for NEPA review, with the assistance of the following cooperating agencies: the Corps, FWS, the Environmental Protection Agency, the State of Alaska, the North Slope Borough, the Native Village of Nuiqsut, the City of Nuiqsut, and

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 4 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 4 of 110

for the Project.[17]  Then, on March 26, 2020, BLM released a Supplemental Draft EIS that evaluated additional Project components.[18]  BLM published its notice regarding the availability of the Final EIS ("FEIS" or "EIS") on August 14, 2020.[19]

The EIS evaluated a No Action Alternative (Alternative A) and three action alternatives (Alternatives B, C, D).[20]  Under Alternative A, the Project would not be constructed; however, oil and gas exploration in the area would continue.[21] Alternative B, ConocoPhillips' preferred alternative, would extend an all-season gravel road from an existing North Slope development toward the Project area. Gravel roads would connect all Project facilities, including the processing facility, operations center, and all drill sites.[22]  Alternative C, the "Disconnected Infield Roads" alternative, would extend the same all-season gravel road from existing development toward the Project Area, but it would not have gravel roads

---

the Iñupiat Community of the Arctic Slope. BLM AR 186055–056 (ROD).

[17] 84 Fed. Reg. 45,801 (Aug. 30, 2019).

[18] 85 Fed. Reg. 17,094 (Mar. 26, 2020) ("This targeted Supplement to the Draft EIS only addresses additional analysis for three Project components added by the Project proponent: Module [D]elivery Option 3, a constructed freshwater reservoir, and up to three boat ramps for subsistence access."); BLM AR 178271 (Supp. Draft EIS).

[19] 85 Fed. Reg. 49,677 (Aug. 14, 2020).

[20] BLM AR 182395.

[21] BLM AR 182396.

[22] BLM AR 182396.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 5 of 110

connecting other portions of the Project, among other differences.[23]  "The intent of Alternative C is to reduce effects to caribou movement and decrease the number of stream crossings required; this is also intended to further reduce impacts to subsistence users of these resources, and reduce impacts to hydrology and wetlands."[24]   Alternative D, the "Disconnected Access" alternative, would not extend the all-season gravel road from existing development.[25]  "The intent of Alternative D is to minimize the Project's footprint and fill, reduce the number of required bridges (six versus 7), and lessen the length of linear infrastructure on the landscape to decrease effects to caribou movement and subsistence.   This alternative's reduction of linear gravel infrastructure in the Project area may also reduce impacts to hydrology (e.g., sheet flow) and wetlands (e.g., direct fill, indirect impacts from dust)."[26]   Each action alternative evaluated the same five drill site locations: Bear Tooth ("BT") drill sites 1–5.[27]

For each action alternative, the EIS also considered three separate sealift module delivery options for delivering large, prefabricated modules to the Project

---

[23] BLM AR 182396–397.

[24] BLM AR 182373.

[25] BLM AR 182397.

[26] BLM AR 182373.

[27] *See, e.g.*, BLM AR 182754 (Alternative B); BLM AR 182755 (Alternative C); BLM AR 182756 (Alternative D).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 6 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 6 of 110

area.[28]  Sealift module delivery Option 3, ConocoPhillips' preferred option, would require the construction of a partially grounded ice bridge crossing the Colville River near Ocean Point.[29]

On October 26, 2020, then-Secretary of the Interior David Bernhardt signed the Record of Decision ("ROD") authorizing Alternative B, ConocoPhillips' preferred alternative, and Sealift Module Delivery Option 3, the Colville River ice bridge crossing.[30]  However, at the request of ConocoPhillips, the ROD deferred from approval Bear Tooth drill sites 4 and 5 (BT4 and BT5) and their respective connecting road and pipeline segments.[31]

## 2.  Clean Water Act

On February 3, 2020, ConocoPhillips submitted a CWA Section 404 permit application to the Corps, seeking authorization to discharge fill and dredged material, as well as perform work in the waters of the United States ("WOUS"), including wetlands.[32]  The application was determined incomplete, and

---

[28] BLM AR 182408–409.

[29] BLM AR 182409.

[30] BLM AR 186073 (ROD).

[31] BLM AR 186056 (ROD).

[32] Corps AR 000150 (ROD); Corps AR 004942–5604 (Feb. 2020 CWA Permit Application).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 7 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 7 of 110

ConocoPhillips submitted a revised application on March 18, 2020.[33] In December 2020, the Corps issued its ROD and the Section 404 permit to ConocoPhillips.[34]

The Corps authorized the permanent discharge of fill and dredged material into 481.1 acres of WOUS, including wetlands; the temporary discharge of fill and dredged material into 157.9 acres of WOUS, including wetlands; and the permanent conversion of 135.8 acres of WOUS to open water as a result of gravel mine excavation and a constructed freshwater reservoir.[35]

### 3. Endangered Species Act

On March 16, 2020, BLM initiated formal consultation with FWS pursuant to the ESA.[36] The formal consultation culminated in FWS issuing its Biological Opinion ("BiOp") for the Willow Project on October 16, 2020.[37] As relevant here, FWS concluded that the Project was not likely to jeopardize the continued existence of polar bears and not likely to result in the adverse modification of polar bear critical habitat.[38] FWS's BiOp also included an incidental take statement.[39]

---

[33] Corps AR 000150 (ROD); Corps AR 004241–478 (Mar. 2020 404 Application).

[34] *See* Corps AR 000001–144 (Sec. 404 Permit); Corps AR 000150–234 (ROD).

[35] Corps AR 000151 (ROD) ("Total permanent impact to all WOUS, including wetlands, is 616.9 acres.").

[36] FWS AR 000096.

[37] FWS AR 000813–976 (BiOp). The BiOp was amended by memo to include the Corps as a federal Action Agency party to the consultation. FWS AR 000811–812.

[38] FWS AR 000942; FWS AR 000944 (BiOp).

[39] FWS AR 000944–945 (BiOp).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 8 of 110
Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 8 of 110

## II. Procedural Background

In late 2020, Plaintiffs initiated the instant actions and sought to preliminarily enjoin ConocoPhillips from undertaking certain construction activities for the Willow Project in the winter of 2020–2021.[40]  On February 1, 2021, this Court denied Plaintiffs' motions for preliminary injunctive relief.[41]  Plaintiffs appealed the ruling to the Ninth Circuit Court of Appeals and simultaneously sought an injunction pending appeal from this Court.[42]  On February 6, 2021, this Court issued a temporary injunction enjoining certain construction activities for up to two weeks.[43]  On February 13, 2021, the Ninth Circuit granted Plaintiffs' emergency motions for an injunction pending appeal and extended this Court's February 6, 2021 injunction for the duration of the appeal.[44]  Thereafter, the parties stipulated to extend the temporary injunction until December 1, 2021, and Plaintiffs voluntarily dismissed

---

[40] Docket 1 (CBD Compl.) (Case No. 3:20-cv-00308-SLG); Docket 9 (CBD Mot. for Preliminary Inj.); Docket 1 (SILA Compl.) (Case No. 3:20-cv-00290-SLG); Docket 17 (SILA Mot. for Preliminary Inj.).

[41] *See* Order, *Sovereign Iñupiat for a Living Arctic v. BLM*, Case No. 3:20-cv-00290-SLG, Case No. 3:20-cv-00308-SLG, 2021 WL 343925 (D. Alaska Feb. 1, 2021) [hereinafter, Feb. 1 order].

[42] Dockets 44, 45 (Case No. 3:20-cv-00308-SLG); Dockets 45, 46 (Case No. 3:20-cv-00290-SLG).

[43] Order, *Sovereign Iñupiat for a Living Arctic v. BLM*, Case No 3:20-cv-00290-SLG, Case No. 3:20-cv-00308-SLG, 2021 WL 454280 (D. Alaska Feb. 6, 2021).

[44] *See* Order, *Sovereign Iñupiat for a Living Arctic v. BLM*, Case No. 21-35085 (9th Cir. Feb. 13, 2021).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 9 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 9 of 110

their appeals.[45]  Presently before this Court are Plaintiffs' motions for summary judgment on all claims relating to the Willow Project.

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the [Administrative Procedure Act] of its own force may serve as a jurisdictional predicate."[46]

## LEGAL STANDARD

Plaintiffs seek judicial review under the Administrative Procedure Act ("APA").[47]  Under that statute, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"[48]  Agency action is arbitrary and capricious if it:

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise.[49]

---

[45] Docket 62 (Case No. 3:20-cv-00308-SLG); Docket 63 (Case No. 3:20-cv-00290-SLG).

[46] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[47] Docket 68 at 4, ¶ 6 (Case No. 3:20-cv-00308-SLG) (Am. Compl.); Docket 36 at 78, ¶¶ 1–3 (Case No. 3:20-cv-00290-SLG) (Am. Compl.).

[48] 5 U.S.C. § 706(2)(A).

[49] *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 10 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 10 of 110

A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency.[50] "[D]eference to the agency's decisions is especially warranted when reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise."[51] "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[52] "Whether agency action is 'not in accordance with law' is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[53]

---

[50] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

[51] *Native Village of Point Hope v. Salazar*, 680 F.3d 1123, 1130 (9th Cir. 2012) (internal quotation marks omitted).

[52] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted).

[53] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Envtl. Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 11 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 11 of 110

## DISCUSSION

### I. National Environmental Policy Act

### A. NPRPA's Time Limitation for Seeking Judicial Review

The Naval Petroleum Reserves Production Act's ("NPRPA") judicial review provision was enacted in 1980 as part of an appropriations rider ("1980 Rider"). It amended the NPRPA of 1976 and provides:

> Any action seeking judicial review of the adequacy of any program or site-specific environmental impact statement under [NEPA] concerning oil and gas leasing in the National Petroleum Reserve-Alaska shall be barred unless brought . . . within 60 days after notice of the availability of such statement is published in the Federal Register.[54]

The Court's February 1, 2021 order denied Plaintiffs' motions for a preliminary injunction based on a determination that their NEPA claims were "quite likely" barred by the judicial review provision.[55] The Ninth Circuit motions panel, however, disagreed when addressing the motions for a stay pending interlocutory appeal.[56] With the benefit of the Ninth Circuit motions panel's order and the parties' merits briefing, the Court now reconsiders.

---

[54] 42 U.S.C. § 6506a(n)(1); *see* Pub. L. No. 96-514, 94 Stat. 2964 (1980), amending Pub. L. No. 94-258, 90 Stat. 303 (1976). The 1980 Rider renamed the reserve to the National Petroleum Reserve in Alaska ("NPR-A").

Plaintiffs' claims under the APA are otherwise subject to a six-year statute of limitations. *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010) (citing 28 U.S.C. § 2401(a)).

[55] *See* Feb. 1 order, at 12–22.

[56] *See* Order, *Sovereign Iñupiat for a Living Arctic v. BLM*, Case No. 21-35085, at 2–4 (9th Cir.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 12 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 12 of 110

The parties disagree whether the judicial review provision applies to Plaintiffs' NEPA claims challenging the Willow EIS.[57]  Plaintiffs contend that the review provision only applies to challenges to EISs that evaluate the issuance of leases, and not to EISs evaluating oil and gas development and production projects like the Willow EIS.[58]  Defendants respond that the review provision applies not only to the review of EISs evaluating the issuance of leases, but also to EISs evaluating development and production projects, including the Willow Project, that occur on leased lands in the NPR-A.[59]

In interpreting a statute, judicial "inquiry begins with the statutory text, and ends there as well if the text is unambiguous."[60]  "But oftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in

_____

Feb. 13, 2021) [hereinafter, Ninth Circuit order].

[57] Feb. 1 order, at 12–22.  The parties do not dispute that Plaintiffs' actions were filed more than 60 days after the FEIS notice was published.  The Notice of Availability of the FEIS was published in the Federal Register on August 14, 2020.  85 Fed. Reg. 49,677.  CBD Plaintiffs filed their original complaint on December 21, 2020, and SILA Plaintiffs filed theirs on November 17, 2020.

[58] Docket 92 at 21–28 (Case No. 3:20-cv-00308-SLG); Docket 95 at 17–20 (Case No. 3:20-cv-00290-SLG).  Hereinafter, Plaintiffs' briefings will be referenced with "CBD" or "SILA", and not case numbers, to distinguish them.

[59] Docket 103 at 20–26 (Fed. Defs.); Docket 104 at 22–34 (ConocoPhillips).  The State of Alaska, Docket 101 at 13 n.2, and the North Slope Brough, Docket 102 at 20, incorporated by reference Federal Defendants' and ConocoPhillips' arguments on the judicial review provision.

[60] *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004); *see Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning . . . of the law itself.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 13 of 110

context.'"[61]  Therefore, "when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'"[62]

The Court turns to the language of the judicial review provision.  Both Plaintiffs and Defendants dissect the meaning of the word "leasing."  Generally, "[w]hen a term is not defined by a statute," as is the case here, "it is to be construed in accord with its ordinary or natural meaning."[63]  CBD Plaintiffs contend that "'leasing' is the gerund form of the verb 'to lease.'  A 'gerund' is 'a noun formed by adding '-ing' to a verb, that describes an action'"—specifically, in this case, the action of leasing.[64]  SILA Plaintiffs assert that "leasing" as used in the review provision is a verb, and that "Congress' use of the word 'leasing' instead of 'lease' indicates intent to refer to the action of leasing—not to extend the provision to anything relating to a lease."[65]  Federal Defendants respond that "other dictionaries

---

[61] *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)).

[62] *Id.* (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133).

[63] *United States v. van den Berg*, 5 F.3d 439, 441 (9th Cir. 1993) (citing *Perrin v. United States*, 508 U.S. 223, 228 (1993)); *see Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (stating that in interpreting a statute, "[w]ords are to be given the meaning that proper grammar and usage would assign them" (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012))).

[64] Docket 92 at 21 n.1 (CBD Opening Br.) (quoting *Gerund*, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/gerund (last visited by CBD Plaintiffs Apr. 21, 2021)).

[65] Docket 95 at 17 (SILA Opening Br.); Docket 107 at 10 (SILA Reply).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 14 of 110
Case 3:20-cv-00290-SLG    Document 125    Filed 08/18/21    Page 14 of 110

define leasing as an ongoing act, i.e., 'the act of using or letting somebody use something, especially property or equipment, in exchange for rent or a regular payment.' This latter definition comports with the term's common usage; in plain language, leasing an apartment to a tenant does not conclude the moment the lease is signed, but instead when the lease is terminated."[66] ConocoPhillips similarly contends that it "did not stop 'leasing' lands in the Petroleum Reserve when it signed the lease[,]" and suggests that "leasing" is a present participle, not a gerund or a verb.[67]

The parties also dispute the meaning of "concerning." Plaintiffs contend that Congress' use of this term "does not expand the category of actions the section addresses or change the meaning of 'leasing.'"[68] Federal Defendants respond that "even under Plaintiffs' proffered definition of the word 'concerning'—i.e., 'relating to' or 'regarding'—an EIS addressing exploration and development work, which is conducted pursuant to an oil and gas lease, plainly regards and relates to 'oil and gas leasing.'"[69]

---

[66] Docket 103 at 22 (Fed. Defs.) (quoting *Leasing*, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/leasing?q=leasing (last visited by Federal Defendants May 25, 2021)).

[67] Docket 104 at 28 & n.84, 29 (ConocoPhillips).

[68] Docket 92 at 23 (CBD Opening Br.); Docket 95 at 18 (SILA Opening Br.).

[69] Docket 103 at 23 (Fed. Defs.); Docket 104 at 29 (ConocoPhillips).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 15 of 110

Case 3:20-cv-00290-SLG    Document 125    Filed 08/18/21    Page 15 of 110

The parties further dispute the review provision's reference to "program or site-specific" EISs.[70]  Plaintiffs assert that the reference supports their reading of the statute because Congress would have been aware, when it enacted the review provision, that there can be programmatic *or* site-specific EISs evaluating a lease sale, not solely programmatic EISs.[71]  Federal Defendants respond that "NPRPA's application of the limitations period to 'site-specific' EISs also shows that Congress intended for the provision to apply to exploration and development EISs" because "Interior's practice has long been to first address overarching lease sale decisions in a program EIS, and then to address exploration and development resulting from lease issuance . . . in site-specific EISs or environmental assessments."[72]

The Court finds that the ordinary or natural construction of "leasing"—the most critical term here—is more consistent with Plaintiffs' position.  Within the oil and gas context, "leasing" generally refers to a specific stage of a multi-stage process.[73]  Defendants' citations to the meaning of "leasing" in other contexts are

---

[70] 42 U.S.C. § 6506a(n) ("Any action seeking judicial review of the adequacy of any program or site-specific environmental impact statement . . . .").

[71] Docket 92 at 23–24 (CBD Opening Br.) (citing *Suffolk County v. Sec'y of the Interior*, 562 F.2d 1368, 1377 (2d Cir. 1977*); Alaska v. Andrus*, 580 F.2d 465, 468–69 (D.C. Cir. 1978), *vacated in part sub nom., W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978); *Massachusetts v. Clark*, 594 F. Supp. 1373, 1383 (D. Mass. 1984)); Docket 95 at 18 (SILA Opening Br.); *see also* Ninth Circuit order, at 3–4 ("The statute's reference to 'site-specific' EISs does not mean that it necessarily extends beyond challenges to leasing decisions, because site-specific EISs can be required for some leasing decisions.").

[72] Docket 103 at 23 (Fed. Defs.).

[73] *N. Slope Borough v. Andrus*, 642 F.2d 589, 593 (D.C. Cir. 1980) ("As provided in the Outer Continental Shelf Lands Act (OCSLA), the lease sale itself is only a preliminary and relatively

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 16 of 110

less persuasive.[74]  And the Court need not resolve the grammatical conundrum of whether "leasing" is a verb, gerund, or present participle, as each of these parts of speech connotes a specific action taking place—in this case, the act of leasing.

Regarding the term "concerning," the Court finds that the use of this modifier could support a broader scope than Plaintiffs' reading suggests, to encompass acts (i.e., exploration, development, and production) that extend beyond the issuance of a lease.[75]  And yet the Ninth Circuit motions panel determined that the "plain words" of the statute—not just the term "leasing"—support Plaintiffs' position.[76]

The Court also relies on the Ninth Circuit motions panel's ruling with regard to the "program or site-specific" language.  While it is generally the case that programmatic EISs evaluate proposed lease sales,[77]

---

self-contained stage within an overall oil and gas development program which requires substantive approval and review prior to implementation of each of the major stages: leasing, exploring, producing." (footnote omitted)); *see also N. Alaska Env'tl. Ctr. v. Kempthorne*, 457 F.3d 969, 974, 977 (9th Cir. 2006) ("This is because such projects generally entail separate stages of leasing, exploration and development.").  ConocoPhillips itself recognizes that for the Willow Project, the "leasing stage . . . is long past."  Docket 104 at 53.

[74] *See* Docket 104 at 28 n.85 (ConocoPhillips) (referencing, for example, "leasing" an apartment).

[75] *See* Feb. 1 order, at 16.

[76] Ninth Circuit order, at 3.

[77] "In general, a 'programmatic' EIS analyzes alternatives to, and overall effects of, a broad agency program.  A 'site-specific' or 'project-specific' EIS focuses on particular facilities." *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 606 F.2d 1261, 1270 n.32 (D.C. Cir. 1979) (citing *Scientists' Inst. for Pub. Info. v. AEC*, 481 F.2d 1079, 1086–88 (D.C. Cir. 1973) and *Kleppe v. Sierra Club*, 427 U.S. 390, 412–15 (1976)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 17 of 110

[t]he statute's reference to "site-specific" EISs does not mean that it necessarily extends beyond challenges to leasing decisions, because site-specific EISs can be required for some leasing decisions. . . . Congress accordingly could well have been referring only to leasing decisions when it referred to programmatic and site-specific EISs in § 6506a(n)(1).[78]

Based on the motions panel's reasoning, the language related to "program or site-specific" does not inform the Court's interpretation of the statute.[79]

In sum, the plain language of the review provision, and particularly its use of the term "leasing," supports Plaintiffs' interpretation. And yet the 60-day time limit applies to "[a]ny action" regarding "any program or site-specific" EIS that is "concerning oil and gas leasing" in the NPR-A. Read together, these broad words suggest that Congress might have intended to apply the 60-day limitation to EISs evaluating development and production activities on the leased lands as well.[80]

The Court turns to the purpose and language of the 1980 Rider as a whole. In its February 1 order, the Court found that the references to exploration and

---

[78] Ninth Circuit order, at 3–4 (citing *Env't Def. Fund v. Andrus*, 596 F.2d 848, 852 (9th Cir. 1979) and *Port of Astoria v. Hodel*, 595 F.2d 467, 478 (9th Cir. 1979)); *see Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (presuming Congress intends to incorporate court and agency constructions of a term when it enacts a new statute using that term).

[79] The motions panel ultimately concluded "[a]t the very least, appellants' contention that the statute does not apply to their challenges raises a serious question." Ninth Circuit order, at 4. The inclusion of "[a]t the very least" suggests that the panel's reasoning was not necessarily limited to the lower "serious questions" standard at issue earlier in the litigation.

[80] *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("We have previously noted that '[r]ead naturally, the word any has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (alteration in original) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997))).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 18 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 18 of 110

production in the 1980 Rider indicate that "Congress intended to expedite legal challenges to all aspects of oil and gas development, including not just leasing but exploration and production projects as well," as such an interpretation would be consistent with the congressional goal of expeditiously increasing the nation's oil production.[81]   And yet the Court also acknowledges that a primary focus of the 1980 Rider was the critical first step toward that production—to "privatize the formerly government-led exploration program and expedite lease sales."[82]

The Court also considers the 1978 amendment to the Outer Continental Shelf Lands Act ("OCSLA") as an aid in interpretation.[83]   CBD Plaintiffs assert that

---

[81] Feb. 1 order, at 17–20; *see* Pub. L. No. 96-514, 94 Stat. 2964 (directing the Secretary to prescribe "an expeditious program of competitive leasing of oil and gas" in the NPR-A).

[82] Docket 107 at 12 (SILA Reply).  SILA Plaintiffs contend that "[w]hen Congress adopted the NPRPA in 1976, it included a general prohibition on production and development" that remained in place until 2005.  Docket 95 at 19–20 (citing Energy Policy Act of 2005, Pub. L. 109-58 § 347 (2005)).  As "Congress is presumed to act with knowledge of the provisions of legislation already enacted," according to SILA Plaintiffs, this Court should not interpret the judicial review provision to apply to EISs evaluating production projects because that interpretation "would render [the general prohibition on production] superfluous." *Id.* at 20 (citing *United States v. Trident Seafoods Corp.*, 92 F.3d 855, 862 (9th Cir. 1996) and *United States v. Bonilla-Montenegro*, 331 F.3d 1047, 1051 (9th Cir. 2003)).  But the general prohibition in the 1976 NPRPA statute carves out an exception: "until authorized by an Act of Congress."  Pub. L. 94-258, § 104(a), 90 Stat. 303, 304 (1976).  Pursuant to that carve out, Congress appears to have authorized private leasing and production in the NPR-A when it passed the 1980 Rider, which also provided its own exception to the general prohibition.  Pub. L. 96-514, 94 Stat. 2964, 2964 (1980).  At least one other court has held that the 1980 Rider authorized production.  *See Wilderness Soc. v. Salazar*, 603 F. Supp. 2d 52, 57 (D.D.C. 2009) ("The NPRPA prohibited production of petroleum or development leading to such production in the NPR–A without prior authorization by Congress.  *See* 42 U.S.C. § 6504(a).  Authorization for such production came in December 1980, when Congress passed the appropriations bill for the fiscal year ending September 30, 1981.").

[83] *See Attia v. Google LLC*, 983 F.3d 420, 425 (9th Cir. 2020) ("[Courts] look to . . . the language of related or similar statutes to aid in interpretation.") (quoting *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013))).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 19 of 110

"Congress' contemporaneous amendment of the Outer Continental Shelf Lands Act . . . further demonstrates that the word 'leasing' in section 6506a(n)(1) does not cover development."[84]  According to CBD Plaintiffs, in amending OCSLA in 1978, just two years prior to amending the NPRPA, Congress adopted different judicial review provisions for any "leasing program" and for "any exploration plan or any development and production plan,"[85] demonstrating that Congress "did not treat the word 'leasing' as encompassing separate, future development and exploration decisions for purposes of judicial review."[86]  ConocoPhillips acknowledges that Congress amended OCSLA to provide different venues for actions challenging "a leasing program" and an "exploration plan or any development and production plan" but, contrary to CBD Plaintiffs' assertions, contends that Congress chose *not* to make such a distinction when amending the NPRPA two years later.[87]

The statutes are clearly similar: OCSLA governs oil and gas activities in offshore United States waters, including waters north of the NPR-A.[88]  Broadly

---

[84] Docket 92 at 22 (CBD Opening Br.) (citing Pub. L. No. 95-372, 92 Stat. 629, 657–59 (1978)).

[85] Pub. L. No. 95-372, 92 Stat. 629, 658.  The review provisions in OCSLA provide for different venues, not time limitations.

[86] Docket 92 at 22–23 (CBD Opening Br.).

[87] Docket 104 at 30 (ConocoPhillips).

[88] The Outer Continental Shelf includes "all submerged lands lying seaward of state coastal waters (3 miles offshore) which are under U.S. jurisdiction." *OCS Lands Act History*, U.S. Department of the Interior, Bureau of Ocean Energy Management, http://www.boem.gov/oil-gas-energy/leasing/ocs-lands-act-history (last visited August 12, 2020); *see also* 43 U.S.C. §

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 20 of 110

speaking, OCSLA, as enacted in 1953, appears quite similar to the NPRPA as amended in 1980.[89]  Like the NPRPA, when enacted OCSLA broadly directed the Secretary to conduct a leasing program and then only passingly referred to other oil and gas activities, such as exploration and production.  But when amending OCSLA in 1978, Congress "codified with great care" "the distinction between a sale of a 'lease' and the issuance of a permit to 'explore,' 'produce,' or 'develop' oil[.]"[90] Just two years later, when it passed the 1980 Rider, Congress clearly chose not to make this "excessively fine" distinction in the NPRPA.[91]  This could mean one of two things:  First, as Plaintiffs would have it, it means that Congress understood the distinction between the different stages of oil and gas development and chose to focus only on judicial review at the leasing stage in the 1980 Rider.  Second, as Defendants would have it, it means that Congress intended to limit the time frame for judicial review of all stages of oil and gas development in the NPR-A, and not just leasing, much as it appears to have grouped all these activities together in OCSLA prior to the 1978 amendment.[92]  Plaintiffs' position seems more probable.

---

1331(a).

[89] *See generally* Pub. L. No. 83-212, 67 Stat. 462 (1953).

[90] *Sec'y of the Interior v. California*, 464 U.S. 312, 335–36 (1984) ("The pre-1978 OCSLA did not specify what, if any, rights to explore, develop, or produce were transferred to the purchaser of a lease."); *see generally* Pub. L. No. 95-372, 92 Stat. 629 (1978)).

[91] *Id.* at 336.

[92] *See id.* at 336 & n.20.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 21 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 21 of 110

It seems unlikely that, just two years after statutorily separating judicial review of the oil and gas stages in the 1978 OCSLA, Congress, when amending the NPRPA in 1980, reverted back to its ostensible pre-1978 approach of grouping all oil and gas activities under leasing.

ConocoPhillips contends that "OCSLA just shows that '[i]f Congress intended to' limit the application of the NPRPA statute of limitations to approval of the leasing program, 'it knew how to do so.'"[93]  But the Ninth Circuit case quoted by ConocoPhillips was referring to Congress "knowing" how to expressly overrule Supreme Court decisions.[94]  CBD Plaintiffs' precedent more aptly holds that courts should "not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes."[95]  ConocoPhillips also attempts to distinguish the 1978 OCSLA amendment from the 1980 Rider on the basis that the term "leasing program" as used in the OCSLA amendment, and the term "leasing" as used in the 1980 Rider, have different meanings.[96]  But the 1980 Rider refers

---

[93] Docket 104 at 30 & n.93 (ConocoPhillips) (quoting *E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 753 (9th Cir. 2003)).

[94] *Luce, Forward, Hamilton & Scripps*, 345 F.3d at 753 ("If Congress intended to preclude [a Supreme Court decision] from permitting enforcement of arbitration agreements, it knew how to do so.  In fact, other provisions of the 1991 Act are devoted to overruling Supreme Court decisions.").

[95] *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1811–12 (2019) (citing *Law v. Siegel*, 571 U.S. 415, 422 (2014)).

[96] Docket 104 at 27 n.82 (ConocoPhillips).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 22 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 22 of 110

to itself as authorizing a "leasing program" as well, indicating that "leasing" and "leasing program" are not as distinguishable as ConocoPhillips suggests.[97]

In short, Congress' distinction between the leasing stage and exploration, development, and production stages in the judicial review provisions of the 1978 OCSLA amendment supports Plaintiffs' interpretation that the NPRPA's judicial review provision was not intended to apply to EISs evaluating development and production projects.

A court may also look to legislative history.[98] In the February 1 order, this Court found that the legislative history generally supports Defendants' position.[99] Upon further consideration, the Court finds the legislative history inconclusive, especially given that the parties appear to agree that "the statements of individual legislators are entitled to little, if any, weight."[100]

---

[97] *See* Pub. L. 96-514, 94 Stat. 2964 (1980) ("[T]he withdrawals established by section 102 of Public Law 94-258 are rescinded for the purposes of the oil and gas leasing program authorized herein.").

[98] *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830–31 (9th Cir. 1996) ("Then, if the language of the statute is unclear, we look to its legislative history." (quoting *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir.1994))); *see also Food Mktg. Inst.*, 139 S. Ct. at 2364 (stating that legislative history should never "muddy the meaning of clear statutory language" (quotation marks omitted)).

[99] Feb. 1 order, at 20–21.

[100] *Coal. for Clean Air v. S. Cal. Edison Co.*, 971 F.2d 219, 227 (9th Cir. 1992). *See* Docket 103 at 25 (Fed. Defs.) ("Finally, although the comments of individual legislators do not demonstrate the intent of Congress as a whole, the record here shows that the shared goal of expedited review was not artificially limited to lease issuance decisions."); Docket 107 at 12 (SILA Reply).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 23 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 23 of 110

Lastly, the parties disagree on whether there is a presumption in favor of judicial review. The Court reads the controlling precedent to apply a presumption in favor of judicial review only when determining whether a statute completely precludes judicial review.[101] Under any interpretation, the judicial review provision in the 1980 Rider does not preclude judicial review so long as the action is brought within 60 days. The Court also does not read the controlling precedent to accord a presumption against judicial review of agency action.[102]

The scope of the NPRPA's judicial review provision is a close question. Based on the foregoing, and with the benefit of the Ninth Circuit motions panel's

---

[101] *See Salinas v. United States R.R. Ret. Bd.*, 141 S. Ct. 691, 698 (2021) (citing *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)); *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) ("[W]hen a statutory provision 'is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010))); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (noting the presumption of review under the APA may be rebutted only if the relevant statute precludes review or the action is committed to agency discretion).

[102] ConocoPhillips' precedent concerning the presumption of review are distinguishable. *See* Docket 104 at 24. *Badaracco v. Commissioner of Internal Revenue* and *FDIC v. Former Officers & Directors of Metropolitan Bank* respectively concerned time limits on the government's ability to collect federal taxes and bring civil suit, not time limits on the rights of citizens to review agency action. 464 U.S. 386, 388 (1984); 884 F.2d 1304, 1306 (9th Cir. 1989). ConocoPhillips' other case, *Tosello v. United States*, did address a plaintiff taxpayer's suit against the government. 210 F.3d 1125, 1127 (9th Cir. 2000). But the Ninth Circuit held there that the tax provision "under which [the plaintiff] brought suit represents a limited waiver of the government's sovereign immunity. As such, that provision must be construed narrowly, and the applicable statute of limitations . . . likewise must be construed strictly in favor of the government." *Id.* (citing *Badaracco*, 464 U.S. at 398). Defendants here do not advance any argument that the NPRPA's judicial review provision itself waives Federal Defendants' sovereign immunity. *See Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988) ("[I]t is undisputed that the 1976 amendment to [APA] § 702 was intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 24 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 24 of 110

order and the parties' merits briefing, the Court determines that the 60-day judicial

review provision in the 1980 Rider applies only to the review of EISs evaluating

lease sales and hence does not apply to Plaintiffs' NEPA challenges to the Willow

EIS.  Therefore, Plaintiffs' NEPA claims are timely and the Court addresses them

on the merits.

### B. Plaintiffs' Greenhouse Gas Claim

Relying on the Ninth Circuit's recent opinion in *Center for Biological Diversity*

*v. Bernhardt* ("*Liberty*"),[103] CBD Plaintiffs and SILA Plaintiffs each assert that BLM

failed to adequately analyze the effects of Willow's downstream greenhouse gas

emissions in its alternatives analysis.[104]   In *Liberty*, the Ninth Circuit rejected a

Bureau of Ocean Energy Management ("BOEM") EIS evaluating an offshore oil

and gas project (the "Liberty Project") because the agency failed to properly assess

downstream greenhouse gas emissions that would result from consuming oil

abroad.[105]   Plaintiffs here assert that BLM "used the same [emissions] modeling

approach for Willow"[106] and relied on the "same core rationale and record" as

---

[103] 982 F.3d 723 (9th Cir. 2020).

[104] Docket 95 at 31–32 (SILA Opening Br.); Docket 92 at 28–31 (CBD Opening Br.).  "Upstream
emissions are those that result directly from the project itself (e.g., construction and operation),
and downstream emissions are those that result from the consumption of the oil produced by
the project (e.g., heating homes or fueling cars)."  *Liberty*, 982 F.3d at 735.

[105] *Liberty*, 982 F.3d at 740.

[106] Docket 95 at 31 (SILA Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 25 of 110

BOEM.[107]   Defendants respond that *Liberty* is distinguishable for a number of reasons.[108]   The Court addresses Defendants' arguments in turn.[109]

First, Defendants assert that BLM's greenhouse gas emissions analysis "does not suffer from the flaw[]" that the Ninth Circuit identified in BOEM's foreign emissions analysis in *Liberty*.[110]   As the Ninth Circuit explained, "BOEM's conclusion that *not* drilling [the Liberty Project] will result in more carbon emissions than drilling is counterintuitive."[111]   Faced with this "somewhat perplexing[]" conclusion and without further explanation from BOEM, the Ninth Circuit could not "ascribe the implausibility of the result to BOEM's expertise or rational decision-making."[112]   Defendants contend that the Willow EIS lacks this "primary error"

---

[107] Docket 92 at 28 (CBD Opening Br.).  Here, it appears that BOEM prepared the greenhouse gas emissions analysis for BLM based on a similar Market Simulation Model.  *Compare* BLM AR 275730 (Liberty Project EIS) ("BOEM ran its market Simulation Model (MarketSim)") *with* BLM AR 182504 (Willow EIS) ("the Market Simulation Model (MarketSim)").

[108] Docket 103 at 26–30 (Fed. Defs.); Docket 104 at 47–54 (ConocoPhillips); Docket 102 at 21–26 (North Slope Borough); Docket 101 at 19–21 (State of Alaska).

[109] There is no dispute that BLM's EIS, like BOEM's EIS in *Liberty*, did not provide "'a quantitative estimate of the downstream greenhouse gas emissions' that will result from consuming oil abroad."  *Liberty*, 982 F.3d at 740 (quoting *Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1374 (D.C. Cir. 2017)).  *See* BLM AR 183508 (Appendix E.2B) ("The lower prices for oil and other energy sources associated with increased U.S. production as a result of the Willow Master project would affect both domestic and foreign energy consumption. However, currently neither BOEM nor BLM has the ability to estimate differences in GHG emissions caused by changes in foreign consumption.").

[110] Docket 103 at 27 (Fed. Defs.); Docket 104 at 49–50 (ConocoPhillips); Docket 102 at 21–22 (North Slope Borough).

[111] *Liberty*, 982 F.3d at 739 (emphasis in original).

[112] *Id.* at 736, 739.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 26 of 110

because BLM "rationally assumed here that *not* developing the Willow Project would result in *zero* downstream carbon emissions"[113] and is therefore distinguishable from the EIS in *Liberty*.

While BOEM's "counterintuitive" and "perplexing[]" conclusion appears to have played a role in the Ninth Circuit's decision, the decision is rooted in BOEM's failure to include foreign oil consumption in its quantification of greenhouse gas emissions.[114] The Ninth Circuit recognized that "in some cases quantification may not be feasible."[115] But the Circuit Court held that the "record belies BOEM's contention that it could not have summarized or estimated foreign emissions with accurate or credible scientific evidence."[116] And if quantification is not feasible, the agency "must thoroughly explain why such an estimate is impossible[,]" which the Ninth Circuit held BOEM had failed to do.[117] It is these holdings that form the underpinnings of the Ninth Circuit's decision that BOEM's "alternatives analysis in the EIS was arbitrary and capricious."[118]

---

[113] Docket 104 at 50 (ConocoPhillips).

[114] *Liberty*, 982 F.3d at 739.

[115] *Id*. (quoting *Sierra Club*, 867 F.3d at 1374).

[116] *Id*. at 738 ("Various studies provided by CBD in the administrative record confirm the effect of increasing domestic oil supply on foreign consumption and the feasibility of its estimation.").

[117] *Id*. at 739 (citing 40 C.F.R. § 1502.22).

[118] *Id*. at 740.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 27 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 27 of 110

Second, Defendants contend that "unlike [BOEM's] analysis found to be deficient in the Liberty EIS, BLM comprehensively evaluated greenhouse gas emissions for the Willow Project and explained in detail why the lack of reliable data about country-by-country energy substitutions prevented quantification of foreign consumption of oil in its indirect effects analysis."[119]

In *Liberty*, in responding to public comments, BOEM stated that the Liberty Project "could only have a negligible impact on worldwide oil prices and, as a result, only a negligible impact on foreign consumption and emissions levels."[120]  And in explaining its greenhouse gas emissions model, BOEM asserted that "[e]xcluding the foreign oil and gas markets is reasonable" because "[o]il consumption in each country is different, and BOEM does not have information related to which countries would consume less oil."[121]

---

[119] Docket 104 at 51 (ConocoPhillips); Docket 103 at 28 (Fed. Defs.) ("BLM explained in the Willow FEIS why it could not perform a reliable quantitative estimate of downstream GHG emissions in foreign countries, thus avoiding the key shortcoming the court identified in *Liberty*."); Docket 102 at 24 (North Slope Borough) ("BLM's . . . explanation for not estimating GHG emissions from foreign oil consumption is significantly more robust and substantive that what BOEM provided for Liberty."); Docket 101 at 20 (State of Alaska) ("Here, BLM fully disclosed its inability to estimate differences in greenhouse gas emissions caused by changes in foreign consumption.").

[120] *Liberty*, 982 F.3d at 738 ("BOEM responds only that '[c]ontext suggests that any change in foreign oil consumption resulting from the pending decision on the Liberty DPP would be very small.'").

[121] *Id.* (alterations in original).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 28 of 110

Here, BLM offers substantially similar reasons as BOEM for its decision not to estimate foreign greenhouse gas emissions.[122]  For example, BLM stated that "[t]ypically, a single project has a negligible impact on overall global GHGs."[123]  And BLM similarly contended it lacked sufficiently reliable data on foreign emissions factors and consumption patterns.[124]  In short, BLM offers the same basic reasons for its decision not to estimate foreign greenhouse gas emissions that the Ninth Circuit rejected in *Liberty*: a negligible impact and a purported lack of information on foreign energy consumption and emissions patterns.[125]

---

[122] The North Slope Borough asserts that *Liberty* is distinguishable because, unlike BOEM, "BLM explained that, for Willow, 'substitution sources for the Project would also be consumed domestically.'"  Docket 102 at 23.  But the BOEM model also assumed "that all oil and gas produced domestically is consumed domestically."  *Liberty*, 982 F.3d at 739.  And as the Ninth Circuit recognized in *Liberty*, oil is a global commodity.  *Id.* at 736 ("If oil is produced from Liberty, the total supply of oil in the world will rise.  Increasing global supply will reduce prices. Once prices drop, foreign consumers will buy and consume more oil.").

[123] BLM AR 182963.

[124] *Compare* BLM AR 183508 ("This estimation would require detailed data on proportional consumption changes and the most likely energy substitutions . . . for all countries worldwide.") and BLM AR 182957 ("The issue is the uncertainty and lack of reliable data as to the likely distribution of demand changes among countries . . . .") *with Liberty*, 982 F.3d at 737 ("BOEM determined it did not have sufficiently 'reliable information on foreign emissions factors and consumption patterns.'").

[125] Federal Defendants contend that this "Court should defer to BLM's choice of methodology, and its determination that it lacked reliable data necessary to conduct Plaintiffs' preferred methodology."  Docket 103 at 29; *see also* Docket 101 at 20 n.7 (State of Alaska); Docket 104 at 51 (ConocoPhillips).  However, the Ninth Circuit in *Liberty* declined to defer to BOEM in this same regard because "the scope of its expertise does not include the economic analysis of greenhouse gas emissions."  *Liberty*, 982 F.3d at 740 ("[S]uch deference applies only when the agency is making predictions 'within its area of special expertise.'" (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983))).  As BOEM appears to have prepared for BLM the market-simulation model at issue here, the Court declines to defer to that model here as well.  *See* BLM AR 183502.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 29 of 110

The Court acknowledges that while BLM offered similar reasons as BOEM in *Liberty*, it did provide a lengthier explanation.[126]   However, while BLM's explanation provides more discussion, the Court finds that the agency still does not "thoroughly explain why such an estimate [of foreign emissions] is impossible."[127]   Specifically, BLM did not "cite any materials in support of [its] statements nor describe the research it relied upon to reach these conclusions."[128] And BLM failed to address the studies that were in the agency record in *Liberty*—

---

[126] *See, e.g.*, BLM AR 182957 ("It is unreasonable to extend BOEM's limited modeling of foreign oil markets used in establishing an equilibrium price in the model to global GHG emissions estimates comparisons between a Willow MDP Project alternative and a No Action Alternative. The issue is the uncertainty and lack of reliable data as to the likely distribution of demand changes among countries, the oil-substitutes available in other countries and those countries' incremental substitution patterns (cross-price elasticities) and resulting energy mix of oil and the various substitutes, and the GHG intensity of at least the major substitutes in each country.  The incremental substitution patterns and the GHG emission rates for even the same class of fuels can vary significantly from country to country, and using broad averages in place of weighted averages can result in very different results, especially when the averages hide wide ranges in the underlying factors."); BLM AR 182963 ("In addition, oil consumption is different in each country, and information on which countries would consume less oil was not available. For gas consumption, we do not have information on how changes in the U.S. market would affect other countries. While there is uncertainty regarding consumption in different energy markets, in the short term, EIA tends to project continued demand."); BLM AR 183508 ("However, currently neither BOEM nor BLM has the ability to estimate differences in GHG emissions caused by changes in foreign consumption. This estimation would require detailed data on proportional consumption changes and the most likely energy substitutions, as well as on emissions from refineries, natural gas systems, coal processing, and other emission factors specific to the energy substitutes for all countries worldwide.").

[127] *Liberty*, 982 F.3d at 739 ("The Department of Interior has promulgated a regulation addressing such situations, where 'incomplete or unavailable information' impedes the agency's ability to evaluate a 'reasonably foreseeable significant adverse effect[]' of the project.  The regulation requires the agency to include a statement explaining that the information is lacking, its relevance, a summary of any existing credible evidence evaluating the foreseeable adverse impacts, and the agency's evaluation of the impacts based upon 'theoretical approaches or research methods generally accepted in the scientific community.'" (quoting 40 C.F.R. § 1502.22)).

[128] *Id.* at 738 ("BOEM cites to no evidence in support of these conclusions . . . .").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 30 of 110

at least two of which are in this administrative record as well[129]—that the Ninth Circuit held belied the agency's "contention that it could not have summarized or estimated foreign emissions with accurate or credible scientific evidence."[130]

In short, BLM's greenhouse gas emissions analysis suffers from the same flaws the Ninth Circuit identified in *Liberty*. Accordingly, the Court finds BLM's exclusion of foreign emissions in its alternatives analysis in the Willow EIS was arbitrary and capricious.[131]

Third and finally, Federal Defendants and ConocoPhillips assert that BLM's failure to estimate foreign greenhouse gas emissions is effectively inconsequential. According to Federal Defendants, even if BLM had quantified foreign emissions in its alternatives analysis, BLM lacked the authority to adopt the no-action alternative, given ConocoPhillips' existing lease rights.[132] Moreover, "BLM would not have approved another [action] alternative on the basis of a

---

[129] *See* BLM AR 318368–451 (Bordoff and Houser, 2015); BLM AR 319437–439 (Erickson, 2016).

[130] *Liberty*, 982 F.3d at 738 (citing *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 704–05 (9th Cir. 1993)).

[131] ConocoPhillips, Docket 104 at 51; the North Slope Borough, Docket 102 at 26; and the State of Alaska, Docket 101 at 20 n.7, assert that a D.C. Circuit case, *Sierra Club v. United States Dep't of Energy*, 867 F.3d 189, 202 (2017), is more on point here. But in that case, unlike here, the plaintiffs did not challenge the agency's "method employed" to address foreign emissions, "but instead believe[d] it should have evaluated additional variables." *Id.* The court saw "nothing arbitrary" in the agency's explanation for not evaluating the additional variables. *Id.* And in any event, *Liberty* controls here. The State of Alaska urges the Court to ignore controlling Ninth Circuit precedent. *See* Docket 101 at 20 n.7. The Court unequivocally declines to do so.

[132] Docket 103 at 30 (Fed. Defs.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 31 of 110

quantification of foreign emissions" because BLM's estimated greenhouse gas emissions were "the same across the action alternatives considered in the Willow EIS."[133]    Relying on *Department of Transportation vs. Public Citizen*, ConocoPhillips advances a similar contention that BLM lacked the authority to adopt a no-action alternative due to the nature of its leasehold interests.[134]

A no-action alternative must be considered in every EIS.[135]   It "allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action."[136]   This comparative analysis is "the heart" of the EIS.[137]   Even assuming, without deciding, that BLM could not have selected the no-action alternative, Federal Defendants and ConocoPhillips offer no valid reason for the Willow EIS to be excused from NEPA's clear legal requirement that the agency prepare an "informed and meaningful" no-action alternative.[138]

---

[133] Docket 103 at 30 (Fed. Defs.).

[134] Docket 104 at 52–53 (ConocoPhillips) (citing 541 U.S. 752, 767–68 (2004)).

[135] 40 C.F.R. § 1502.14(d) (2019).  The Council on Environmental Quality ("CEQ") has adopted new NEPA regulations that became effective on September 14, 2020. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,304 (July 16, 2020); *see also* 40 C.F.R. § 1506.13 (2020).  As the parties do not appear to dispute the applicability of the previous regulations, the Court applies them here.  *See, e.g.*, Docket 103 at 30 (Fed. Defs.) (citing 40 C.F.R. § 1502.14(a) (2019)); Docket 92 at 32 n.2 (CBD Opening Br.).

[136] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (internal quotation marks omitted).

[137] 40 C.F.R. § 1502.14(d) (2019).

[138] *Liberty*, 982 F.3d at 735 (quoting *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 32 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 32 of 110

ConocoPhillips' reliance on *Public Citizen* is misplaced. First, the "critical feature" of that case was the fact that the Federal Motor Carrier Safety Administration ("FMCSA") "ha[d] no ability to countermand the President's lifting of the moratorium or otherwise categorically to exclude Mexican motor carriers from operating within the United States."[139] There is no similar critical feature here. Second, in *Public Citizen*, the Supreme Court emphasized that "FMCSA ha[d] no statutory authority to impose or enforce emissions controls or to establish environmental requirements unrelated to motor carrier safety."[140] Here, in

---

1988)); *see also* Docket 104 at 53 n.195 (citing Forty Most Asked Questions Concerning CEQ's NEPA Regulations, No. 3., 46 Fed. Reg. 18,026 (Mar. 23, 1981), available at https://www.energy.gov/sites/default/files/2018/06/f53/G-CEQ-40Questions.pdf (last visited August 12, 2021) ("[T]he regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives.") and *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1065-67 (9th Cir. 1998) ("The No-Action Alternative would not meet the purpose and need of the project. It is included here, in compliance with NEPA regulations, to provide a baseline against which the action alternatives are evaluated.")).

[139] *Pub. Citizen*, 541 U.S. at 766.

[140] *Id.* at 759. *Liberty* distinguished *Public Citizen* on the basis that *"BOEM has the statutory authority to act on the emissions resulting from foreign oil consumption. If it later concludes that such emissions will be significant, it may well approve another alternative included in the EIS or deny the lease altogether." Liberty*, 982 F.3d at 740. Here, with a non-NSO lease, BLM's authority may be more restricted, but not to the same extent as in *Public Citizen. See Sierra Club v. Mainella,* 459 F. Supp. 2d 76, 105 (D.D.C. 2006) ("The holding in *Public Citizen* extends only to those situations where an agency has 'no ability' because of lack of 'statutory authority' to address the impact. [National Park Service], in contrast, is only constrained by *its own regulation* from considering impacts on the Preserve from adjacent surface activities." (emphasis in original)); *Hanlon v. Barton*, 740 F. Supp. 1446, 1457 & n.65 (D. Alaska 1988) ("Furthermore, the Service's ability to suspend activity during an operating period is complicated only by contractual obligations; the Service has not shown that its authority to suspend harvesting is circumscribed by law. . . . Nor is it clear that such a showing would excuse the Service from including a true no-action alternative in the FEIS.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 33 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 33 of 110

contrast, BLM does have statutory authority over the environmental consequences stemming from the Willow Project, even if it may be contractually constrained.[141] Third, BLM is the "legally relevant cause" here, as the agency issued the leases in question and retains continuing responsibility over lands within the NPR-A.[142] As such, *Public Citizen* is inapposite.

In conclusion, the Court finds that *Liberty* controls here. The Willow EIS "'should have either given a quantitative estimate of the downstream greenhouse gas emissions' that will result from consuming oil abroad, or 'explained more specifically why it could not have done so,' and provided a more thorough discussion of how foreign oil consumption might change the carbon dioxide equivalents analysis."[143] Because BLM failed to do so, the agency's "alternatives analysis in the EIS was arbitrary and capricious."[144]

## C. CBD Plaintiffs' Additional NEPA Claims

---

[141] *See* 42 U.S.C. § 6506a(b).

[142] *Pub. Citizen*, 541 U.S. at 767, 769, 770 ("Put another way, the legally relevant cause of the entry of the Mexican trucks is not FMCSA's action, but instead the actions of the President in lifting the moratorium and those of Congress in granting the President this authority while simultaneously limiting FMCSA's discretion.") ("As this Court held in *Metropolitan Edison Co. v. People Against Nuclear Energy*, . . . NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause."); *see* BLM AR 400089–131; 42 U.S.C. § 6506a(b).

[143] *Liberty*, 982 F.3d at 740 (quoting *Sierra Club*, 867 F.3d at 1374).

[144] *Id.*

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 34 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 34 of 110

CBD Plaintiffs assert that BLM violated NEPA by (1) failing to consider reasonable alternatives and by (2) failing to take a hard look at the Project's impact on the Teshekpuk Caribou Herd.[145]

## 1. Reasonable Alternatives

CBD Plaintiffs contend that "the alternatives BLM considered are [too] similar and do not allow for an informed choice about options with substantially greater [environmental] protections."[146] Specifically, CBD Plaintiffs assert that "BLM violated NEPA by failing to consider reasonable alternatives . . . that would prohibit permanent infrastructure [e.g., gravel roads] in the Teshekpuk Lake and Colville River Special Areas or that would eliminate the construction of permanent roads and permit drilling only during the winter season."[147] According to CBD Plaintiffs, "BLM's primary reason" for not considering other alternatives—the agency's asserted limited authority to restrict ConocoPhillips' lease rights—is

---

[145] Docket 92 at 31–38 (CBD Opening Br.).

[146] Docket 92 at 32 (CBD Opening Br.) ("Instead, each action alternative considered in the final EIS would have a similar footprint and would permit ConocoPhillips to construct all of its proposed drill sites in the locations it proposed, along with the same basic transportation and pipeline layout.").

[147] Docket 92 at 31 (CBD Opening Br.). Federal Defendants assert that the 2020 NPR-A IAP/EIS ROD eliminated the Colville River Special Area. Docket 103 at 32 n.10 (citing BLM AR 287108). As CBD Plaintiffs do not appear to dispute this, *see generally* Docket 103 (CBD Reply), the Court focuses on the parties' arguments related to the Teshekpuk Lake Special Area.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 35 of 110

"unsupported" and constitutes a "fundamental error" rendering the EIS's alternatives analysis legally inadequate.[148]

An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action, "and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."[149] An EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones."[150] "The agency need only evaluate alternatives that are reasonably related to the purposes of the project."[151] However, an EIS must consider alternatives "varied enough to allow for a real, informed choice."[152] "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate."[153] The "touchstone for [a court's] inquiry is whether an EIS's selection

---

[148] Docket 92 at 31–34 (CBD Opening Br.).

[149] 40 C.F.R. § 1502.14(a) (2019).

[150] *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)); *see also Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) ("Nor must an agency consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area.").

[151] *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012) (internal quotation marks omitted).

[152] *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008).

[153] *Westlands Water Dist.*, 376 F.3d at 868 (quoting *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 575 (9th Cir. 1998)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 36 of 110

and discussion of alternatives fosters informed decision-making and informed public participation."[154]

Here, BLM defined the Project's purpose as follows: "The purpose of the Proposed Action is to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources under leaseholds in the northeast area of the NPR-A, consistent with the proponent's federal oil and gas lease and unit obligations."[155]

In response to public comments urging the consideration of more alternatives, BLM asserted that ConocoPhillips' lease rights precluded the agency from considering alternatives concerning the configuration or location of the drill pads. In particular, BLM maintained that ConocoPhillips has the right to "to extract all the oil and gas possible within the leased areas."[156]  But while ConocoPhillips

---

[154] *Id*. (quoting *Calif. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

[155] BLM AR 182390.

[156] *See* BLM AR 183012 ("[M]oving the location of drill pads would not allow CPAI to exercise its rights under its leases to extract all the oil and gas possible within the leased areas"); BLM AR 183110 (noting the Alternatives Development Appendix was "updated [to] reflect that [moving] the location of drill pads would not allow CPAI to exercise its rights under its leases to extract all the oil and gas possible within the leased areas" and that this "appl[ies] to the location of pads, the pad size, or the number of pads."); *see also* BLM AR 183185 (eliminating an alternative that would "[r]educe the number and/or size of drill site pads" because, in part, it "[w]ould not allow CPAI to exercise their rights under their leases to extract all the oil and gas possible within the leased areas.  Leases provide the lessee the right to extract all of the oil and gas resources within the lease, subject to regulation.").

Each action alternative considered the same drill site locations and would produce the same amount of oil.  *See* AR 182398 ("The Project would construct five drill sites (at the same locations under all action alternatives)."); BLM AR 183506 (Alternative Production Schedules).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 37 of 110

has the right to "extract . . . all the oil and gas" and "the right to build and maintain necessary improvements," those rights are subject to certain conditions, including applicable regulations in effect as of lease issuance and lease stipulations. The leases do not grant the lessee the unfettered right to drill wherever it chooses or categorically preclude BLM from considering alternative development scenarios.[157] Further, BLM's asserted restriction on its authority is inconsistent with its own statutory responsibility to mitigate adverse effects on the surface resources.[158] While BLM's asserted lack of authority may not have been the "primary reason for refusing to consider [certain] alternatives,"[159] as CBD Plaintiffs suggest, it certainly appears to have been a significant reason. To the extent BLM relied on this reason to not examine other alternatives, its alternatives analysis was inadequate.

Specifically as to the TLSA, BLM offered the following explanation for rejecting CBD Plaintiffs' proposed alternatives:

The purpose and need [for the Project] cannot be met without any infrastructure in the TLSA. Parts of the infield road system, as well as

---

[157] *See, e.g.*, BLM AR 400089 ("Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provision of this lease."); BLM AR 400090, §§ 4, 6, 7.

[158] 42 U.S.C. § 6506a(b) ("Activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve in Alaska.").

[159] Docket 92 at 31 (CBD Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 38 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 38 of 110

> BT2 and BT4, would be within the TLSA in an area that is available to oil and gas leasing. . . . All else being equal, the TLSA is only an administrative boundary, and Project impacts would not necessarily be greater within the TLSA than they would outside the TLSA.[160]

The Court agrees with ConocoPhillips that infrastructure is allowed, and indeed anticipated, within the TLSA.[161]  However, BLM's first explanation ("The purpose and need . . . .") presupposes the preclusion of any alternative development scenarios within the TLSA based on the lease terms, which the Court has already rejected.  BLM's second explanation ("All else being equal, the TLSA is only an administrative boundary . . . .") is inconsistent with the agency's statutory and regulatory directives.  The TLSA is not "only an administrative boundary." Congress specifically directed the agency to ensure that oil and gas activity in the TLSA "be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve."[162]  The EIS's assertion that Project impacts may not "necessarily be greater within the TLSA than they would outside the TLSA" entirely distorts this Congressional directive.  For the foregoing reasons, BLM did

---

[160] BLM AR 183012.  As discussed, *see supra* p.7, approval of BT4 drill site was deferred in the ROD.

[161] *See* Docket 104 at 46 (ConocoPhillips).

[162] 42 U.S.C. § 6504(a); 43 C.F.R. § 2361.0-5(f); 42 Fed. Reg. 28,723 (June 3, 1977) ("The purpose of this publication is to give notice of the designation of the Utukok River Uplands, Teshekpuk Lake, and Colville River as special areas within the" NPR-A.); *see also* 43 CFR § 3131.3.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 39 of 110

not provide an adequate explanation for its elimination from more detailed study of an alternative with modified or no infrastructure in the TLSA.

As to the winter-only drilling alternative, BLM offered the following explanation:

> Drilling only during the winter season would reduce drilling to approximately 2 months per year; the ice road season is only about 4 months, and the drill rig would have to be mobilized, rigged up, drilled, and demobilized in that time period. This would eliminate the economic feasibility of the Project. This would also effectively extend the impacts many decades.[163]

The Court need not assess the economic feasibility reason for rejecting the winter-only alternative, because BLM also explained that a winter-only alternative would "create unacceptable hazards for safety and emergency response."[164] The EIS itself offers substantive discussion of the safety risks presented by a winter-only drilling alternative.[165] CBD Plaintiffs contend that ConocoPhillips, and not BLM, studied the seasonal alternative and "ConocoPhillips' analysis of an alternative cannot satisfy BLM's obligation to give detailed consideration to reasonable alternatives."[166] CBD Plaintiffs, however, offer no support for this assertion. The Court finds BLM's proffered safety and emergency response

---

[163] BLM AR 183014; *see also* BLM AR 183012.

[164] BLM AR 183188.

[165] BLM AR 183188–189.

[166] Docket 103 at 25 (CBD Reply) (citing BLM AR183188–189).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 40 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 40 of 110

reason to be an adequate basis for eliminating a winter-only drilling alternative from detailed study.[167]

In conclusion, to the extent that BLM failed to consider the statutory directive that "maximum protection" be given to surface values within the TLSA, it acted contrary to law. And to the extent that BLM developed its alternatives analysis based on the view that ConocoPhillips has the right to extract all possible oil and gas on its leases, the agency acted contrary to law as well. On remand, BLM shall reassess its alternatives analysis consistent with the terms of this order.

### 2. Teshekpuk Caribou Herd

CBD Plaintiffs assert "the Willow Project is within important winter habitat for the Teshekpuk Caribou Herd" ("TCH") and that BLM failed to take a hard look at the impacts of the Project on the TCH.[168] CBD Plaintiffs assert several errors in BLM's analysis, each of which the Court addresses in turn.

First, CBD Plaintiffs point to findings from the 2012 NPR-A IAP/EIS:

> If oil and gas activities occurred in areas with an abundance of caribou or other mammals, or in areas with high-quality habitat, impacts could be greater than those based strictly on number of acres of habitat impacted either directly (i.e., buried under gravel) or indirectly (e.g.,

---

[167] *See* BLM AR 183188 ("CPAI conducted internal examinations of additional concepts to Project elements that were not further evaluated by the BLM or cooperating agencies as they had been sufficiently described and dismissed based on CPAI's initial evaluation."); *see also* 40 C.F.R. § 1502.14(a) (2019) (providing that "and for alternatives which were eliminated from detailed study, [the agency must] briefly discuss the reasons for their having been eliminated").

[168] Docket 92 at 36 (CBD Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 41 of 110

disturbance effects of human activity that extend beyond their sources on gravel pads and roads).[169]

CBD Plaintiffs assert that this finding creates "an obligation for BLM to address in the Willow EIS whether the project may exclude caribou from high-quality habitat."[170]  But neither of the cases cited by CBD Plaintiffs stands for that categorical proposition.[171]  Moreover, while the 2012 IAP/EIS recognized that depending on the location of oil and gas activity within the NPR-A, the activity could impact the wintering TCH, it also determined that "[t]he loss of relatively small areas of tundra habitat to gravel pads, roads, and other alterations . . . would likely have a minimal impact on the Teshekpuk Caribou Herd."[172]  In short, the Court

---

[169] BLM AR 269655; *see* Docket 92 at 36–37 (CBD Opening Br.) (citing BLM AR 269645–646; BLM AR 269858).

[170] Docket 103 at 29 (CBD Reply) (citing BLM AR 269655; BLM AR 269858).  The 2012 NPR-A Integrated Activity Plan/Environmental Impact Statement ("IAP/EIS") is a previous planning-level EIS for management of the NPR-A.

[171] *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (rejecting EA and holding site-specific EIS is required for timber salvage sale when programmatic EIS recognized the risk of soil erosion into streams caused by road building); *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010) (holding that agency must provide a reasoned explanation for new factual findings that contradict previous factual findings).

[172] BLM AR 269645 (assessing Alternative A); *see also* BLM AR 269655 (discussing "caribou [generally] or other mammals"); BLM AR 269858 (stating the rather obvious proposition for a planning-level EIS that, "[o]verall, the level of [site-specific] impact would depend on the specific location of any oil or gas field."); BLM AR 269645 ("Development of oil or gas fields could result in impacts to wintering Teshekpuk Caribou Herd caribou. . . . Wintering animals could also be temporarily disturbed or avoid the development area.  Repeated disturbance of the same animals during the winter could have negative impacts on the energy balance of individual animals, which might result in lowered calving success or even increased winter mortality.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 42 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 42 of 110

disagrees that the 2012 IAP/EIS legally obligates BLM to more carefully consider the potential exclusion of the TCH from purported high-quality habitat.

Second, CBD Plaintiffs assert that the Willow Project presents an "unprecedented threat" to the TCH.[173]   But while the 2012 NPR-A IAP/EIS recognized the potential novel exposure of the TCH to oil and gas development,[174] ConocoPhillips has since developed oil and gas infrastructure within the TCH's winter range, including within the NPR-A.[175]   The Willow EIS itself explains that "TCH animals have already been exposed to winter ice roads in this area and may have habituated to some degree."[176]   Thus, CBD Plaintiffs' assertion of an "unprecedented" threat is unfounded.

Third, the record demonstrates that BLM took the requisite "hard look" at the TCH with respect to their winter habitat.[177]   The EIS contains multiple TCH seasonal distribution maps, which demonstrate that only a very small portion of the

---

[173] Docket 92 at 16 (CBD Opening Br.).

[174] BLM AR 269646 ("Oil and gas development within the NPR-A could introduce for the first time such infrastructure and activities into the winter range of a North Slope caribou herd (Teshekpuk Caribou Herd).").

[175] *See* BLM AR 182802 (Seasonal Distribution of Female Caribou in the Teshekpuk Caribou Herd) (showing that existing development overlaps with High, Medium, and Low female density for winter habitat); *see also* Docket 102 at 32 (North Slope Borough) ("ConocoPhillips has built three drillsites and associated infrastructure in the eastern portion of the NPR-A . . . .").

[176] BLM AR 182571.  *Cf.* Docket 92 at 17 (CBD Opening Br.) ("There is no evidence that caribou habituate to disturbance during the winter." (citing BLM AR 176307–308; BLM AR 176164–170)).

[177] *See* BLM AR 182554.  The EIS contains a comprehensive section discussing terrestrial mammals, principally focusing on caribou. *See* BLM AR 182553–575.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 43 of 110

TCH's winter range overlaps with the Willow Project.[178]   The EIS contains other

instances of BLM specifically considering winter impacts to caribou, including the

TCH.[179]   First, the EIS assesses habitat loss for terrestrial mammals, which applies

across all seasons, but determines that "the habitats lost are not unique and occur

throughout the analysis area and the [Arctic Coastal Plain], caribou would likely

move to similar habitats nearby."[180]   Second, the EIS discusses activities that could

disturb or displace TCH caribou, noting that "[b]ehavioral disturbance can cause

immediate responses in caribou, including startle or flight responses" and "may

also result in displacement or long-term reduction of use in areas experiencing

constant human activity or noise."[181]   However, it adds that "[b]ecause caribou

have a very low energetic cost of locomotion, substantial impacts from energetic

---

[178] *See* BLM AR 182802 (Seasonal Distribution of Female Caribou in the Teshekpuk Caribou Herd); BLM AR 182803 (Mean Caribou Density by Season 2001–2018); BLM AR 182804 (Movement of GPS-Collared Caribou of the Teshekpuk Caribou Herd 2004–2018).

[179] *See, e.g.*, BLM AR 182555 ("those TCH wintering in the central Brooks Range could cross the proposed gravel roads and pads while migrating south"); BLM AR 182571 ("Due to the high volume of traffic expected on the ice roads during 2025 and 2027, TCH caribou may avoid the area and have low crossing success during those winters and springs."); BLM AR 182566 ("Noise would be greatest during winter construction, especially near bridges with piles (where impact hammers would be used) and around the mine site, where blasting and gravel hauling would occur."); BLM AR 182567 ("Scheduling the heaviest construction-related traffic during winter, employing environmental and safety training, and mandating that all drivers yield the right-of-way to wildlife would help reduce the potential for vehicle strikes."); BLM AR 182568 (recognizing "[d]isturbance or displacement from noise (winter only)" from pile installation); BLM AR 182570 (noting ice roads "could have long-lasting effects on disturbance and displacement of caribou in winter"); BLM AR 183187 (relocating the BT-4 drill site outside of the K-5 Teshekpuk Lake Caribou Habitat area for all action alternatives in response to comments).

[180] BLM AR 182564.

[181] BLM AR 182565.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 44 of 110

expenditure following disturbances is unlikely without a high level of exposure to infrastructure."[182]  Third, the EIS recognizes the potential for greater impacts during winter construction and detailed anticipated frequencies of vehicle, fixed wing, and helicopter traffic during winter (and other seasons) along with the impacts of noise associated with these and other activities.[183]  Lastly, the EIS recognizes that scheduling the heaviest construction traffic in the winter would reduce the potential for vehicle strikes.[184]

Fourth, CBD Plaintiffs assert that "BLM ignored evidence in the record that it could have used to evaluate the significance of the project's displacement of caribou from important winter habitat."[185]  CBD Plaintiffs suggest that "BLM could have considered, for example, how the presence of lichen in an area is important winter habitat criteria."[186]  But CBD Plaintiffs do not establish that BLM's decision

---

[182] BLM AR 182565 (citation omitted).

[183] BLM AR 182566–567 (Alternative B); BLM AR 182570 (Alternative C); BLM AR 182571 (Alternative D).

[184] BLM AR 182568.

[185] Docket 103 at 28 (CBD Reply).

[186] Docket 103 at 21, 30 (CBD Reply) (citing BLM AR 182564; BLM AR 182571).  Plaintiffs offer three studies to support the notion that BLM should have assessed habitat quality based on the presence of lichen.  *See* BLM AR 176043–053 ("Winter habitat selection by caribou in relation to lichen abundance, wildfires, grazing, and landscape characteristics in northwest Alaska"); BLM AR 223433–441 ("Observed and predicted effects of climate change on Arctic caribou and reindeer"); BLM AR 176112–123 ("Reindeer and caribou (*Rangifer tarandus*) response towards human activities").  None of the studies appear to specifically address the TCH on the North Slope.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 45 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 45 of 110

to not evaluate impacts to purported high-quality caribou habitat was arbitrary. Even assuming that the entire Willow Project analysis area was high quality habitat, it is not evident that BLM's response to comments—that any impacts to the TCH "would be limited by the large size of the winter range"—is arbitrary.[187] Specifically, BLM estimates only 1.1% of the TCH's winter range will be located within 2.5 miles of Willow's new gravel infrastructure.[188] BLM reasonably concluded there likely are alternative wintering areas in the remaining 98.9% of the TCH's winter range.[189] In sum, the record does not demonstrate that TCH winter habitat is "an important aspect of the problem" that BLM "entirely fail[ed] to consider."[190]

Fifth, NEPA directs that "impacts shall be discussed in proportion to their significance" and "[t]here shall only be brief discussion of other than significant

---

[187] Docket 92 at 37–38 (CBD Opening Br.) (citing AR 183127 ("Information on caribou likely avoiding and having difficulty crossing roads with a very high level of traffic was added to Final EIS Section 3.12.2.6.2, Disturbance or Displacement. The main effect of this is likely to be altered distribution and lowered access to some areas of winter habitat. The impact of this would be limited by the large size of the winter range during most years. Travel conditions are generally good in the ACP during winter, so energetic implications from locomotion are unlikely to be high.")).

[188] BLM AR 185605.

[189] *See* BLM AR 182571 ("The resulting decline in available and accessible habitat could potentially result in energetic impacts for some caribou, however the TCH winter range covers a large area, with a substantial portion of the herd wintering in the Brooks Range in most years (Figure 3.12.4), therefore alternative wintering areas are likely to be available.").

[190] *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 578 (9th Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 46 of 110
Case 3:20-cv-00290-SLG    Document 125    Filed 08/18/21    Page 46 of 110

issues."[191]  In the 2012 NPR-A IAP/EIS, BLM previously determined that oil and

gas development in the NPR-A would have the "greatest potential for impacts to

caribou . . . through disruption of calving areas and interference in the movement

of mosquito-harassed [TCH] caribou between insect-relief habitat and foraging

areas," collectively, the spring and summer seasons.[192]  Accordingly, in the Willow

EIS, BLM appropriately focused on impacts during these seasons, in particular

during calving.[193]  Additionally, according to the State, caribou in Alaska are

distributed in 32 herds, totaling approximately 950,000 animals.[194]  In 2013, the

TCH population was estimated at 39,172 animals; in 2017, the most recent

population estimate, the herd has increased to 56,255 animals.[195]  Here, the depth

---

[191] 40 C.F.R. § 1502.2(b) (2019).

[192] BLM AR 269982.

[193] *See, e.g.*, BLM AR 182553 ("Caribou exhibit high fidelity to calving grounds."); BLM AR 182566 ("Air traffic noise would be greatest at airstrips and when animals are directly under low-flying aircraft. The magnitude of disturbance to caribou would likely be greatest during calving. Low-level aircraft traffic over calving grounds and early post-calving aggregations have been reported to reduce calf survival (Harrington and Veitch 1992), although these results were based on small sample sizes and may have been confounded by herd differences (Reimers and Colman 2009).); BLM AR 182572 ("The Teshekpuk Lake area is critical to caribou calving, post-calving, mosquito-relief, and oestrid fly-relief uses.")  ("Disturbance [from Module Delivery Option 2] would occur in winter, when displacement is unlikely to be as strong as during the calving season."); BLM AR 185765 ("In addition, while the Project may result in displacement of some calving caribou because the alternatives analysis area is located in low density calving areas for the TCH, displacement would likely not have population-level effects (Willow MDP Final EIS Section 3.12.2.3.2, Disturbance or Displacement).").

[194] *See* Docket 101 at 16 (State of Alaska).

[195] BLM AR 182553.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 47 of 110

of analysis demanded by CBD Plaintiffs exceeds the significance of potential winter impacts to a game species that enjoys a robust population.

In conclusion, the Court finds that BLM took the requisite hard look at the Project's winter impacts on the Teshekpuk Caribou Herd.[196]

### D. SILA Plaintiffs' NEPA Claims

SILA Plaintiffs independently assert that BLM violated NEPA by (1) lacking sufficient information to take a hard look at various aspects of the Project and by (2) failing to adequately consider Willow's cumulative effects.[197]

#### 1. Hard Look

SILA Plaintiffs assert that the "agencies lacked critical project design and baseline information necessary to take a hard look at Willow's impacts."[198]   As

---

[196] *See, e.g.*, BLM AR 182555 ("[T]hose TCH wintering in the central Brooks Range could cross the proposed gravel roads and pads while migrating south."); BLM AR 182571 ("Due to the high volume of traffic expected on the ice roads during 2025 and 2027, TCH caribou may avoid the area and have low crossing success during those winters and springs."); BLM AR 182566 ("Noise would be greatest during winter construction, especially near bridges with piles (where impact hammers would be used) and around the mine site, where blasting and gravel hauling would occur."); BLM AR 182567 ("Scheduling the heaviest construction-related traffic during winter, employing environmental and safety training, and mandating that all drivers yield the right-of-way to wildlife would help reduce the potential for vehicle strikes."); BLM AR 182568 (recognizing "[d]isturbance or displacement from noise (winter only)" from pile installation); BLM AR 182570 (noting ice roads "could have longer lasting effects on disturbance and displacement of caribou in winter"); BLM AR 183187 (relocating the BT-4 drill site outside of the K-5 Teshekpuk Lake Caribou Habitat area for all action alternatives in response to comments).

[197] Docket 95 at 20–31 (SILA Opening Br.).

[198] Docket 95 at 20 (SILA Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 48 of 110

SILA Plaintiffs advance this argument against numerous Project components evaluated in the EIS, the Court addresses each in turn.[199]

First, SILA Plaintiffs assert that "[f]or aquatic impacts, the EIS did not adequately describe how major project elements, including seven major bridges and 200+ culverts, would be constructed or provide specific design information."[200] SILA Plaintiffs further contend that the EIS only contains "generalized summaries" of culverts' and bridges' impacts on "hydrology, like restricted flow and turbidity changes."[201] But the EIS itself contains a short section generally addressing bridge design, which notes that "[s]pecific bridge crossings details are in Appendix D.1, Sections 4.3 through 4.5."[202] Appendix D.1 specifies the length, location, and number of piles below the ordinary high-water level for each bridge for each action alternative.[203] Although the design drawings for the bridges and culverts are not

---

[199] Federal Defendants, Docket 103 at 34–38; ConocoPhillips, Docket 104 at 35–39; and North Slope Borough, Docket 102 at 37–42, principally responded by citing to the administrative record. Accordingly, Defendants' assertions are not recounted in detail here. The State of Alaska generally incorporated Federal Defendants' and ConocoPhillips' briefings on this issue. *See* Docket 101 at 16 n.3.

[200] Docket 95 at 20 (SILA Opening Br.).

[201] Docket 95 at 20 (SILA Opening Br.). To the extent that SILA Plaintiffs allege the Corps lacked design information on culverts and bridges, the Court disagrees. ConocoPhillips provided the Corps various typical culvert designs and specific bridge designs with its Section 404 Permit Application. Corps AR 004379–381 (Mar. 2020 404 Application) (various typical culvert designs); Corps AR 004382–395 (Mar. 2020 404 Application) (Fish Creek, Judy Creek, Judy Creek Kayyaaq, Willow Creek 2, Willow Creek 4, Willow Creek 4A, and Willow Creek 8 bridge designs).

[202] *See* BLM AR 182400 (Section 2.5.3.1 Bridges).

[203] See BLM AR 183240 (addressing Alternative B); BLM AR 183256 (Alternative C); BLM AR

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 49 of 110

contained in the appendix, it appears that, contrary to SILA Plaintiffs assertion, BLM was provided with those design drawings.[204]  Likewise, the EIS discusses culvert design as well.[205]

As to the aquatic impacts of culverts, it appears that SILA Plaintiffs are asserting that a site-specific EIS requires BLM to individually assess the impact of each culvert. [206]  But NEPA is governed by a rule of reason.[207]  Such a level of site-specificity for culverts is not necessary to "foster both informed decision-making and informed public participation."[208]  Moreover, NEPA only requires that

------------------------------

183270 (Alternative D).

[204] A copy of the drawings is located in BLM's administrative record.  *See* BLM AR 143766–891.  *Cf.* BLM AR 182932 (stating that culvert and bridge future monitoring is "included in the Final EIS due to the lack of a basis of design for structures proposed by CPAI.").

[205] *See* BLM AR 182400 (2.5.3.2.2 Culverts); BLM AR 182481 (3.8.2.1.3 Additional Suggested Avoidance, Minimization, or Mitigation) ("At a minimum, design culverts to perform satisfactorily for all flood events up to and including the 50-year event.") ("Identify the locations requiring cross-drainage culverts during spring breakup prior to construction by noting all locations where water is flowing over the proposed alignment."); BLM AR 182387 (noting culvert battery locations across action alternatives); *see also* BLM AR 182411–412 (comparing bridge and culvert numbers across action alternatives).

[206] Docket 107 at 16 (SILA Reply) ("Defendants cite to a 'typical' culvert design and statements that culverts would be located based on site-specific conditions to assert that the analysis was sufficient. But the agencies never updated the FEIS to analyze the culverts' site-specific impacts." (footnote omitted)).

[207] *See N.Y. Nat. Res. Def. Council, Inc. v. Kleppe*, 429 U.S. 1307, 1311 (1976) ("In evaluating the adequacy of EIS's [courts] consistently have enforced this essential requirement, tempered by a practical 'rule of reason.'"); *see also Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 88 (2nd Cir. 1975) ("[A]n EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible.").

[208] *Or. Env't Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) (quoting *Block*, 690 F.2d at 761).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 50 of 110

"[i]mpacts shall be discussed in proportion to their significance."[209] Given the likely

minimal impact of a single culvert, it is not arbitrary for BLM to take a "hard look"

at the impacts from culverts generally. Accordingly, the Court concludes that BLM

took the requisite hard look at aquatic impacts from culverts as well as bridges.[210]

Second, SILA Plaintiffs assert that "the EIS also contained little to no

information on the length or location of the proposed roads, the amount of gravel

needed for each road, or the site-specific impacts from infrastructure

placement."[211] This assertion is without merit. The EIS details in numerous places

the total length and acreage of gravel roads,[212] as well as the impacts of gravel

---

[209] 40 C.F.R. § 1502.2(b) (2019).

[210] *See* BLM AR 182377 (noting impacts of culverts and bridges in relation to action alternatives); BLM AR 182400 (2.5.3.2.1 Bridges) (2.5.3.2.2 Culverts) ("Culverts would be placed in roads to maintain natural surface drainage patterns[.]"); BLM AR 182450 (discussing culvert impact on airflow and thermal dynamics of the soils); BLM AR 182484–485 (3.8.2.3.4 In-Water Structures (bridges, culverts, water intakes, boat ramps)) ("Hydrologic changes to surface waters could result from the installation and use of culverts and bridges."); BLM AR 182488 (noting effects from in-water in structures, including culverts and bridges); BLM AR 182504 ("[C]ulverts could alter surface flow and result in ponded water upgradient of the structure . . . ."); BLM AR 182516–517 (noting culverts and bridges may remove or alter fish habitat under Alternative B); BLM AR 185533–534 (1.3.1.1 Bridge Crossings) (discussing potential impacts from bridge crossings); BLM AR 185534–535 (1.3.1.2 Culverts) (discussing potential impacts from culverts); *see generally* BLM AR 182469–493 (3.8 Water Resources); BLM AR 185504–545 (Appendix E.8 Water Resources Technical Appendix).

As a matter of practicality, it also seems unreasonable, even impossible, to demand that BLM conduct hydrology studies, for example, for every single culvert. Additionally, ConocoPhillips and BLM took a closer look at the Colville River crossing, which seems appropriate given that it "is the largest waterbody in the analysis area." BLM AR 182470.

[211] Docket 95 at 21 (SILA Opening Br.).

[212] *See, e.g.*, BLM AR 182375–376 (noting length and acreage of gravel road for each alternative and discussing impacts); *see also* BLM AR 183232 (gravel roads length and acreage for Alternative B); BLM AR 183242 (estimating gravel footprint and fill quantity for Alternative B);

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 51 of 110

infrastructure.[213]  The EIS also contains maps that clearly identify gravel road locations.[214]  ConocoPhillips also provided the Corps with typical designs for road construction and maps.[215]  As to the impacts from gravel roads, it appears that SILA Plaintiffs are asserting that NEPA requires a mile-by-mile impacts analysis. For the reasons previously discussed above as to bridges and culverts, NEPA does not require that level of site-specificity.[216]  Accordingly, the EIS took an adequately hard look at the impacts from gravel roads.

Third, SILA Plaintiffs assert "the EIS only provided a wide range of the number of wells per pad, ignoring that the number of wells informs the size,

_____

BLM AR 183277 (noting length and acreage for each action alternative).

[213] *See* BLM AR 182376 (comparing gravel road impacts and dust shadow from gravel roads in relation to action alternatives); BLM AR 182400 (2.5.3.2 Gravel Roads); BLM AR 182427 ("Gravel roads would be a minimum of 5 feet thick (averaging 7 feet thick due to local topography) to maintain the existing thermal regime and protect underlying permafrost from melting."); BLM AR 182484 (3.8.2.3.3 Gravel Infrastructure) (discussing impacts of gravel roads and pads); BLM AR 182487 (discussing potential impacts of stormwater runoff from gravel roads and pads); BLM AR 182503–504 (discussing indirect changes in wetland composition from gravel roads and pads); BLM AR 182516 (noting potential habitat loss or alteration from gravel roads and pads); BLM AR 185900–905 (Appendix I.3 Dust Control Plan) (applying mitigation measures to roads and pads).

[214] *See, e.g.*, BLM 182387 (map comparison of action alternatives); BLM AR 182754 (Alternative B Map); BLM AR 182755 (Alternative C); BLM AR 182756 (Alternative D); *see also* BLM AR 185888–898 (ConocoPhillips Road Optimization Memorandum) (screening eight alternative road routes).

[215] *See, e.g.*, Corp AR 004355 (Mar. 2020 404 Application) (typical road design); Corps AR 004371 (typical vehicle pull out design); Corps AR 004326 (Willow Access Road Key Map).

[216] SILA Plaintiffs do not demonstrate that the impacts from any one section of gravel road are unique and, therefore, require specific analysis.  For example, a vehicle traveling on one section of a gravel road will create a dust shadow, just the same as another vehicle on a separate road section.  It is not unreasonable for BLM to consider such impacts generally.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 52 of 110

infrastructure needs, and impacts of each pad."[217]  The EIS states that "[e]ach drill

site would be sized to accommodate 40 to 70 wells at a typical 20-foot wellhead

spacing; the Project would have a total of 251 wells."[218]  Even if that is considered

a "wide range" of wells per pad, SILA Plaintiffs do not explain why BLM's decision

to provide that range of wells per pad is arbitrary.  And for the same reasons

discussed above with respect to bridges and culverts, the Court declines to impose

a well-by-well impacts analysis, particularly where the overall number of wells for

the Project is provided.  Accordingly, the EIS took an adequate hard look at impacts

from wells.

Fourth, SILA Plaintiffs assert that BLM impermissibly deferred its NEPA

analysis after making an irretrievable commitment of resources.[219]  SILA Plaintiffs

appear to misinterpret responses to public comments—stating that BLM might do

additional NEPA analysis later in time—as suggesting BLM failed to meet its NEPA

obligations in the EIS.[220]  BLM's response merely recognized that additional NEPA

---

[217] Docket 95 at 21 (SILA Opening Br.).

[218] BLM AR 182398; *see also* BLM AR 182410 (comparing number of drill site gravel pads and acreage across alternatives).

[219] Docket 95 at 21–22 (SILA Opening Br.).

[220] *See, e.g.*, BLM AR 182995 ("When an application is submitted for a ROW [Right of Way] and/or APD [Application for Permit to Drill] for the Willow MDP Project, the BLM will review the application for completeness and determine whether the scope of the Project falls within what was analyzed in the EIS, and if any further NEPA analysis is required."); *see also* BLM AR 182994 ("After approval of the Willow MDP Project, CPAI could submit an APD.  An APD is required for each proposed well to develop a proponent's onshore lease. Prior to authorizing an APD, the BLM reviews the information in the APD package to ensure that it is accurate and addresses all requirements; during this time, the BLM also ensures that there is appropriate

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 53 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 53 of 110

analysis *may* be necessary pursuant to 40 C.F.R. § 1502.9(c)(1)(i) (2019), which requires supplemental analysis when there are "substantial changes in the proposed action that are relevant to environmental concerns." Accordingly, BLM did not impermissibly defer NEPA analysis.

Fifth, SILA Plaintiffs assert that "the EIS failed to adequately analyze the impacts to wetlands and waterways" because (1) the Corps did not receive ConocoPhillips' Section 404 permit application until after the Draft EIS was released and did not update the EIS to incorporate information in the permit application regarding wetlands and (2) because the EIS "lacked key, site-specific project and baseline information to even engage in [a wetlands and waterways] analysis."[221]

As to the timing of the Section 404 Permit Application, SILA Plaintiffs do not establish that this renders BLM's or the Corps' NEPA analyses improper. A Section 404 permit application is not required to satisfy BLM's NEPA obligations. And SILA Plaintiffs do not specifically identify information contained in the application that was necessary for the agencies to complete the NEPA process.[222]

---

NEPA documentation. APDs submitted for proposed wells and associated infrastructure as part of the Willow MDP Project are analyzed in the Willow MDP EIS. Each APD would be checked against the existing NEPA documentation, using a DNA [Determination of NEPA Adequacy]. If the BLM cannot document in a DNA that the existing NEPA documentation fully covers activities and the effects of those activities in an APD package, the BLM would require that additional analysis (either in an EA or an EIS) be completed to comply with the NEPA.").

[221] Docket 95 at 22–23 (SILA Opening Br.).

[222] *Cf.* Docket 95 at 22 (SILA Opening Br.) ("Nonetheless, the agencies did not update the EIS to

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 54 of 110

Moreover, the EIS contains a section dedicated to wetlands and vegetation, including a technical appendix.[223]  In their reply, SILA Plaintiffs maintain that the appendix is inadequate because it provides only a "general overview[]" and is not "specific to Willow."[224]  But the Wetlands and Vegetation Section of the EIS uses the general information regarding different types of wetlands and vegetation from the appendix and applies it specifically to the Willow Project.[225] SILA Plaintiffs do not substantively explain why or how that analysis is inadequate.[226]  Accordingly, SILA Plaintiffs do not demonstrate that BLM or the Corps, which reviewed and adopted the EIS, arbitrarily or inadequately evaluated impacts to wetlands under NEPA.[227]

---

incorporate information related to the 404 permit application, such as likely impacts to wetlands.").

[223] See BLM AR 182493–506 (Section 3.9); BLM AR 185546–557 (Technical Appendix).

[224] Docket 107 at 14 (SILA Reply).

[225] See BLM AR 182493–506 (Section 3.9).

[226] SILA Plaintiffs offer a single response to a public comment as an "example." Docket 95 at 22 (SILA Opening Br.) (citing BLM 182998 ("Because wetlands are abundant on the North Slope and the wetlands that would be impacted by the project are not unique, the indirect effects to fish would likely not be measurable.")). The Court disagrees that this is a "conclusory statement."  BLM explained its reasoning, which SILA Plaintiffs fail to refute. *See Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 849 (9th Cir. 2013) ("Stated another way, when an agency clearly responds to comments, it creates a rebuttable presumption that it has considered and answered the commenter's concerns. To overcome that presumption, the commenting party must engage with those responses and at least say why they are thought to be inadequate.").

[227] *See* 40 C.F.R. § 1506.3(c) (2019); Corps AR 000151, 000156 ("As the federal manager of the NPR-A, BLM is responsible for land use authorizations and compliance with the requirements of the National Environmental Policy Act of 1969 (NEPA) (42 USC 4321 et seq.). Under NEPA, the BLM is the lead federal agency, and has federalized the entire proposed project. As stated in Section 1.0 of this document, the Corps has adopted the BLM's FEIS for the proposed

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 55 of 110

Sixth, SILA Plaintiffs assert that "the lack of project information was also reflected in the mitigation measures adopted for Willow. Those measures demonstrate that work to gather baseline information to inform project component design had not occurred. Without this design and key information, BLM could not analyze the impacts of these components."[228] For example, SILA Plaintiffs contend that BLM imposed future monitoring requirements on water crossings because it lacked bridge and culvert design information.[229] But, as previously discussed, BLM's administrative record contains the drawings.[230] SILA Plaintiffs also take issue with a measure that instructs ConocoPhillips to account for snow- and ice-impacted conditions on bridges, culverts, and pipeline crossings.[231] But allowing the final design of culverts or bridges to be adapted to the unique and changing conditions on the North Slope does not constitute an impermissible "plan for a plan" as SILA Plaintiffs suggest.[232] Accordingly, the mitigation measures do

---

project.").

[228] Docket 95 at 23 (SILA Opening Br.).

[229] Docket 95 at 23 (SILA Opening Br.) (citing BLM AR 182932).

[230] *See supra* n.204.

[231] Docket 95 at 23 (SILA Opening Br.); *see* BLM AR 182481 ("As appropriate, consider both 1) snow- and ice-impacted conditions and 2) ice-free conditions in the hydraulic design of bridges, culverts, and pipeline river crossings. Cross-section data at the time of the peak stage and peak discharge that are available for many rivers and streams indicate that the WSE was affected by snow and/or ice blockage. Based on the available information, develop designs that would perform satisfactorily during the design event considering both the possibility of open-water conditions and the possibility that snow and ice blockage is occurring at the time of the design event."). This measure was adopted in the ROD. *See* BLM AR 186081.

[232] Docket 95 at 23 (SILA Opening Br.) (citing *N. Plains Res. Council, Inc. v. Surface Transp.*

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 56 of 110

not demonstrate that the agencies lacked necessary information to adequately assess the impacts of the Project in the EIS.

Seventh, SILA Plaintiffs assert that "[t]he EIS lacked other baseline information necessary to evaluate the impacts to aquatic resources and fisheries, for example at the Colville River Crossing."[233]  As to aquatic resources, SILA Plaintiffs appear to take issue with the construction of an ice bridge across the Colville River near Ocean Point.  While BLM and the State of Alaska did raise concerns about the limited data set,[234] BLM—specifically in response to EPA comments—ultimately estimated "discharge at Ocean Point . . . using the [commonly used] drainage-area ratio method."[235]  SILA Plaintiffs offer no

---

*Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011)).  *Northern Plains* is distinguishable.  There, the Ninth Circuit rejected an EIS that included future data collection regarding potentially impacted plants and wildlife as mitigation measures "as a proxy for baseline data" because the data was not available during the EIS process.  *Id*. at 1085.

[233] Docket 95 at 24 (SILA Opening Br.).

[234] BLM AR 135601 ("It is agreed that 3 data points over 3 days makes it difficult to analyze impacts because the amount of data doesn't provide a baseline for comparison."); BLM AR 101501 ("Until the crossing is sampled repeatedly for the next few years, all we are really doing is guessing what the crossing conditions might be."); *see* BLM AR 145089–145146 (Willow Ice Road – Ocean Point Water Resources Field Investigation) (collecting data points); BLM AR 145591–145619, 145464–530 (ICE Design & Consult Report).

[235] BLM AR 185513; *see* BLM AR 185540 ("The drainage-area ratio method suggested by EPA to develop an Ocean Point discharge dataset is indeed commonly used to estimate both flood frequency magnitudes, and individual streamflow discharges, for sites where no streamflow data are available using data from one or more nearby gaging stations (Emerson et al., 2005). The method is intuitive and straightforward to implement and is in widespread use by analysts and managers of surface-water resources. It's often used for locations where no supporting discharge data are available to confirm the validity or develop some type of bias correction to account for differences in watershed characteristics."); *see generally* BLM AR 185510–185514 (section specifically addressing the Colville River within the water resources technical appendix); BLM AR 185538–545 (Appendix E.8B Ocean Point Technical Memorandum).

---

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 57 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 57 of 110

substantive response to BLM's decision to employ a "commonly used" scientific method to address the Colville River ice crossing. Accordingly, the Court will defer to BLM's expertise.[236] SILA Plaintiffs also do not demonstrate that BLM arbitrarily evaluated impacts to fisheries. The EIS contains nearly 20 pages addressing the "affected environment [of] and environmental consequences" to fish.[237] With respect to the Colville River ice crossing, the EIS clearly states that "fish are not anticipated to be present at or moving through Ocean Point to any large extent during the proposed operational period in winter because the river ice can be naturally grounded, little flow exists, most fish exhibit limited movement during winter, and most fish harvested and detected in research appear to use habitats further downstream."[238] Even though fish are not expected at the crossing, ConocoPhillips is nonetheless required to monitor for fish prior to construction, anticipated to occur in 2025 and 2027, and, if fish are present, "work with ADF&G through the permitting process to determine if and how to accommodate fish passage through the ice bridge."[239] Accordingly, the ROD's adaptive management

---

[236] *N. Plains Res. Council, Inc.*, 668 F.3d at 1075 ("A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise." (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983))).

[237] *See* BLM AR 182506–525.

[238] BLM AR 182524 (citing Moulton, Seavey *et al.* 2006; Moulton, Seavey *et al.* 2010) ("In addition, because the entirety of the ice bridge crossing would not be grounded, channels for fish movement would be present."). Additionally, "[i]t is anticipated that the ice bridge at the Colville River crossing would be needed for [only] 5 weeks." BLM AR 182525.

[239] BLM AR 182524–525; *see* BLM AR 186083–084 (ROD) (Mitigation Measure 10: Option 3

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 58 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 58 of 110

plan for the Colville River ice crossing does not demonstrate the "EIS lacked other baseline information necessary to evaluate the impacts to aquatic resources and fisheries[.]"[240]

In conclusion, BLM did not fail to take a hard look at the site-specific impacts of certain Willow Project components or to obtain key baseline and project information necessary to evaluate those impacts in the EIS.[241]

## 2. Cumulative Impacts

SILA Plaintiffs assert that BLM's cumulative impacts analysis violates NEPA because it does not contain (a) sufficiently detailed information regarding various

---

Colville River Crossing Data and Adaptive Management Plan); BLM AR 186085 (ROD) (Mitigation Measure 13: Overwintering Fish Habitat).

"Within the Ocean Point area, it is likely that ice conditions vary year-to-year and grounded ice may be present in specific locations, while absent from others." Corps AR 000178 (ConocoPhillips' response to public comment). Given this year-to-year variance, especially in light the novel and unpredictable impacts of climate change, it seems reasonable to require that "CPAI will monitor ice conditions and flow at the crossing location over the next several winters [just] prior to ice bridge construction in 2025 and 2027", BLM AR 182524, in order to "specifically to identify the most desirable crossing location," Corps AR 000178, and monitor and accommodate any actual fish presence.

[240] Docket 95 at 24 (SILA Opening Br.); *see Protect Our Comm. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) ("Moreover, the EIS's inclusion of an adaptive-management plan, among other mitigation measures, provides flexibility in responding to environmental impacts through a regime of continued monitoring and inspection. That an agency decides to incorporate an adaptive management plan as one component of a comprehensive set of mitigation measures does not mean that the agency lacked a sufficient foundation of current baseline data from which to evaluate the Project's environmental effects.").

[241] SILA Plaintiffs repeatedly cite to *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989), and *Great Basin Res. Watch v. Hankins*, 456 F.3d 955, 973–74 (9th Cir. 2006), to support the general assertion that BLM failed to analyze site-specific impacts of the Willow Project. But those citations merely recite general NEPA requirements and do not stand for the specific proposition that SILA Plaintiffs appear to suggest.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 59 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 59 of 110

reasonably foreseeable future actions ("RFFAs") and (b) an adequate analysis of the cumulative impacts to fish and polar bears in light of those RFFAs.[242]

NEPA requires that an agency consider the "cumulative impact" of the proposed action together with other actions.[243] The regulations define "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and [RFFAs] . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."[244] "[I]n considering cumulative impact, an agency must provide 'some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'"[245] "This cumulative analysis 'must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future

_____

[242] Docket 95 at 25–31 (SILA Opening Br.); Docket 107 at 19–25 (SILA Reply).

The CEQ recently repealed the requirement to conduct a cumulative impacts analysis, effective September 14, 2020. *See* 85 Fed. Reg. at 43,304. However, the parties do not directly dispute that the previous regulations, which required such an analysis, are applicable here. *See* Docket 104 at 56 (ConocoPhillips) ("Even assuming a cumulative impact analysis is required following repeal of the NEPA cumulative impact regulations, none of these arguments have any merit."); Docket 102 at 34 (North Slope Borough); Docket 103 at 41 (Fed. Defs.).

[243] *See* 40 C.F.R. § 1508.25(a)(2) (2019).

[244] 40 C.F.R. § 1508.7 (2019).

[245] *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) (quoting *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (alterations in original)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 60 of 110

projects.'"[246]  The EIS defines an RFFA "as a project for which there is an existing proposal, a project currently in the NEPA process, or a project to which a commitment of resources (such as funding) has been made."[247]

### a. RFFAs

SILA Plaintiffs contend that the EIS does not sufficiently analyze the cumulative impacts of three specific RFFAs: Greater Willow 1 and 2 ("Greater Willow"), Nanushuk, and nearby exploration activities.[248]  The Court addresses each RFFA in turn.

### i. Greater Willow

SILA Plaintiffs assert that the EIS does not provide detailed information on Greater Willow, including "the proposed drill site locations, estimates for production amount and timing, and that Willow's pipelines were designed to support Greater Willow development."[249]  However, this information is contained in the EIS.[250]  SILA

---

[246] *Id.* (quoting *Ocean Advocs.*, 402 F.3d at 868) (internal quotation marks omitted).

[247] BLM AR 182668.

[248] Docket 95 at 25–28 (SILA Opening Br.).

[249] Docket 95 at 26 (SILA Opening Br.) (footnotes omitted).  The parties appear to dispute whether Greater Willow should be considered an RFFA.  *Compare* Docket 104 at 46–47 (ConocoPhillips) and Docket 102 at 44–45 (North Slope Borough) *with* Docket 107 at 20–21.  However, BLM clearly listed it as such.  BLM AR 182673.  The Court will defer to BLM's determination.  *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) ("When an agency's determination of what are reasonably foreseeable future actions and appropriate component parts is fully informed and well-considered, we will defer to that determination." (internal quotation marks and citation omitted)).

[250] *See* BLM AR 183202–203 (4.2.2 Pipelines); BLM AR 183610–614 (2.2.1 Greater Willow Potential Drill Sites #1 and #2); BLM AR 182862 (Reasonably Foreseeable Future Actions that

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 61 of 110

Plaintiffs reply that this information should have been included in the cumulative impacts section, not elsewhere in the EIS.[251]  But the Court finds that the information's inclusion in the EIS is sufficient for the decision maker and the public to understand the potential scope and impacts of Greater Willow.  And in any event, "[i]t is not for this court to tell [BLM] what specific evidence to include, nor how specifically to present it" so long as the evidence in the record is sufficient to support the agency's conclusion.[252]

### ii.  Nanushuk

SILA Plaintiffs assert that the Willow "EIS failed to provide detailed information on Nanushuk," a new oil and gas development east of the Colville River that began construction in 2019.[253]  However, the Willow EIS cumulative impacts section expressly incorporates relevant portions of the Nanushuk EIS.[254]  The

_____

may Interact with the Willow Project).

[251] Docket 107 at 21 (SILA Reply).

[252] *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1112 (9th Cir. 2015) (emphasis omitted) (quoting *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008)).

[253] Docket 95 at 26–27 (SILA Opening Br.).

[254] See BLM AR 182668 ("The cumulative effects analyses are documented in multiple EISs for similar types of projects and programs on the North Slope . . . [including the] Nanushuk Project Final Environmental Impact Statement (USACE 2018, Section 3.1.3, and throughout Chapter 3) provide a broad analysis of existing and potential oil and gas-related activities on the North Slope that is applicable to the cumulative impacts analysis for the Willow MDP. The cumulative impacts summaries and conclusions in the above-referenced EISs were reviewed for the applicability of information and methods to the Project; then past and present actions and RFFAs affecting the resources evaluated in the EIS were identified and evaluated."); *see also* 40 C.F.R. § 1502.21 (2019) (incorporation by reference).  SILA Plaintiffs cite to *Kern*, 284 F.3d at 1076.  However, *Kern* merely notes that an "EA may be deficient if it fails to include a cumulative

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 62 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 62 of 110

incorporation of the Nanushuk EIS provides the decision maker and the public with detailed information that can be considered in the cumulative effects of the Willow Project. SILA Plaintiffs offer no reason that the Willow Project must recount already accessible and detailed information.

### iii. Other Exploration Activities

Lastly, SILA Plaintiffs contend that BLM arbitrarily grouped a number of potential activities as a single "Miscellaneous Seismic Exploration."[255] SILA Plaintiffs contend that BLM should have separately analyzed these RFFA activities, including "Greater Grizzly" exploration activities, "Harpoon" exploration activities, the production testing and potential development of "Narwhal," and other activities near Willow.[256]

The Ninth Circuit has held that an agency may group together several projects in its cumulative impacts analysis, including RFFAs.[257] BLM's grouping of these uncertain potential exploration and related activities was not arbitrary,

---

impact analysis or to tier to an EIS that has conducted such an analysis." *Id.*

[255] Docket 95 at 27–28 (SILA Opening Br.) ("As a result, the EIS obscures the associated cumulative impact of extensive, ongoing exploration activities involving drilling, water withdrawals, ice road construction, and the use of heavy machinery to conduct seismic surveys, all in Willow's surrounding area."); *see* BLM AR 182669.

[256] Docket 95 at 27–28 (SILA Opening Br.); *see* BLM AR 100578-560; BLM AR 135562–567.

[257] *Cascadia Wildlands*, 801 F.3d at 1112 ("Thus, 40 C.F.R. § 1508.7 does not explicitly require individual discussion of the impacts of reasonably foreseeable projects, and, absent such a requirement, it is not for the court to tell the agency how specifically to present such evidence in an EA.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 63 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 63 of 110

especially when BLM provided a reasoned explanation for its decision to do so.[258] Nothing that SILA Plaintiffs cite to in the administrative record demonstrates that BLM's decision or explanation is arbitrary or capricious.[259] In sum, the cumulative impacts analysis of RFFAs complies with NEPA.[260]

### b. Fish & Polar Bears

SILA Plaintiffs maintain that the EIS fails to adequately analyze Willow's cumulative effects on fish and polar bears.[261] SILA Plaintiffs assert that the cumulative impacts discussion is deficient because it did not contain a detailed

---

[258] *See* BLM AR 182669 ("For the EIS, exploration activity is grouped as one RFFA due to the disparate and constantly changing details about activities by a wide variety of project proponents and the uncertainty related to any one proponent's exploration plans beyond the currently permitted activity. Exploration activities typically include construction and use of ice roads and pads (and sometimes ice airstrips), heavy equipment operation, traffic, water withdrawal, exploration well drilling, and seismic surveys. These activities have historically occurred across the North Slope and will continue to do so, with concentrated activity likely to occur within the NPR-A and in areas south and east of Nuiqsut (outside of the NPR-A)."); *see also* BLM AR 182682–684 (specifically addressing impacts of exploration activities on the Native communities of Nuiqsut and Utqiaġvik).

[259] SILA Plaintiffs cite to an e-mail to assert that the EIS improperly deemed all exploration as "speculative." Docket 95 at 26 (citing BLM AR 100578–579). Accordingly, the Court will not attribute this reasoning to the EIS. Additionally, the fact that ConocoPhillips suggested certain activities as RFFAs does not render BLM's decision or reasoning arbitrary. Docket 95 at 26; *see* BLM AR 100578–579; BLM AR 135563–567. Notably, ConocoPhillips' language is largely couched in conditional terms. *See* BLM AR 135566 (stating that ConocoPhillips "will *likely* continue to pursue Willow area appraisal in 2020") ("*depending* on success") (seeing "*potential* for one to two rigs operating in the NPR-A *as we* evaluate our portfolio of leases") ("Narwhal Reservoir Development: A *potential* future project") (emphases added); *cf.* BLM AR 135566 ("The Narwhal reservoir is currently undergoing a long-term production test with wells drilled from the existing CD4 pad.") ("Harpoon exploration is currently underway this winter.").

[260] *See Kern*, 284 F.3d at 1075 ("When an agency's determination of what are reasonably foreseeable future actions and appropriate component parts is fully informed and well-considered, we will defer to that determination." (internal quotation marks and citation omitted)).

[261] Docket 95 at 28 (SILA Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 64 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 64 of 110

analysis of the impact that Greater Willow, Nanushuk, and nearby exploration activities would have on these animals.[262]

With respect to fish, the EIS contains a subsection discussing the cumulative impacts of Willow and other activities on fish.[263]   The subsection substantively discusses the impacts of freshwater withdrawals, vessel traffic, and climate change, among other issues.   The Court finds this discussion is not perfunctory but sufficiently detailed to "provide useful analysis" of the cumulative impacts.[264] With respect to polar bears, the EIS also contains a substantive discussion of the cumulative impacts on marine mammals, and specifically addresses polar bears.[265]   The section analyzes the cumulative effects of other projects in the area, mainly discussing the impact of climate change resulting in a loss of sea-ice habitat, upon which the polar bear depends.[266]   The Court finds the EIS adequately

---

[262] Docket 95 at 28 (SILA Opening Br.) ("Largely due to the lack of information about individual RFFAs, the EIS failed to adequately analyze Willow's cumulative effects on fish and polar bears.").

[263] *See* BLM AR 182675–676.

[264] *Id.* (quoting *Ocean Advocs.*, 402 F.3d at 868).

[265] BLM AR 182679–680.

[266] BLM AR 182679–680 ("Recent shifts in distribution and habitat use by polar bears in the Beaufort and Chukchi seas are likely attributable to the loss of sea-ice habitat. The greatest declines in optimal polar bear habitat would occur in those areas, where reduced habitat will likely reduce polar bear populations . . . Polar bears of the SBS stock experienced twice as many days of reduced sea ice from 2008 to 2011 than did those of the Chukchi Sea stock. Despite similar diets, SBS bears were smaller and in poorer condition, exhibited lower reproduction, and twice as many were fasting in spring[.] Consuming terrestrial foods is judged to be insufficient to offset the loss of ice-based hunting. The lack of sea ice or the delayed formation of ice also forces bears to spend more time on land, where they have difficulty catching prey and spend longer periods fasting, increasing the chance of interactions with

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 65 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 65 of 110

addresses the cumulative impacts to fish and polar bears. Although the discussion does not specifically address Greater Willow, Nanushuk, or nearby exploration activities, the agencies took a sufficiently "hard look" at the cumulative impacts of oil and gas development activities and climate change on both fish and polar bears on Alaska's North Slope and adjacent waters.[267]

## II.    Clean Water Act

### A. Legal Standard

Section 404 of the CWA prohibits the discharge of dredged or fill material into waters of the United States, including wetlands, unless authorized by a Corps permit.[268]  The Section 404 permit process is governed simultaneously by Corps'

---

humans and increasing the risk of mortality of bears killed in defense of life or property . . . The Project could exacerbate the effects of climate change by adding development and the chance of human-bear interactions in terrestrial habitats that bears are increasingly forced to use.

As sea-ice cover diminishes with a warming climate, polar bears may spend more time on land and fast more, which would reduce access to prey and negatively affect energy levels, respectively[.]  It may also mean a higher likelihood of bears encountering human infrastructure and activities on land. The impacts of onshore development would likely affect polar bears through a disturbance in terrestrial denning habitat, especially during construction, but those would be mitigated through the ITRs and Letters of Authorization issued by USFWS (which stipulate mitigation and minimization measures).").

[267] *See Cascadia Wildlands*, 801 F.3d at 1112.

[268] 33 U.S.C. §§ 1311(a), 1344.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 66 of 110

regulations[269] and by the EPA's Section 404(b)(1) Guidelines.[270] "Both sets of rules must be observed."[271]

As relevant here, the EPA Section 404(b)(1) Guidelines prohibit the Corps from issuing a permit if the proposed discharge "will cause or contribute to significant degradation of the waters of the United States" and "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."[272] On judicial review, the proper inquiry is whether "the Corps' 'decision [to issue the permit] was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"[273]

### B. Discussion

SILA Plaintiffs assert that "the Corps violated the CWA for two reasons: (1) it lacked sufficient information to determine that Willow's direct and secondary effects would not cause significant degradation; and (2) it lacked information to conclude that all appropriate and practicable steps would be taken to minimize

---

[269] 33 C.F.R. § 320 *et seq.*

[270] 40 C.F.R. § 230 *et seq.*

[271] *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 947 (9th Cir. 2008) (quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986)).

[272] 40 C.F.R. § 230.10(c), (d).

[273] *Bering Strait Citizens for Responsible Res. Dev.*, 524 F.3d at 949 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 67 of 110

Willow's adverse effects and failed to analyze the sufficiency of proposed mitigation."[274]  The Court addresses each assertion in turn.

## 1. Significant Degradation

### a. Direct Effects

SILA Plaintiffs assert that the Corps lacked fundamental baseline information that "was critical to understanding the functions of wetlands Willow would destroy[.]"[275] Without this information, according to SILA Plaintiffs, "the Corps' conclusion that Willow would not cause significant degradation was arbitrary."[276]

The Court finds that SILA Plaintiffs have not demonstrated that the Corps lacked necessary baseline information.  ConocoPhillips' Section 404 Permit Application is over 600 pages in length and includes information on Project component locations, the type of fill to be used, and the footprint by National

---

[274] Docket 95 at 33 (SILA Opening Br.); Docket 107 at 27–36 (SILA Reply).

[275] Docket 95 at 34 (SILA Opening Br.).

[276] Docket 95 at 34 (SILA Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 68 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 68 of 110

Wetland Inventory ("NWI") code.[277]  The Corps also had location information,[278] including an entire Willow wetlands index map.[279]  In its ROD and Permit Evaluation, the Corps determined it had "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines."[280]  The Corps' determination that it had sufficient information is entitled to deference.

SILA Plaintiffs also contend that the "Corps failed to analyze the impacts and lost functions from Willow" and, therefore, its finding of no significant degradation is arbitrary.[281]  Citing to 40 C.F.R. § 230.11(e), SILA Plaintiffs assert that "[r]emarkably, nowhere in the Corps' analysis is there a determination of 'the nature and degree of effect' the project will have on the 'structure and function of the aquatic ecosystem.'"[282]

---

[277] *See, e.g.*, Corps AR 004267–269 (Mar. 2020 404 Application) (Table 2-1. Project Components Locations); Corps AR 004289 (Table 6-1. Footprint of Project Components and Fill Requirements in WOUS) (Table 6-2. Footprint of Excavations in WOUS); Corps AR 004291 (Table 6-3. Footprint in WOUS by NWI Code); *see also* Corps AR 004324 (Willow footprint and fill quantities); *see generally* Corps AR 004241–478 (Mar. 2020 404 Application) ("The Wetland Delineation Report (Attachment E) has not been updated since the February 2020 DA Application submittal and is not being resubmitted at this time."); Corps AR 005172–604 (Feb. 2020 404 Application) (Attachment E: Wetland Delineation Report).

[278] *See, e.g.*, Corps AR 004321–323, 004326–354.

[279] *See* Corps AR 005571–604.

[280] *See* Corps AR 000204; *see also* 40 C.F.R. § 230.12(a)(3)(iv).

[281] Docket 107 at 28 (SILA Reply).

[282] Docket 107 at 28 (SILA Reply).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 69 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 69 of 110

The ROD expressly addresses this regulatory requirement in Section 6.1.5.[283]  SILA Plaintiffs do not assert any deficiency with the Corps' analysis in that section.  Rather, SILA Plaintiffs appear to take issue with the Corps' wetlands analysis in the ROD, which is contained in a different section and addresses a separate regulation.[284]  SILA Plaintiffs have not demonstrated that the Corps failed to comply with its regulatory obligations.[285]  Accordingly, the Corps' conclusion that

---

[283] *See* Corps AR 000201–202 (6.1.5 Aquatic Ecosystem and Organism Determinations) ("In consideration of all avoidance, minimization, and special conditions, including the specific discussions in the referenced parts of this document, the proposed project would comply with this factor of the Guidelines.").  Section 6.1.5 cross-references three other sections, which appreciably discuss the nature and degree of effect on the aquatic ecosystem.  *See, e.g.*, Corps AR 000197–198 (6.1.1. Physical Substrate Determinations) ("In marine waters, direct disturbance of substrates would cause a temporary and localized increase in suspended sediment concentration that would likely return to background shortly after screeding is completed."); Corps AR 000198–199 (6.1.2 Water Quality, Circulation, Fluctuation and Salinity Determinations) ("In marine waters, screeding at Oliktok dock and the barge lightering area could have temporary localized impacts to currents, but these wouldn't be anticipated to have a measurable impact to overall current patterns nor water circulation."); Corps AR 000206-207 (6.2.2 Fish, Crustaceans, Mollusks, and Other Aquatic Organisms in the Food) ("Construction activities within or adjacent to streams and adjacent wetlands could affect aquatic organisms by increasing turbidity and sedimentation, altering stream channels or substrate composition, altering or removing cover, increasing erosion, or degrading habitat.").

[284] *See* Corps AR 000210 ("6.3.2 Wetlands [40 CFR 230.41]") ("The evaluation of impacts in the FEIS is adequate for the Corps' purposes.").

[285] To the extent that SILA Plaintiffs assert that the Corps violated any other provision of 40 C.F.R. § 230.11, the Corps separately addressed each provision.  *See* Corps AR 000197–215 (addressing § 230.11(a)–(g) and finding compliance with restrictions on discharge under § 230.12)).  SILA Plaintiffs offer no rebuttal to the other provisions.  *See* Docket 95 at 34 n.143 (citing § 230.11(a)–(h)).

SILA Plaintiffs cite to other regulatory provisions but they do not contain a functional analysis requirement. *See* Docket 95 at 34, n.143 (SILA Opening Br.) (citing 33 C.F.R. § 320.4(a)(1) (addressing general polices for evaluating permit applications); 33 C.F.R. § 336.1(c)(5) (noting endangered species may be a relevant factor in evaluating permits); 33 C.F.R. § 336.1(c)(8) (fish and wildlife as a potentially relevant factor); and 40 C.F.R. § 230.20–.23 (falling under Subpart C, which the Corps evaluated, *see* Corps AR 000197–199)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 70 of 110

Willow would not cause significant degradation from direct effects was not arbitrary or capricious.[286]

### b. Secondary Effects

SILA Plaintiffs generally assert that the "Corps also lacked critical information regarding Willow's secondary effects [to wetlands], and failed to consider the scant information it had."[287] SILA Plaintiffs specifically assert that the Corps "failed to adequately analyze site-specific impacts from fugitive dust and water impoundment" from culverts and gravel infrastructure (*e.g.*, gravel roads).[288]

As to fugitive dust, SILA Plaintiffs assert that the Corps arbitrarily assumed that the dust shadow would only occur within 100 meters (328 feet) of gravel fill, which is purportedly "inconsistent with [the Corps'] determination that impacts within 500 feet of fill in anadromous waterways were significant enough to warrant compensatory mitigation."[289]

---

[286] *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 200–01 (4th Cir. 2009) ("The Corps is entitled to use its best professional judgment for assessing the structure and function of the affected aquatic ecosystem, and its [analysis] address[es] the required considerations under the Guidelines, 40 C.F.R. § 230.11(e) (2008). Thus, these findings were not inconsistent with the Corps' regulations and cannot be characterized as arbitrary, capricious, or otherwise not in accordance with the law." (footnote omitted)).

[287] Docket 95 at 35 (SILA Opening Br.). "Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." 40 C.F.R. § 230.11(h)(1).

[288] Docket 95 at 35 (SILA Opening Br.).

[289] Docket 95 at 36 (SILA Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 71 of 110

SILA Plaintiffs conflate two distinct analytical standards that are not inconsistent with each other. The 500-foot fish-bearing waterway buffer is used by the Corps to identify instances where compensatory mitigation may be required.[290] The 328-foot radius is used to evaluate indirect impacts to wetlands and vegetation, including fugitive dust from gravel components (*e.g.*, roads and pads). The 328-foot radius is derived from studies of dust distribution from existing gravel roads on the North Slope.[291] In their reply, SILA Plaintiffs appear to assert the studies do not support the Corps' decision to assess indirect impacts within that radius.[292] But "[b]ecause analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible

---

[290] *See, e.g.*, Corps AR 000186–187; *see also* U.S. Army Corps of Eng'rs*, Alaska District Compensatory Mitigation Thought Process*, at 5 (Sept. 18, 2018), available at https://www.poa.usace.army.mil/Portals/34/docs/regulatory/2018MitigationThoughtProcess.pdf ("The District has previously produced internal guidance identifying six instances where compensatory mitigation may be required . . . Fill placed in fish bearing waters and jurisdictional wetlands within 500 feet of such waters when impacts are determined to be more than minimal.").

[291] *See* BLM AR 182503–504 (3.9.2.3.3 Indirect Change in Wetland Composition) ("The area of deposition by airborne dust is called the dust shadow. Within the shadow, deposited dust overlays and potentially smothers vegetation before eventually being incorporated into the native soil and altering the soil composition. Road dust has the greatest effect within 35 feet of a road, but deposition may occur over a broader area. Roughly 95% of dust settles within 328 feet (100 m) from a road surface (Myers-Smith, Arnesenm et al. 2006; Walker and Everett 1987)."); *see also* BLM AR 231604–611 (Myers-Smith, Arnesenm et al. 2006); BLM AR 256387–391 (Walker and Everett 1987).

[292] Docket 107 at 31–32 (SILA Reply). SILA Plaintiffs take issue with one of the two studies cited in the EIS, Myers-Smith, Arnesenm et al. 2006. SILA Plaintiffs also offer another study, which was not directly cited to support the radius determination, Auerbach (1997). *See* BLM AR 192108–126.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 72 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 72 of 110

federal agencies."[293]  While there may be impacts from dust shadow outside of the 328-foot radius, SILA Plaintiffs have not demonstrated that the Corps committed a clear error of judgment here.[294]

As to water impoundment from culverts and gravel infrastructure, SILA Plaintiffs maintain that, "[c]ritically, the Corps did not address the fact that [] there was a 64% chance Willow's culverts would not function properly during their lifetime or explain how that failure rate factored into its findings" or respond to other public comments related to water impoundment.  SILA Plaintiffs cite to a design with risk for failure up to a 50-year flood.[295]  BLM's ROD, which was issued before

---

[293] *Earth Island Inst. v. U.S. Forest Serv*., 351 F.3d 1291, 1301 (9th Cir. 2003) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive.").

[294] *See* BLM AR 273698 (Alpine GMT-2 EIS) ("An area of indirect impact that extends 328 feet to either side of gravel infrastructure is considered a reasonable estimate for an impact zone (Auerbach et al. 1997).  It doubled the 164 feet used previously to estimate indirect gravel impacts in the NPR-A by BLM (2012) and for the Point Thomson EIS by the U.S. Army Corps of Engineers (2012a).  For this analysis, as for the GMT1 analysis before it (BLM 2014), the area of indirect impact was determined by applying a 328-foot-wide buffer to the perimeter of gravel filled areas and calculating the area of each vegetation and wetland type within the impact zone using GIS."); BLM AR 277003 (Nanushuk EIS) (This accounts for the area of potential direct and indirect effects due to permafrost melt, snow drift, fugitive dust, and changes in surface drainage (ponding water). The 328-foot boundary is based on peer-reviewed studies of dust distribution on Dalton Highway. These studies indicate that dust distribution decreases with distance from the road, with the majority of dust fall (about 95% of the total load) occurring within approximately 328 feet (100 m) of the road (Auerbach et al. 1997; Myers-Smith et al. 2006; Walker and Everett 1987). . . . Measurable effects have been observed beyond 328 feet: Everett (1980) documented effects to snow melt up to 984 feet (300 m) from the road, and Myers-Smith et al. (2006) documented changes in thaw depth up to 1,000 feet. However, since a majority of dust fallout occurs within 328 feet (100 m), and it has been documented that the level of impact decreases with distance from the road, 328 feet (100 m) was selected as the area of impact evaluation for this Project.").

[295] Docket 95 at 36 (SILA Opening Br.) (citing BLM AR 185535 ("A culvert based on a 50-year flood design that is likely to be in place for 50 years before removal or replacement would have

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 73 of 110

the Corps' ROD, requires that stream culverts be designed to, "[a]t a minimum . . . perform satisfactorily for all flood events up to *and including* the 50-year event," which requirement is incorporated into the Corps' ROD and Permit Evaluation.[296] The Corps' ROD and Permit Evaluation also incorporate relevant portions of the EIS in considering the secondary impacts to wetlands.[297] SILA Plaintiffs' other argument regarding culvert design is unavailing.[298]

---

a 36% chance that the design flood would not be exceeded one or more times during the life of the structure (*i.e.*, 64% chance that design flood would be exceeded.")).

[296] BLM AR 186081 (emphasis added) (2.4.1 Measure 6: Culvert, Bridge, and Pipeline Stream Crossings); BLM AR 182400 ("Culvert size, design, and layout would be determined based on site-specific conditions to pass the 50-year flood event with a headwater elevation not exceeding the top of the culvert.").

[297] Corps AR 000206 (ROD) (6.2.2 Fish, Crustaceans, Mollusks, and Other Aquatic Organisms in the Food) ("References: Fisheries resources are discussed in FEIS Section 3.10; essential fish habitat (EFH) is discussed in FEIS Section 3.10.1.3.") ("Construction activities within or adjacent to streams and adjacent wetlands could affect aquatic organisms by increasing turbidity and sedimentation, altering stream channels or substrate composition, altering or removing cover, increasing erosion, or degrading habitat. Proposed jurisdictional activities would include . . . including installation of culverts and bridges[.] Impacts on fish and other aquatic organisms could include displacement; changes in feeding or breeding behaviors; interference with passage; and stress, injury, or mortality. Turbidity and sedimentation, alteration or removal of in-stream and streambank cover, streambank erosion, and introduction of water pollutants resulting from proposed project activities could increase stress, injury, and mortality of aquatic organisms in the proposed project area."); Corps AR 000218–219 (7.2.4 Floodplain Management, Flood Hazards and Floodplain Values) ("Reference: FEIS Section 3.8") ("The proposed project would result in potential for impounding waters upstream of ice roads and culverts during breakup events, changes from an undisturbed to a moderately industrial landscape, and impacts to fish and wildlife resources through changes to habitat and flow patterns."); Corps AR 000219–220 (ROD) (7.2.5 Shoreline Erosion and Accretion) ("Reference: FEIS Sections 3.8 and 3.19.4") ("Disturbance of waterways for gravel road crossings would cause erosion and accretion, particularly during construction, at culverts and bridges. Erosion may also occur in wetlands due to permafrost melting or thermokarst erosion from disturbance of tundra or accumulation of dust from the gravel fills."); *see also* Corps AR 000715 (noting that secondary impacts on wetlands and vegetation are discussed in sections 3.8.2.3.3 and 3.9.2.3.3 of the Draft EIS and Supplemental Draft EIS).

[298] Docket 107 at 31 (SILA Reply) ("Secondary impacts from culverts were also inadequately analyzed because the Corps did not have site-specific culvert designs available for review at the

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 74 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 74 of 110

In sum, the Court finds that the Corps' analysis of secondary impacts to wetlands, in particular regarding fugitive dust and culverts, was not arbitrary or capricious and was otherwise in accordance with the law.[299]

## 2. Mitigation

SILA Plaintiffs assert that the Corps' determination of "no significant degradation" is arbitrary because it is based, in part, on erroneous findings that appropriate mitigation measures would be implemented for the Project.[300] SILA Plaintiffs advance two main arguments to support their assertions, which are addressed in turn.

### a. Appropriate and Practicable Mitigation Measures

SILA Plaintiffs contend that the Corps' minimization measures requiring ConocoPhillips "to maintain natural drainage patterns and preserve floodplain connectivity" are impermissibly vague and "overlook[] the significant inefficiency

---

time the project was authorized."). But typical culvert designs were provided to the Corps with its permit application. *See* Corps AR 004379–381 (Mar. 2020 404 Application). And the fact that the Corps imposed monitoring requirements on culverts was reasonable to give flexibility in final culvert design, especially in light of the unique North Slope conditions. *See* Corps AR 000195–196 (Special Permit Condition No. 26) (imposing culvert monitoring reports over three summers).

[299] *See* Corps AR 000202–203 (ROD) (6.1.7 Determination of Secondary Effects on the Aquatic Ecosystem); Corps AR 000208–209 (ROD) (6.3.2 Wetlands) ("References: Permafrost impacts are discussed in FEIS Section 3.4. Wetland resources are discussed in Section 3.19.10.1, 3.9 and Appendix E9 of the FEIS.") ("The FEIS analyzed three categories of impacts to wetland resources: temporary, permanent and secondary. The evaluation of impacts in the FEIS is adequate for the Corps' purposes.").

[300] Docket 95 at 37 (SILA Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 75 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 75 of 110

rate predicted for Willow's culverts and the associated impacts to aquatic resources."[301]   SILA Plaintiffs also contend that the Corps' and EIS's dust control plan is impermissibly vague and does not constitute an analysis of whether "appropriate and practicable steps have been taken which will minimize' Willow's secondary effects."[302]

With respect to drainage mitigation, SILA Plaintiffs principally rely on the alleged high risk for culvert failure, which the Court already rejected.[303] Additionally, both BLM's ROD and the Corp's ROD require ConocoPhillips to maintain natural surface drainage.[304]   In the Court's view, this is not a vague

---

[301] Docket 95 at 37 (SILA Opening Br.).

[302] Docket 95 at 38 (SILA Opening Br.) (quoting 40 C.F.R. § 230.10(d) ("[N]o discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem.")); see BLM AR 186080 (ROD) (adopting EIS's dust control plan); Corps AR 000196 (Special Condition No. 27) ("Compliance with this condition shall be determined by visible dust and gravel presence on tundra wetland areas adjacent to the authorized fill areas.").

[303] See supra pp. 73–74.

[304] See BLM AR 182400; BLM AR 186081–083 (ROD); Corps AR 000190 (Special Condition No. 11) ("Along all access roads and pad, the natural drainage patterns shall be maintained using appropriate ditching, trench plugs, culverts, drainage systems, and other measures to ensure hydrology is not altered. If there is evidence of altered hydrology (such as excessive ponding, drying, channelization, etc.) the permittee shall be required to restore hydrology to preconstruction conditions."); Corps AR 000195 (Special Condition No. 25) ("If placement of the road fill material is not completed within any winter season, sufficient openings shall be provided in the roadbed to maintain natural drainage flows and overland cross-drainage. Road opening widths shall be of sufficient size to prevent scour of the adjacent tundra wetlands."); Corps AR 000195 (Special Condition No. 26) (requiring culvert monitoring report for 3 summer seasons following fill placement).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 76 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 76 of 110

measure and SILA Plaintiffs do not offer examples of more specific, appropriate, or practicable steps to maintain surface drainage.

SILA Plaintiffs' assertions with respect to dust control are also unfounded. BLM's EIS contains an entire Dust Control Appendix.[305] The Corps also included a special condition to control dust, determined by visible dust and gravel presence on tundra wetland areas adjacent to the authorized fill areas.[306] Once again, these mitigation measures are not vague and SILA Plaintiffs do not offer examples of more specific, appropriate, or practicable steps to maintain dust control.

In conclusion, SILA Plaintiffs have not established that the Corps arbitrarily or capriciously failed to consider appropriate and practicable steps to minimize secondary effects.

### b. Compensatory Mitigation

SILA Plaintiffs assert the Corps lacked sufficient information to assess impacts to the aquatic ecosystem, and therefore it could not make a nonarbitrary determination of compensatory mitigation.[307] And SILA Plaintiffs maintain that ConocoPhillips was only required to mitigate a fraction of the Project's total impacts

---

[305] BLM AR 185900–905; BLM AR 186080 (ROD).

[306] Corps AR 000196 (Special Permit Condition No. 27).

[307] Docket 95 at 37–38 (SILA Opening Br.) (citing Argument Section II.A). Again, it appears that SILA Plaintiffs' assertions here rely on the argument that the Corps lacked sufficient information to reach its no significant degradation determination, which the Court has rejected. *See supra* pp. 68–69.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 77 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 77 of 110

to wetlands, specifically only for impacts within 500 feet of anadromous waterways, and within the Teshekpuk Lake and Coville River Special Areas, when they read the regulations to require the entire Project to be offset.[308]  SILA Plaintiffs further contend that ConocoPhillips' compensatory mitigation project itself, in particular the preservation of land in the vicinity of Fish Creek and Cape Halkett, is impermissibly vague.[309]

### i. Compensatory Mitigation Requirement

As an initial matter, the parties dispute the extent to which the Corps' regulations require compensatory mitigation.  SILA Plaintiffs assert that "the amount of required compensatory mitigation must be, to the extent practicable, sufficient to replace lost aquatic resource functions."[310]  Defendants respond that mitigation is only required for "significant resource losses," which lies within the Corps' discretion.[311]

The regulations accord considerable discretion to the Corps in determining compensatory mitigation.  For example, they provide that "[t]he district engineer must determine the compensatory mitigation to be required in a DA permit, based

---

[308] Docket 95 at 39 (SILA Opening Br.).

[309] Docket 95 at 40 (SILA Opening Br.).

[310] Docket 95 at 38 (SILA Opening Br.) (quoting 40 C.F.R. § 230.93(f)(1)).

[311] Docket 103 at 12 (Fed. Defs.); Docket 104 at 81 (ConocoPhillips); Docket 103 at 70–71 (North Slope Borough).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 78 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 78 of 110

on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity."[312]  Additionally, the regulations provide that "[i]f the district engineer determines that compensatory mitigation is necessary to offset unavoidable impacts to aquatic resources, the amount of required compensatory mitigation must be, to the extent practicable, sufficient to replace lost aquatic resource functions."[313]

Likewise, the Corps' "purpose and general considerations" regulations on compensatory mitigation use discretionary terms.[314]  Moreover, the Corps' general policy guidance states: "All compensatory mitigation will be for significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment."[315]  SILA Plaintiffs are correct that this "significant resource losses" language only appears in a "general statement of mitigation policy."[316]  However, according the Corps and the EPA, this

---

[312] 40 C.F.R. § 230.93(a)(1); 33 C.F.R. § 332.3(a)(1).

[313] 40 C.F.R. § 230.93(f)(1); 33 C.F.R. § 332.3(f)(1).   "The term practicable means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.3(l).

[314] 33 C.F.R. § 332.1(c)(2) ("Compensatory mitigation for unavoidable impacts *may be* required to ensure that an activity requiring a section 404 permit complies with the Section 404(b)(1) Guidelines." (emphasis added)); 33 C.F.R. § 332.1(c)(3) ("Compensatory mitigation for unavoidable impacts *may be* required to ensure that an activity requiring a section 404 permit complies with the Section 404(b)(1) Guidelines.  During the 404(b)(1) Guidelines compliance analysis, the district engineer *may determine* that a DA permit for the proposed activity cannot be issued because of the lack of appropriate and practicable compensatory mitigation options." (emphases added)).

[315] 33 C.F.R. § 320.4(r)(2).

[316] 33 C.F.R. § 320.4(r), n.1 ("This is a general statement of mitigation policy which applies to all

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 79 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 79 of 110

policy constitutes "the threshold for determining when compensatory mitigation is required for DA permits."[317]

That the Corps has discretion in determining the extent of compensatory mitigation is also supported by other guidance issued by the EPA and the Corps. The Corps' Alaska District Compensatory Mitigation Thought Process couches the requirement of compensatory mitigation in discretionary language.[318] The Corps' Regulation Guidance Letter No. 02-2 does so as well.[319] In particular, the Guidance Letter specifically refutes SILA Plaintiffs' assertion that the entire Willow Project must be mitigated.[320] It also appears that the Corps and the EPA, in issuing

---

Corps of Engineers regulatory authorities covered by these regulations (33 CFR parts 320-330). It is not a substitute for the mitigation requirements necessary to ensure that a permit action under section 404 of the Clean Water Act complies with the section 404(b)(1) Guidelines.").

This language is consistent with the Corps' broader Section 404 obligation, which requires the Corps to deny a permit application that "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).

[317] 73 Fed. Reg. 19,594, 19,602 (Apr. 10, 2008). The Corps' interpretation of its regulation to only require compensatory mitigation for significant resource losses may be entitled to at least some deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019).

[318] U.S. Army Corps of Eng'rs, *Alaska District Compensatory Mitigation Thought Process* [hereinafter, Alaska Thought Process], at 3, 5 (Sept. 18, 2018), available at https://www.poa.usace.army.mil/Portals/34/docs/regulatory/2018MitigationThoughtProcess.pdf ("Unavoidable adverse impacts to waters of the United States that result from activities authorized under Section 404 of the Clean Water Act . . . may require compensatory mitigation.") ("The District has previously produced internal guidance identifying six instances where compensatory mitigation may be required.").

[319] *See generally* U.S. Army Corps of Eng'rs, Regulatory Guidance Letter No. 02-02 (Dec. 24, 2002).

[320] *Id.* at 2 ("There may be instances where permit decisions do not meet the 'no overall net loss of wetlands' goal because compensatory mitigation would be impracticable, or would only achieve inconsequential reductions in impacts. Consequently, the 'no overall net loss of wetlands goal' may not be achieved for each and every permit action, although all Districts will

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 80 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 80 of 110

the 2008 Compensatory Mitigation Rule, intended district engineers to have considerable discretion over compensatory mitigation.[321] Finally, a 2018 Memorandum of Agreement between the EPA and the Corps, which specifically addressed compensatory mitigation in Alaska, supports this conclusion as well.[322]

Based on the foregoing, the Court concludes that the compensatory mitigation regulations provide the Corps with considerable discretion in determining the extent to which compensatory mitigation is practicable and capable of compensating for lost aquatic function.[323]

SILA Plaintiffs next assert that "[t]he Corps needed to explain why it limited its assessment and mitigation to three narrow areas (within 500 feet of anadromous waters and within the Teshekpuk Lake and Colville River Special

---

strive to achieve this goal on a cumulative basis, and the Corps will achieve the goal programmatically.").

[321] *See, e.g.*, 73 Fed. Reg. 19,594, 19,609 (Apr. 10, 2008) ("This rule does not change the circumstances under which compensatory mitigation is required. As in the past, the district engineer will require compensatory mitigation to the extent appropriate and practicable. This rule appropriately balances the need for consistency with the need for flexibility, including its requirements for permittee-responsible mitigation. District engineers will continue to determine on a case-by-case basis what is required to satisfy the requirements of the 404(b)(1) Guidelines and other aspects of the Corps Regulatory Program.").

[322] *See generally* U.S. Army Corps of Eng'rs and EPA, *Memorandum of Agreement, Mitigation Sequence for Wetlands in Alaska under Section 404 of the Clean Water Act* (June 15, 2018) ("In Alaska, minimization of impacts has been in many circumstances the only mitigation required.") ("Compensatory mitigation is required only to the extent that it is appropriate and practicable.") ("The Corps determines the compensatory mitigation requirements for Section 404 permits, based on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity.").

[323] *See* 40 C.F.R. § 230.93(a)(1).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 81 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 81 of 110

Areas)."[324]    However, the Corps did explain its process: "In order to create a predictable and clear determination as to which losses would be considered significant and require compensatory mitigation, the Corps considered the magnitude of anthropogenic impacts" through a modified watershed impervious cover model ("ICM").[325]    The Corps determined that compensatory mitigation would be required for "all proposed permanent impacts to waters of the U.S., including wetlands, which would occur within HUC 10 watersheds that would cumulatively have 4.4% or greater anthropogenic disturbance[.]"[326]    The Corps then applied the model to "10 individual HUC 10 watersheds" and concluded that, because "none of the watersheds approach the 4.4 percent level of impervious cover to be considered impacted, compensatory wetland mitigation was not required on that evaluation alone."[327]

---

[324] Docket 107 at 33 (SILA Reply).

[325] *See* Corps AR 000183–186 ("The Corps' determination of appropriate and practicable compensatory mitigation requirements for unavoidable losses of aquatic resources was based on a watershed-level analysis consistent with federal regulations and the 2018 Joint USACE-EPA Memorandum of Agreement.").

It appears that the impervious cover model was based on Alaska-specific guidance. *See* Alaska Thought Process, at 5 ("Situations that can indicate degradation of the watershed's aquatic environment can include, but are not limited to . . . impervious surface cover[.]").

[326] Corps AR 000185.

[327] Corps AR 000186 ("Only one of the impacted watersheds will have a cumulative post-project disturbance percentage over 1 percent (Ugnuravik River, 1.99 percent). The remaining nine watersheds are well below 1 percent, and the total watershed disturbance, factoring in disturbance from the Willow project, is 0.27 percent.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 82 of 110

Case 3:20-cv-00290-SLG    Document 125    Filed 08/18/21    Page 82 of 110

While the applicable regulations require the Corps to use a watershed approach, the regulation does not specify any particular approach.[328]  SILA Plaintiffs do not assert there was a more appropriate or practicable watershed approach or assert that the results of the approach used are inaccurate.[329]  Accordingly, the Corps' watershed approach to determining compensatory mitigation was not arbitrary or capricious or otherwise in violation of the law.

After concluding compensatory mitigation would not be required on the basis of the ICM, the Corps evaluated "[f]actors beyond watershed impacts . . . for significant impacts to the aquatic ecosystem."[330]  The Corps found that there would be "[s]ignificant unavoidable impacts requiring compensatory mitigation . . . for anadromous fish-bearing WOUS and jurisdictional wetlands within 500 feet of those waters, impacts occurring within the Colville River Special Area (CRSA), and impacts within the Teshekpuk Lake Special Area (TLSA)[.]"[331]  The Corps then

---

[328] 33 C.F.R. 332.3(c)(1), 40 C.F.R. § 230.93(c)(1) ("The district engineer must use a watershed approach to establish compensatory mitigation requirements in DA permits to the extent appropriate and practicable.").

[329] *Cf.* Docket 107 at 34 (SILA Reply) ("Contrary to Defendants' claims, the goal of the Corps' watershed approach is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of compensatory mitigation sites. Neither this regulation nor the guidance documents cited by Defendants limit the Corps' consideration of mitigation to impacts that are only significant on a watershed scale or allow the Corps to define significance in a way that would negate a project's impacts from ever meeting that threshold. The Corps' failure to require mitigation to replace lost aquatic resource functions violated the CWA." (internal quotation marks omitted)).

[330] Corps AR 000186.

[331] Corps AR 000186.  It appears that the 500-foot anadromous buffer was based on Alaska-specific guidance.  *See* Alaska Thought Process, at 5 ("Fill placed in fish bearing waters and

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 83 of 110

applied the "Alaska North Slope Region Rapid Wetland Assessment" to determine that the Project would result in 16, 108.9, and 9 debits for each impact area, respectively.[332]   SILA Plaintiffs do not directly challenge this methodology; the Court will defer to the Corps here.[333]

In conclusion, the CWA regulations provide the Corps considerable discretion in determining the extent to which compensatory mitigation is practicable and capable of compensating for lost aquatic function.[334]   SILA Plaintiffs do not demonstrate that the Corps' compensatory mitigation determination was arbitrary or capricious.

### ii.  Mitigation Plan

SILA Plaintiffs argue that ConocoPhillips' compensatory mitigation plan ("Mitigation Plan") for the preservation of land in the vicinity of Fish Creek and Cape Halkett is impermissibly vague.[335]

---

jurisdictional wetlands within 500 feet of such waters when impacts are determined to be more than minimal.").

[332] Corps AR 000186–187 ("Using the 'Alaska North Slope Region Rapid Wetland Assessment,' the applicant determined and the Corps concurred that the proposed project would result in" a total of 133.9 debits.); Corps AR 000336 ("CPAI has applied the USACE North Slope Rapid Assessment Method (Berkowitz et al. 2017), and the Alaska District Credit Debit Methodology (USACE 2016) to determine that this acreage results in 122.4 debits for direct impacts.").

[333] 73 Fed. Reg. 19,594, 19,634 (Apr. 10, 2008) ("District engineers will determine on a case-by-case basis whether a particular functional or condition assessment method is appropriate and practicable for calculating compensatory mitigation amounts for DA permits."); Alaska Thought Process, at 10 ("In addition, Appendix 4 contains a list of functional assessment methodology currently in use within the Alaska District.); *id.*, at 56 ("North Slope Rapid Assessment Method").

[334] *See* 40 CFR § 230.93(a)(1).

[335] Docket 95 at 40–41 (SILA Opening Br.).  *See generally* Corps AR 000326–612 (Mitigation

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 84 of 110

First, SILA Plaintiffs assert that the Mitigation Plan "only points to two large expanses in the vicinity of Fish Creek and Cape Halkett; it does not identify the actual 800-acre area to be preserved or the functions at either site."[336]  Given that Special Condition No. 21 requires the Mitigation Plan to be implemented prior to commencing any fill activities at Willow, it is not arbitrary or capricious for the precise locations to be determined at a later date.[337]  Further, it appears that ConocoPhillips did conduct functional assessments of the areas using the North Slope Rapid Assessment Method and the Alaska District Credit Debit Methodology.[338]

_____

Plan).

[336] Docket 95 at 40 (SILA Opening Br.); *see* Corps AR 000355 (Fish Creek); Corps AR 000356 (Cape Halkett); *see also* Corps AR 000417–418 (general vicinity maps).

[337] Corps AR 000194 (ROD) ("Prior to initiation of work authorized by this permit, the permittee shall implement the Compensatory Mitigation Plan (CMP), dated October 24, 2020, which is incorporated herein by reference. If conflicts occur between the mitigation plan and any permit conditions, the permit conditions shall prevail.  The site protection instrument must be approved by the Corps prior to recording, and recorded at the local recording district, prior to commencing the discharges of fill material authorized under this DA permit. A copy of the recorded site protection instrument shall be provided to the Corps within 30-days of recordation.").

[338] Corps AR 000359; *see also* Corps AR 000487–491.

The Corps adopted ConocoPhillips functional assessment and Mitigation Plan.  *See, e.g.*, Corps AR 000187 ("Using the 'Alaska North Slope Region Rapid Wetland Assessment,' the applicant determined and the Corps concurred that the proposed project would result in 16 debits."); Corps AR 000188 ("The applicant's mitigation plan would provide appropriate and sufficient compensatory mitigation required to offset unavoidable losses to aquatic resources authorized by the DA permit.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 85 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 85 of 110

Second, SILA Plaintiffs take issue with assumptions underlying the Mitigation Plan, including the hypothetical 100-acre development footprint, asserting that "the record does not explain how the Corps verified ConocoPhillips' projected footprints[.]"[339]  But SILA Plaintiffs do not point to any requirement that the Corps verify the footprints.   And ConocoPhillips explained that the "development scenario was based on past experience developing oil and gas resources on the North Slope."[340]  Without an existing, specific development plan, it is not arbitrary or capricious for the Mitigation Plan to estimate development footprints in that manner.

Third, citing 33 C.F.R. § 332.3(h)(1)(iv), SILA Plaintiffs assert that "'preservation' must eliminate a demonstrated threat."[341]  But this regulation does not require a "demonstrated threat."[342]  The Mitigation Plan adequately explained

---

[339] Docket 95 at 40 (SILA Opening Br.).

[340] Corps AR 000359 ("In accordance with the methodology, a reasonable development must be considered that would occur in the absence of preservation. To meet this part of the process CPAI proposed a development scenario based on past experience developing oil and gas resources on the North Slope.").

[341] Docket 95 at 40 (SILA Opening Br.).

[342] *See* 33 C.F.R. § 332.3(h)(1)(iv) (requiring that "[t]he resources are under threat of destruction or adverse modifications").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 86 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 86 of 110

the potential for development at both Fish Creek[343] and Cape Halkett.[344]  The

Corps found both explanations satisfied the criteria of 33 C.F.R. § 332(h).[345]  The

Corps' determination is entitled to deference.

Fourth, SILA Plaintiffs assert that the "mitigation plan makes vague

statements regarding what activities would be permitted to occur at the sites, and

what legal instrument would be used to ensure protection of whichever site is

chosen."[346]  But Special Condition No. 21 requires that "[t]he site protection

instrument must be approved by the Corps . . . prior to commencing the discharges

of fill material authorized under this DA permit."[347]  SILA Plaintiffs reply that the

fact that the "Corps would later approve the preservation site miss[es] the point:

the Corps needed that information to determine whether preservation would offset

---

[343] Corps AR 000355 ("The Fish Creek area is located within the designated CRU, a producing oil and gas unit. The subsurface estate of the lands is held by ASRC, and CPAI holds oil and gas leases from ASRC for the lands. Thus, the land rights for oil and gas development are already held by an active oil and gas operator, although development remains subject to a funded development proposal and government permitting approvals. Preservation in the Fish Creek area will preserve lands that are privately held and available for development, including development under existing oil and gas leases. The Fish Creek area was previously approved for preservation credit for the Nuiqsut Spur Road project.").

[344] Corps AR 000356 ("Cape Halkett, as a private parcel, is not subject to BLM's restrictions on development and offers a location where subsurface lease holders could locate necessary surface infrastructure to access adjacent subsurface resources through directional drilling.").

[345] Corps AR 000355 ("For the foregoing reasons, preservation in the Fish Creek area satisfies the criteria of 33 CFR §332(h) for the Willow Project."); Corps AR 000356 ("For the foregoing reasons, preservation in the Cape Halkett area satisfies the criteria of 33 CFR §332(h) for the Willow Project.").

[346] Docket 95 at 41 (SILA Opening Br.)

[347] Corps AR 000194 (ROD).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 87 of 110

losses from Willow."[348]  However, the Mitigation Plan specifies that the "instrument will restrict surface disturbance but allow local recreational and subsistence activities."[349]

In conclusion, SILA Plaintiffs have failed to demonstrate that the Mitigation Plan is arbitrary or capricious or otherwise not in accordance with the law.

## III.  Endangered Species Act

### A. Legal Standard

#### 1.  ESA

"The ESA was enacted to prevent the extinction of fish, wildlife, and plant species."[350]  To accomplish this goal, as relevant here, the ESA has two distinct requirements: Section 9 and Section 7.

Section 9 prohibits the "taking" of an endangered species.[351]  A "take" under the ESA occurs when an endangered animal is harassed, harmed, pursued, hunted, shot, wounded, killed, trapped, captured, or collected, or when anyone attempts to engage in such conduct.[352]

---

[348] Docket 107 at 36 (SILA Reply).

[349] Corps AR 000342.

[350] *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004) (citing *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 973 (9th Cir. 2003)).

[351] 16 U.S.C. § 1538(a)(1)(B), (C).

[352] 16 U.S.C. § 1532(19); 50 C.F.R. § 17.3 (defining "harass" as action that "creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 88 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 88 of 110

"Section 7 of the ESA describes the process for agency consultation. Unlike Section 9, it does not contain an outright prohibition on take; it requires only that an agency consult with FWS or [National Marine Fisheries Service] before it takes any action that may affect a species listed as [] endangered under the ESA."[353] The formal consultation results in FWS issuing a written Biological Opinion ("BiOp"), which assesses the likelihood of the proposed action resulting in jeopardy to an endangered species or destruction or adverse modification to the species' designated critical habitat.[354] "To determine whether the action will ultimately jeopardize a listed species or adversely modify its habitat, the agency may rely on mitigation measures proposed by the project planners."[355] If FWS determines that the proposed action will neither jeopardize the species ("no jeopardy determination") nor adversely modify its habitat ("no adverse modification determination"), it then authorizes the taking of a species incidental to the proposed project.[356]

When the agency authorizes the incidental taking of a species, it must also issue an incidental take statement ("ITS") with the BiOp.[357] "The incidental take

---

[353] *Liberty*, 982 F.3d at 741 (citing 16 U.S.C. § 1536(a)(2), (4)).

[354] *See* 16 U.S.C. § 1536(b)(3)(A).

[355] *Liberty*, 982 F.3d at 741 (citing *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 955 (9th Cir. 2003)).

[356] *See* 16 U.S.C § 1536(b)(4).

[357] 16 U.S.C. § 1536; 50 C.F.R. § 402.14(i); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 89 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 89 of 110

statement estimates the amount of the project's incidental take of the listed species, includes any 'reasonable and prudent measures' considered 'necessary or appropriate to minimize such impact,' and—in the case of marine mammals like the polar bear—describes specific measures necessary to comply with the" MMPA.[358] "The purpose of the incidental take statement is, at least in part, to specify the amount of take that may occur, and include triggers that indicate non-compliance with the statement and require re-consultation [under Section 7 of the ESA] with FWS."[359] "A taking that complies with the terms and conditions of a Section 7 incidental take statement is not prohibited by Section 9."[360]

## 2. Coordination between the MMPA and ESA

The MMPA prohibits the take or harassment of certain marine mammals, but its scope is narrower and its procedures distinct from those of Sections 7 and 9 of the ESA.[361] "Both the ESA and the MMPA apply when, as here, an agency

---

893, 909 (9th Cir. 2012).

[358] *Liberty*, 982 F.3d at 742 (citing 50 C.F.R. § 402.14(i)(1)); *see* 16 U.S.C. § 1361 *et seq.* (MMPA).

[359] *Id.* at 748 (citing 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i)).

[360] *Id.* at 742 (citing *Salazar*, 695 F.3d at 909; 16 U.S.C. § 1536(o)(2); and 50 C.F.R. § 402.14(i)(5)).

[361] *Id.* The MMPA's definition of take is "more protective" than take under the ESA. *See id.* at 745 (citing Endangered and Threatened Wildlife and Plants; Special Rule for the Polar Bear Under Section 4(d) of the Endangered Species Act, 78 Fed. Reg. 11,766, 11,770 (Feb. 20, 2013)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 90 of 110

seeks approval for the incidental take of threatened and endangered marine mammals."[362]

Here, BLM, the action agency, initiated consultation with FWS in March 2020 regarding the polar bear pursuant to Section 7 of the ESA.[363] The formal consultation culminated in FWS issuing its BiOp for the Willow Project on October 16, 2020.[364] As relevant here, FWS concluded that the Project would not jeopardize the continued existence of polar bears and was not likely to result in the adverse modification of polar bear critical habitat.[365] The BiOp also included an incidental take statement.[366]

Both groups of Plaintiffs argue that FWS violated the ESA by (1) relying on unspecified and uncertain future MMPA mitigation measures in reaching its no-jeopardy and no-adverse-modification conclusions and (2) failing to adequately determine the polar bear take in the ITS.[367]

---

[362] *Id.* at 742. The ESA protects the polar bear species. *See* 73 Fed. Reg. 28,212 (May 15, 2008). The MMPA separately protects polar bear stocks, as relevant here the Southern Beaufort Sea ("SBS") subpopulation. *See* 81 Fed. Reg. 52,276 (Aug. 5, 2016). The SBS stock's critical habitat is located on the North Slope and its coastal waters. 75 Fed. Reg. 76,086 (Dec. 7, 2010).

[363] FWS AR 000096 (BiOp).

[364] FWS AR 000811–976 (BiOp). The BiOp was amended by memo to include USACE as a federal Action Agency party to the consultation. FWS AR 000811–812.

[365] FWS AR 000942, 000944 (BiOp).

[366] FWS AR 000944–945 (BiOp).

[367] Docket 92 at 38–45 (CBD Opening Br.); Docket 103 at 33–43 (CBD Reply); Docket 95 at 42–48 (SILA Opening Br.); Docket 107 at 37–42 (SILA Reply).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 91 of 110

## B. Discussion

Relying on the Ninth Circuit's recent decision in *Liberty*, which invalidated a BiOp that relied on future MMPA measures that were not supported by a "clear, definite commitment of resources" and measures that were "too vague to enforce" in reaching its no-jeopardy conclusion,[368] Plaintiffs assert that FWS's BiOp impermissibly relied on unspecified and uncertain future MMPA mitigation measures to reach its no-jeopardy and no-adverse-modification conclusions.[369] Federal Defendants respond that the BiOp did not rely on future MMPA mitigation measures in reaching its conclusions.[370] Defendants also assert that the Ninth Circuit's decision in *Liberty* is no longer controlling because the applicable regulations have been revised and do not preclude reliance on future MMPA measures.[371] The Court addresses Defendants' contentions in turn.

### 1. FWS's Reliance on MMPA Mitigation Measures to Reach No Jeopardy and No Adverse Habitat Modification Conclusions

---

[368] *Liberty*, 982 F.3d at 743–47 (internal quotation marks omitted).

[369] Docket 92 at 38–42 (CBD Opening Br.) ("unspecified, undetailed measures") ("future MMPA measures"); Docket 103 at 33–41 (CBD Reply); Docket 95 at 43–45 (SILA Opening Br.) ("future, uncertain mitigation measures") ("undefined measures") ("unspecified"); Docket 107 at 37–39 (SILA Reply).

[370] Docket 103 at 57 (Fed. Defs.).

[371] Docket 103 at 57 (Fed. Defs.); Docket 104 at 59–67 (ConocoPhillips); Docket 102 at 48–50 (North Slope Borough). The State of Alaska generally incorporated by reference Federal Defendants' and ConocoPhillips' arguments regarding the ESA, at least with respect to SILA Plaintiffs' arguments. Docket 101 at 30 n.11, 31 n.12; *see generally* Docket 101 at 27–32.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 92 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 92 of 110

The BiOp's no-jeopardy and no-adverse-habitat modification analysis repeatedly references future MMPA mitigations measures.[372] In the no-jeopardy conclusion, the BiOp found that the proposed Project itself, principally its distant location from polar bear habitat, would limit any impacts.[373] However, the conclusion also noted that the proposed Willow Project "contains protective measures that provide significant minimization of impacts to polar bears, most importantly BLM's commitment to ensure compliance with the MMPA."[374] Accordingly, the Court finds that FWS relied on future MMPA mitigation measures to reach its no-jeopardy conclusion.

Similarly, in the no-adverse-habitat modification conclusion, FWS stated that, "[i]n particular, we expect the requirement to obtain MMPA incidental and intentional take authorizations . . . prior to engaging in any activity that may take polar bears would contribute to the protection of critical habitat, by minimizing disturbance, which could otherwise affect access to or use of critical habitat for denning, resting, or movements."[375] Accordingly, the Court finds that FWS relied

---

[372] *See, e.g.*, FWS AR 000925 (BiOp) ("Importantly, BLM's commitment to ensure compliance with the MMPA . . . limit[] potential impacts of the project to those in compliance with the protective limitations of the MMPA, which is a more restrictive standard than the ESA."); FWS AR 000928–929 (BiOp) ("Most important is BLM's commitment to require compliance with the MMPA over the life of the project, although this is complemented with several additional minimization measures built into the Project Description.").

[373] FWS AR 000942 (BiOp).

[374] FWS AR 000942 (BiOp).

[375] FWS AR 000944 (BiOp).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment

on future MMPA mitigation measures to reach its no-adverse-habitat modification conclusion.

## 2. Has *Liberty's* holding on future mitigation measures been supplanted by new regulations?

As an initial matter, the parties do not appear to dispute that the new ESA regulations, which took effect on October 28, 2019, apply to the Willow BiOp, which was issued on October 16, 2020.[376]

The Ninth Circuit in *Liberty* addressed the legal standard for evaluating the adequacy of an agency's mitigation measures under the ESA. The Circuit Court quoted the standard established in *National Wildlife Federation v. National Marine Fisheries Service* ("*NWF v. NMFS*"), which held that "[m]itigation measures relied upon in a biological opinion must constitute a 'clear, definite commitment of resources,' and be 'under agency control or otherwise reasonably certain to occur.'"[377] The *Liberty* court also cited to *Center for Biological Diversity v. Rumsfeld*, a District of Arizona case, which explained that "[t]he measures 'must be subject to deadlines or otherwise-enforceable obligations.'"[378] The *Liberty* court concluded the legal standard section in its own words: "Binding mitigation

---

[376] *See* Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976 (Aug. 27, 2019); *see also* 84 Fed. Reg. 50,333 (Sept. 25, 2019).

[377] *Liberty*, 982 F.3d at 743 (quoting *NWF*, 524 F.3d 917, 936 & n.17 (9th Cir. 2008)).

[378] *Id.* (quoting 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)); *see also id.* at n.6 ("District courts in this circuit follow the standard articulated by *Rumsfeld*.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 94 of 110

measures cannot refer only to generalized contingencies or gesture at hopeful plans; they must describe, in detail, the action agency's plan to offset the environmental damage caused by the project."[379]

The Ninth Circuit then examined two of the mitigation measures in the Liberty BiOp, each of which referenced the applicant's requirement to comply with future authorizations issued under the MMPA. The Circuit Court held those measures were invalid, reasoning that "[t]he agency cannot refer to future, unstated authorizations under the MMPA to fulfill its obligations under Section 7" of the ESA.[380] The Ninth Circuit then addressed the other two mitigation measures, and held those, too, were inadequate because they were only "examples of possible strategies that could be taken."[381] The Circuit Court concluded its discussion by stating that "the mitigation measures proposed by FWS are too vague to enforce" and again quoted *NWF v. NMFS*.[382]

In 2019, FWS and National Marine Fisheries Service ("NMFS") (collectively, the "Services") revised the regulations that implement Section 7 of the ESA. As relevant here, the Services revised 50 C.F.R. § 402.14(g)(8) to provide:

> In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service

---

[379] *Id.*

[380] *Id.* at 745–46.

[381] *Id.* at 747.

[382] *Id.*

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 95 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 95 of 110

will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. *Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.*[383]

In making this change, the Services explained:

[J]udicial decisions have created confusion regarding what level of certainty is required to demonstrate that a measure will in fact be implemented before the Services can consider it in a biological opinion. In particular, the Ninth Circuit has held that even an expressed sincere commitment by a Federal agency or applicant to implement future improvements to benefit a species must be rejected absent "specific and binding plans" with "a clear, definite commitment of resources for future improvements." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008). To address this issue, we are proceeding with the revisions to § 402.14(g)(8) . . . .[384]

Quoting *Rumsfeld*, the Services noted that courts have also held that mitigation measures supporting a biological opinion's no-jeopardy conclusion must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise enforceable obligations[.]"[385]    Directly in

---

[383] *Id.* (emphasis added). *Compare* 50 C.F.R. § 402.14(g)(8) (2019) ("In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation.").

[384] 84 Fed. Reg. 44,976, 45,002 (Aug. 27, 2019).

[385] 84 Fed. Reg. at 45,003 (quoting *Rumsfeld*, 198 F.Supp.2d at 1152).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 96 of 110
Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 96 of 110

response to what the agencies termed the "confusion" caused by *NWF v. NMFS* and *Rumsfeld*, the Services explained that the regulatory change is intended "to make clear that . . . the Services are not required to obtain binding plans or other such documentation prior to being able to lawfully evaluate the effects of an action as proposed."[386]   In short, the Services intentionally supplanted the "heightened standard of assurances" of *NWF v. NMFS* and *Rumsfeld* with a standard that "do[es] not require any additional demonstration of binding plans."[387]

SILA Plaintiffs maintain that the regulatory "revision does not affect the Ninth Circuit's holding in [*Liberty*] and its applicability here: FWS still cannot support no-jeopardy and no-adverse-modification determinations based on future, unspecified mitigation measures. This specificity is required under the ESA and its current regulations."[388]   Similarly, CBD Plaintiffs maintain that, even with the revised regulations, "[*Liberty*] holds that any mitigation measures underlying a jeopardy or adverse modification conclusion must be specified and described in sufficient detail to support the conclusion, and a commitment to comply with an entirely

---

[386] 84 Fed. Reg. at 45,003.

[387]  84 Fed. Reg. at 45,005 ("We do not interpret the [ESA] as requiring a heightened standard of assurances, beyond a sincere commitment and inclusion of a proposed measure as part of the action under consultation, before the Services can lawfully evaluate the effects of the action."); 50 C.F.R. § 402.14(g)(8).

[388] Docket 107 at 38–39 (SILA Reply) (footnote omitted) ("The new sentence establishes only that FWS need not demand *additional* proof that mitigation measures will be implemented following consultation; it did not eliminate the requirement for mitigation to be identified with specificity."); *see also* Docket 95 at 44–45 (SILA Opening Br.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 97 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 97 of 110

different regulatory regime [i.e., the MMPA] in the future does not meet this requirement."[389] In short, Plaintiffs contend that the revised regulations only eliminate the requirement that there be binding plans and that the ESA, applicable regulations, and *Liberty* still require mitigation measures to be specific and detailed in the ITS.

The Services addressed the specificity requirement in their revision to § 402.14(g)(8). They explained that they were "striking the proposed text that referenced 'specific' plans and 'a clear, definite commitment of resources,'" but added that the mitigation measures in § 402.14(c)(1) "must also be described in sufficient detail [by the action agency in its request for consultation] that the Services can both understand the action and evaluate its adverse and beneficial effects."[390] Notably, the Services did not revise the regulation regarding incidental take statements, which—consistent with the ESA itself—requires that an ITS "specifies those reasonable and prudent measures . . . necessary or appropriate to minimize such impact" and, "[i]n the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking."[391]

---

[389] Docket 103 at 34 (CBD Reply).

[390] 84 Fed. Reg. at 44,979.

[391] 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i)(1)(ii), (iii); *see* § 402.14(i)(1)(iv) (Incidental

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 98 of 110
Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 98 of 110

Thus, while the Services' new regulation appears to repudiate *Liberty* and other Ninth Circuit cases that required a "demonstration of binding plans"[392] for mitigation measures, the new regulations do not eliminate the requirement in the ESA and the regulations that the ITS "[s]pecifies [] measures that are necessary to comply with [the MMPA],"[393] "specifies those reasonable and prudent measures that the [FWS] considers necessary or appropriate to minimize [the] impact"[394] on endangered species, and "sets forth the terms and conditions"[395] that must be complied with to implement the measures specified.

The ITS for Willow does not specify any mitigation measures for polar bears. Instead, it states:

> The Service cannot authorize take of polar bears under the ESA at this time because such take has not yet been authorized under the MMPA and/or its 2007 Amendments. After take has been authorized under the MMPA, take under the ESA that results from actions conducted in compliance with all requirements and stipulations set forth in the MMPA authorization will be considered by the Service to

---

take statement must set "forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the [mitigation] measures specified under paragraphs (i)(1)(ii) and (i)(1)(iii) of this section"); *see also Liberty*, 982 F.3d at 742 ("The incidental take statement estimates the amount of the project's incidental take of the listed species, includes any 'reasonable and prudent measures' considered 'necessary or appropriate to minimize such impact,' and—in the case of marine mammals like the polar bear—describes specific measures necessary to comply with the aforementioned provisions of the MMPA." (citing 50 C.F.R. § 402.14(i)(1); *Salazar*, 695 F.3d at 909; 16 U.S.C. § 1536(b)(4))).

[392] 84 Fed. Reg. at 45,002.

[393] 16 U.S.C. § 1536(b)(4)(C)(iii); 50 C.F.R. § 402.14(i)(1)(iii).

[394] 16 U.S.C. § 1536(b)(4)(C)(ii); 50 C.F.R. § 402.14(i)(1)(ii).

[395] 16 U.S.C. § 1536(b)(4)(C)(iv); 50 C.F.R. § 402.14(i)(1)(iv).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 99 of 110

also be authorized under the ESA. The MMPA authorization will also provide conditions and mitigation measures the applicant must comply with to reduce impacts to polar bears. Recognizing that the MMPA is in certain respects more protective than the ESA, and that the MMPA remains the primary regulatory mechanism for the Service's management of polar bears, the applicable conditions and mitigation measures to be developed and implemented through future MMPA take authorization processes will serve as the reasonable and prudent measures (RPMs) and implementing terms and conditions (T&Cs) for this BO. Therefore, no additional RPMs or T&Cs are provided below for polar bears.[396]

In *Liberty*, the Ninth Circuit made clear that the ITS itself must specify the mitigation measures, which is precisely what the ESA and the applicable regulation regarding incidental take statements provides. The ITS cannot reference future unspecified mitigation measures to comply with that statutory directive. The Court finds considerable merit in Plaintiffs' assertion that the Willow ITS lacks the requisite specificity of mitigation measures to meet the statutory and regulatory requirement that the ITS "specifies [] reasonable and prudent measures" and "sets forth the terms and conditions . . . that must be complied with[.]"[397] Therefore, the ITS is not in accordance with the law.

### 3. FWS's Take Findings

Again relying on *Liberty*, Plaintiffs assert that "FWS unlawfully failed to specify the amount and extent of 'take' in its incidental take statement."[398] Plaintiffs

---

[396] FWS AR 000945 (BiOp).

[397] 16 U.S.C. § 1536(b)(4)(C)(ii), (iv); 50 C.F.R. § 402.14(i)(1)(ii), (iv); *Liberty*, 982 F.3d at 742.

[398] Docket 92 at 43–44 (CBD Opening Br.); Docket 103 at 41–43 (CBD Reply); Docket 95 at 45–

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 100 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 100 of 110

contend that the ITS's conclusion that no take will occur is contradicted by, or inconsistent with, other statements in the BiOp that, according to Plaintiffs, acknowledge that take will occur.[399]  Defendants respond that the BiOp is not contradictory and that FWS properly specified the amount and extent of take.[400]

In addressing Plaintiffs' challenges on this issue, the Court distinguishes between take caused by hazing and all other take, which the Court terms disturbance take.  "Hazing" polar bears refers to actions taken to deter them from entering a worksite" or to protect human safety.[401]

### a. Disturbance Take

The ITS concluded that no disturbance take of polar bears under the ESA would occur because "[i]ncidental effects to polar bears from the Proposed Action are expected to be in the form of short-term, minor changes in behavior which do not create a likelihood of injury (much less cause injury)."[402]  Plaintiffs assert that

---

48 (SILA Opening Br.); Docket 107 at 40–42 (SILA Reply).

[399] Docket 92 at 44 (CBD Opening Br.) ("FWS contemplated take from disturbance to behavioral patterns, including to breeding and sheltering."); Docket 95 at 47 (SILA Opening Br.) ("FWS's statements acknowledging that take will occur are inconsistent with its finding that Willow will not result in any ESA-prohibited take, including 'injury.'").

[400] Docket 103 at 64–67 (Fed. Defs.); Docket 104 at 67–72 (ConocoPhillips); Docket 102 at 55–59 (North Slope Borough).  The State of Alaska generally incorporated by reference Federal Defendants' and ConocoPhillips' arguments regarding the ESA, at least with respect to SILA Plaintiffs' arguments.  Docket 101 at 31 n.12; *see generally* Docket 101 at 31–32.

[401] *Liberty*, 982 F.3d at 750 n.9.

[402] FWS AR 000945 (BiOp).  With respect to the potential take of polar cubs, FWS developed a model to assess the potential den disturbance that may result in take of polar bear cubs.  The model found an "84% probability that 0 takes occur."  On this basis, FWS determined that take of polar bear cubs was "not reasonably certain to occur.  *Compare* FWS AR 000927 (BiOp

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 101 of 110

the BiOp contemplates polar bear disturbance rising to the level of "harassment" under the ESA, which contradicts the ITS's conclusion that no disturbance take of polar bears would occur.

While the BiOp clearly contemplates the possibility of disturbance to both denning and non-denning (i.e., transient) polar bears,[403] FWS determined that the disturbance would not rise to the level of harassment, which the regulations define as an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."[404] CBD Plaintiffs assert that the BiOp's acknowledgement that at least some of the disturbances to polar bears would be "biologically significant" contradicts FWS's determination that there would be no take by harassment, as

---

denning conclusion) ("not reasonably certain to occur") *with* FWS AR 000945 (ITS conclusion) ("or are not reasonably certain to occur and therefore would not constitute harassment or other any form of take as defined by the ESA and implementing regulations"). Under ESA regulations, an ITS is only required when take is "reasonably certain to occur." 50 C.F.R. § 402.14(g)(7) ("Formulate a statement concerning incidental take, if such take is reasonably certain to occur."). Accordingly, FWS was not required to specify take of polar bear cubs by den disturbance because it determined such take was not reasonably certain to occur. As Plaintiffs do not directly challenge the FWS's model, the Court will defer to the agency's determination with respect to the take of polar bear cubs.

[403] *See* FWS AR 000925–929 (BiOp) ("Activities associated with the Willow MDP could potentially disturb polar bears, impacting denning and non-denning individuals.").

[404] 50 C.F.R. § 17.3; 16 U.S.C. § 1532(19).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 102 of 110

Case 3:20-cv-00290-SLG    Document 125    Filed 08/18/21    Page 102 of 110

that is defined as disturbance that "significantly disrupt[s] normal behavioral patterns."[405]

In *Liberty*, the Ninth Circuit held the ITS invalid when "FWS contemplated these types of nonlethal take in its biological opinion" but "did not quantify the nonlethal take that polar bears are expected to face (or explain why it could not do so)."[406]   Similarly, here FWS contemplated that at least some biologically significant disturbances of polar bears would occur distinct from hazing, but FWS nonetheless quantified that non-lethal take of polar bears at zero.  This constitutes error and is therefore arbitrary and capricious under the APA.[407]

### b.  Hazing Take

As noted above, "hazing" polar bears refers to actions taken to deter them from entering a worksite" or to protect human safety.[408]  The ITS states that FWS "anticipate[s] that up to 2 bears may be hazed with non-lethal contact rounds over

---

[405] Docket 103 at 41 (CBD Reply); *see* FWS AR 000942 (BiOp) ("We find that a host of construction and production activities associated with the Proposed Action would intermittently incidentally expose small numbers of polar bears of the SBS stock to disturbance. *We also find that most of those exposures would not be biologically significant.* The spatial and temporal distance between disturbance events would limit the potential for impacts to be biologically significant to individual bears and further reduce the potential for biologically significant impacts to individual bears to compound to effects at the stock level, let alone the species level." (emphasis added)).

[406] *Liberty*, 982 at F.3d at 749–50

[407] In addition, the ensuing discussion regarding take in an ITS and compliance with the MMPA would apply to non-hazing take as well.

[408] *Liberty*, 982 F.3d at 750 n.9.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 103 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 103 of 110

the life of the project."[409] "Injuries or lethal impacts [from non-lethal contact rounds] are exceptionally rare."[410]

Federal Defendants acknowledge that this hazing action constitutes an incidental take.[411] SILA Plaintiffs assert that this hazing take statement is inconsistent with other portions of the ITS.[412] Specifically, SILA Plaintiffs contend the hazing take statement contradicts the very next sentence of the ITS, which states that FWS "cannot authorize take of polar bears under the ESA at this time because such take has not yet been authorized under the MMPA and/or its 2007 Amendments."[413] The Court agrees. FWS has issued an ITS in its BiOp, but "FWS cannot issue an incidental take statement authorizing the take of an endangered

---

[409] FWS AR 000945 (BiOp); *see also* FWS AR 000930 (BiOp) ("Therefore, based on historical interactions between humans and polar bears at industry facilities on the North Slope, combined with the small proportion of hazing actions that result in injury, and the overall positive outcomes of hazing actions, we expect no lethal impacts and ≤ 2 deterrence actions that require the use of contact rounds, causing physical injuries, over the 30-year life of the Proposed Action."); FWS AR 000942 (BiOp) ("In consideration of these factors, we predict that up to 2 polar bears may be hazed resulting in non-lethal physical injuries during activities over the 30-year life of the Proposed Action.").

[410] FWS AR 000902 (BiOp).

[411] Docket 103 at 56 (Fed. Defs.) ("Accordingly, the Service quantified all non-hazing and hazing incidental take at zero and two, respectively."); *see also* Docket 104 at 70 (ConocoPhillips) ("FWS's ITS authorizes . . . up to two takes resulting from hazing events."); Docket 102 at 58 (North Slope Borough) ("However, that does not negate the unambiguous statement that ESA-defined take is anticipated to occur in a sublethal amount of up to two hazed polar bears over the entire duration of the Willow Project."); *cf.* Docket 101 at 31 (State of Alaska) ("Thus, FWS found that [] any take of polar bear was extremely unlikely, and if take were to occur, it would most likely be in the form of harassment to two bears over the course of thirty years. This observation, however, is not an incidental take authorization.").

[412] Docket 95 at 46–47 (SILA Opening Br.).

[413] FWS AR 000945 (BiOp).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 104 of 110

or threatened species under the ESA until the take has been authorized under the MMPA."[414]

ConocoPhillips asserts that "FWS made its authorization of the two hazing-related takes contingent upon issuance of the appropriate MMPA authorizations.[415] But the Ninth Circuit has interpreted agency guidance as "[a]t no point [suggesting] Section 7 approval occurs automatically, upon MMPA approval."[416] Indeed, citing the same statutory provision that ConocoPhillips asserts supports its position—16 U.S.C. § 1536(b)(4)(C)—the Ninth Circuit reached the opposite conclusion: "FWS cannot issue an incidental take statement authorizing the take of an endangered or threatened species under the ESA until the take has been authorized under the MMPA."[417] "[E]ven if the action agency obtains MMPA approval, the take statement must be 'subsequently revised' to reflect that approval . . . ."[418] In sum, it appears that FWS impermissibly authorized take under the ESA to occur automatically upon MMPA approval.

---

[414] *Liberty*, 982 F.3d at 742 (citing 16 U.S.C. § 1536(b)(4)(c)).; *see also* Incidental Take of Endangered, Threatened, and Other Depleted Marine Mammals, 54 Fed. Reg. 40,338, 40,346 (Sept. 29, 1989), codified at 50 C.F.R. §§ 18.27, 228, 402.14).

[415] Docket 104 at 70 n.266 (ConocoPhillips).

[416] *Liberty*, 982 F.3d at 745 n.8 ("FWS, NMFS, and two other federal agencies have also issued guidance suggesting they did not contemplate that MMPA compliance would automatically satisfy an action agency's Section 7 obligations." (citing 54 Fed. Reg. at 40,346)).

[417] *Id.* at 742 ("The incidental take statement must incorporate any mitigation measures required under the MMPA." (citing 50 C.F.R. § 402.14(i)(1)(iii))).

[418] *Id.* at 745 n.8.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 105 of 110

Case 3:20-cv-00290-SLG    Document 125    Filed 08/18/21    Page 105 of 110

The State of Alaska, for its part, takes a different tact, asserting that FWS's "observation" of the potential for two hazing takes to occur is not, in fact, an "incidental take authorization."[419]  But this assertion is inconsistent with the language of the BiOp, which contains an "Incidental Take Statement" that purports to automatically authorize non-lethal take under the ESA once an MMPA authorization is issued.  This violates the ESA and is "therefore arbitrary and capricious under the APA."[420]

### C. BLM's Reliance on the Invalid BiOp

Section 7 of the ESA imposes a duty on BLM to ensure that its actions are not likely to jeopardize the continued existence of the listed species or result in destruction or adverse modification of its critical habitat.  An agency cannot meet its Section 7 duties by relying on a legally flawed biological opinion.[421]  Because the Court concludes that portions of FWS's biological opinion are invalid, BLM's reliance on it is unlawful.

### IV.    Remedy

Both groups of Plaintiffs request vacatur under the APA.[422]  Defendants request additional briefing on remedies.[423]

---

[419] Docket 101 at 31 (State of Alaska).

[420] *Liberty*, 982 F.3d at 750.

[421] *Id.* at 751.

[422] *See* Docket 92 at 45 (CBD Opening Br.); Docket 95 at 49–50 (SILA Opening Br.)

[423] *See* Docket 103 at 67–68 (Fed. Defs.); Docket 104 at 85–87 (ConocoPhillips); Docket 102 at

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 106 of 110

Vacatur is the normal remedy under the APA, which directs reviewing courts to "set aside" unlawful agency action.[424]  However, "courts are not mechanically obligated to vacate agency decisions that they find invalid."[425] "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[426]

With regard to the seriousness of errors, the Court recognizes the comprehensive nature of the EIS, the BiOp, and the CWA Section 404 Permit process, many aspects of which Plaintiffs here do not challenge or have been upheld by the Court.  But as to the errors found by the Court, they are serious.  BLM made much the same error in its greenhouse gas emissions analysis as BOEM did in *Liberty*.  The Ninth Circuit ultimately vacated BOEM's approval of the Liberty project.[427]  BLM also failed to adequately analyze a reasonable range of

---

74–76 (North Slope Borough).

[424] 5 U.S.C. § 706(2)(A); *see also Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to set aside the action.  In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." (internal quotation marks and citations omitted), *rev'd on other grounds sub nom.*, *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261 (2009)).

[425] *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013*); see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has power to do so, it is not required to set aside every unlawful agency action."); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.").

[426] *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

[427] *Liberty*, 982 F.3d at 751.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 107 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 107 of 110

alternatives for the Willow Project—a process that is "the heart of the environmental impact statement."[428]  And its take analysis for polar bears was in violation of law.

With regard to the disruptive consequences, no significant environmental disruption will occur in light of the parties' stipulation to extend the temporary injunction until December 1, 2021.[429]  The Court recognizes that vacatur would have considerable economic consequences to ConocoPhillips, which has already made a significant investment in the Willow Project.  And it would have a negative impact to the many other stakeholders in the Project.[430]  But the Court is also cognizant that construction at Willow has not yet commenced.  Finally, the Court recognizes that the Ninth Circuit motions panel determined when entering the injunction pending appeal that the "balance of hardships tips sharply in [Plaintiffs'] favor, and that an injunction . . . is in the public interest."[431]  On balance, the equities tip strongly towards the equitable remedy of vacatur.[432]

---

[428] 40 C.F.R. § 1502.14 (2019).

[429] Docket 62 (Case No. 3:20-cv-00308-SLG); Docket 63 (Case No. 3:20-cv-00290-SLG).

[430] *See* Docket 104 at 87 n.349 (ConocoPhillips) ("ConocoPhillips has invested approximately $500 million in lease acquisition, exploration and appraisal drilling, conceptual engineering, permitting, and other expenditures to find the Willow discovery, plan the development, and secure BLM's approval.").

[431] Ninth Circuit order, at 5.

[432] While Defendants have requested additional briefing on remedies, the Court finds, particularly in light of the parties' request for a prompt determination on the merits, that additional briefing on this topic would not be helpful to the Court's determination.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 108 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 108 of 110

## CONCLUSION

In light of the foregoing, Plaintiffs' motions for summary judgment are GRANTED in part and DENIED in part.[433]  **IT IS ORDERED** that:

- BLM's approval of the Willow Project under NEPA is **VACATED** for the following reasons:

  o  BLM's exclusion of foreign greenhouse gas emissions in its alternatives analysis in the EIS was arbitrary and capricious.

  o  BLM acted contrary to law insofar as it developed its alternatives analysis based on the view that ConocoPhillips had the right to extract all possible oil and gas from its leases.

  o  BLM acted contrary to law in its alternative analysis for the Teshekpuk Lake Special Area insofar as it failed to consider the statutory directive that it give "maximum protection" to surface values in that area.

- FWS's BiOp is **VACATED**.  The incidental take statement is not in accordance with the law because it lacks the requisite specificity of mitigation measures for the polar bear.  Additionally, the ITS's take finding with respect to the polar bear is arbitrary and capricious. Accordingly, BLM's reliance on the BiOp is arbitrary and capricious.

---

[433] Docket 92 (Case No. 3:20-cv-00308-SLG); Docket 95 (Case No. 3:20-cv-00290-SLG).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 109 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 109 of 110

- In all other respects, Plaintiffs' motions for summary judgment are **DENIED**.

This action is **REMANDED** to the appropriate agencies for further proceedings consistent with this opinion.

Dated this 18th day of August, 2021 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order re Motions for Summary Judgment
Page 110 of 110

Case 3:20-cv-00290-SLG   Document 125   Filed 08/18/21   Page 110 of 110